## AFFIDAVIT OF SPECIAL AGENT JON BENTSEN

I, Jon Bentsen, being duly sworn, depose and state:

1.    I am a Special Agent ("SA") of the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), currently assigned to the Office of the Special Agent in Charge, Boston Massachusetts.  I have been employed as a Special Agent since April 2008 and prior to being assigned to Boston, I worked in the HSI Office of the Resident Agent in Charge, Key West, Florida as well as the Office of the Special Agent in Charge, New York, New York.  Over the past 10 years, I have participated in numerous criminal investigations involving various crimes including narcotics, crimes against children, human smuggling, and counter-proliferation.

2.    Since June 2014, I have conducted investigations involving counter-proliferation, that is, crimes involving the illegal export of U.S. technology.  I have received specialized training on how to conduct investigations involving the illegal exportation of weapons, technology, and other controlled commodities and on the federal criminal statutes that regulate and, in certain instances, prohibit the export of U.S. controlled commodities, including weapons, weapons systems, military equipment, and technology.  I am responsible for investigating and enforcing violations of the Arms Export Control Act, 22 U.S.C. § 2778, as well as the International

1

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and relevant regulations.  I have participated in several investigations of violations of United States laws relating to the unlawful export from the United States of goods and technology restricted for export for reasons of national security and foreign policy.

3.    I am currently involved in a joint criminal investigation of SHUREN QIN ("QIN"), a Chinese national who resides at 102 Evergreen Avenue, Wellesley, Massachusetts.  I am submitting this affidavit in support of a criminal complaint charging QIN with visa fraud, in violation of 18 U.S.C. § 1546, and conspiring to commit violations of U.S. export regulations, in violation of 50 U.S.C. § 1705, Executive Order 13222, and 15 C.F.R. §§ 736.2(b)(5), 764.2, 744.16 and Supplement No. 4 (the U.S. Entity List).

4.    As described in detail below, during this investigation, we have determined that: (1) QIN knowingly made false statements, under the penalty of perjury, with respect to a material fact, to both obtain a visa to enter the United States and become a lawful permanent resident under the EB-5 Immigrant Investor Visa Program, in violation of 18 U.S.C. § 1546; and (2) QIN has conspired with individuals located in the People's Republic of China ("PRC") to violate U.S. export regulations by causing U.S. origin goods to be illegally

exported from the United States to the PRC, in violation of 50
U.S.C. § 1705.

5.    Based upon records uncovered during this
investigation, including on QIN's own electronic devices, QIN
has been communicating with, and/or has received taskings from,
entities affiliated with the People's Liberation Army ("PLA"),
including Chinese military research institutes.  For instance,
QIN was tasked by a Chinese military research institute,
Northwestern Polytechnical University also known as Northwestern
Polytechnic University, Northwest Polytechnic University, and
Northwest Polytechnical University ("NWPU"), to obtain items
used for anti-submarine warfare.  As described below, because of
the national security risks posed by NWPU to the United States,
the U.S. Department of Commerce requires an export license to be
obtained for exports of U.S. origin goods to NWPU.  Between in
or about July 2015 and continuing until at least December 2016,
QIN exported hydrophones (devices used to detect and monitor
sound underwater) from the United States to NWPU in the PRC on
numerous occasions without a license by concealing that NWPU was
the true end-user from the American supplier and causing false
shipping information to be filed with the U.S. Government in
violation of 50 U.S.C. § 1705.

6.    I have personally participated in this investigation.
The information in this affidavit is based upon my training and

experience, my personal knowledge of this investigation, and information provided to me by other agents, including Special Agents employed by the U.S. Department of Commerce, Bureau of Industry and Security's Office of Export Enforcement, HSI, Naval Criminal Investigative Service, the Defense Criminal Investigative Service, and the Federal Bureau of Investigation. In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts which I believe are sufficient to establish the requisite probable cause.

## I.   SUMMARY OF THE APPLICABLE LAW AND REGULATIONS

### A.   Immigration Laws and Regulations

7.   Title 18, United States Code, Section 1546 makes it a crime to knowingly make under oath or penalty of perjury, or subscribe as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations.  Visa applications as well as applications for permanent residence, naturalization, or to remove any conditions on one's immigration status qualify as documents required by the immigration laws or regulations for purposes of Section 1546.

