UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 18-10205-DJC |
| v. | Violations: |
| (1) SHUREN QIN, | Count One: Conspiracy to Commit Export Violations (50 U.S.C. § 1705) |
| (2) LINKOCEAN TECHNOLOGIES, LTD., | Counts Two and Three: Visa Fraud (18. U.S.C. § 1546(a)) |
| and | |
| (3) NORTHWESTERN POLYTECHNICAL UNIVERSITY, a/k/a NORTHWESTERN POLYTECHNIC UNIVERSITY, a/k/a NORTHWEST POLYTECHNIC UNVERSITY, a/k/a NORTH POLYTECHNICAL UNIVERSITY, | Count Four: Conspiracy to Defraud the United States (18 U.S.C. § 371) |
| | Counts Five and Six: False Statements (18 U.S.C. § 1001) |
| | Counts Seven Through Ten: Money Laundering (18 U.S.C. § 1956) |
| Defendants | Counts Eleven Through Fourteen: Smuggling (18 U.S.C. § 554) |
| | Forfeiture Allegations: (18 U.S.C. § 981(a) and 28 U.S.C. § 2461(c)) |

FIRST SUPERSEDING INDICTMENT

The Grand Jury charges that:

INTRODUCTORY ALLEGATIONS

**A.     Defendants, Their Co-conspirators, and Related Governmental Entities**

1.     SHUREN QIN ("QIN") is a Chinese national who entered the United States and obtained status as a conditional lawful permanent resident ("LPR") through the EB-5 Immigrant Investor Visa Program ("EB-5 Program") in or about November 2014.

1

2.      In or about 2005, QIN established LINKOCEAN TECHNOLOGIES, LTD. ("LINKOCEAN") in the People's Republic of China ("PRC") and has served as its President since its inception.  LINKOCEAN is headquartered in Qingdao, China.  It imports U.S., Canadian, and European origin goods with applications in underwater and marine technologies into the PRC and then sells these parts to entities located in the PRC.

3.      The People's Liberation Army ("PLA") is the military of the PRC.  The PLA Navy is the naval warfare branch of the PLA and is responsible for the development and operation of its surface warships, submarines, and unmanned submersible vehicles.

4.      LINKOCEAN's clients are all located in the PRC and have included the PLA Navy, Chinese military entities, and Chinese research institutes.  Since coming to the United States in or about November 2014, QIN has worked as LINKOCEAN's President and Manager in the United States.  For substantial periods of time from in or about June 2015 and continuing until June 2018, QIN operated LINKOCEAN out of his residence located in Wellesley, Massachusetts.  Despite his change in residence from the PRC to the United States, QIN continued to use LINKOCEAN to supply underwater and marine-related products manufactured in the United States, Canada, and Europe to customers located in the PRC, including PLA controlled military entities.

5.      Based upon records maintained by QIN, LINKOCEAN's "VIP" customers included, among others, the PLA Navy South China Sea Fleet Troop 91388, the PLA Naval Submarine Academy, the PLA University of Science and Technology, Northwestern Polytechnical University, Harbin Engineering University, and Research Institutes 702, 710, 715, and 760 of the China Shipbuilding Industry Corporation.  Indeed, after obtaining status in the

2

United States as a conditional LPR, between in or about 2015 and 2018, QIN supplied goods worth more than $8 million to PRC government controlled entities.  Further, more than $3.5 million of these items were procured for, and delivered to, the PLA Navy and related Chinese military entities such as the National University of Defense Technology, PLA Naval Submarine Academy, and two "Troops" of the Chinese Military.

6.      Northwestern Polytechnical University, also known as Northwestern Polytechnic University, Northwest Polytechnic University, and Northwest Polytechnical University ("NWPU") is Chinese military research institute that works closely with the PLA on the advancement of its military capabilities.  Specifically, it has been involved in the development of unmanned aerial vehicles, autonomous underwater vehicles, and missile proliferation projects. Beginning in 2001, the U.S. Department of Commerce ("DOC") has designated NWPU on its Entity List, which requires that export licenses be obtained from DOC prior to shipping any U.S. origin goods, except items classified as EAR99 (that is, items that have only commercial applications and are not subject to any controls) to NWPU.  *See* 66 Fed. Reg. 24266.  Because of the increased national security risks posed by NWPU (and 11 similar Chinese entities) to the United States, the export control restrictions were increased on September 20, 2016.  81 Fed. Reg. 64696; *see* 15 C.F.R. § 744, Supplement No. 4 (DOC Entity List).   Accordingly, since September 2016, U.S. law has prohibited exports to NWPU and its aliases unless the exporter/shipper first obtained an export license from DOC.

7.      National University of Defense Technology ("NUDT") is a top military academy directed by China's Central Military Commission.  NUDT is involved in national defense research for the PLA and responsible for modernizing the PRC's armed forces and designing

3

advanced weapons.  Like NWPU, on February 15, 2015, NUDT was added to the DOC's Entity List.  80 Fed. Reg. 8524; *see* 15 C.F.R. § 744, Supplement No. 4.  Since that time, all exports of U.S. origin goods to NUDT require an export license from the DOC.

8.     Harbin Engineering University ("HEU") is a PRC controlled entity that was initially formed in 1953 under the direction of the PLA as the "PLA Military Engineering Institute."  Although the entity changed its name to "Harbin Engineering University" in 1966, HEU has continued to conduct research and development for use by, and on behalf of, the PRC, including for the PLA Navy and other state-controlled entities.

9.     China Shipbuilding Industry Corporation ("CSIC") is one of two PRC Government owned and controlled shipbuilding conglomerates.  CSIC is composed of numerous enterprises in northern China, 28 research institutes, and six laboratories.  CSIC designs, manufactures, and repairs the majority of PLA Naval ships (including surface and submersible vessels) and equipment.

10.     Co-conspirator A was, at all relevant times, a manager and professor at NWPU located in the PRC who worked on projects related to maritime information transmission and acquisition.

