UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Number 1:18-cr-10205-DJC |
| | ) | |
| SHUREN QIN, et al. | ) | |

_____)

## MEMORANDUM IN SUPPORT OF DEFENDANT SHUREN QIN'S MOTION TO SUPPRESS EVIDENCE

On November 24, 2017 at Logan International Airport, Homeland Security Investigations ("HSI") detained Defendant Shuren Qin ("Mr. Qin") and his family for more than two hours, seized his laptop computer and iPhone[1] without a warrant, forensically imaged the devices, spent multiple months reviewing those forensic images using specialized software that organized, cataloged, and searched the data, and then relied upon materials located during that search to obtain warrants to search the very same electronic devices.

Notwithstanding HSI's characterization of this forensic review as a purportedly "routine" warrantless border search, the Supreme Court and the First Circuit have made clear that electronic devices differ both quantitatively and qualitatively from any other type of personal property and there is, in fact, nothing "routine" about the extraordinary invasion of privacy occasioned by their seizure and search. That extraordinary invasion of privacy outweighs the *de minimis* extent to which such conduct could conceivably further the interests that support border search authority – ferreting out undeclared dutiable goods and preventing the introduction of contraband at the border. HSI's seizure and forensic review of Mr. Qin's devices was unreasonable in both scope and duration absent probable cause and a warrant or, at a minimum,

---

[1] The devices at issue in this Motion are a Dell Latitude E6540 laptop computer, bearing Serial No. W3807E4M, and an Apple iPhone, bearing Serial No. DNPP4XLSG5MR.

sufficient individualized suspicion.  Because HSI had none, the evidence obtained from Mr.

Qin's laptop computer and iPhone, and the statements he made while he was detained, must be

suppressed.

## BACKGROUND

A marine biologist by training, Mr. Qin founded LinkOcean Technologies, Ltd.

("LinkOcean") in Qingdao, China in 2005 to provide oceanographic instruments from

manufacturers in the United States, Canada, and Europe to Chinese scientists.  In order to

provide his two young children with an American education and to conduct more business with

manufacturers based in this country, Mr. Qin immigrated to the United States with his family in

2014 after obtaining conditional permanent resident status through the EB-5 Immigrant Investor

Visa Program.  Since June 2016, the Qin family has lived in Wellesley, Massachusetts, though

Mr. Qin has also traveled back and forth to China – where his company remains headquartered

and his parents still reside – twice in the intervening years.

In April 2017, HSI, the criminal investigative arm of the Department of Homeland

Security, opened an investigation into Mr. Qin and LinkOcean based on a "tip" that it received

from the Defense Security Service ("DSS") that Mr. Qin allegedly contacted representatives of

Riptide Autonomous Solutions ("Riptide") multiple times to inquire about an autonomous

underwater vehicle ("AUV") that purportedly has both commercial and military applications and

"may be controlled for export to China."  *See* Exhibit A, SQ-01707-08, HSI Report of

Investigation, dated Oct. 19, 2017; Exhibit B, SQ-01693, HSI Report of Investigation, dated Jan.

29, 2018.  In May 2017, an undercover agent from HSI, posing as a third-party reseller with a

relationship to Riptide and other companies, engaged Mr. Qin in email communications

regarding the purchase of a Riptide autonomous underwater vehicle ("AUV") in an attempt to

ensnare him in a violation of United States export laws.[2]  *See* Exhibit C, SQ-01666-85, emails

between Mr. Qin and agent.  On June 30, 2017, the agent and Mr. Qin met to further discuss the

potential purchase of an AUV for export to a Chinese university scientist for purposes of water

quality testing.  *See* Exhibit A, SQ-01707-09, HSI Report of Investigation, dated Oct. 19, 2017;

Exhibit D, SQ-01734-807, Transcript of June 30, 2017 Meeting; Exhibit C, SQ-01671, June 1,

2017 email from Qin to agent.  During that meeting, the agent urged Mr. Qin to consider

purchasing an AUV from a different manufacturer – Xylem – because it was more sophisticated.[3]

*See* Exhibit D, SQ-01752-90, Transcript of June 30, 2017 Meeting.  Following the meeting, the

agent and Mr. Qin continued to communicate by email until mid-August 2017.  *See* Exhibit C,

SQ-01678-85, emails between Mr. Qin and agent.[4]  Because Mr. Qin sought only a less

expensive, stripped down AUV for his Chinese scientist customer, the deal with the agent was

not consummated and nothing transpired from the undercover operation.   Mr. Qin had no

contact with the agent after mid-August 2017.

      Three months later, on November 24, 2017, Customs and Border Protection ("CBP")

agents stopped Mr. Qin at Logan Airport for a secondary inspection when he was returning home

from a month-long visit to China with his wife and two young children.  While the HSI report of

---

[2]       AUVs are self-guiding, self-powered vehicles commonly used for oceanographic research.  *See* National Oceanic and Atmospheric Administration Ocean Exploration and Research, *What is an AUV?*, *available at* https://oceanexplorer.noaa.gov/facts/auv.html.  Scientists can use sensors attached to an AUV to, for example, map the ocean floor, record environmental information, explore geologic formations, etc.  *Id.*  AUVs are not on the munitions list.  As the agent indicated in his meeting with Mr. Qin on June 30, 2017, the AUV that Mr. Qin sought was a commercial item, not a military item.  *See* Exhibit D, Transcript of June 30, 2017 Meeting, at SQ-01801.

[3]       HSI Special Agent Thomas Brian Andersen stated in his affidavit in support of the warrant to search Mr. Qin's laptop that the manufacturer of the AUV in question was Ultra Electronics, rather than Xylem.  This and other inaccuracies in Mr. Andersen's affidavit will be further explored at an evidentiary hearing on this Motion and may well provide additional grounds for relief.  *See Franks v. Delaware*, 438 U.S. 154 (1978).