8.   Under the EB-5 Immigrant Investor Visa Program, entrepreneurs are eligible to apply to become lawful permanent residents and obtain a green card if they make an investment in

a commercial enterprise in the United States and plan to create or preserve 10 permanent, full-time jobs for qualified U.S. workers.

9.   To obtain an EB-5 visa, applicants must first complete a Form I-526, Immigrant Petition by Alien Entrepreneur.  If the I-526 petition is approved, then the applicant may file a DS-260, Application for Immigrant Visa and Alien Registration ("Visa Application").  If this Visa Application is approved, the EB-5 investor will be granted conditional permanent residence in the United States for a period of two years.  The EB-5 investor may than apply to become a permanent resident of the United States using Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ("Form I-829"), 90 days before the second anniversary of the EB-5 investor's admission into the United States.

### B.   Export Laws and Regulations

10.   The Export Administration Regulations ("EAR"),[1] 15 C.F.R. §§ 730-744, control the export and re-export of "dual-use items," that is, commercial items that also have a military

---

[1] Although the Export Administration Act of 1979 ("EAA"), as amended, 50 U.S.C. App. §§ 2401-2420 (1988), expired on August 20, 2001, Executive Order 13222, 66 Fed. Reg. 44025 (August 17, 2001), which has been extended by successive annual Presidential Notices, the most recent being that of August 15, 2017, 82 Fed. Reg. 39005, has continued the EAR in effect under the International Emergency Economic Powers Act, 50 U.S.C. §§1701-1706.

application, to foreign countries.  The EAR defines the items that are subject to Commerce controls as including commodities, software, and technology.  The Department of Commerce ("DOC") promulgates the EAR and maintains the Commerce Control List, which specifies the goods and technologies that require export licenses.

11.  The EAR places limitations on the export of those goods and technology that the Secretary of Commerce deems could make a significant contribution to the military potential of other countries, could prove detrimental to the national security of the United States, or are contrary to the foreign policy of the United States.  EAR controls are based not only on the nature of the item, but also on its destination, end-use, and end-user.

12.  Section 734.3 of the EAR provides that, except for certain enumerated categories, such as items exclusively controlled for export and re-export by the Department of State, Department of Energy, the Department of Treasury's Office of Foreign Asset Control, the U.S. Nuclear Regulatory Commission, or the Patent and Trademark Office, all items made, wholly or in part, in the United States, wherever located, are subject to the EAR.

13.  The EAR prohibits any person from exporting or causing the exportation from the United States of a controlled commodity without having first obtained a validated export license from the DOC unless an exception applies.  Under the EAR, "[n]o

person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required by the EAA, the EAR, or any other, license or authorization issued thereunder."  15 C.F.R. §764.2(b).

14.   The EAR also prohibits any person from engaging in any conduct that "is contrary to the EAA, the EAR, or any order, license, or authorization issued thereunder" or conspiring or acting "in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder."  15 C.F.R. §§764.2(2), 764.2(d).

15.   The EAR further states that "[n]o person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, finance, forward, or otherwise service, in whole or in part any item exported or to be exported from the United States, or that is otherwise subject to the EAR, with knowledge that a violation of the EAA, the EAR, or any other order, license or authorization issued thereunder has occurred, is about to occur or is intended to occur in connection with the item."  15 C.F.R. §764.2(e).

16.   An export is an actual shipment or transmission of items subject to the EAR out of the United States.  15 C.F.R.

§734.2(b)(1).  A re-export is an actual shipment or transmission of items subject to the EAR from one foreign country to another foreign country.  15 C.F.R. §734.2(b)(4).

17.  Further, at a minimum, for all exports (including exports by U.S. mail) of any commodity valued over $2500.00, or for which an export license is required for shipment outside of the United States, the U.S. seller, manufacturer, exporter, or its shipping agent is required to file detailed information with the U.S. Government, which enables the government "to prevent the export of certain items to unauthorized destinations and/or end users."  *See* 15 C.F.R. §§ 30.1(b), 758.1.  Prior to 2013, this was done by completing a Shipper's Export Declaration ("SED") but now is required to be done electronically by filing Electronic Export Information ("EEI") in the Automated Export System ("AES") with the U.S. Government.  The information, however, is the "electronic equivalent of the export data collected on the Shipper's Export Declaration."  78 Fed. Reg. 16375 (announcement of mandatory automated export system filing requirement on March 14, 2013).  For each export transaction, pursuant to 15 C.F.R. § 30.6, the following EEI data is required to be filed in AES: (1) the name and address of the U.S. seller, manufacturer, broker (or ordering party), or exporter who will be receiving the primary benefit, usually monetary, from the transaction; (2) the date of export; (3) the ultimate