11.     Co-conspirator B was, at all relevant times, a senior manager and director at NWPU located in the PRC.

12.     Co-conspirator C was, at all relevant times, the operations manager of LINKOCEAN located in the PRC who worked for QIN and was involved in the illegal procurement of U.S. origin goods for customers in the PRC from at least in or about 2012 to the present.

4

13.     Co-conspirator D was, at all relevant times, an agent of LINKOCEAN located in the PRC who worked for QIN and was involved in the illegal procurement of U.S. origin goods for customers in the PRC.

**B.     The Procurement of Goods for the PLA and Related Entities**

14.     QIN and his LINKOCEAN employees received taskings and orders from the PLA and associated PRC government controlled military entities for components with applications in underwater and marine technologies.  As a result, QIN and his LINKOCEAN employees placed orders with U.S., Canadian, and European suppliers for the requested parts.  In communications with suppliers, QIN instructed his LINKOCEAN employees not "to mention the [PLA] Navy directly" or tell the suppliers that the parts were being procured for military projects.  Once the parts were ready for delivery, QIN either exported the parts himself, or caused the ordered parts to be exported, to the PRC.  In his transactions with U.S. suppliers, QIN and his co-conspirators disguised and concealed the identity of the true end-user.

15.     QIN and his LINKOCEAN employees have communicated with, and/or received taskings from, PLA entities, including Chinese military research institutes.  For instance, beginning in or about July 2015, QIN and LINKOCEAN were tasked by NWPU with obtaining items used for anti-submarine warfare from the United States.

16.     Between in or about July 2015, and continuing until at least December 2016, QIN exported approximately 60 hydrophones (part no. HT1-92-WB), which had a value in excess of $100,000, from the United States to NWPU without obtaining any export licenses by concealing that NWPU was the true end-user from the U.S. supplier and causing false shipping information to be filed with the U.S. Government.  A hydrophone is a device used to detect or monitor sound

underwater.  HTI-92-WB hydrophones are classified under DOC's Export Control Classification Number 6A991.  As a result, these hydrophones could not be exported to NWPU because of its designation on the DOC Entity List without first obtaining an export license from DOC.

17.     At no time did QIN, LINKOCEAN, their co-conspirators, or anyone associated with NWPU, apply for or obtain an export license from DOC authorizing the export of U.S. manufactured hydrophones to NWPU or any its subsidiaries, including Xi'an Overland Science Co. Ltd. ("Xi'an Overland").

### C.   Filing Requirements for Exports

18.     The Department of Commerce requires the filing of electronic export information ("EEI"), previously Shipper's Export Declaration forms ("SEDs"), in the Automated Export System ("AES") for exports of any commodity valued over $2,500, or for which an export license is required for shipment outside of the United States (with exceptions not relevant to the exports at issue in this Indictment).   The purpose of this filing requirement is to "strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and/or end users because AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation." 15 C.F.R. § 30.1(b).

19.     For each export transaction, pursuant to 15 C.F.R. § 30.6, the following information, among other things, is required to be filed in AES: the names and addresses of the parties to the transaction; the description, quantity, and value of the items exported; the ultimate consignee (end user); and the ultimate country of destination.  Knowingly providing false and misleading information, or causing such information to be provided, in connection with the

6

preparation and submission of "export control documents," including EEI filings, is a violation

of the Export Administration Regulations ("EAR"), 15 C.F.R. § 764.2(g)(1)(ii).

20.     Since in or about June 2012, and continuing until at least June 2018, QIN has

caused false end-user information to be filed in SEDs and EEI with the U.S. Government for the

items he procured from the United States and shipped to the PRC.  QIN instructed U.S. suppliers

and shipping companies to identify "LINKOCEAN" as the "ultimate consignee" for the exports.

As a result, LINKOCEAN, which is purely a seller and distributor, was falsely identified in

numerous export transactions in AES as the ultimate end-user of U.S. origin goods, when in fact

QIN knew that LINKOCEAN was not the end-user for these goods and that the goods were

being delivered to other entities in the PRC, including PRC government controlled military end-

users.

### D.     QIN's Immigration Fraud Scheme

21.     Under the EB-5 Program, entrepreneurs are eligible to apply to become lawful

permanent residents and obtain green cards if they make an investment in a commercial

enterprise in the United States, and plan to create or preserve 10 permanent, full-time jobs for

qualified U.S. workers.

22.     To obtain an EB-5 visa, applicants must first complete a Form I-526, Immigrant

Petition by Alien Entrepreneur.  If the I-526 petition is approved, then the applicant may file a

DS-260, Application for Immigrant Visa and Alien Registration ("Visa Application").  If this

Visa Application is approved, the EB-5 investor will be granted conditional permanent residence

in the United States for a period of two years.  The EB-5 investor may then apply using Form I-

829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ("I-829

Petition"), 90-days before the second anniversary of the EB-5 investor's admission into the United States.  If the I-829 Petition is approved, the EB-5 investor will become a LPR of the United States and all conditions are removed so that the investor (as well as any spouse and unmarried children under the age of 21) can live in the United States permanently.

23.     In or about 2012, QIN filed an I-526 Immigrant Petition by Alien Entrepreneur based upon an alleged $500,000 investment in a real estate company located in Seattle, Washington.  The QIN's I-526 petition was approved in or about November 2013.  On or about March 5, 2014, QIN filed a Visa Application through the EB-5 Program.  QIN made a false statement on this application in that he answered "no" to a question that asked whether the applicant would "seek to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States?"  QIN electronically signed his Visa Application under penalty of perjury, 28 U.S.C. § 1746, certifying that all of his answers were true and correct to the best of his knowledge.  In his Visa Application, QIN also certified that he could speak and read English.

24.     On or about July 13, 2016, QIN signed, under the penalty of perjury, a Form I-829 Petition certifying that the information contained in his Petition was "complete, true, and correct."  On his I-829 Petition, however, QIN made a false statement when he answered "no" to Question 16, which stated: "Since becoming a conditional permanent resident, have you **EVER** committed any crime for which you were not arrested?"