[4]       In the course of this email exchange, Mr. Qin asked the agent not to tell Xylem that the end user for the product was located in China and suggested that the agent could simply state that the customer was in the United States.  *See* Exhibit C, SQ-01678, July 2, 2017 email from Qin to agent.  Mr. Qin made this request because he believed that Xylem already had an exclusive distributor in China and, for business reasons, would not sell a product to the agent for resale by Mr. Qin's company, rather than by its exclusive distributor.  Regardless, the agent's company – not the manufacturer – would have exported the product if the purchase had been consummated and the agent clearly understood that the product was going to China.

the encounter states only that Mr. Qin was "selected for a secondary inspection by [CBP] Officers," *see* Exhibit E, SQ-01711, HSI Report of Investigation, dated Dec. 10, 2017, the corresponding CBP report reflects that Mr. Qin was sent to secondary inspection because of a purported "referral" from the "TTR – Tactical Terrorism Response Team."  *See* Exhibit F, SQ-01687-88, CBP TECS – Secondary Inspection Report, dated November 24, 2017.

Shortly thereafter, HSI agents arrived on the scene, took custody of Mr. Qin's laptop computer and iPhone, and accessed both devices using login information provided by Mr. Qin. Exhibit E, SQ-01711, HSI Report of Investigation, dated Dec. 10, 2017.  HSI then performed a "preview" of the devices' contents purportedly in order to "quickly determine the presence of merchandise or evidence related to merchandise within the devices, to assess the volume of information, and finally to determine whether an image of the devices could be completed without substantial delay to the QIN family."  *Id.*  This preview allegedly revealed that "a substantial portion of the data on both devices was in the Chinese language and that an image could not be produced without a lengthy delay."  *Id.*  HSI thereafter seized Mr. Qin's laptop computer and iPhone "using HSI authority" for what HSI characterized at the time – and in the months thereafter – as a "routine border search for merchandise or evidence related to merchandise."  *Id.*[5]  The CBP Report of the encounter agreed with the HSI Report that the devices were "detained by H.S.I. under H.S.I.'s authority," and not because of any individualized

---

[5]     HSI agents repeatedly referred to the seizure, forensic imaging, and review of Mr. Qin's devices as a "routine border search" in their subsequent investigative reports.  *See* Exhibit E, SQ-01711, HSI Report of Investigation, dated Dec. 10, 2017; Exhibit G, SQ-01712, HSI Report of Investigation, dated Dec. 20, 2017; Exhibit B, SQ-01692, HSI Report of Investigation, dated Jan. 29, 2018.  This characterization was reiterated by a DHS attorney, with whom attorney William Joyce communicated on behalf of Mr. Qin in an attempt to seek the return of Mr. Qin's devices.  *See* Exhibit H, SQ-02817, Jan. 9, 2018 email from Jennifer Mulcahy ("I received your message last week regarding Qin and his production of passwords to aid in the border search of several electronic devices."); Exhibit I, SQ-02813, Jan. 11, 2018 email from Jennifer Mulcahy ("[T]he information needed to complete the border search and determine the admissibility or exclusion of your client's electronic devices and their contents, are the PGP passphrase, the Keychain passphrase, and the password or passphrase needed to access the Windows encrypted file system.").

suspicion concerning Mr. Qin.  *See* Exhibit F, SQ-01688, CBP TECS – Secondary Inspection Report, dated Nov. 24, 2017.

In the course of this search and seizure, Mr. Qin's devices were transported from Logan Airport to the HSI Boston Counter-Proliferation Investigations Center forensic lab, where they were forensically imaged.  *See* Exhibit E, SQ-01711, HSI Report of Investigation, dated Dec. 10, 2017; Exhibit G, SQ-01713-14, HSI Report of Investigation, dated Dec. 20, 2017.  Despite several requests by Mr. Qin to return his devices (*see e.g.* Exhibit J, Mar. 8, 2018 letter from William Joyce to Special Agent in Charge Bartholomew Cahill), HSI agents spent months reviewing the forensic images with the assistance of a field agent based in New York who was fluent in Chinese, as well as apparently a specialized software program called Intella, which is capable of organizing, cataloging, and searching data on devices via the application of search terms.  *See* Exhibit G, SQ-01713-14, HSI Report of Investigation, dated Dec. 20, 2017; Exhibit B, SQ-01693-94, HSI Report of Investigation, dated Jan. 29, 2018; Exhibit K, SQ-24557-58, Email from SA Andersen to SA McKenna, dated Dec. 13, 2017.

On February 2, 2018 – more than two months after Mr. Qin's devices had been seized – HSI Special Agent Thomas Brian Andersen sought and obtained warrants to search Mr. Qin's laptop computer and additional email accounts based on information obtained from the warrantless search of Mr. Qin's devices.  Using these same materials as support, Special Agent Jon Bentsen obtained a warrant to search Mr. Qin's iPhone nearly three months later on April 26, 2018.  These materials were relied on again in June 2018 to obtain warrants to search Mr. Qin's home, as well as three other electronic devices contained therein.  Although the warrant application for Mr. Qin's laptop purported to seek permission to "conduct a more comprehensive search" of the device, *see* Exhibit L, SQ-00107, Affidavit of SA Thomas Brian Andersen in

Support of Application for a Search Warrant, *In the Matter of the Search of Shuren Qin's Dell Latitude E6540 Hard Drive, Serial #W3807E4M*, it is unclear what, if any, further searching and reviewing of the contents of Mr. Qin's devices may have been done following the issuance of the search warrants.[6]  The government has refused to provide discovery on this issue, but any additional searches would have been performed on the very same forensic images that HSI had already been reviewing for months.  The government did not return Mr. Qin's laptop to him until early 2019 in the midst of discovery in this case.  It has never returned his cell phone.

The Superseding Indictment charges Mr. Qin with various export violations based in large part on the same materials that underpinned HSI's initial warrant application.  In addition, Mr. Qin has been charged in Count Six with making a false statement to the CBP agents while he was detained on November 24, 2017.

In the course of discovery, the government produced to defense counsel a copy of the forensic images of Mr. Qin's laptop computer and iPhone.  All told, the images encompass 750 gigabytes of data, including numerous categories of sensitive materials, such as tens of thousands of personal photographs, personal correspondence dating back more than a decade, medical records of the Qin family, account passwords and purchasing histories, reading materials, financial records, estate plans, and location data.  *See* Exhibit N, Declaration of Z. Han at ¶6(a)-(i).