consignee/end-user who is located abroad and will actually be receiving the export shipment; (4) the "country of ultimate destination in which the goods are to be consumed, further processed, stored, or manufactured;" (5) the method of transportation; (6) the commodity classification number and commodity description; (7) the quantity of units being exported; (8) the value of the goods being exported in U.S. dollars, which should be the same as the selling price to the foreign buyer; (9) the identity and address of any intermediary consignee or authorized shipping agent; and (10) if applicable, the export license number, and Export Control Classification Number ("ECCN") or U.S. Munitions List category code.  15 C.F.R. § 30.6.  Lastly, "[a]ll EEI submitted to AES must be complete, correct, and based on personal knowledge of the facts stated or on information furnished by the parties to the export transaction."  15 C.F.R. § 30.3.  Thus, the filer of the EEI -- whether it be the U.S. seller, manufacturer, broker, or exporter or its authorized agent -- must ensure that all information reported to the government is true, accurate, and complete. *See* 15 C.F.R. § 758.1(f).

18.  Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including SEDs and EEI filings, is a violation of the EAR.  15

C.F.R. §764.2(g)(1)(ii)), IEEPA, and 18 U.S.C. §1001; *see* 15 C.F.R. § 772.1 (EAR defines an "Export control document" to include, among other things, "EEI on the Automated Export System (AES) presented in connection with shipments to any country").

19.   Additionally, violation of, or conspiring to violate, any federal regulation (including any regulation within the EAR) or any executive order is a federal felony punishable by up to twenty years' imprisonment under the criminal provision of IEEPA.  *See* 50 U.S.C. § 1705 ("It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter... A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of [one of these unlawful acts] ... shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than twenty years, or both."); Executive Order 13222 (continuing the enforceability of EAR under IEEPA).

### C.   Designation of NWPU on Entity List

20.  Since 1997, the DOC has maintained a list of foreign persons (including individuals, businesses, government and private organizations, and research institutions) that are subject to increased export restrictions and licensing requirements.  This list is known as the Entity List and is

published at Supplement No. 4 to Part 744 of the EAR. *See* 15 C.F.R. § 744, Supplement No. 4. Foreign persons are included on this list if the DOC determines that they have engaged in activities that: (1) support weapons of mass destruction programs; (2) are sanctioned by the Department of State; or (3) are contrary to U.S. national security and/or foreign policy interests.

21. Beginning in 2001, the DOC has designated NWPU on its Entity List, which required that export licenses be obtained from DOC for all U.S. origin goods except items classified as EAR99 (that is, items that have only commercial applications and are not subject to any specific export controls) to NWPU. *See* 66 Fed. Reg. 24266. NWPU is a Chinese military research institute that works closely with the PLA on the advancement of its military capabilities. Specifically, it has been involved in the development of unmanned aerial vehicles, autonomous underwater vehicles ("AUVs"), and missile proliferation projects. Because of the increased national security risks posed by NWPU to the United States, the export control restrictions were increased on September 20, 2016. 81 Fed. Reg. 64696; *see* 15 C.F.R. § 744, Supplement No. 4 (DOC Entity List). Accordingly, since September 2016, U.S. law prohibited exports to NWPU and its aliases unless the exporter/shipper first obtained an export license from DOC. Further, no export

licenses have ever been granted to export any U.S. origin goods
to NWPU.

II.  **FACTS SUPPORTING PROBABLE CAUSE**

    A.  **BACKGROUND REGARDING QIN'S BUSINESS**

    22.  QIN was born in the PRC.  As described below, QIN
became a lawful permanent resident ("LPR") of the United States
in 2014.  Based upon my investigation, I have determined that
QIN operates several companies, which appear to be based in
China, for the purpose of importing U.S. and European-origin
goods with applications in underwater or marine technologies
into the PRC.