8

E.     **QIN Conceals Information from, and Makes False Statements to, U.S. Law
       Enforcement**

25.     On November 24, 2017, CBP Officers conducted an interview of QIN at Logan

Airport.  During this interview, QIN confirmed that he was the President of LINKOCEAN,

which is headquartered in the PRC, but he indicated that while he was in the United States, he

conducts business for his LINKOCEAN company from his Wellesley Massachusetts residence.

In response to questions by the CBP Officers about the types of parts he exports to the PRC, QIN

stated that he exports instruments used for testing water from the United States, and imports

them into the PRC.  QIN further clarified for the CBP officers that he "only" exported

instruments that attach to a buoy.  The CBP Officers asked QIN if he had exported anything else.

QIN answered "no" to this question, when in fact, between in or about June 2012 and November

2017, QIN had exported, or caused to be exported, among other things, remotely operated side

scan sonar systems, unmanned underwater vehicles, unmanned surface vehicles, robotic boats,

and hydrophones.  The items that QIN failed to disclose to, and concealed from, CBP during this

interview have military applications and several of these items were delivered to military end-

users.  For instance, QIN had exported a U.S. manufactured remotely operated side scan sonar

system (the Arc Explorer Dual Frequency Towed Side Scan Sonar System) to the PLA Troop

68221 in November 2015.

26.     On or about June 21, 2018, Special Agents of the Department of Homeland

Security, Homeland Security Investigation ("HSI"), and DOC, Office of Export Enforcement,

interviewed QIN about his knowledge of U.S. export laws and his businesses, including

LINKOCEAN.  During this interview, QIN told the Special Agents, among other things, that he

was familiar with export license requirements, the meaning of the term "ultimate consignee," and the DOC Entity List.  In addition, during this interview, the Special Agents asked QIN whether he had any customers that appeared on the DOC Entity list, to which QIN responded, "no." When QIN made this statement, he knew it was false.  Based on customer records found on QIN's own computer, QIN had at least two customers that were on the DOC Entity List – NWPU and NUDT.  Shortly after QIN lied about not having any customers on the DOC Entity List, the Special Agents asked QIN whether he knew "Northwest Polytechnical University or NWPU."  QIN refused to answer this question, terminated the interview, and stated "I answered too much questions."

<u>COUNT ONE</u>
Conspiracy to Commit Export Violations
(50 U.S.C. § 1705)

The Grand Jury charges that:

27.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

28.     From a date unknown to the Grand Jury, but no later than in or about July 2015,

and continuing thereafter until at least in or about December 2016, in the District of

Massachusetts and elsewhere, the defendants

(1) SHUREN QIN,
(2) LINKOCEAN TECHNOLOGIES, LTD.,
(3) NORTHWESTERN POLYTECHNICAL UNIVERSITY,
a/k/a NORTHWESTERN POLYTECHNIC UNIVERSITY,
a/k/a NORTHWEST POLYTECHNIC UNIVERSITY,
a/k/a NORTHWEST POLYTECHNICAL UNIVERSITY,

did knowingly and willfully conspire, combine, confederate and agree with one another and with

other persons known and unknown to the Grand Jury to export items from the United States to

NWPU, a PRC entity that is designated on the Department of Commerce's Entity List, without

having first obtained the required licenses from the United States Department of Commerce, in

violation of 50 U.S.C. § 1705, Executive Order 13222, and 15 C.F.R. §§ 736.2(b)(5), 764.2,

744.16 and Supplement No. 4 (the Entity List).

<u>MANNER AND MEANS</u>

The manner and means by which the conspiracy was sought to be accomplished included,

among other things, the following during the dates of the alleged conspiracy:

11

29.     QIN used e-mail accounts and other forms of communication to communicate with his conspirators in the PRC.  Several of the foreign co-conspirators used e-mail accounts that contained LINKOCEAN and NWPU's name in the domain name.  The majority of the e-mail communications between QIN and his co-conspirators and employees were written in Chinese.

30.     NWPU (through, at a minimum, Co-conspirator A and Co-conspirator B) tasked QIN and LINKOCEAN with purchasing items from U.S. suppliers for export overseas to the PRC for use by NWPU and other Chinese military-related entities.

31.     To obtain items and export them from the United States, defendants QIN, LINKOCEAN, and LINKOCEAN's employees (Co-conspirator C and Co-conspirator D) made false statements to suppliers and shipping companies about the ultimate end-user for the goods being purchased and exported from the United States.

32.     Further, it was part of the conspiracy that the defendants QIN, LINKOCEAN, NWPU, and their conspirators caused U.S. suppliers and shipping companies to violate the EAR by unwittingly shipping goods to NWPU and its wholly-owned subsidiary, Xi'an Overland, an entity designated on the DOC's Entity List, without obtaining the necessary export licenses.  *See* 15 C.F.R. § 744.16, Supplement No. 4 (Entity List)

OVERT ACTS

33.     In furtherance of the conspiracy, and to effect the objects thereof, the defendants and their co-conspirators committed and caused to be committed overt acts within the District of Massachusetts and elsewhere, including, but not limited to, the following:

a.      In and about July and August 2015, Co-conspirator A requested that QIN and

12

LINKOCEAN obtain price quotes for hydrophones from U.S. suppliers.

b.     In or about August 2015, LINKOCEAN obtained several price quotes for different models of hydrophones sold and manufactured by a U.S. company located in Mississippi ("US Supplier #1").

c.     On or about August 20, 2015, Co-conspirator C advised US Supplier #1 via e-mail that "LinkOcean won the contract for 40 units of HT1-92-WB, the end user is Prof. [Co-conspirator A] at NWPU." Co-conspirator C further indicated in her e-mail, "Shuren [QIN], my boss will place an PO [purchase order] to you soon." In response, US Supplier #1 informed Co-conspirator C at LINKOCEAN via e-mail that "end user NWPU (Northwestern Polytechnical University) is on a special Dept. of Commerce Entity List which requires us to obtain an export license for this user."