---

[6]      The warrant application filed with respect to Mr. Qin's iPhone is far more cursory and does not indicate what type of search permission was requested to perform; it simply incorporates as an exhibit the affidavit filed in support of the application for a warrant to search Mr. Qin's laptop.  *See* Exhibit M, Affidavit in Support of Application for a Search Warrant, *In the Matter of the Search of Shuren Qin's Apple iPhone, bearing serial number DNPP4XLSG5MR.*

**ARGUMENT**

**A. In the absence of probable cause and a warrant, the searches and seizures of Mr. Qin's electronic devices were unreasonable both in scope and duration and the evidence obtained therefrom must be suppressed.**

"Since the time of its framing, 'the central concern underlying the Fourth Amendment' has been ensuring that law enforcement officials do not have 'unbridled discretion to rummage at will among a person's private effects.'" *U.S. v. Wurie*, 728 F.3d 1, 14 (1st Cir. 2013) (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009)). To that end, the Supreme Court has made clear that "the ultimate touchstone of the Fourth Amendment is reasonableness," and such "reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 134 S.Ct. 2473, 2482 (2014). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Carpenter v. U.S.*, 138 S.Ct. 2206, 2221 (2018) (internal quotation marks and alterations omitted); *Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.")). The government bears the burden of proving that a warrantless search was reasonable. *U.S. v. Bain*, 874 F.3d 1, 17 (1st Cir. 2018).

The sole "exception" to the warrant requirement that bears any relevance to this case is border search authority, which permits warrantless and suspicionless "routine" searches of entrants and their effects based on the government's interests in "regulat[ing] the collection of duties" and "prevent[ing] the introduction of contraband into this country." *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). "The sovereign's right to conduct suspicionless searches at the border 'does not mean, however, that at the border anything goes.'" *United States v. Cano*, -- F.3d --, No. 17-50151, 2019 WL 3850607, at *6 (9th Cir. 2019) (internal quotation marks

omitted).  Rather, border search authority remains "subject to substantive limitations imposed by the constitution."  *U.S. v. Ramsey*, 431 U.S. 606, 620 (1977).  That is to say, even at the border, "reasonableness remains the touchstone for a warrantless search."  *U.S. v. Kim*, 103 F.Supp.3d 32, 50 (D.D.C. 2015) (quoting *U.S. v. Cotterman*, 709 F.3d 952, 957 (9th Cir. 2013)).

In order to determine whether a warrantless search is reasonable, a court must balance the degree to which the search intrudes upon the individual's privacy against the extent to which the search promotes the government interests that underlie the applicable warrant exception.  *Riley*, 134 S. Ct. at 2484; *see also Montoya de Hernandez*, 473 U.S. at 537 ("The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.").  To be sure, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior."  *Montoya de Hernandez*, 473 U.S. at 538.  At the border, individuals have a reduced expectation of privacy, whereas the government's "interest in preventing the entry of unwanted persons and effects is at its zenith."  *U.S. v. Flores-Montano*, 541 U.S. 149, 152 (2004).  But "the fact that an [individual] has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely."  *Riley*, 134 S. Ct. at 2488.  "To the contrary, when privacy-related concerns are weighty enough a search may require a warrant, notwithstanding [] diminished expectations of privacy…."  *Id*.  And as with any exception to the warrant requirement, the government cannot rely on border search authority where application of the doctrine would "untether the rule from [its] justifications[.]"  *See Kim*, 103 F.Supp.3d at 55 (quoting *Riley*, 134 S. Ct. at 2485).  In the border search context, those justifications are "narrow[ly]" limited to the enforcement of customs laws – i.e. ferreting out undeclared dutiable goods and preventing the introduction of contraband.  *See Cano*, -- F.3d --,

2019 WL 3850607, at *6.  A general search for evidence of a crime "cannot be justified on the mere basis that it occurred at the border."  *Id.* (internal alterations and quotation marks omitted).

As this Court has previously recognized, both the Supreme Court and the First Circuit have made clear that "electronic devices implicate privacy interests in a fundamentally different manner than searches of typical containers or even searches of a person."  *Alasaad v. Nielsen*, No. 17-cv-11730-DJC, 2018 WL 2170323, at *19 (D. Mass. May 9, 2018) (citing *Riley*, 134 S. Ct. at 2488-89; *Wurie*, 728 F.3d at 8).  The Supreme Court explained in *Riley* that electronic devices diverge from all other physical property "in both a quantitative and a qualitative sense."  *See Riley*, 134 S. Ct. at 2489; *see also Wurie* 728 F.3d at 8-10.[7]  Prior to the digital age, a search was quantitatively "limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy," as "people did not typically carry a cache of sensitive personal information as they went about their day."  *Riley*, 134 S.Ct. at 2489-90; *see also U.S. v. Cotterman*, 709 F.3d at 964 ("The amount of private information carried by international travelers was traditionally circumscribed by the size of the traveler's luggage or automobile.").  "That is no longer the case;" the electronic devices that are ubiquitous in our society are "capable of storing warehouses of information."  *Cotterman*, 709 F.3d at 964.

Not only is the capacity of a modern electronic device immense, but the type of information stored thereon is qualitatively distinct from other effects a person might typically carry.  *See Riley*, 134 S.Ct. at 2489-90.  Indeed, an electronic device contains the "combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually, and sometimes even sexually, in the owner's life…."  *U.S. v. Djibo*, 151 F.Supp.3d

---

[7]     Although *Riley* specifically addressed the privacy interests at stake in the search of a cell phone, its reasoning applies with equal, if not greater, force to a laptop computer given that the Court's analysis relied in large part on the fact that modern cell phones "are in fact minicomputers" with computer-like storage capacity.  *See Riley*, 134 S.Ct. at 2489; *see also Wurie*, 728 F.3d at 8 ("In reality, 'a modern cell phone is a computer,' and 'a computer…is not just another purse or address book.").

297, 310 (E.D.N.Y. 2015); *see also Cotterman*, 709 F.3d at 964 ("Laptop computers…are simultaneously offices and personal diaries.  They contain the most intimate details of our lives: financial records, confidential business documents, medical records and private emails.  This type of material implicates the Fourth Amendment's specific guarantee of the people's right to be secure in their 'papers.'").

Searching an electronic device exposes "to the government far *more* than the most exhaustive search of a house," a setting which has historically received the Fourth Amendment's most stringent protections.  *See Riley*, 134 S. Ct. at 2491 (emphasis in original).  An electronic device "not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the [electronic device] is."  *Id.*  Even a cursory perusal of the data that HSI extracted from Mr. Qin's devices provides a case in point, revealing 750 gigabytes worth of data, including personal contacts, personal communications, financial records, family photographs, web browsing history, medical records, location data, and estate planning documents – a vast quantity of precisely the kind of sensitive information with which the Supreme Court was concerned in *Riley*.