    23.  One of QIN's companies is LINKOCEAN TECHNOLOGIES, LTD.
("LINKOCEAN").  In or about August 2005, QIN established
LINKOCEAN in the PRC and has served as its President since that
time.  LINKOCEAN is headquartered in Qingdao, China.  According
to LINKOCEAN's website, LINKOCEAN operates as a seller and
distributor of U.S. and European-origin goods in the PRC.
According to its website, LINKOCEAN's clients are all located in
the PRC and include Chinese research institutes and the PLA
Navy.  The PLA Navy is the naval warfare branch of the Chinese
Army and is responsible for the development and operation of its
surface warships, submarines, and unmanned submersible vehicles.

    24.  In or about 2017, QIN met with an undercover employee
of HSI ("UCE") under the auspices of building a future business

relationship. During this meeting, QIN acknowledged that
LINKOCEAN's customers were all in the PRC.  He further indicated
that he only sells marine-related products in China and works
with a lot of U.S. companies.

25.  In 2017, QIN also sent an e-mail to the UCE requesting
a quote for three sonobuoys and information related to AUVs.
From my training and experience, I am aware that sonobuoys are
defense articles and are controlled under the United States
Munitions List ("USML")[2] as sonobuoys only have a military
application.  Sonobuoys are devices, which are typically three
feet in length with a diameter of five inches that can be used
in the water to conduct anti-submarine warfare.  They are
capable of both detecting underwater submarine activity and
transmitting signals and other information related to this
activity.  AUVs, commonly known as unmanned underwater vehicles,
are programmable, robotic vehicles that travel underwater and
have a wide range of military and commercial applications.

26.  Additionally, in the same e-mail in which QIN
requested that the UCE provide him quotes for sonobuoys and
AUVs, QIN also instructed the UCE not to tell the U.S.
manufacturer of the AUVs ("US Supplier #1") that the end-user

_____

[2] Since 1989, the United States Government has imposed an
Arms Embargo against the PRC. Thus, no defense article
controlled under the USML can be exported to the PRC.

was located in the PRC.  From my training and experience, I am
aware that AUVs are controlled for export to the PRC.  Indeed,
the U.S. Supplier to whom QIN instructed the UCE to lie about
the end-user's location manufactures AUVs that are controlled by
both the Department of State and the DOC because of their
sensitive military applications.  Accordingly, many of these
parts cannot be exported to the PRC because of the U.S. Arms
Embargo and the remaining parts require an export license to
ship them to the PRC.

**B.   QIN's IMMIGRATION HISTORY**

27.   Based upon my review of QIN's Alien-file, QIN became
an LPR under the EB-5 program in July 2014 when his DS-260,
Application for Immigrant Visa and Alien Registration ("Visa
Application"), was approved.  In or about 2012, QIN filed his I-
526 Immigrant Petition by Alien Entrepreneur, which was approved
in or about November 2013.  On or about March 5, 2014, QIN filed
and signed a Visa Application through the EB-5 Immigrant
Investor Visa Program.  On this application, QIN answered "no"
to a question that asked whether the applicant was entering the
United States to "engage in export control violations or other
unlawful activity."  QIN electronically signed his Visa
Application certifying that all of his answers were true and
correct to the best of his knowledge.  Based upon my
investigation, I believe QIN's answer to the question regarding

14

whether he intended to enter the United States to commit export violations was false.  Along with the other agents involved in this investigation, I have uncovered evidence that since 2012, QIN has engaged in numerous violations of U.S. export laws, and he has caused others to violate U.S. export laws prior to 2014 when he was living in the PRC.

28.  Subsequently, on July 13, 2016, QIN signed under the penalty of perjury Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status, certifying that the information contained in his petition was complete, true, and correct.  I believe that QIN made a false statement on this petition when he answered "no" to Question 16.  Question 16 states: "Since becoming a conditional permanent resident, have you **EVER** committed any crime for which you were not arrested?"  As detailed in this affidavit, QIN has been violating U.S. export laws since 2012 by concealing his true end-user from U.S. distributors and causing false shipping information to be filed with the U.S. Government.  Moreover, as described in paragraphs 31, and 33-43 below, between in or about July 2015, and continuing until at least December 2016, QIN knowingly exported approximately 78 hydrophones (having a value in excess of $100,000) to NWPU, a Chinese military-related institution involved in missile proliferation, by lying to the U.S. supplier and causing false shipping information to be filed with the U.S.