d.     On or about August 23, 2015, Co-conspirator D at LINKOCEAN in the PRC sent an e-mail to QIN informing QIN that Co-conspirator A had called the prior day and instructed LINKOCEAN not to mention that NWPU was the end-user when placing the order with the overseas company. Co-conspirator D also advised QIN in this e-mail that Co-conspirator A had stated that NWPU "is partly a military unit" and it therefore may be difficult to ship the parts from the overseas company into the PRC if they were to tell the truth about the end-user. Accordingly, Co-conspirator D told QIN that Co-conspirator A had instructed LINKOCEAN to falsely identify the end-user as "Shaanxi Normal University."

e.     On or about August 24, 2015, QIN requested Co-conspirator A via e-mail to provide him (QIN) more information regarding the Shaanxi Normal University, as the "overseas" company might have questions. Additionally, among other things, QIN informed Co-conspirator

13

A in this email that they may need the seal from the University to verify the identity of the end-user and asked Co-conspirator A if he was able to obtain it.

f.      On or about August 25, 2015, QIN sent an e-mail to Co-conspirator B at NWPU regarding the preparation of the end-user certificate for the hydrophone order for US Supplier #1. In this e-mail, QIN advised Co-conspirator B that he had attached "the end-user certificate that we had to fill out" when we shipped "the underwater ROV [remotely operated underwater vehicle] from" a U.S. company located in California ("US Supplier #2").  QIN indicated that he expected US Supplier #1 to be asking for similar information shortly, but instructed Co-conspirator B that "when you talk to your friend over at Xi'an Shiyou University, tell them not to worry" because they will only need to "provide general information."

g.      On or about August 30, 2015, QIN placed a purchase order with US Supplier #1 for the 40 hydrophones (part no. HTI-92-WB) and related components and accessories, knowing that the end-user of these parts was NWPU.  He sent an e-mail to US Supplier #1 in which he stated:

> The End-User is Dr. Chen Ziheng at Xi'an Shiyou University, the budget is from Xi'an Shiyou University.  My previous PO has wrong information, [Co-conspirator B] is a new sales [person].   Please delete it.  Attached is the correct PO.

The Purchase Order that QIN included with his e-mail named "Xi'an Shiyou U., Dr. Chen Ziheng" as the end-user for hydrophone order.

h.      On or about August 30, 2015, Co-conspirator B sent QIN an e-mail in which he attached a completed end-user certificate for the hydrophone order, which falsely indicated that the end-user for the hydrophones was Xi'an Shiyou University, when in fact the end-user was NWPU.  Co-conspirator B told QIN to review the certificate and see if it was sufficient.  Co-

14

conspirator B further advised QIN to send him any edits to the certificate, at which point, he (Co-conspirator B) would then find someone to affix the seal of the university to the document.

      i.     On or about August 31, 2015, QIN forwarded to Co-conspirator B via e-mail a list of questions that US Supplier #1 had requested be answered prior to exporting the hydrophones to the PRC, and asked Co-conspirator B to answer them. These questions pertained to how the parts would be used, by whom, and how the parts would be safeguarded when they were not being used.

      j.     On September 2, 2015, Co-conspirator B sent QIN via e-mail answers to the questions from US Supplier #1. Among other things, Co-conspirator B advised QIN to tell US Supplier #1 that the hydrophones would be used for "recording the seismic noise and marine animal noise" in the "South sea of china, east sea of china, [and] yellow sea of china" by "Teachers and students."

      k.     On or about September 8, 2015, QIN forwarded Co-conspirator B an e-mail with a "letter of assurance" that US Supplier #1 had requested be completed by the end-user. QIN advised Co-conspirator B that the form needed the signature of Professor Ziheng, "but please remember that it must be printed using the letterhead of Xi'an Shiyou University."

      l.     On or about September 9, 2015, Co-conspirator B sent the completed Letter of Assurance form to QIN via e-mail, which, as QIN instructed, was printed on the letterhead of "Xi'an Shiyou University." The Letter of Assurance was addressed to US Supplier #1 and stated, in pertinent part:

> We understand that [US Supplier #1] may provide me with hardware, software, and/or technology ("Products"), that may be subject to the export laws and regulations of the United States and other nations. I also understand that, under

15

these export control laws and regulations, [US Supplier #1's] delivery of Products to me may take place only after [US Supplier #1] has received written assurance from myself.

Accordingly, I hereby agree:

***
- that the products will not be used in military applications or transferred to any defense agency or activity outside the United States without an export license from the United States Department of State;

- that the products are not purchased for use in nuclear, biological, chemical weapons, or missile program;

- that we will not transfer, export, or re-export, directly or indirectly to any party listed by the U.S. Government or under any applicable law as prohibited from receiving Products and we are not on, or under control of anybody on, any such list;

- that we will comply with all applicable laws and regulations and obtain all required export licenses whenever we transfer, export, re-export Products obtained from [US Supplier #1]; . . .

The bottom of the form contained a signature block, which purports to be signed by Chen Ziheng, an Associate Professor of Xi'an Shiyou University. QIN then e-mailed this completed form to US Supplier #1, knowing that it contained false end-user information. Indeed, QIN knew that the end-user, NWPU, was on the DOC's Entity List and, consequently, was prohibited from receiving US Supplier #1's products without an export license.

m.   On or about September 15, 2015, QIN paid US Supplier #1 $43,200, which represented 60% of the entire cost of NWPU's order of 40 hydrophones and related components and accessories, via wire transfer.

n.   In or about November 2015, LINKOCEAN and NWPU executed "Hydrophone"

16

Purchase Contracts in which LINKOCEAN agreed to deliver hydrophones (part no. HTI-92-WB) to NWPU and NWPU agreed to pay LINKOCEAN $84,532.  Under these contracts, LINKOCEAN was also required to install and debug the hydrophones as well as to provide any necessary post-sale service and maintenance.  In addition, in relation to these Hydrophone Purchase Contracts, in or about November 2015, LINKOCEAN entered into an "Import Agent Service Agreement" with Xi'an Overland Science Co., Ltd., in which LINKOCEAN authorized Xi'an Overland to handle all Chinese import related matters regarding the hydrophones.

      o.     On or about November 10, 2015, QIN paid US Supplier #1 $29,291.50, which represented the remainder of the cost of NWPU's 40-unit hydrophone order and shipping costs, via wire transfer.