In *Riley*, the Supreme Court weighed the significant intrusion associated with an electronic device search against its concomitant conclusion that such searches do not appreciably further the government interests underlying the search incident to arrest exception – protecting officer safety and preventing the destruction of evidence – and concluded that electronic devices raise such weighty and unique privacy concerns that their search is <u>never</u> reasonable incident to arrest absent probable cause and a warrant.  *See Riley*, 134 S. Ct. at 2485-95; *see also Wurie* 728 F.3d at 8-10, 12-13 (drawing the same conclusion).  The Supreme Court reached this conclusion despite the fact that the searches at issue were simple manual searches of a device performed

within hours of arrest. Forensic searches, like those that HSI performed on Mr. Qin's devices, are far more intrusive, "reveal[ing] a wealth of information about how the device and its contents have been used," Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 537 (2005), and "capable of unlocking password-protected files, restoring deleted material, and retrieving images viewed on web sites." *Cotterman*, 709 F.3d at 957. Certainly, if a simple manual search of an electronic device raises distinct privacy concerns, those raised by the forensic imaging and months' long review of an electronic device – "essentially a computer strip search" – are immeasurable. *See id.* at 966.

As this Court explained in *Alasaad*, although *Riley* was decided in the context of a search incident to arrest, its reasoning applies with equal force in the context of a border search. *See* 2018 WL 2170323, at *18-*20. As an initial matter, the singular privacy concerns raised by an electronic device search are undoubtedly the same in either context. Moreover, both doctrines are "longstanding, historically recognized exception[s] to the Fourth Amendment's general principle that a warrant be obtained," *Ramsey*, 431 U.S. at 621, and both arise in situations where the balance of interests "tilts favorably toward the government." *Alasaad*, 2018 WL 2170323, at *18 (citing *Riley*, 134 S.Ct. at 2488); *see also Kim*, 103 F.Supp.3d at 55 ("[T]hat the Supreme Court has specifically likened the border search warrant exception to the search incident to arrest exception reinforces the Court's view that an analysis similar to the one in *Riley* should be undertaken here.").

In any event, "[j]udicially recognized exceptions to the warrant requirement do not exist in isolation; rather, they are all part of Fourth Amendment jurisprudence, justified because, ordinarily, the circumstances surrounding the search and the nature of the search have been deemed 'reasonable.'" *Alasaad*, 2018 WL 2170323, at *16. With this in mind, other courts have

applied *Riley*'s reasoning not only in the context of border search authority, *see Kim*, 103 F.Supp.3d at 53-59, but also in other contexts, such as the vehicle exception, *see U.S. v. Camou*, 773 F.3d 932, 942-43 (9th Cir. 2014); *Wertz v. State*, 41 N.E.3d 276, 282 (Ind. Ct. App. 2015), and the probation search exception, *see U.S. v. Lara*, 815 F.3d 605, 610-12 (9th Cir. 2016).  That is to say, although the question before the Supreme Court in *Riley* was whether warrantless electronic device searches are permissible in the context of a search incident to arrest, the framework that the Court applied is a well-accepted, generalized framework aimed at answering the fundamental question raised by any warrantless search – whether it was reasonable.  *See, e.g., Montoya de Hernandez*, 473 U.S. at 537 ("The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.").  And the Court made clear that the government bears a uniquely heavy burden in demonstrating that a warrantless search was reasonable when it concerns the contents of an individual's electronic device.  *See Riley*, 134 S.Ct. at 2488-91; *see also Carpenter v. U.S.*, 138 S.Ct. at 2222 (reaffirming *Riley*'s conclusion that digital data searches are meaningfully different for Fourth Amendment purposes and holding that historical cell-site location information is sufficiently sensitive that it cannot be obtained without a warrant, notwithstanding the fact that the data is collected by a third party). [8]

---

[8]  Relying on the Supreme Court's statement in *Riley* that "other case-specific exceptions may still justify a warrantless search of a particular phone," the Eleventh Circuit held in *U.S. v. Vergera* that *Riley* was "expressly limited" to the search incident to arrest exception.  884 F.3d 1309, 1312 (11th Cir. 2018).  As explained above, *Riley* is not so limited.  To the contrary, the language of *Riley*'s holding – that "a warrant is generally required before [a cell phone] search, even when a cell phone is seized incident to arrest" – suggests on its face that the Supreme Court envisioned a broader application of the warrant requirement.  *See id.* at 2493; *see also Vergera*, 884 F.3d at 1318 (Pryor, J. *dissenting*) ("I believe we must look to *Riley* to inform our analysis of Vergera's privacy interest in his cell phones – the very same interests held by the arrestees in *Riley* – to determine whether a warrant is required for a forensic cell phone search *even when* the search occurs at the border.") (emphasis in original).  The Court raised the specter of other case-specific exceptions in direct response to "extreme hypotheticals" posed by the government and pointed specifically to the continued availability of the exigent circumstances exception to put those concerns to rest.  *See Riley*, 134 S.Ct. at 2494.  There is nothing in the Court's opinion to suggest that its analysis of the *sui generis* privacy concerns at stake or the balancing test that it employed would not be equally applicable in any Fourth

Applying *Riley's* framework to the facts of this case leads inexorably to the conclusion that reasonableness required HSI to obtain a warrant before performing its forensic review of Mr. Qin's electronic devices.  There can be no doubt that the invasion of Mr. Qin's privacy was substantial – and, indeed, far more substantial than the invasion of privacy resulting from the offending manual searches at issue in *Riley*.  HSI agents created identical images of the entirety of Mr. Qin's laptop computer hard drive and iPhone and spent multiple months searching, translating, and pouring over the information they contained with the assistance of a field agent who was fluent in Chinese, as well as forensic software that allowed them to catalog and review the devices full contents.  The data accessible to HSI included ostensibly deleted materials and vast quantities of sensitive, personal data dating back more than a decade.  Against this backdrop, the searches of Mr. Qin's electronic devices were qualitatively and quantitatively more invasive than the type of "routine" examination that is accommodated by border search authority. *See Kim*, 103 F.Supp.3d at 57-59 (finding similar warrantless search of laptop seized at border unreasonable and questioning whether it could "accurately be characterized as a border search at all"); *Cotterman*, 709 F.3d at 966 ("An exhaustive forensic search of a copied laptop hard drive intrudes upon privacy and dignity interests to a far greater degree than a cursory search at the border.").  Rather, "given the extensive nature and duration of the search here and the use of a list of specific search terms," the forensic review of Mr. Qin's devices "more resembled the common nonborder search based on individualized suspicion, which must be prefaced by the