Government in violation of 50 U.S.C. § 1705, Executive Order
13222, 15 C.F.R. §§ 736.2(b)(5), 764.2, 744.16 and Supplement
No. 4 (Entity List).

####    C.    CBP SECONDARY INSPECTION AND INTERVIEW

29.   On November 24, 2017, CBP Officers conducted a
secondary inbound inspection and interview of QIN at Logan
Airport.   During this interview, QIN stated, among other things,
that he was returning from a one-month vacation from the PRC.
He confirmed that he was the President of LINKOCEAN, which is
headquartered in the PRC, but he indicated that while he was in
the United States, he conducts business for his LINKOCEAN
company from his home address – 102 Evergreen Avenue, Wellesley,
Massachusetts.   In describing his LINKOCEAN business, QIN
advised that "he exports" products from the United States into
the PRC and sells these parts to PRC customers.   In response to
questions by the CBP Officers about the types of parts he
exports to the PRC, QIN indicated that he exports from the
United States and imports into the PRC instruments for testing
water.   He clarified that he "only" exported instruments that
attach to a buoy.   The CBP Officers asked QIN if he had exported
anything else and QIN answered "no."   Based upon my
investigation, I believe that this answer was false because
between in or about June 2012 and November 2017, QIN had
exported, or caused to be exported, remotely-operated side scan

sonar systems, unmanned underwater vehicles, unmanned surface vehicles, robotic boats, and hydrophones. I have been informed that the items that QIN failed to disclose to, and concealed from, CBP during this interview have military applications. Specifically, they can be used for weapon delivery systems, anti-submarine warfare, mine counter-measures, and intelligence, surveillance, and reconnaissance activities.

30. During the course of the secondary inspection, QIN revealed that he was in possession of a cell phone (Apple iPhone) and a Dell Latitude laptop computer (the detained computer). QIN advised the CBP officers that these items were his and he used them to conduct his business, including the purchase, sale, and export of U.S. origin goods to the PRC. As a result, QIN's devices were detained and searched pursuant to border search authority.

31. During the border search, HSI agents found evidence that demonstrated the following: (1) in or about 2013, QIN started communicating with and developing a business relationship with representatives of NWPU, which, as indicated above, has been designated on DOC's Entity List; (2) between in or about July 2015 and continuing until at least December 2016, QIN conspired with Chinese agents of LINKOCEAN and NWPU to evade U.S. export laws and smuggle parts from the United States to the PRC for NWPU; (3) between in and about July 2015 and December

17

2016, QIN caused approximately 78 hydrophones (having a value in excess of $100,000) to be exported from the United States to the PRC (for his customer NWPU) without first obtaining an export license; (4) as a result of NWPU's designation on the DOC's Entity List, QIN was required to obtain an export license before causing the hydrophones to be exported from the United States because they were classified under Export Control Classification Number 6A991; (5) QIN knew that U.S. law required export licenses to be obtained from the U.S. Government prior to exporting goods to certain entities in the PRC and knew that export licenses were required to ship U.S. goods to NWPU; and (6) as a result of the export license requirements for shipments of U.S. goods to NWPU, QIN agreed with agents of NWPU to evade U.S. export laws by falsifying the end-user information provided to a U.S. company.

     **D.    SCHEME TO ILLEGALLY EXPORT AND SMUGGLE GOODS TO NWPU**

     32.  I have reviewed numerous e-mails found on QIN's computer that discuss the illegal export of the hydrophones from the United States to NWPU in the PRC.  Many of these e-mails were written in Chinese and were translated with the assistance of an HSI Special Agent and FBI translator who are both fluent in Mandarin.  A summary of the pertinent e-mails is described below.

33.   In and about July and August 2015, an agent of NWPU ("Conspirator #1") requested that QIN and his company, LINKOCEAN, obtain price quotations for hydrophones.  A hydrophone is a device used to detect or monitor sound underwater.  In August 2015, LINKOCEAN obtained several quotes for different models of hydrophones sold and manufactured by a U.S. Company located in Mississippi ("US Supplier #2).  During these communications, US Supplier #2 advised LINKOCEAN that some of these hydrophones "cannot be exported to China without a license."  In addition, US Supplier #2 explained to representatives of LINKOCEAN the process to obtain an export license from the U.S. Government.