      p.     On or about December 16, 2015, QIN and LINKOCEAN caused 40 hydrophones (part. HT1-92-WB) to be exported from United States to Xi'an Overland (NWPU's wholly owned subsidiary and NWPU's import agent for the hydrophone orders) in the PRC, for the benefit of NWPU.  In relation to this export, QIN and LINKOCEAN caused US Supplier #1 to file false shipping information with the U.S. Government in that the EEI listed the ultimate end-user as Xi'an Overland and identified the License Number as "NLR," which means "No License is Required," when, in fact, QIN and his conspirators knew that a license was required.

      q.     On or about September 4, 2016, QIN placed a purchase order for 20 hydrophones (part no. HTI-92-WB) and related accessories with US Supplier #1 for a total price of $36,000, knowing that the end-user of these parts was NWPU.

      r.     On or about September 20, 2016, QIN paid US Supplier #1 $21,600, which represented 60% of the entire cost of the 20-unit hydrophone order via wire transfer.

s.     On or about October 17, 2016, Co-conspirator B sent an e-mail to Co-conspirator A in which he indicated that NWPU had "used the instruments and equipment that we purchased from Qingdao Linkocean last year" and instructed Co-conspirator A to pay LINKOCEAN the remaining balance of the contract.

t.     On or about November 15, 2016, QIN paid US Supplier #1 $14,400, which represented the remainder of the cost of NWPU's 20-unit hydrophone order and shipping costs, via wire transfer.

u.     On or about December 1, 2016, QIN sent an e-mail to Co-conspirator D and another LINKOCEAN employee containing the subject line "Order 1601B (NWPU [Co-conspirator B's name] Hydrophone Order." In this e-mail, QIN asked his employees: "What's the plan to ship this to LINKOCEAN? The overseas (company) is able to ship it tomorrow."  In response, a LINKOCEAN employee advised QIN that "it was agreed that DHL will be utilized for transport and the product name should be entered as 'Data Logger'" on the shipping records.

v.     On or about December 1, 2016, QIN instructed US Supplier #1 via e-mail to ship the 20-unit hydrophone order to LINKOCEAN using its DHL account.  QIN also asked US Supplier #1 to put the name "Data logger" on the shipment documents.

w.    On or about December 6, 2016, QIN and LINKOCEAN caused 20 hydrophones (part no. HT1-92-WB) to be exported from United States to LINKOCEAN in the PRC for the benefit of NWPU.  In relation to this export, QIN and LINKOCEAN caused US Supplier #1 to file false shipping information with the U.S. Government in that the EEI listed the ultimate end-user as LINKOCEAN and identified the License Number as "NLR," when, in fact, QIN and his conspirators knew that a license was  required.  Upon delivery of the parts to LINKOCEAN in

18

the PRC, agents of LINKOCEAN delivered them to NWPU in violation of U.S. export laws and regulations.

All in violation of Title 50, United States Code, Section 1705 and Title 18, United States Code, Section 2.

<u>COUNT TWO</u>
Visa Fraud
(18 U.S.C. § 1546(a))

The Grand Jury further charges that:

34.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

35.     On or about March 5, 2014, in the People's Republic of China, the defendant

(1) SHUREN QIN,

did knowingly subscribe as true, under penalty of perjury (28 U.S.C. § 1746), a false statement

with respect to a material fact in an application, to wit, QIN answered "no" to the question: "Do

you seek to engage in espionage, sabotage, export control violations, or any other illegal activity

while in the United States?" on his Form DS-260, Application for Immigrant Visa and Alien

Registration, which statement the defendant then and there knew was false, in that QIN had

already caused violations of U.S. export laws and regulations while living in the People's

Republic of China and intended to continue to violate said laws and regulations after entering the

United States.

All in violation of Title 18, United States Code, Section 1546(a).

20

<u>COUNT THREE</u>
Visa Fraud
(18 U.S.C. § 1546(a))

The Grand Jury further charges that:

36.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

37.     On or about July 13, 2016, in the District of Massachusetts, the defendant

(1) SHUREN QIN,

did knowingly subscribe as true, under penalty of perjury (28 U.S.C. § 1746), a false statement

with respect to a material fact in an application, to wit, QIN answered "no" to Question 16 of

Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status,

which stated: "Since becoming a conditional permanent resident, have you EVER committed any

crime for which you were not arrested?," which statement the defendant then and there knew was

false, in that QIN had caused false end-user information to be filed in SEDs and EEI with the

U.S. Government for items had had procured from the United States and caused to be exported to

the PRC, and QIN had illegally exported U.S. origin goods to the People's Republic of China

since entering the United States, including, on at least two occasions between in or about 2015

and July 2016, when QIN caused hydrophones bearing part no. HT1-92-WB, classified under

Export Control Classification Number 6A991, to be exported from the United States to NWPU

in the PRC, which had been designated on the DOC's Entity List since 2001, without first

obtaining the required export licenses from the Department of Commerce.

All in violation of Title 18, United States Code, Section 1546(a).

21

<u>COUNT FOUR</u>
Conspiracy to Defraud the United States
(18 U.S.C. § 371)

The Grand Jury further charges that:

38.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

39.     Beginning on a date unknown to the Grand Jury, but no later than in or about June

2012 and continuing until in or about June 2018, in the District of Massachusetts and elsewhere,

the defendants

(1) SHUREN QIN,
(2) LINKOCEAN TECHNOLOGIES, LTD.,

did knowingly and willfully conspire, combine, confederate and agree with one another and with

other persons known and unknown to the Grand Jury to defraud the United States by impeding,

obstructing, and interfering with the lawful government functions of various federal agencies,

including the Department of Commerce and the Department of Homeland Security, in the

ascertainment and collection of customs and export information and the exercise of authority to

inspect and examine cargo crossing the United States border, through deceitful, improper,

unlawful, and dishonest means, to wit: knowingly filing and causing the filing of false and

misleading SEDs and EEI with the U.S. Government, in violation of 18 U.S.C § 371.