---

Amendment context.  Other courts have concluded that *Riley*'s warrant requirement does not apply in the border search context, relying on the fact that the balance of interests is struck more favorably to the government at the border.  *See, e.g., Cano*, -- F.3d --, 2019 WL 3850607, at *8; *U.S. v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019).  It simply does not suffice to rely on a notion that the border is categorically different, since "the Supreme Court and the First Circuit have acknowledged that digital searches are different too…." *Alasaad*, 2018 WL 2170323, at *20.  And in any event, as explained above, the fact that the balance of interests tilts toward the government does not distinguish a border search from a search incident to arrest.

usual warrant and probable cause standards." *Kim*, 103 F.Supp.3d at 58 (quoting *U.S. v. Brennan*, 538 F.2d 711, 716 (5th Cir. 1976)).

This substantial invasion of Mr. Qin's privacy must be balanced against the extent to which the forensic searches of his electronic devices furthered the purposes of border search authority – "to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537.  The government cannot credibly argue that either of these interests were appreciably implicated where there was <u>no</u> evidence of contraband or dutiable goods on Mr. Qin's person or in his luggage and he himself was permitted freely to leave the airport with his luggage.

According to HSI, it seized, forensically searched, and engaged in translation and analysis of Mr. Qin's devices to look for "merchandise or evidence related to merchandise." Exhibit E SQ-01711, HSI Report of Investigation, dated Dec. 10, 2017; Exhibit B, SQ-01693, HSI Report of Investigation, dated Jan. 29, 2018.  Given that digital contraband plays no role in this case, it is unclear what "merchandise" could possibly have been contained within the data stored in Mr. Qin's devices.  *See U.S. v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J. *concurring*) ("[T]he best argument for carving [cell phones] out of the government's traditional border-search authority is the physical limitations of their capacity.  Most contraband…cannot be stored within the data of a cell phone.").

That leaves only "evidence related to merchandise," which, in the context of this case, is presumably a thinly-veiled reference to information regarding the potential export control violations for which HSI had been investigating Mr. Qin unfruitfully for seven months.  Any thread of connection that may exist between such information and collecting duties or preventing the introduction of contraband at the border is constitutionally insufficient.  *See Cano,* -- F.3d --,

14

2019 WL 3850607, at *13 ("Searching for evidence and searching for contraband are not the same thing."); *U.S. v. Kolsuz*, 185 F.Supp.3d 843, 858 (E.D.Va. 2016), *aff'd*, 890 F.3d 133 (4th Cir. 2018) (Digital information "is merely evidence of things an individual seeks to export illegally – not the things themselves – and therefore the government's interest in obtaining this information is less significant than the government's interest in directly discovering the items to be exported illegally").  To be sure, forensic review of an entrant's electronic devices could potentially reveal evidence of criminal activity, export-related or otherwise.  But such general law enforcement activity bears no relation to the traditional purpose of border search authority – "protecting this Nation from entrants who may bring anything harmful into this country," *Montoya de Hernandez*, 473 U.S. at 544 – particularly where, as here, (1) agents had already seized and secured the electronic devices and, thus, anything purportedly inadmissible to the country that may have been contained therein had successfully been interdicted; and (2) agents had no basis to suspect Mr. Qin of criminal activity connected in any way to the fact that he happened to be crossing a border.  *See Kim*, 103 F.Supp.3d at 57-58 (questioning how border search authority could justify two weeks of "unlimited scrutiny" of forensic image of defendant's computer and "what aspect of the security or territorial integrity of the nation was implicated" once agents had secured and preserved the device's contents); *United States v. Laich*, No. 08-20089, 2010 WL 259041, at *4 (E.D. Mich. Jan. 20, 2010) ("Significantly, the Government does not argue that [defendant's] international travels were in furtherance of the alleged offense. Inasmuch as the extended border search doctrine was designed to aid in the protection of the borders of the United States, it cannot be casually transformed into a tool for general crime prevention" by virtue of the fact that the subject of an existing investigation is crossing a border).

Indeed, the Supreme Court "has long 'draw[n] a sharp distinction between searches for contraband and those for evidence that may reveal the importation of contraband," *Cano*, -- F.3d --, 2019 WL 3850607, at *10 (quoting *Molina-Isidoro*, 884 F.3d at 296 (Costa, J. *concurring*)), making clear that, as to the former, "the government is entitled to possession of the property[,]" but as to the latter "it is not." *Boyd v. U.S.*, 116 U.S. 616, 623 (1886) ("The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him.")); *see also Molina-Isidoro*, 884 F.3d at 295 (Costa, J. *concurring*) (*"The First Congress authorized customs officials to search for and seize 'goods, wares, and merchandises' that may be concealed in ships entering the country to avoid duties; it did not provide that authority to obtain evidence of crimes other than the contraband itself.").  This distinction is borne out by statute which authorizes border officials "to seize '*merchandise* which…shall have been introduced into the United States in any manner contrary to law[,]'" but provides "no general authority to search for a crime[,]… even if there is a possibility that such crimes may be perpetrated at the border in the future." *Cano*, -- F.3d --, 2019 WL 3850607, at *10 (quoting 19 U.S.C. §482(a)) (emphasis in original) (explaining that the scope of border search authority does not include the power to search for contraband that is not present at the border or evidence of past or future border-related crimes).