34.   On or about August 14, 2015, US Supplier #2 provided LINKOCEAN a quote for 40 hydrophones (part no. HT1-92-WB) with cables and attachments, for a purchase price of $69,000.  On or about August 20, 2015, an employee of LINKOCEAN ("Employee #1) advised US Supplier #2 via e-mail that "LinkOcean won the contract for 40 units of HTI-92-WB, the end user is Prof. Yang at NWPU."  Employee #1 further indicated that "Shuren [QIN], my boss will place an PO [purchase order] to you soon."  Later that same day, US Supplier #2 informed Employee #1 at LINKOCEAN via e-mail that their "end user NWPU (Northwestern Polytechnical University) is on a special Dept. of Commerce Entity List which requires us to obtain an export license for this user."  In

response, QIN asked US Supplier #2 via e-mail what documents were required to get an export license.  Also, on or about August 20, 2015, US Supplier #2 advised QIN via e-mail that the export license requirement "was a USA requirement" that required information about "how the product will be used and how it will be maintained."

35.  On or about August 23, 2015, another employee of LINKOCEAN in the PRC ("Employee #2"), advised QIN via e-mail, which was originally written in Chinese, that Conspirator #1 called the office yesterday and instructed LINKOCEAN not to mention that NWPU was the end-user when placing an order "overseas."  I believe "overseas" refers to the United States and Europe.[3]  In Employee #2's e-mail, he also revealed to QIN that according to Conspirator #1, NWPU "is partly a military unit" and therefore, it would be difficult to "import" parts into PRC from "overseas" if they were to tell the truth about the end-user.  Accordingly, Conspirator #1 instructed LINKOCEAN to falsely identify the end-user to the United States' companies as "Shaanxi Normal University."

36.  On or about August 24, 2015, QIN requested Conspirator #1 via e-mail, which was written in Chinese, to provide him more

---

[3] Based upon my review of QIN's e-mails, whenever QIN communicated with his customers and conspirators in China, he referred to the United States as being overseas even after he moved to the United States.

information regarding Shaanxi Normal University as the "overseas company" might have questions.  Additionally, among other things, QIN informed Conspirator #1 that they may need the seal from the University and asked Conspirator #1 if he was able to get it.

37.  On or about August 30, 2015, after being notified by Conspirator #1 to lie about the identity of the end-user of the hydrophones, QIN sent an e-mail to US Supplier #2 in which he stated:

> The End-user is Dr. Chen Ziheng at Xi'an Shiyou
> University, the budget is from Xi'an Shiyou
> University.  My previous PO has wrong information,
> Nancy is a new sales[person].  Please delete it.
> Attached is correct PO.

Based upon the e-mail correspondence between Conspirator #1 and LINKOCEAN, I believe QIN provided false end-user information to US Supplier #2 so as to illegally obtain U.S. origin goods for which he knew an export license was required and would have likely been denied because, as Conspirator #1 revealed, NWPU is a Chinese military entity.

38.  On or about August 30, 2015, another agent of NWPU ("Conspirator #2") sent QIN an e-mail in which he attached a completed end-user certificate to use for the hydrophone order, which falsely indicated that the end-user for the hydrophones was Xi'an Shiyou University when, in fact, the end-user was NWPU.  Conspirator #2 told QIN in Chinese to review the

certificate and see if it was sufficient.  Conspirator #2 further advised QIN to send him any edits to the certificate and then he would find someone to affix the seal of the university to the document.

39.  On or about August 31, 2015, US Supplier #2 sent LINKOCEAN via e-mail a list of questions that they requested be answered prior to exporting the hydrophones to the PRC. These questions pertained to how the hydrophones would be used, where they would be used, and how they would be safeguarded.  QIN forwarded these questions to Conspirator #2, whom he addressed as a professor, and told Conspirator #2 that he had received more questions from "overseas."  QIN asked Conspirator #2 to answer the questions.