<u>OVERT ACTS</u>

40.     In furtherance of the conspiracy, and to effect its objects, the defendants and their

co-conspirators committed overt acts, including but not limited to, the following:

      a.     Between in or about June 2012, and continuing until June 2018, QIN caused false end-user information to be filed in the form of SEDs and EEI with the U.S. Government in that the information, which was filed, identified the ultimate consignee as "LINKOCEAN" despite the fact that QIN knew that LINKOCEAN was not the end-user for any of the products procured from U.S. suppliers and was merely a broker and trading company that was going to deliver the U.S. goods to their customers and the actual end-users in the PRC.

      b.     On or about August 20, 2015, Co-conspirator C advised US Supplier #1 via e-mail that "LinkOcean won the contract for 40 units of [hydrophones bearing part no.] HT1-92-WB, the end user is Prof. [Co-conspirator A] at NWPU." Co-conspirator C further indicated in her e-mail, "Shuren [QIN], my boss will place an PO [purchase order] to you soon." In response, US Supplier #1 informed Co-conspirator C at LINKOCEAN via e-mail that "end user NWPU (Northwestern Polytechnical University) is on a special Dept. of Commerce Entity List which requires us to obtain an export license for this user."

      c.     On or about August 23, 2015, Co-conspirator D at LINKOCEAN in the PRC sent an e-mail to QIN informing QIN that Co-conspirator A had called the prior day and instructed LINKOCEAN not to mention that NWPU was the end-user when placing the order with the overseas company. Co-conspirator D also advised QIN in this e-mail that Co-conspirator A had stated that NWPU "is partly a military unit" and it therefore may be difficult to ship the parts from the overseas company into the PRC if they were to tell the truth about the end-user. Accordingly, Co-conspirator D told QIN that Co-conspirator A had instructed LINKOCEAN to falsely identify the end-user as "Shaanxi Normal University."

23

d.      On or about August 30, 2015, QIN placed a purchase order with US Supplier #1 for the 40 hydrophones (part no. HTI-92-WB) and related components and accessories, knowing that the end-user of these parts was NWPU.  He sent an e-mail to US Supplier #1 in which he stated:

> The End-User is Dr. Chen Ziheng at Xi'an Shiyou University, the budget is from Xi'an Shiyou University.  My previous PO has wrong information, [Co-conspirator B] is a new sales [person].   Please delete it.  Attached is the correct PO.

The Purchase Order that QIN included with his e-mail named "Xi'an Shiyou U., Dr. Chen Ziheng" as the end-user for hydrophone order.

e.      In or about September 2015, QIN forwarded forms via e-mail to US Supplier #1, which contained false end-user information for the 40 unit hydrophone order in that QIN knew NWPU was the true end-user but the forms falsely listed Xi'an Shiyou University as the end-user.

f.      On or about September 15, 2015, QIN placed an order with a U.S. supplier located in Virginia ("US Supplier #3") for an ARC Explorer Dual Frequency Towed Side Scan Sonar for a purchase price of $34,955.   On the purchase order, QIN identified the end-user as "Gan Su" when, in fact, the end-user was the PLA Troop 68221.

g.      On or about November 4, 2015, QIN caused US Supplier #3 to file false shipping information with the U.S. Government in relation to the export of one ARC Explorer Dual Frequency Towed Side Scan Sonar from the United States to the PRC in that the EEI listed the ultimate end-user as "LINKOCEAN" when, in fact, the actual end-user was PLA Troop 68221.

24

h.      On or about December 16, 2015, QIN and LINKOCEAN caused 40 hydrophones

(part no. HT1-92-WB) to be exported from United States to Xi'an Overland (NWPU's wholly

owned subsidiary and NWPU's import agent for the hydrophone orders) in the PRC, for the

benefit of NWPU.  In relation to this export, QIN and LINKOCEAN caused US Supplier #1 to

file false shipping information with the U.S. Government in that the EEI listed the ultimate end-

user as Xi'an Overland and identified the License Number as "NLR," which means "No License

is Required" when, in fact, QIN and his conspirators knew that a license was required.

i.      On or about September 4, 2016, QIN placed a purchase order for 20 hydrophones

(part no. HTI-92-WB) and related accessories with US Supplier #1 for a total price of $36,000,

knowing that the end-user of these parts was NWPU.

j.      On or about December 1, 2016, QIN sent an e-mail to Co-conspirator D and

another LINKOCEAN employee containing the subject line "Order 1601B (NWPU [Co-

conspirator B's name] Hydrophone Order." In this e-mail, QIN asked his employees: "What's

the plan to ship this to LINKOCEAN? The overseas (company) is able to ship it tomorrow."  In

response, a LINKOCEAN employee advised QIN that "it was agreed that DHL will be utilized

for transport and the product name should be entered as 'Data Logger'" on the shipping records.

k.      On or about December 1, 2016, QIN instructed US Supplier #1 via e-mail to ship

the 20-unit hydrophone order to LINKOCEAN using its DHL account.  QIN also asked US

Supplier #1 to put the name "Data logger" on the shipment documents.

l.      On or about December 6, 2016, QIN and LINKOCEAN caused 20 hydrophones

(part no. HT1-92-WB) to be exported from United States to LINKOCEAN in the PRC for the

benefit of NWPU.  In relation to this export, QIN and LINKOCEAN caused US Supplier #1 to

25

file false shipping information with the U.S. Government in that the EEI listed the ultimate end-user as LINKOCEAN and identified the License Number as "NLR," when, in fact, QIN and his conspirators knew that a license was required.  Upon delivery of the parts to LINKOCEAN in the PRC, agents of LINKOCEAN delivered them to NWPU in violation of U.S. export laws and regulations.

m.      On or about July 2, 2017, QIN wrote an e-mail to a person he believed was a U.S. broker but who was in fact an undercover HSI employee ("UCE"), in which he (QIN) asked the UCE to obtain a quote for sonobouys and autonomous underwater vehicles from a U.S. manufacturer with offices in Massachusetts and Indiana ("US Supplier #4").  In that e-mail, QIN instructed the UCE not to tell US supplier #4 that QIN's end-user was located in the PRC.

n.      On or about December 5, 2017, QIN placed an order for 4 – MAT-1 Titanium Data Loggers from a U.S. Supplier located in Massachusetts ("US Supplier #5") on behalf of Harbin Engineering University.  QIN, however, identified the end-user on paperwork with US Supplier #5 as "HIU, Song Yang."

o.      On or about December 17, 2017, QIN and LINKOCEAN caused US Supplier #5 to file false shipping information with the U.S. Government in relation to the export of the 4 – MAT-1 Titanium Data Loggers from the United States to the PRC in that the EEI listed the ultimate end-user as LINKOCEAN when, in fact, the end-user was Harbin Engineering University.

p.      On or about January 19, 2018, QIN incorporated a new company, OCEANTIME, INC. ("OCEANTIME"), in Massachusetts to make it easier to export items from the United States to the PRC.  By so doing, QIN intended to avoid any further inquiries regarding the

ultimate consignee and end-user of U.S. origin goods.  Rather than having U.S. suppliers ship the

parts to the PRC on LINKOCEAN's behalf, and file any EEI with the U.S. Government, QIN

planned to use OCEANTIME as a trading company similar to LINKOCEAN in the PRC.

q.      On or about April 13, 2018, QIN wrote an e-mail to a representative of US

Supplier #5, which stated, in pertinent part: "I set up a trading company in US, it's name is

Oceantime Inc., Going forward I want to use Oceantime to place PO to you."

All in violation of Title 18, United States Code, Section 371.

<u>COUNT FIVE</u>
False Statements
(18 U.S.C. § 1001)

The Grand Jury further charges that:

41.     The allegations contained in paragraphs 1-26 are hereby re-alleged and incorporated by reference as if fully set forth herein.

42.     On or about June 21, 2018, in the District of Massachusetts, the defendant

(1) SHUREN QIN,

in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation, which QIN then knew to be false, to wit: when asked by Special Agents of HSI and DOC, Office of Export Enforcement if he ever had any customers who appeared on the DOC's Entity List, QIN answered, "No," when, in fact, QIN had at least two customers who were designated on the DOC Entity List – NWPU and NUDT.

All in violation of Title 18, United States Code, Section 1001(a)(2).

28

<u>COUNT SIX</u>
False Statements
(18 U.S.C. § 1001)

The Grand Jury further charges that:

43.     The allegations contained in paragraphs 1-26 are hereby re-alleged and incorporated by reference as if fully set forth herein.

44.     On or about November 24, 2017, in the District of Massachusetts, the defendant

(1) SHUREN QIN,

in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation, which QIN then knew to be false, to wit, in response to questions by officers of Customs and Border Protection, QIN stated that: (1) he exports from the United States and imports into China instruments for testing water; (2) he "only" exported instruments that attach to a buoy; and (3) he had not exported any other articles or items from the United States when, in fact, between in or about 2012 and November 2017, QIN had exported, or caused to be exported to the PRC, among other things, unmanned underwater vehicles, unmanned surface vehicles, robotic boats, hydrophones, and had also exported to the PLA Troop 68221 a remotely-operated side scan sonar system.

All in violation of Title 18, United States Code, Section 1001(a)(2).

29

<u>COUNT SEVEN</u>
Money Laundering
(18 U.S.C. § 1956)

The Grand Jury further charges that:

45.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

46.     On or about September 16, 2015, in the District of Massachusetts and elsewhere,

the defendant

(1) SHUREN QIN,

did transmit and transfer and cause the transmission and transfer of funds, that is, $43,200.00,

from a place outside the United States, that is, a LINKOCEAN PRC bank account, to and

through a place inside the United States, that is, a Hancock Whitney Bank account, whose

corporate headquarters are located in Gulfport, Mississippi, and for whom the accountholder was

located in Long Beach, Mississippi, with the intent to promote the carrying on of a specified

unlawful activity, that is, export control and smuggling violations, to wit, Export Administration

Regulations, in violation of 50 U.S.C. § 1705, 15 C.F.R. §§ 736.2(b)(5), 758.1, 764.2, 744.16

and Supplement No. 4 (the DOC Entity List), and Executive Order 13222, as charged in Count 1,

and Smuggling Goods from the United States, in violation of 18 U.S.C. § 554, as charged in

Counts 12-13.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

<u>COUNT EIGHT</u>
Money Laundering
(18 U.S.C. § 1956)

The Grand Jury further charges that:

47.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

48.     On or about November 12, 2015, in the District of Massachusetts and elsewhere,

the defendant

(1) SHUREN QIN,

did transmit and transfer and cause the transmission and transfer of funds, that is, $29,291.50,

from a place outside the United States, that is, a PRC LINKOCEAN bank account, to and

through a place inside the United States, that is, a Hancock Whitney Bank account, whose

corporate headquarters are located in Gulfport, Mississippi, and for whom the accountholder was

located in Long Beach, Mississippi, with the intent to promote the carrying on of a specified

unlawful activity, that is, export control and smuggling violations, to wit, Export Administration

Regulations, in violation of 50 U.S.C. § 1705, 15 C.F.R. §§ 736.2(b)(5), 758.1, 764.2, 744.16

and Supplement No. 4 (the DOC Entity List), and Executive Order 13222, as charged in Count 1,

and Smuggling Goods from the United States, in violation of 18 U.S.C. § 554, as charged in

Counts 12-13.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

31

<u>COUNT NINE</u>
Money Laundering
(18 U.S.C. § 1956)

The Grand Jury further charges that:

49.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

50.     On or about September 20, 2016, in the District of Massachusetts and elsewhere,

the defendant

(1) SHUREN QIN,

did transmit and transfer and cause the transmission and transfer of funds, that is, $21,600.00,

from a place outside the United States, that is, a LINKOCEAN PRC bank account, to and

through a place inside the United States, that is, a Hancock Whitney Bank account, whose

corporate headquarters are located in Gulfport, Mississippi, and for whom the accountholder was

located in Long Beach, Mississippi, with the intent to promote the carrying on of a specified

unlawful activity, that is, export control and smuggling violations, to wit, Export Administration

Regulations, in violation of 50 U.S.C. § 1705, 15 C.F.R. §§ 736.2(b)(5), 758.1, 764.2, 744.16

and Supplement No. 4 (the DOC Entity List), and Executive Order 13222, as charged in Count 1,

and Smuggling Goods from the United States, in violation of 18 U.S.C. § 554, as Counts 12-13.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

32

COUNT TEN
Money Laundering
(18 U.S.C. § 1956)

The Grand Jury further charges that:

51.     The allegations contained in paragraphs 1-26 are hereby re-alleged and incorporated by reference as if fully set forth herein.

52.     On or about November 16, 2016, in the District of Massachusetts and elsewhere, the defendant

(1) SHUREN QIN,

did transmit and transfer and cause the transmission and transfer of funds, that is, $14,400.00, from a place outside the United States, that is, a LINKOCEAN PRC bank account, to and through a place inside the United States, that is, a Hancock Whitney Bank account, whose corporate headquarters are located in Gulfport, Mississippi, and for whom the accountholder was located in Long Beach, Mississippi, with the intent to promote the carrying on of a specified unlawful activity, that is, export control and smuggling violations, to wit, Export Administration Regulations, in violation of 50 U.S.C. § 1705, 15 C.F.R. §§ 736.2(b)(5), 758.1, 764.2, 744.16 and Supplement No. 4 (the DOC Entity List), and Executive Order 13222, as charged in Count 1, and Smuggling Goods from the United States, in violation of 18 U.S.C. § 554, as charged in Counts 12-13.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

<u>COUNTS ELEVEN-FOURTEEN</u>
Smuggling
(18 U.S.C. § 554)

The Grand Jury further charges that:

53.     The allegations contained in paragraphs 1-26 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

54.     On or about the dates listed as to each count, in the District of Massachusetts and

elsewhere, the defendants

(1) SHUREN QIN,
(2) LINKOCEAN TECHNOLOGIES, LTD.,

did fraudulently and knowingly buy, sell, receive, and facilitate the transportation, concealment,

and sale of merchandise, articles, and objects described more fully below, contrary to the laws

and regulations of the United States; and did fraudulently and knowingly export and send and

cause to be exported and sent from the United States merchandise, articles, and objects contrary

to the laws and regulations of the United States, that is, 50 U.S.C. § 1705, 15 C.F.R.

§§ 736.2(b)(5), 758.1, 764.2, 744.16 and Supplement No. 4 (the DOC Entity List), and Executive

Order 13222:

34

| Count | Approximate Date of Purchase and Export | Item Description |
|-------|------------------------------------------|------------------|
| 11 | November 4, 2015 | 1 - Arc Explorer Dual Frequency Towed Side Scan Sonar System (part no. SSS-ARC-DF-Towed) |
| 12 | December 16, 2015 | 40 - hydrophones (part no. HTI-92-WB) |
| 13 | December 6, 2016 | 20 - hydrophones (part no. HTI-92-WB) |
| 14 | December 17, 2017 | 4 – MAT-1 Titanium Data Loggers, 4500 meters |

All in violation of Title 18, United States Code, Sections 554 and 2.

## EXPORT AND SMUGGLING VIOLATIONS FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further alleges that:

55.     Upon conviction of one or more of the offenses set forth in Counts 1 and 11-14 of this Superseding Indictment, the defendants

(1) SHUREN QIN,
(2) LINKOCEAN TECHNOLOGIES, LTD.,
(3) NORTHWESTERN POLYTECHNICAL UNIVERSITY,
a/k/a NORTHWESTERN POLYTECHNIC UNIVERSITY,
a/k/a NORTHWEST POLYTECNIC UNIVERSITY,
a/k/a NORTHWEST POLYTECHNICAL UNIVERSITY,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

56.     If any of the property described in Paragraph 55, above, as being forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c), as a result of any act or omission of the defendants --

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the Court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 55 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## VISA FRAUD FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(6))

57.     Upon conviction of one or more of the offenses in violation of 18 U.S.C.

§ 1546(a), set forth in Counts 2 and 3 of this Superseding Indictment, the defendant

### (1) SHUREN QIN,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(6), any conveyance, including

any vessel, vehicle, or aircraft used in the commission of the offense of which the person is

convicted; and any property real or personal, that constitutes, or is derived from or is traceable

to the proceeds obtained directly or indirectly from the commission of the offense of which the

person is convicted; and that is used to facilitate, or is intended to be used to facilitate, the

commission of the offense of which the person is convicted.

58.     If any of the property described in Paragraph 57, above, as being forfeitable

pursuant to 18 U.S.C. § 982(a)(8), as a result of any act or omission of the defendant --

       a.   cannot be located upon the exercise of due diligence;

       b.   has been transferred or sold to, or deposited with, a third party;

       c.   has been placed beyond the jurisdiction of the Court;

       d.   has been substantially diminished in value; or

       e.   has been commingled with other property which cannot be divided without
          difficulty;

it is the intention of the United States of America, pursuant to 18 U.S.C. § 982(b), incorporating

21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of

the property described in Paragraph 59 above.

All pursuant to Title 18, United States Code, Section 982(a)(6).

38

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

59.     Upon conviction of one or more of the offenses in violation of 18 U.S.C.

§ 1956(a)(2)(A), set forth in Counts 7 through 10 of this Superseding Indictment, the defendant

### (1) SHUREN QIN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offenses, and any property traceable to such property.

60.     If any of the property described in Paragraph 59, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendant --

            a.   cannot be located upon the exercise of due diligence;

            b.   has been transferred or sold to, or deposited with, a third party;

            c.   has been placed beyond the jurisdiction of the Court;

            d.   has been substantially diminished in value; or

            e.   has been commingled with other property which cannot be divided
                 without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 61 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

All pursuant to Title 18, United States Code, Section 982(a)(6).

39

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY


_____
B. STEPHANIE SIEGMANN
JASON A. CASEY
Assistant United States Attorneys


DISTRICT OF MASSACHUSETTS, Boston, MA          October 30, 2018


Returned into the District Court by the Grand Jurors and filed.


_____
Deputy Clerk
10/30/18 @ 4:00pm

40