In other words, the purportedly "routine border search" conducted in this case for "evidence related to merchandise" cannot properly be considered a border search at all.  It was quite plainly <u>not</u> a search for dutiable goods or contraband, but rather a search for evidence of criminal wrongdoing in furtherance of an existing (albeit, cold) investigation – precisely the type

of search for which the Fourth Amendment requires probable cause and a warrant.  *See*

*Carpenter*, 138 S.Ct. at 2221 ("[O]ur cases establish that warrantless searches are typically

unreasonable where 'a search is undertaken by law enforcement officials to discover evidence of

criminal wrongdoing.'").  To rely on border search authority to support such a search would

"untether the rule from [its] justifications," an outcome that the Fourth Amendment simply will

not permit.  *See Riley*, 134 S.Ct. at 2485; *see also Cano*, -- F.3d --, 2019 WL 3850607, at *10-

*11 (explaining that, in light of the historical rationale for border search authority, it "authorizes

warrantless searches of [an electronic device] only to determine whether [the device] contains

contraband" and cannot be used to justify a broader search for evidence of a crime).  And any

thread of connection that could possibly exist between the searches of Mr. Qin's devices and the

government interests that support warrantless routine border searches certainly does not

outweigh the extraordinary invasion of privacy to which Mr. Qin was subjected.  *See Carpenter*,

138 S. Ct. at 2222 ("When confronting new concerns wrought by digital technology, this Court

has been careful not to uncritically extend existing precedents.").  Accordingly, the forensic

searches of Mr. Qin's electronic devices were unreasonable absent probable cause and a warrant,

and the evidence obtained therefrom must be suppressed.  *See Kim*, 103 F.Supp.3d at 56-59

(applying *Riley* and granting motion to suppress because warrantless laptop search "was

supported by so little suspicion of ongoing or imminent criminal activity, and was so invasive of

Kim's privacy and so disconnected from not only the considerations underlying the breadth of

the government's authority to search at the border, but also the border itself, that it was

unreasonable").[9]

---

[9]      Any other conclusion would provide lesser Fourth Amendment protection to email than to traditional mail,
as the law is clear that, even at the border, envelopes may be opened "only when the customs officers have reason to
believe they contain other than correspondence, while the *reading* of any correspondence inside the envelopes is
forbidden" absent a search warrant.  *Ramsey*, 431 U.S. at 624 (emphasis added).  "Given the fundamental

This conclusion is underscored by the fact that HSI agents later obtained warrants to search the very same forensic images that they had already been reviewing for months, an act that implicitly acknowledges the unreasonableness of conducting those searches without warrants in the first place.  That is to say, either the searches were lawful "routine border searches" from the get-go, in which case HSI need not have obtained warrants at all, or they were not, in which case HSI's warrant applications were based on documents acquired unlawfully during the initial forensic review.  Nor is the government helped by the argument – suggested by the wording of the warrant applications – that the searches performed pursuant to the warrants were somehow "more comprehensive" than, and thus distinct from, the so-called "border searches."  HSI forensically imaged Mr. Qin's devices within hours of seizing them and it was those forensic images that HSI reviewed both before and, presumably, after obtaining warrants.  Under such circumstances, it would be disingenuous to suggest that there is a meaningful difference for Fourth Amendment purposes between the review performed prior to issuance of the warrants and any additional review that may have occurred thereafter.  *Accord Kim*, 103 F.Supp.3d at 52 ("Once an entire hard drive has been copied, the investigative imperatives of the case dictate the extent and nature of the investigation," but agents had access to the entire contents of the electronic device from the time that it was forensically imaged and had given "themselves the luxury of the one thing that is absolutely not available [in a typical border search]: time.").

Apart from the scope of the searches performed on Mr. Qin's electronic devices, the duration of the warrantless detention was unreasonable and independently justifies suppression of the evidence.  As this Court has explained, "prolonged detentions of devices – including after

---

similarities between email and traditional [mail]," such a result "would defy common sense[.]"  *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010).

travelers have left the border – resemble seizures, and must, therefore, be reasonable not only at their inception but also for their duration." *Alasaad*, 2018 WL 2170323, at \*21 (citing *U.S. v. Place*, 462 U.S. 696, 708-10 (1983) (holding that the ninety-minute detention of luggage was a "seizure" requiring probable cause)); *see also Segura v. United States*, 468 U.S. 796, 812 (1984) ("Of course, a seizure reasonable at its inception…may become unreasonable as a result of its duration or for other reasons.").

Even assuming that the initial warrantless seizures of Mr. Qin's laptop and iPhone were justified, the subsequent detention of those devices – for over two months and five months, respectively, and including an exhaustive review – represented an unreasonable infringement on Mr. Qin's possessory interests absent a warrant. *See, e.g., U.S. v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009) (holding that three week delay in obtaining warrant post-seizure of computer "constitute[d] a significant interference with Mitchell's possessory interest" and was unreasonable because a computer "is the digital equivalent of its owner's home" and is "relied upon heavily for personal and business use."); *U.S. v. Laich*, No. 08-20089, 2010 WL 259041, at \*4 (E.D. Mich. Jan. 20, 2010) (holding that CBP's decision to permanently seize defendant's laptop based on a border search and transport it hundreds of miles to another jurisdiction for further review was unreasonable); *House v. Napolitano*, 11-10852-DJC, 2012 WL 1038816, at \*9-10 (D. Mass. Mar. 28, 2012) (holding that forty-nine day detention of a locked laptop based on a border search raised a plausible Fourth Amendment claim) ("[E]ven if the initial seizure of a laptop and other electronic devices at the border requires no reasonable suspicion, the government cannot simply seize property under its border search power and hold it for weeks, months, or years on a whim.") (internal quotation marks and alterations omitted)).  This conclusion is particularly inevitable given that (1) HSI's lengthy delay in seeking warrants to

seize and search Mr. Qin's devices resulted directly from the fact that agents were wading

through the contents of those very devices looking for the probable cause necessary to support

the searches and seizures in the first instance, and (2) HSI did not return Mr. Qin's laptop to him

until early 2019 in the midst of the discovery process in this case and has never returned his cell

phone, despite having preserved all of the data contained in the devices within hours of seizure.

Against this backdrop, HSI's forensic review of Mr. Qin's electronic devices must be

seen for what it was: a blatant end-run around the warrant requirement, which HSI had been

unable to satisfy despite months of investigation, including an unsuccessful undercover

operation.  *See U.S. v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013) ("[W]arrantless cell phone data

searches strike us as a convenient way for the police to obtain information related to a

defendant's crime of arrest – or other, as yet undiscovered crimes – without having to secure a

warrant.").  Accordingly, the evidence obtained therefrom must be suppressed.[10]

**B.  Even if the Court were to find that probable cause and a warrant were not required, the evidence obtained from Mr. Qin's electronic devices must be suppressed because the searches were "non-routine" and were not supported by the necessary individualized suspicion.**

Even if the Court were to find that a warrant requirement is impracticable in the border

search context (which it should not under these facts), the extraordinary invasion of privacy

occasioned by the lengthy seizure and forensic review of Mr. Qin's electronic devices still

required probable cause.  *Cf. California v. Acevedo*, 500 U.S. 565, 579-80 (1991) (although a

warrant is not required to search a container within a vehicle, such a search is unreasonable

unless supported by probable cause specific to the container to be searched).  As this Court has

previously recognized, the Supreme Court "rejected the reasonable suspicion standard" for

---

[10]     Because later warrants to search Mr. Qin's email account, home, and devices seized therefrom were all premised on materials gathered during the unlawful search of his electronic devices, any evidence obtained from searches conducted pursuant to those warrants is also subject to suppression as "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341 (1939).

electronic device searches in the search incident to arrest context because such a standard "would prove no practical limit at all…." *Riley*, 134 S.Ct. at 2492 (explaining that, in the context of electronic devices, the reasonable suspicion standard would neither "protect[] against searches for evidence of past crimes" nor "restrict[] broad searches resulting from minor crimes"). Because "[d]igital device searches at the border, perhaps even when supported by reasonable suspicion, raise the same concerns," *Alasaad*, 2018 WL 2170323, at *20, the reasonable suspicion standard is equally insufficient in the border search context. Nonetheless, as explained below, from the facts available to them on November 24, 2017, HSI agents did not have reasonable suspicion, much less probable cause, to support the seizure and search of Mr. Qin's electronic devices and, thus, the evidence obtained therefrom must be suppressed.

The First Circuit has made clear that, at an absolute minimum, "non-routine" border searches must be supported by reasonable suspicion, which was notably absent in this case. *See U.S. v. Molina-Gomez*, 781 F.3d 13, 19 (1st Cir. 2015) ("Non-routine searches…require reasonable suspicion."); *U.S. v. Braks*, 842 F.2d 509, 514 (1st Cir. 1988) ("[T]he 'reasonable suspicion' standard applies in the First Circuit to non-routine searches…."). It is "[t]he degree of invasiveness or intrusiveness associated with any particular type of search" that "determines whether or not that search qualifies as routine." *Braks*, 842 F.2d at 511.

Notwithstanding any label HSI may have affixed to the searches in this case, the Supreme Court's decision in *Riley* makes clear that there is nothing routine about the extraordinary invasion of privacy occasioned by forensic imaging and review of an individual's electronic devices. *See, e.g., U.S. v. Kolsuz*, 890 F.3d 133, 146 (4th Cir. 2018) ("After <u>Riley</u>, we think it is clear that a forensic search of a digital phone must be treated as a nonroutine border search…."); *U.S. v. Saboonchi*, 48 F.Supp.3d 815, 819 (D. Md. 2014) (explaining that *Riley* confirms that

border searches of digital devices are non-routine); *Kim*, 103 F.Supp.3d at 57 (finding a similarly

invasive computer search to be "qualitatively and quantitatively different from a routine border

examination" in light of *Riley*).[11]   Indeed, even prior to *Riley*, courts recognized that a forensic

search of an electronic device must be considered non-routine – and thus unconstitutional in the

absence of reasonable suspicion – in light of the substantial privacy interests at stake.  *See, e.g.*

*Cotterman*, 709 F.3d at 962-68 ("International travelers…do not expect [] that… agents will

mine every last piece of data on their devices or deprive them of their most personal property for

days (or perhaps weeks or even months, depending on how long the search takes).  Such a

thorough and detailed search of the most intimate details of one's life is a substantial intrusion

upon personal privacy and dignity" and requires a showing of reasonable suspicion.); *United*

*States v. Saboonchi*, 990 F.Supp.2d 536, 569 (D. Md. 2014) ("It is difficult to conceive of a

property search more invasive or intrusive than a forensic computer search—it essentially is a

body cavity search of a computer.  If any property search can be considered nonroutine, a

forensic search of an electronic device must fall into that category.").  Seemingly in recognition

of this fact, while Mr. Qin's electronic devices were undergoing forensic review purportedly in

connection with a "routine border search," CBP issued a policy requiring that any "Advanced

Search" – that is, any search in which an electronic device is "connect[ed] to external

---

[11]     In *U.S. v. Touset*, the Eleventh Circuit held that a forensic search of an electronic device could be
performed without any individualized suspicion, reasoning that its precedent did not require such suspicion for a
search of property – no matter how invasive – as opposed to a search of a person at the border.  890 F.3d 1227,
1232-37 (11th Cir. 2018).  As an initial matter, *Touset* actually found and relied in the alternative on the fact that
reasonable suspicion was present.  *See id.* at 1237-38.  In any event, *Touset* ignores *Riley*'s holding that digital
device searches are fundamentally different from, and "implicate privacy concerns far beyond those implicated by,"
any other type of personal property – a holding that the First Circuit similarly espoused in *Wurie*.  *See Riley*, 134
S.Ct. 2488-89; *Wurie*, 728 F.3d at 8-10.  Although the Supreme Court has not explicitly spoken on the level of
suspicion required for a non-routine search of property, it certainly has not held that property searches never require
individualized suspicion.  *See House*, 2012 WL 1038816, at *7.  Rather, the case law makes clear that any highly
intrusive search impacting the dignity and privacy interests of travelers must be supported by at least reasonable
suspicion.  *See Flores-Montano*, 541 U.S. at 152; *see also Braks*, 842 F.2d at 511.  After *Riley*, it can hardly be
argued that a forensic review of an electronic device is not a highly intrusive search impacting dignity and privacy
interests.

equipment...to review, copy, and/or analyze its contents" – must be supported by reasonable suspicion. *See* CBP Directive No. 3340-049A §5.1.4 (Jan. 4, 2018).

The Supreme Court has defined reasonable suspicion as an "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when law enforcement officers on the scene can point to "specific and articulable facts" that – considered together with any rational inferences drawn therefrom – indicate criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968)). In order to satisfy the standard, a reasonably prudent officer must be justified in the belief that the suspected criminal activity is "ongoing or imminent." *Kim*, 103 F.Supp.3d at 44 (citing *Cortez*, 449 U.S. at 417); *see also U.S. v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in his belief that the suspect is breaking, or is about to break, the law."); *Kolsuz*, 185 F.Supp.3d at 859 ("Importantly, as the Supreme Court has made clear, the reasonable suspicion standard relates to ongoing or imminent crime.").

Moreover, even under a reasonable suspicion standard, reasonableness still requires that a forensic search further the narrow purposes underlying border search authority. *See Cano*, -- F.3d --, 2019 WL 3850607, at *9-*11 (internal alterations and quotation marks omitted). Thus, reasonable suspicion of a crime other than a present customs violation will not suffice. *See id.* at *12 ("[B]order searches... do not encompass searches for evidence of past or future border-related crimes[.]"). Rather, "border officials may conduct a forensic [electronic device] search only when they reasonably suspect that the [device] to be searched itself contains contraband," and only when the scope of that search is so limited. *Id.* at *11-*12.

HSI agents had no reasonable suspicion of any criminal activity – much less reasonable suspicion that the electronic devices contained digital contraband – from the information available at the time of the offending searches, the sum total of which was as follows: (1) Mr. Qin was born in China, (2) he operated a business which exported oceanographic instruments to entities in China, (3) at least seven months prior to the seizure, HSI received a tip from DSS that Mr. Qin purportedly contacted Riptide multiple times about a product that allegedly has both commercial and military uses and may be controlled for export to China, but there was no indication that his company ever actually purchased that product, and (4) between April and August 2017 – more than three months before his devices were seized on November 24, 2017 – HSI ran an undercover operation to try to ferret out export control violations by Mr. Qin, but came up empty-handed.

These are hardly the type of "specific and articulable facts" pointing to ongoing or imminent crime that the reasonable suspicion standard requires.  *Cf. Kolsuz*, 890 F.3d at 143-47 (affirming district court decision that reasonable suspicion of present export violations existed where defendant's luggage contained firearms parts on the munitions list for which he admitted he had no export license); *Kim* 103 F.3d at 45-46 (finding that agents did not have reasonable suspicion where there was evidence that defendant may have been involved in a prior export controls violation, but the only evidence of recent activity was an inquiry made to defendant during an undercover operation that "quickly c[a]me to a dead end," and the agent decided to seize defendant's laptop in a "border search" before he knew when defendant would be traveling to U.S. or for what purpose).   Rather, HSI agents had, at most, a vague notion that if they continued to investigate Mr. Qin they might turn up something.  Indeed, HSI's contemporaneous characterization of the forensic imaging and review as a "routine border search" belies the notion

that the investigating agents, who presumably are well-versed in the requirements of the Fourth Amendment, believed they possessed facts that amounted to reasonable suspicion at the time.

HSI agents also did not have any reason to believe that Mr. Qin's electronic devices contained digital contraband, and even if they had, the scope of the search far exceeded that necessary to determine whether digital contraband was present. For example, if one were searching only for digital contraband, there would be no need to translate the text of emails from Chinese to English. *See Cano*, -- F.3d --, 2019 WL 3850606, at *10 (explaining that emails may be evidence of a crime but not themselves contraband). Thus, there can be no credible argument that the forensic review of Mr. Qin's electronic devices furthered the narrow purposes underlying the border search exception. *Id.* at *11-*12. Instead, the purportedly "routine" search of Mr. Qin's electronic devices was "nothing more than a fishing expedition to discover what [Mr. Qin] might have been up to." *Kim*, 103 F.Supp.3d at 46. This is precisely the type of "unbridled … rummag[ing] at will among a person's private effects" that the Fourth Amendment is intended to prevent. *See Wurie*, 728 F.3d at 14 (quoting *Gant*, 556 U.S. at 345).

## C. Mr. Qin's statements to the CBP agents must be suppressed under the Fifth Amendment.

Finally, Mr. Qin's statements to the CBP agents must be suppressed because they were obtained without *Miranda* warnings in violation of the Fifth Amendment. As with the seizures and searches of the laptop computer and iPhone, the CBP agents' detention of Mr. Qin and his family – which took place in a secondary inspection room, lasted over two hours, and involved questions well beyond the scope of a typical customs interview – was not routine; to the contrary, the detention was in the nature of a custodial interrogation. At the time of the detention, HSI had an open criminal investigation into Mr. Qin and HSI agents were present at the scene. Mr. Qin is not a native English speaker but was not offered the assistance of an

interpreter during the questioning.  The questions and answers were not recorded despite the significant language barrier.  And according to the CBP report (and Count Six of the Superseding Indictment), the questions asked were specific backward looking questions about the products Mr. Qin shipped to China in the past, which had nothing to do with Mr. Qin's admissibility into the country on November 24, 2017.  Indeed, the CBP agents' questions about Mr. Qin's past conduct make no sense <u>unless</u> they were aimed at eliciting an incriminating response for use in HSI's criminal investigation.  *Accord U.S. v. Molina-Gomez*, 781 F.3d at 21-24 (suppressing statements where defendant was questioned by CBP agents in a small, windowless room for one-and-a-half to two hours about drug trafficking activity that had nothing to do with defendant's admissibility to the country).  For these reasons, Mr. Qin's statements should be suppressed.

## CONCLUSION

The government cannot rely on border search authority to justify the extraordinary invasion of Mr. Qin's privacy occasioned by the lengthy detention and forensic review of his electronic devices.  Rather, these searches and seizures were unreasonable – and thus unconstitutional – absent probable cause and a warrant or, at a minimum, reasonable suspicion that the devices contained digital contraband.  HSI had neither.  Similarly, the questions posed to Mr. Qin during the secondary detention were in the nature of custodial interrogation and designed to elicit incriminating evidence to support HSI's criminal investigation.  Accordingly, the evidence seized from Mr. Qin's laptop computer and iPhone, as well as the statements he made during his detention, must be suppressed.


Respectfully submitted,
SHUREN QIN,
By his attorneys,

26

*/s/ William H. Kettlewell*
William H. Kettlewell (BBO #270320)
Sara E. Silva (BBO #645293)
Elizabeth C. Pignatelli (BBO #677923)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA  02110
(617) 371-1000
bill.kettlewell@hoganlovells.com
sara.silva@hoganlovells.com
elizabeth.pignatelli@hoganlovells.com

Michael R. Schneider (BBO #446475)
GOOD SCHNEIDER CORMIER & FRIED
83 Atlantic Avenue
Boston, MA 02110
(617) 523-5933
ms@gscfboston.com

Dated: August 28, 2019