40.  On or about September 2, 2015, US Supplier #2 sent an e-mail to QIN advising him that they had "determined that an export license is no longer required due to the fact that the end user has changed."  I have learned from the DOC that the HT1-92-WB hydrophones are classified under Export Control Classification Number 6A991 and are controlled for anti-terrorism reasons.  In general, these parts do not require an export license to ship them to the PRC.  Because the actual end-user for these parts was NWPU, which is designated on the DOC's Entity List, an export license, however, was required.  No export license was obtained for this transaction or the two

subsequent illegal exports that QIN caused to be shipped from the United States to the PRC for NWPU (as described in paragraph 43 below).  Indeed, neither QIN nor LINKOCEAN has ever sought or obtained an export license from the DOC.

41.  In addition, on or about September 2, 2015, US Supplier #2 requested that QIN have his customer complete the attached "Letter of Assurance," put it on their letterhead, and return the form to US Supplier #2 "as soon as possible."  On or about September 8, 2015, QIN forwarded the "letter of assurance" form to Conspirator #2 via e-mail and asked Conspirator #2 to review it.  QIN advised Conspirator #2 that all it needed was a signature, but please remember that it must be printed using the letterhead of Xi'an Shiyou University.

42.  On or about September 9, 2015, Conspirator #2 sent the completed Letter of Assurance form to QIN via e-mail, which, as QIN instructed, was printed on the letterhead of "Xi'an Shiyou University."  The Letter of Assurance was addressed to US Supplier #2 and stated, in pertinent part:

> We understand that [US Supplier #2] may provide me with hardware, software, and/or technology ("Products"), that may be subject to the export laws and regulations of the United States and other nations.  I also understand that, under these export control laws and regulations, [US Supplier #2's] delivery of Products to me may take place only after [US Supplier #2] has received written assurance from myself.
>
> Accordingly, I hereby agree:

\*\*\*
- that the products will not be used in military applications or transferred to any defense agency or activity outside the United States without an export license from the United States Department of State;
- that the products are not purchased for use in nuclear, biological, chemical weapons, or missile program;
- that we will not transfer, export, or re-export, directly or indirectly to any party listed by the U.S. Government or under any applicable law as prohibited from receiving Products and we are not on, or under control of anybody on, any such list;
- that we will comply with all applicable laws and regulations and obtain all required export licenses whenever we transfer, export, re-export Products obtained from [US Supplier #2]; . . .

The bottom of the form contains a signature block, which purports to be signed by Chen Ziheng, an Associate Professor of Xi'an Shiyou University.  QIN sent this completed form to US Supplier #2 knowing that it contained false end-user information. Indeed, QIN knew that the end-user NWPU was indeed on the DOC's Entity List and consequently, was prohibited from receiving US Supplier #2's products without an export license.

43.  As a result of the false information provided by QIN on or about December 18, 2015 (that is, the end-user was Xi'an Shiyou University), based upon records maintained in the Automated Export System, which I have reviewed, US Supplier #2 exported the 40 hydrophones (part no. HT1-92-WB) that QIN had procured for NWPU to Xian Overland in the PRC.  QIN had instructed US Supplier #2 to ship the hydrophones to Xian

Overland but US Supplier #2 did not know that Xian Overland was a wholly-owned subsidiary of NWPU.  Similarly, QIN fraudulently procured 38 additional hydrophones for NWPU from US Supplier #2 in 2016.  QIN caused US Supplier #2 to export 18 hydrophones (part no. HT1-92-WB) to LINKOCEAN in the PRC on or about March 4, 2016 and 20 hydrophones (part no. HT1-92-WB) to LINKOCEAN in the PRC on or about December 6, 2016 by using false end-user information in violation of U.S. export laws and regulations.  I have confirmed with the DOC that no export license was ever sought or obtained by QIN or NWPU.

## CONCLUSION

44.    Based on the information described above, I have probable cause to believe, and do in fact believe, that QIN committed visa fraud, in violation of 18 U.S.C. § 1546, and conspired to violate U.S. export laws, in violation of IEEPA, 50 U.S.C. § 1705, Executive Order 13222, and 15 C.F.R. §§ 736.2(b)(5), 764.2, 744.16 and Supplement No. 4 (Entity List).   Accordingly, I respectfully request that this Court issue a criminal complaint charging QIN with those crimes.

_____
JON BENTSEN
Special Agent, HSI


Sworn and subscribed before me this 21ST of June 2018.


_____
DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE