UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 18-CR-10205-DJC |
| v. | ) | |
| | ) | |
| SHUREN QIN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT SHUREN QIN'S
MOTION TO SUPPRESS EVIDENCE**

Defendant Shuren Qin ("Qin") has moved to suppress evidence obtained from warrantless searches of his laptop computer and Apple iPhone and statements he made to customs officials during a secondary inspection at Logan Airport on November 24, 2017. The Court should deny this motion because the searches were lawfully conducted pursuant to border search authority, were reasonable in scope, and the government did not violate any of the defendant's constitutional rights. Based almost entirely upon a single case decided by Ninth Circuit Court of Appeals, *United States v. Cano*, 934 F.3d 1002 (9th Cir. Aug. 16, 2019), the defendant argues that the searches conducted in this case do not qualify as border searches, and because the government failed to obtain a search warrant supported by probable cause, any evidence obtained during the 60-day border search must be suppressed. As described in detail below, the evidence obtained from the border search of the defendant's electronic devices and the statements the defendant made during a secondary inspection are admissible for at least four reasons. First, no suspicion is required to conduct non-destructive searches of personal property, including electronic devices, at the border. Second, even if the Court were to find that reasonable suspicion was required, that standard was easily met here. As described in detail below, investigators at the U.S. Department of Homeland Security's Homeland Security Investigations ("HSI") working jointly with the Defense Criminal Investigative Service ("DCIS"), Naval Criminal Investigative Service ("NCIS"), and Department

of Commerce, Office of Export Enforcement ("DOC/OEE"), knew prior to the border search that Qin and his company LinkOcean Technologies, Ltd. ("LinkOcean") had committed numerous export violations and Qin had declared publicly on LinkOcean's website that one of his customers was the "China Navy."   *See infra* at 5-14 (detailing facts known by the HSI agents when border search began).  From this public disclosure, which the agents learned of months before the border search, the investigators reasonably believed that the defendant was working for or with the China's military, the People's Liberation Army ("PLA").[1]  Third, the good faith exception applies as the HSI agents possessed an objectively good faith belief that the warrantless border search of defendant's electronic devices did not violate the Fourth Amendment.  Fourth, the defendant was not entitled to *Miranda* warnings during the secondary inspection because he was not subject to custodial interrogation.

Additionally, the Court should also deny Qin's attempt to enlarge any hearing on this motion to suppress to attack the factual accuracy of the search warrant affidavits based upon a single alleged immaterial "inaccuracy" contained in a footnote in his memorandum.  *See* Def. Mem. at 3 n.3 (defendant claims the name of a manufacturer of an autonomous underwater vehicle ("AUV") Qin was attempting to obtain for a customer in China was incorrect).  Qin has not requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  Nor has he made the required substantial preliminary showing that the affiant of the search warrant affidavit intentionally included false information in the affidavit or demonstrated a reckless disregard for the truth.  Thus, any evidentiary hearing held on this motion should be limited to the facts and

---

[1]Indeed, Chinese records found on Qin's laptop computer after the Fed. R. Crim. P. 41 search warrant was obtained revealed, as alleged in the Superseding Indictment, that Qin had supplied more than $3.5 million worth of U.S. goods to the PLA and related Chinese military related entities.  *See* First Superseding Ind. at ¶ 5.

circumstances of the border search and the defendant's secondary inspection interview on November 24, 2017.

## I.    STATEMENT OF FACTS[2]

### A.    Background

The United States confronts a wide array of threats at U.S. borders ranging from terrorists who may have weapons of mass destruction or seek to enter the United States for the purpose of executing an attack, transnational criminals smuggling drugs or counterfeit goods, travelers involved in child sex trafficking and the manufacture/supply of child pornography, and individuals who are working for foreign governments to engage in espionage activities and/or to steal U.S. technology and intellectual property.  Every day, well over a million people cross the border of the United States and millions of tons of cargo, worth billions of dollars, also enter the country.  *See* CBP Snapshot of operations showing statistics from July 2019, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2019Aug/CBP_Snapshot_07032019.pdf.  The responsibility to safeguard the U.S. border has been entrusted to the U.S. Department of Homeland Security ("DHS").  Shortly after our country was founded, before the Amendments to the Constitution had even been written or adopted, the First Congress recognized the security risks stemming from the flow of people and goods entering through and exiting the border.  Thus, on July 31, 1789, it enacted the first customs statute that authorized customs officials to conduct warrantless searches of "'any ship or vessel, in which they have reason to suspect any goods, wares, or merchandise subject to duty shall be concealed.'"  *United States v. Ramsey*, 431 U.S. 606, 616 (1977) (describing and quoting first customs statute, Act of July 31, 1789).  The threats faced at our border today are far greater than they were in our country's infancy.  *See generally*

---

[2] If the Court determines that the defendant has met his burden of production, the government will call witnesses that will testify to these facts at the suppression hearing.

Statement for the Record: Worldwide Threat Assessment of the US Intelligence Community Presented to the Senate Select Committee on Intelligence, on Jan. 29, 2019, *available at* https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR---SSCI.pdf (describing global threats to the United States from foreign state actors -- China, Russia, Iran, and North Korea -- as well as foreign terrorist organizations).  Border search authority is essential to the Government's ability to assess and control the vast flow of persons and property across the border so as to uncover threats to our national security, prevent the entry of any dangerous items or persons into the United States that pose a risk to our public safety, and identify and stop any transnational crimes such as the illegal export or importation of merchandise or trafficking of persons, child pornography, drugs, counterfeit goods, and other items.

After the attacks of September 11, 2001, the government restructured its border operations and created DHS.  Under the Homeland Security Act, Congress defined DHS's border security responsibilities to include, among other things, preventing the entry of terrorists and terrorist weapons; securing U.S. borders, territorial waters, ports, and transportation systems; immigration enforcement; and customs enforcement (including preventing the entry of illegal drugs and illegal export of U.S. goods and technology).  Homeland Security Act, P.L. 107-296 at § 402 (codified at 6 U.S.C. § 202).  Congress gave DHS broad statutory search authority to conduct searches at the border (both inbound and outbound) to enforce immigration and customs laws.  *See generally* 8 U.S.C. §§ 1225 and 1357; 19 U.S.C. §§ 482, 507, 1461, 1467, 1496, 1499, 1581-1582, 1589a, 1595a.  Consequently, customs officers (officers and agents of U.S. Customs and Border Protection ("CBP") and HSI as well as the U.S. Coast Guard) have broad authority to detain and search persons who seek to enter the U.S. and their property to ensure compliance with U.S. law and border security.  *See, e.g.*, 19 U.S.C. § 1582.

As early as 1886, the U.S. Supreme Court recognized the importance of border searches. *See Boyd v. U.S.*, 116 U.S. 616 (1886).  Further, the Supreme Court has repeatedly stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border."  *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) (quoting *United States v. Ramsey,* 431 U.S. at 616).

      B.      <u>Investigation of Qin</u>

      **1.**      **Qin's Calls to a Defense Contractor Reported to Government as Suspicious Contacts**

In April 2017, Riptide Autonomous Solutions, LLC ("Riptide"), a defense contractor that works for the U.S. Navy, reported information to the Defense Security Service regarding suspicious activities of Qin.  Riptide stated that Qin, purporting to be the President of a China based business, had repeatedly contacted them via e-mail and requested an in-person meeting to discuss business opportunities in China related to Riptide's development of a micro-unmanned underwater vehicle (micro-UUV).  A micro-UUV is an autonomous vehicle that can operate underwater independently of direct, human input.  The micro-UUV has both military and commercial applications and is subject to export controls. Riptide requested and obtained a Commodity Classification from the U.S. Government for this part.  As a result, in December 2016, the Department of Commerce notified Riptide that the UUV was classified under Export Control Classification Number 8A001.d.1 and controlled for both national security and anti-terrorism reasons.  The UUV therefore could not be exported to People's Republic of China ("PRC") without first obtaining an export license.

Riptide provided law enforcement with an email Qin had sent to them dated April 19, 2017 in which Qin wrote in relevant part:

I am glad to hear that you have teamed with Kraken Sonar to integrate AquaPix MINSAS on Riptide's new 2-Man Portable UUV platform.   It is great news. LinkOcean is representing Kraken in China and I have several leads for AUV [autonomous underwater vehicles] with MINSAS, but the AUV[3] is not allowed to [be] exported to China.  I am in Boston now, can we have a talk?[4]

Shortly after receiving the information from Riptide, law enforcement quickly determined that Qin was a PRC national who had obtained status as a U.S. Lawful Permanent Resident on August 10, 2016 and he was living at 102 Evergreen Avenue, Wellesley, Massachusetts.

On or about April 21, 2017, a NCIS Special Agent (in an undercover capacity) and a representative of Riptide met with Qin.  The purpose of this meeting was to assess whether Qin was involved in illegal activity.  This meeting was not recorded.  At the beginning of the meeting, Qin handed the agent and Riptide representative a business card, which identified Qin's company as LinkOcean Technologies Ltd located in China.  The business card further indicated that the defendant was the "President" of LinkOcean.  The business card listed two e-mail addresses, two telephone numbers, and LinkOcean's website (www.linkocean.cn).  During this meeting, among other things, Qin stated:

- His company serves as a broker for marine technology for customers in China.
- He was interested in representing Riptide in China and his customers would be interested in UUVs.

---

[3]AUVs are autonomous underwater vehicles and are programmable, robotic vehicles that travel underwater and have both military and commercial applications.  As Qin indicated in his e-mail to Riptide, many AUVs cannot be exported to China because they are defense articles and controlled under the U.S. Munitions List ("USML").  Since 1989, the United States Government has imposed an Arms Embargo against the PRC.  Thus, no defense article controlled under the USML can be exported to the PRC.  Some types of AUVs are controlled under the Commerce Control List ("CCL") for national security reasons and thus, require obtaining an export license prior to shipping them to China from the Department of Commerce.  If the end-user is affiliated with the Chinese military, the application would likely be denied.

[4]Qin also sent an e-mail to Riptide on August 28, 2016 in which he stated, among other things: "I am Shuren from LinkOcean Technologies in China.  I am interested in your Micro-UUV and want to sell to Chinese customers."  Riptide submitted its commodity classification request described above, in part, as a result of Qin's email inquiry.

- He had previously contacted several companies that sell AUVs in the United States, including Hydroid, Bluefin, and Oceanserver, but none of them were willing to sell him an AUV.
- He stated that most of his Chinese customers were researchers but also acknowledged that he sold items to the Chinese Navy.

Further, during this meeting, Qin also asked Riptide how he could export a U.S. made AUV. Qin indicated that he knew that end-user information would need to be provided to the U.S. government to obtain an export license. Qin suggested a scheme to Riptide that would allow him to obtain AUVs without applying for an export license – Qin stated that he could establish a company in the United States that he could use to purchase AUVs and then ship the AUVs himself to his customers in China. (This is a common method of circumventing U.S. export laws and smuggling parts from the United States to the PRC).

Subsequently, on or about April 28, 2017, HSI, DCIS, NCIS, and DOC/OEE opened a joint investigation to determine whether Qin was involved in the illegal export of defense articles and marine technology to the PRC, in violation of 22 U.S.C. § 2778 and 50 U.S.C. § 1705, and acting as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951.

## 2. Undercover Investigation

On May 3, 2017, the DOC/OEE Special Agent reviewed the contents of the website identified on the business card Qin had provided at the April meeting. The Special Agent also printed a copy of the LinkOcean website, which bears the date it was printed in the bottom right hand corner. *See* attached Exhibit 1.

According to LinkOcean's website, in 2005, Qin founded LinkOcean in Qingdao, China. LinkOcean's website further states that it operates as a seller and distributor of U.S. and European origin goods in the PRC. According to LinkOcean's website, LinkOcean is "the exclusive representative" of seven U.S. manufacturers and supplies U.S. products used in marine technology

to Chinese customers.  Additionally, based upon LinkOcean's website, all of LinkOcean's clients are all located in the PRC and include Chinese research institutes and the PLA Navy.  The PLA Navy is the naval warfare branch of the Chinese Army and is responsible for the development and operation of its surface warships, submarines, and unmanned submersible vehicles.  China uses a network of government affiliated research institutes to acquire dual-use technologies for the PLA and advance its military.  *See* DOD Annual Report to Congress on Military and Security Developments Involving the People's Republic of China 2019, *available at* https://media.defense.gov/2019/May/02/2002127082/-1/-1/1/2019_CHINA_MILITARY_POWER_REPORT.pdf (describing PRC's militarization process since 2015 and increasing use of civil-military integration).  As a result of Qin's stated customer base, the investigating agents were concerned that Qin was involved in illegally exporting U.S. origin goods to China to benefit the PLA, exporting U.S. manufactured defense articles to China,[5] and exporting U.S. goods to prohibited end-users without obtaining the required export licenses. Further, the DOC/OEE agent suspected that Qin's exports may violate the China Military Rule contained within the Export Administration Regulations, 15 C.F.R. § 744.12 (describing restrictions on exports of certain items for military end-uses in the PRC).

In May 2017, the agents decided to initiate an undercover investigation of Qin.  During this portion of the investigation, the agents attempted to gain more knowledge of Qin's customers in the PRC – specifically, any parts destined for the PLA Navy that Qin was seeking to obtain from U.S. suppliers and how he was exporting those parts to China.  The agents had also hoped to arrange a meeting with one or more of Qin's customers.  That, however, never happened.

---

[5]As indicated above, the U.S. has maintained an Arms Embargo against the PRC since 1989.  Therefore, no defense article could be lawfully exported to the PRC.

Nevertheless, using the undercover operation, the agents learned more about Qin's business.  They exchanged several e-mails with Qin and had one in-person, recorded meeting with him.

On or about June 30, 2017, Qin met with an undercover employee of HSI ("UCE") under the auspices of building a future business relationship.  During this meeting, QIN acknowledged that LinkOcean's customers were all in the PRC.  He further indicated that he only sells marine related products in China and works with several U.S. companies.  A few days after his meeting with the UCE, on July 2, 2017, Qin sent an e-mail to the UCE requesting a quote for three sonobuoys and information related to AUVs.  This e-mail raised national security concerns because, among other things, Qin was seeking to obtain sonobuoys.  Sonobuoys are defense articles and controlled under the USML because they are used in anti-submarine warfare.  Additionally, in the same July 2, 2017 e-mail in which Qin requested quotes for sonobuoys and AUVs, he instructed the UCE: "Please do not tell Xylem [the U.S. manufacturer of the AUVs] your end user is in China."  Rather, Qin told the UCE to tell Xylem that "your customer is in US."  Although the UCE communications ended in July, from the information supplied by Qin, the agents suspected that Qin had lied to U.S. suppliers or manufacturers about the identity of his end-users in the PRC to obtain U.S. goods.

### 3.      Review of Automated Export System Reveals EAR Violations

As is customary in export investigations, and based upon Qin's claims on LinkOcean's website that his company was supplying (and presumably exporting) parts from at least seven U.S. manufacturers to end-users in the PRC, the agents reviewed the Electronic Export Information ("EEI") filed with the U.S. Government related to LinkOcean using the Automated Export System ("AES").  Based upon this review of the AES records, conducted prior to the border search, the investigating agents noticed that all of the EEI filed concerning exports made to China at the request of LinkOcean/Qin falsely identified LinkOcean as the "ultimate consignee," or end-user.

According its website, however, LinkOcean was merely a reseller or intermediary, which resold and delivered the goods to the actual end-users/purchasers in the PRC.  *See* 15 C.F.R. § 758.1 (requiring that detailed information be filed with the U.S. Government for all exports (including exports by U.S. mail) of any commodity valued over $2500.00 or for which an export license is required for shipment outside of the United States, which enables the government "to prevent the export of certain items to unauthorized destinations and/or end users."); 15 C.F.R. § 748.5 (defining parties to a transaction for purpose of filing EEI); *see also* 15 C.F.R. § 772.1.  Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including EEI filings, is a violation of the Export Administration Regulations ("EAR").  *See* 15 C.F.R. §764.2(g)(1)(ii)), International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, Executive Order 13222, and 18 U.S.C. §1001; *see* 15 C.F.R. § 772.1 (EAR defines EEI as constituting an "export control document").

In reviewing LinkOcean's AES records, the agents identified three EAR violations related to Marine Sonic Technology Ltd. ("Marine Sonic").[6]  As a result, they decided to travel to Virginia and interview representatives of that company to determine why Marine Sonic had filed EEI that falsely identified LinkOcean as the ultimate consignee for three exports to the PRC.  Marine Sonic specializes in towed side scan sonars and designing and manufacturing sonar transducers for the AUV market.

---

[6]Marine Sonic has been acquired by Atlas North America ("Atlas NA"), a wholly owned subsidiary of Atlas Elektronick GmbH, but Marine Sonic still does business under the name Marine Sonic.  Thus, it is referred to as Marine Sonic herein.  Atlas NA serves the U.S. market with a specific focus on undersea warfare and unmanned vehicles.

**4.    Less than one month before border search, agents interview Marine Sonic in Virginia regarding LinkOcean**

On November 7, 2017, three weeks before border search occurred, Special Agents from HSI and DOC/OEE interviewed senior managers at Marine Sonic.  Among other things, the senior managers at Marine Sonic told the Special Agents that:

- Marine Sonic was a cleared defense contractor meaning their facility was cleared to work on the classified defense contracts;

- Marine Sonic manufactures and sells defense articles that are controlled under the USML;

- Marine Sonic was aware of the U.S. export laws and had previously applied for export licenses from the Departments of State and Commerce;

- LinkOcean was a customer and reseller of Marine Sonic parts in China.  Qin had reached out to Marine Sonic to become an authorized reseller in China and, during the vetting process, Qin told Marine Sonic that his customers were universities in China;

- Marine Sonic was not aware that LinkOcean and Qin had a U.S. based office or presence;

- In June 2017, Marine Sonic sold LinkOcean a towed side scan sonar system, which Marine Sonic delivered to Qin's shipper, Concordia, in Pennsylvania for export to China.  In August 2017, Marine Sonic sold another towed side scan sonar system to LinkOcean and exported it directly to Qin in China.  Qin requested that Marine Sonic use LinkOcean as the customer/ultimate consignee on the shipping documents rather than using the actual end-user for whom Qin had purchased the item.  As Qin requested, Marine Sonic identified LinkOcean as the ultimate consignee on the EEI filed with the U.S. government even though they knew that LinkOcean was purchasing the goods for another party and was merely a reseller/intermediary, not the end-user.  Qin also suggested that Marine Sonic assign a lower dollar value to the orders he placed to avoid having to pay high import taxes in China;

- In response to questions of the Special Agents regarding a October 10, 2017 export of direction finding compasses to LinkOcean in China, Marine Sonic explained that the EEI filed related to those parts was incorrect.  The Export Control Classification Number ("ECCN") for the compasses was incorrectly identified as 6A001, which requires an export license to ship them to China.  Marine Sonic indicated that the correct ECCN was in fact EAR99 that does not require an export license.  Marine Sonic could not, however, explain how the incorrect information was filed with the U.S. government.

At the conclusion of this interview, the investigators served Marine Sonic with a subpoena requesting records related to sales to Qin and LinkOcean and any exports of U.S. origin goods made at their behalf.  Among other things, this subpoena requested any records concerning technical data and specifications relating to any goods sold or shipped to LinkOcean or exported on its behalf.  For instance, the subpoena requested all records related to Qin and LinkOcean, including:

- Any materials relating to the export or attempted export of any defense articles (including technical data) and services to LinkOcean Technologies and Shuren Qin or any affiliated companies; and

- Any documents, photographs, records, logs, or tangible items concerning, referring to, or relating to, any defense articles or any commodities, technical data or information, or services or training provided to employees of LinkOcean Technologies.[7]

In response, Marine Sonic produced numerous records to the government on November 22, 2017.

### 5.     Border Search and Secondary Inspection

On November 24, 2017, two CBP Officers conducted an interview of Qin and his wife when they arrived at Logan Airport from an international flight from China (Cathay Airways Flight #812).  This interview took place in the public baggage claim area of the International Terminal at

---

[7]Under the Arms Export Control Act, it is illegal to export defense articles or services without first obtaining an export license from the Department of State.  *See* 22 U.S.C. 2778(b)(2); 22 C.F.R. §§ 120.6, 121.1, 123-125.  Defense articles are defined to include both the actual item and any associated technical data (including any "information other than software … which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of a defense articles.").  22 C.F.R. § 120.10(a).  Technical data may be printed or in electronic form.  Similarly, under IEEPA, it is illegal to export items, software, and technology controlled for export under the CCL without first obtaining an export license from the Department of Commerce.  *See* 15 C.F.R. §§ 734.13, 734.15, 736.2, 764.2, 772.1.

Logan Airport (Terminal E).  Although the entire secondary inspection lasted approximately two hours, the CBP officers only interviewed Qin for a total of 60 minutes.

During this interview, Qin was asked questions relating to his admissibility (i.e., travel abroad, immigration status, employment, etc.) and the ownership and contents of the electronic devices in his possession.  Among other things, during this interview, Qin confirmed that he was the President of LinkOcean, which he said was headquartered in the PRC.  Qin said that while he was in the United States, he conducts LinkOcean business from his Wellesley Massachusetts residence.  In response to questions by the CBP Officers about the types of parts he exports to the PRC, Qin stated that he exports instruments used for testing water from the United States, and imports them into the PRC.  Qin further clarified for the CBP officers that he "only" exported instruments that attach to a buoy.  The CBP Officers asked Qin if he had exported anything else. Qin answered "no" to this question, when in fact, based upon the AES records and information obtained from Marine Sonic, between in or about June 2012 and November 2017, Qin had exported, or caused to be exported, among other things, remotely operated side scan sonar systems, unmanned underwater vehicles, unmanned surface vehicles, robotic boats, and hydrophones.  The items that Qin failed to disclose to, and concealed from, CBP during this interview have military applications and the investigators were concerned based upon their knowledge of Qin's customer base from LinkOcean's website that Qin had supplied these parts to China military end-users.

Additionally, during the interview at Logan, Qin revealed that he was in the possession of a cell phone (Apple iPhone) and a Dell Latitude laptop computer.  Qin advised the CBP officers that these items were his and he used them to conduct his business, including the purchase, sale, and export of U.S. origin goods to the PRC.  Indeed, during the interview, in response to questions pertaining to what he exported, Qin powered on his computer and showed the officers shipping

documents and diagrams on his laptop concerning his exports to the PRC.  Qin provided the CBP officers the usernames and passwords for both his cell phone and laptop computer.

Qin's electronic devices were preliminarily reviewed on the evening of November 24, 2017 at Logan Airport.  Because the CBP officers and HSI agents were unable to quickly review the contents of the electronic devices while Qin waited in the Terminal E area, they were detained pursuant to border search authority.  Although Qin's property – his electronic devices – did not clear customs, Qin was nevertheless allowed to enter the United States border after his secondary inspection.

Immediately after the secondary inspection ended on the evening of November 24, 2017, two HSI Special Agents, an agent trained in forensic examination ("the HSI forensic agent") and the case agent, took Qin's electronic devices to a forensic laboratory located in Boston.  The HSI forensic agent then used software tools to make a forensic image (a bit-for-bit identical copy) of Qin's phone and laptop for examination.[8]  The imaging process took several hours and ran overnight.  Qin's phone contained approximately 55 gigabytes of data while the laptop computer contained 776 gigabytes.

After making the forensic image of Qin's cell phone, the HSI forensic agent loaded the image into a forensic software tool, UFED Physical Analyzer.  This software tool indexes and organizes the data to allow the agents to conduct targeted searches using key words designed to find merchandise (i.e., export restricted technical data) and evidence relating to merchandise. Similarly, the HSI forensic agent attempted to load the forensic image of Qin's laptop computer into Axiom, a forensic tool the agent had previously used.  Axiom, however, took more than a

---

[8]Analyzing the forensic image of the original media preserves the integrity of the data and ensures that the original media is not modified or altered during the analysis.

week to parse and index the data.  Because the processing of the information was taking too long, the HSI forensic agent decided to use another forensic tool, Forensic Toolkit ("FTK").  Like UFED Physical Analyzer, FTK is an extremely common and reliable forensic software tool used to review data on electronic media.  While the agents were waiting to review the data on Qin's laptop computer, they began reviewing the contents of Qin's cell phone.

The HSI agents quickly determined that the overwhelming majority of the contents of the phone and laptop computer appeared to be in Mandarin.  As a result, the HSI forensic agent downloaded the UFED Chinese Simplified and Traditional language packs and used that in reviewing the contents of Qin's phone, but the quality of the automated translations was poor. Because there were no local agents that could read, write, or translate Mandarin, the HSI Group Supervisor performed a nationwide search for someone who could assist in translating the contents of Qin's devices.  The Group Supervisor located an HSI agent in New York who spoke Mandarin. She traveled to Boston for one week in December and one week in January to assist in the review and translation of Qin's electronic devices.[9]  In the interim, the HSI agents conducted search queries and reviewed any English materials that appeared to be related to merchandise and the illegal export of U.S. origin goods to the PRC.

On or about December 11, 2017, HSI requested the subject matter expertise of DOC/OEE in reviewing the contents of Qin's electronic devices.  The DOC/OEE case agent had experience in identifying illegal exports to China and was knowledgeable regarding the Commerce

---

[9]During the ten days that the translator assisted in reviewing materials on Qin's electronic devices, the HSI agents found records that demonstrated that Qin had illegally exported hydrophones to Northwestern Polytechnical University ("NWPU"), a PRC end-user that is designated on the Department of Commerce's Entity List.  *See* First Superseding Ind. at ¶¶ 6, 15-17.

regulations.  Like the HSI agents, the DOC/OEE special agent reviewed the contents of Qin's devices using key word searches.[10]

The HSI and DOC/OEE agents worked diligently over a period of 60 days to review Qin's devices to determine if they contained merchandise or evidence related to merchandise.  Although HSI's policy generally requires that border searches of electronic devices be completed within 30 days, this search took 60 days due to two extenuating circumstances.[11]  *See* ICE Policy on Border Searches of Electronic Devices, attached hereto as Exhibit 2.  First, the vast majority of information on Qin's devices was in Mandarin.  Second, the agents also could not open or review a large number of files on Qin's electronic devices because they were encrypted or password protected.  As a result, beginning in or about mid-December, an attorney working at HSI requested passwords from Qin's then attorney to access the encrypted files.  Initially, Qin's attorney agreed to provide the passwords to the investigators so they could access Qin's "Windows encrypted file system," but he never supplied them.  *See* Exhibit 3 containing e-mails exchanged between HSI attorney and Qin's attorney dated January 2018.  Based upon the representations of Qin's then-attorney, the agents believed that Qin would be providing the passwords to access the encrypted files.  During the border search, the agents did not use or attempt to use any tools to decrypt the files based on the understanding that Qin would be supplying the requested information.

---

[10]By using search terms, the agents ensured that their searches were targeted for merchandise and that the scope of their review of the electronic devices during the border search was narrow, not overly invasive. Further, searching or analyzing electronic media using key word searches allows investigators to review the relevant data far more quickly than a manual search.  Some of the key words used by the investigators in searching Qin's devices were: ITAR, USML, CCL, PLA, licensing, export license, military, navy, army, countermeasure, mine, Riptide, Riptide autonomous vehicles, unmanned underwater vehicle, UUV, autonomous underwater vehicle, AUV, buoy, sonobuoy, towed sonar array, Marine sonic technology, Marine Sonic, and MST.

[11]This is an internal policy statement of ICE/HSI and it "does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States …"

### 6.     Post-Border Search Investigation, Charges, and Discovery Issues

The border search of Qin's laptop computer and cell phone concluded on January 24, 2018. Because the government had only reviewed a very small amount of the data on Qin's devices and identified evidence of illegal exports to NWPU, the government obtained search warrants for both of these devices.  The FBI joined the investigation after the border search was completed.  As a result, the investigating team had greater access to the FBI's linguistic services to review and translate materials on Qin's electronic devices.[12]  As noted above, the overwhelmingly majority of the data on Qin's electronic devices was in Chinese.  More than 100 files were also encrypted and therefore could not be reviewed during the border search because Qin never provided passwords or passcodes for those files.  The searches and the forensic review done pursuant to the search warrants were far broader and more comprehensive than that conducted during the border search.  For instance, pursuant to the search warrants, all of Qin's e-mails, customer lists, and LinkOcean spreadsheets were reviewed and the relevant materials were verbatim translated.  In so doing, the agents identified additional violations of the EAR.

On June 20, 2018, Qin was charged by complaint.  On June 26, 2018, a three-count indictment was returned against Qin, followed on October 30, 2018, by a 14-count superseding indictment charging Qin with conspiring to illegally export parts from the United States to China, visa fraud, conspiring to defraud the U.S. government, making false statements, money laundering, and smuggling goods from the United States.  Since Qin was first indicted in June 2018, the government has produced all materials that fell within its discovery obligations consisting of approximately 25,000 pages of bates stamped documents and four terabytes of electronic data

---

[12]According to their policies, CBP and HSI can request technical assistance or subject matter expertise to assist in the review of materials during the border search.  Translators, however, are often in high demand and short supply.  That is what occurred here.  The FBI was unable to provide translation assistance for the border search of Qin's devices in light of their own cases and priorities.

(copies of the electronic media obtained from Qin pursuant to border search authority and Rule 41 search warrants).[13]   The defendant filed three discovery motions, including one seeking the production of materials related to the border search, which were denied.[14]

## II.   LEGAL ARGUMENT

The Defendant's motion to suppress is supported by four arguments: (1) the search of Qin's electronic devices does not constitute a border search because the agents did not limit their search to merchandise or contraband, but also looked for evidence of criminal wrongdoing in furtherance of an existing investigation, and as a result, it violated the Fourth Amendment's warrant requirement (Def. Mem. at 16-17); (2) the searches of Qin's electronic devices were unreasonable in scope and duration and accordingly, the evidence obtained from them must be suppressed (Def. Mem. at 18-20); (3) the border search of Qin's electronic devices "were 'non-routine' and were not supported by the necessary individualized suspicion" (Def. Mem. at 20); and (4) "Qin's statements to CBP officers must be suppressed because they were obtained without *Miranda* warnings," which violated the Fifth Amendment (Def. Mem. at 25).   Each of these arguments is without merit.   The government will address each turn.

---

[13]The defendant highlights the fact that the government "has never returned his cell phone" and did not return his "laptop to him until early 2019 in the midst of discovery in this case."   *See* Def. Mem. at 6.   The fact that the government chose to keep evidence of the defendant's illegal exports is not, however, surprising.   Indeed, that is what prosecutors ordinarily do in criminal cases across the country and what the Federal Rules of Criminal Procedure allow.   Fed. R. Crim. P. 16(g), entitled "Motion to Return Property," also provides a mechanism by which defendants can seek the return of property they believe was the product of "an unlawful search and seizure" but the defendant chose not to file such a motion. Rather, when the defense advised the government that they were having trouble reviewing the forensic copy of the defendant's laptop produced in discovery, the government agreed to produce to the defendant his original computer so that he could effectively prepare for trial subject to a stipulation of authenticity.

[14]As noted in the government's opposition to the defendant's motion seeking all materials related to the border search, the government has produced all reports involving investigative activity conducted prior to the border search.   Further, the government has agreed to produce all *Jencks* materials for each witness it intends to call at the evidentiary hearing on this motion two weeks prior to the hearing.

**A.  The border search of Qin's electronic devices was reasonable and did not violate the Fourth Amendment.**

The search of Qin's electronic devices was reasonable and did not violate the Fourth Amendment as it fell within the well-recognized and long-standing border search exception to the Fourth Amendment.  *See United States v. Ramsey*, 431 U.S. 606, 619 (1977) (border searches conducted "without probable cause and without a warrant" have been recognized as reasonable "from before the adoption of the Fourth Amendment" and have "a history as old as the Fourth Amendment itself.").  Due to the unique balance of interests at the international border, searches conducted of persons and their property when they seek to enter or leave our country "are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985)*.*  These searches "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004).

The Supreme Court has repeatedly recognized that the "United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores-Montano*, 541 U.S. at 152-53.  "[I]nherent in national sovereignty are the overarching rights of a nation to defend itself from outside threats, to act in relation to other nations, and to secure its territory and assets." *United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995).  The Supreme Court has said, therefore, that the ability to conduct warrantless searches of people and property entering or leaving the United States serve this essential need for "national self-protection". *Carroll v. United States*, 267 U.S. 132, 154 (1925); *see also Ramsey*, 431 U.S. at 616 ("Searches made at the border, pursuant to longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border."); *United States v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015) ("The government's power at the border arises out of the sovereign's right and need to protect its

territorial integrity and national security.")  This is particularly true in the wake of the September 11th terrorist attacks, which served to underscore the "heightened need to conduct searches at our borders."  *See Bradley v. United States*, 299 F.3d 197, 202 (3d Cir. 2002); *United States v. Yang*, 286 F.3d 940, 944 n.1 (7th Cir. 2002); *see also United States v. Ikes*, 393 F.3d 501, 505 (4th Cir. 2005) (noting the "realization that important national security interests are at stake has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials").

At the border, the balance of interests is both "qualitatively different" and "struck much more favorably" to the government than in the interior.  *Montoya de Hernandez*, 473 U.S. at 540. This "greater interest on the side of the government at the border is coupled with a lesser interest on the side" of the traveler.  *Ikes*, 393 F.3d at 506; *Flores-Montano*, 541 U.S. at 152 ("Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.").  Whatever the rules that apply to other types of searches, therefore, the "law is clear that searches at the border are a different matter altogether." *Ikes*, 393 F.3d at 503. That is why no court has required a warrant for a border search.  Indeed, the Supreme Court has only once required reasonable suspicion to justify a highly intrusive search of a person at the border.  *See Montoya de Hernandez*, 473 U.S. at 534-36 (prolonged detention of person suspected of smuggling drugs in her "alimentary canal.")

When a person approaches an international border, he should "not be surprised" that his effects are subject to search without a warrant.  *Id.* (citing *United States v. Thirty-Seven Productions*, 402 U.S. 363, 376 (1971)).  Travelers have a reduced expectation of privacy at the border.  As a result of the September 11, 2001 attacks, and more recent terrorism threats such as the threats involving the concealment of improvised explosive devices in computers and printer cartridges, extensive security screening procedures have been implemented at all U.S. airports.

*See United States v. Touset*, 890 F.3d 1227, 1235 (11th Cir. 2018) (discussing screening measures imposed at airports including unpacking electronic devices, separating liquids, gels, and creams, removing shoes, walking through body scanners or undergoing a pat-down).  Thus, "[t]ravelers 'crossing a border … are on notice that a search may be made' and they are free to leave any property they do not want searched – unlike their bodies – at home."  *Id.* (citations omitted).

> **1.   The search of Qin's electronic devices advanced the core rationales underlying the border search doctrine of ensuring national security and protecting our territorial integrity.**

The defendant argues that the search of his electronic devices at the border was not, in fact, a border search at all.  Def. Mem. at 16.  According to the defendant, the searches of his electronic devices were "untethered" from the government interests justifying warrantless border searches, which he describes simply as "discovering dutiable goods or contraband."  *Id.* at 16-17.  Based on his view of what constitutes a border search, the defendant argues that probable cause and a warrant were required.  *Id.*

The defendant's argument  -- essentially that border searches must be limited to searches for contraband -- is not novel and, in fact, finds support in only one case decided just recently by the Ninth Circuit Court of Appeals, *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).  Like the Ninth Circuit in *Cano*, however, the defendant overlooks and oversimplifies the longstanding rationales underpinning the border search doctrine.  The Supreme Court and other courts throughout the country have repeatedly found that border searches are broadly designed to protect our country's national security and territorial integrity – justifications that are expansive enough to accommodate not only the direct interception of contraband, but also the prevention and disruption of ongoing efforts to export contraband illegally or engage in other transnational crimes.  Because the border searches here were unquestionably designed to investigate and disrupt an ongoing scheme to illegally export items with military uses to China (including to

21

entities affiliated with the China's military), they fall squarely within the border search exception to the warrant requirement.

Contrary to the holding in *Cano*, border searches are not limited to searches for actual contraband and courts have justified a variety of other searches under the border search doctrine that furthered the nation's strong interest in self-protection and national security. In *United States v. Kulsuz*, the Fourth Circuit Court of Appeals held that the warrantless, forensic search of the defendant's cell phone at the border in order to investigate the unlawful export of firearms parts fell squarely within the border search exception. 890 F.3d 133, 143-44 (4th Cir. 2018). According to the Fourth Circuit, insofar as it was aimed at investigating a "transnational offense" involving ongoing unlawful exports, the warrantless search went "to the heart of the border search exception," which the court said "rests in part on the sovereign interest of protecting and monitoring exports from the country." *Id.* at 143 (internal quotations omitted). The court in *Kolsuz* went on the note that "[t]he justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to export contraband illegally, through searches initiated at the border." *Id.* at 143-44 (citing cases); *see also United States v. Oriakhi*, 57 F.3d 1290, 1296-97 (4th Cir. 1995) (noting that the United States' interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself and ensuring national security); *United States v. Boumelhem*, 339 F.3d 414 (6th Cir. 2003) (same).

In *Kim*, a case often heralded by border search opponents, the court considered the legality of a "non-routine" border search of the defendant's laptop computer premised on suspected export violations that had occurred four years earlier. 103 F. Supp. 3d at 44. In a lengthy opinion, the court rejected the border search, finding that investigators lacked reasonable suspicion to conduct what it determined was a "non-routine" search. *Id.* at 44-46 (noting that, while a "close case," the

desire to "gather[] evidence of a completed crime" is insufficient to justify a non-routine border search of an electronic device).  The Court noted, however, that the reasonable suspicion required to support a non-routine border search was merely reasonable suspicion of "ongoing or imminent" criminal activity – in that case, illegal exports.  *Id.*  Had the Court been presented with *some* evidence that the defendant's criminal conduct was "ongoing or imminent," therefore, it would have validated the border search.  *Id.* at 46 ("With respect to ongoing activity, the search was nothing more than a fishing expedition to determine what Kim might have been up to.").

Consistent with *Kolsuz* and *Kim*, other courts have reached similar conclusions.  In *United States v. Levy*, the Second Circuit Court of Appeals found that reasonable suspicion to believe that the defendant was involved in "ongoing … securities fraud schemes" justified a warrantless border search and seizure of a notebook belonging to the defendant.  803 F.3d 120, 123-24 (2d Cir. 2015). ("Because their conduct was fully supported by reasonable suspicion that Levy was engaged in a financial crime, the CBP officer in this case was entitled to inspect and copy the notebook *as evidence of that crime*." (emphasis supplied)).  Similarly, in *United States v. Wanjiku*, the Seventh Circuit upheld a border search of the defendant's cell phone and laptop computer because the searching officials had "reasonable suspicion that the search of … [the defendant's] electronic devices would reveal *evidence of criminal activity involving minors*."  919 F.3d 472, 488 (7th Cir. 2019) (emphasis supplied).  These cases are buttressed by a 2006 decision by the United States District Court for the District of Columbia holding that, in the border search context, "[t]he distinction … between contraband and documentary evidence of a crime is without legal basis." *United States v. Gurr*, 471 F.3d 144, 149 (D.D.C. 2006).

The border search conducted in this case is a quintessential example of the doctrine's importance to national sovereignty, national security, and the prevention of transnational crime. At the time of the search, the defendant, a Chinese national, was under investigation for, among

other potential crimes, unlawfully exporting sophisticated U.S. technology—much of it with underwater military applications—to Chinese end users without the necessary export licenses. *See supra* at 5-13 (describing in detail the facts supporting reasonable suspicion). At the time of the search, CBP and HSI knew that at least some of the defendant's customers in China were affiliated with the Chinese military, including the PLA Navy; and they reasonably suspected that he was responsible—on a continuing basis—for exporting goods from the U.S. to these Chinese customers unlawfully. *Id.* These types of export-related crimes, particularly to the extent they are ongoing, greatly implicate "the government's exceptionally strong interest in national defense and national security." *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458-59 (5th Cir. 2016); *accord United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) ("The United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself."). The border search of the defendant's devices was unquestionably conducted in order to discover and, ultimately, disrupt this unlawful export scheme, a purpose that fits squarely within the core rationale underlying the border search doctrine. *See Kolsuz*, 890 F.3d at 143-44; *Gurr*, 471 F.3d at 149 (noting the lack of distinction between evidence and contraband in the border search context). Consequently, there was a direct and substantial link here between the predicate for the search—thwarting the unlawful export of dual-use technology to China's military—and the longstanding rationale for the border search exception. *See Kolsuz*, 890 F.3d at 143-44.

Based on the authority cited above and for the simple reason that border officials had a reasonable basis to believe that the defendant was engaged in an ongoing scheme to unlawfully export sensitive marine technologies to China, the search of the defendant's devices falls comfortably within the border search exception. Nonetheless, the government is cognizant of the Ninth Circuit's decision in *Cano*, which contains a uniquely different—and, in the government's

view, unfounded—interpretation of the border search doctrine and its core rationales.  In light of the authority cited above, the government urges the Court to reject *Cano*, particularly that court's determination that a border search of a cell phone or other electronic device must be limited to the "detection of contraband."  *See Cano*, 934 F.3d at 1017-18.  But even if this Court is inclined to follow *Cano*, the border search here should still be upheld.

As discussed above, at the time of the border search, investigators reasonably suspected that the defendant's electronic devices contained actual unlawful exports – that is, defense articles in the form of technical data designated on the USML.  *See supra* at 12-13*;* 22 C.F.R. § 121.1(a).  Long before the border search, investigators knew that Qin had exported or attempted to export various marine technologies, many of which had known military applications, including AUVs and sonobouys.  With respect to both of these controlled technologies, Qin showed an apparent desire to evade U.S. export control laws.  For example, in one instance, Qin suggested to an undercover agent posing as a Riptide employee that he might establish a U.S. company to acquire an AUV, presumably so he could export the AUV to China himself.  (This was after the U.S. companies had refused to sell an AUV to Qin and his Chinese company, LinkOcean.)  In another instance prior to the border search, Qin instructed another undercover agent *not* to tell a U.S. manufacturer of AUVs and sonobouys that the end user of the items was located in China.  *See supra* at 9.

Given the nature of LinkOcean's business (exporting U.S and European origin goods to the PRC, including to the PLA Navy), Qin's efforts to acquire and export items with known military applications, and Qin's apparent willingness to evade U.S. export laws, it was reasonable for investigators to suspect that his devices contained export-controlled technical data related to export-restricted items.  To the extent Qin may have brought this technical data overseas (Qin was returning from a trip to China at the time of the search) and/or shared them with non-U.S. persons

25

without a license, the technical specifications themselves would constitute unlawful exports and, thus, contraband. *See* 22 C.F.R. § 120.17 (defining the term "export" to include "the sending or taking of a defense article out of the United States in any manner" and "[r]eleasing or otherwise transferring technical data to a foreign person in the United States"). At least in part, therefore, the search of Qin's devices *was* reasonably aimed at discovering contraband—export controlled technical data—within the meaning of *Cano*. Even under the Ninth Circuit's narrow definition of a border search, therefore, the search of Qin's devices still falls well within the border search exception to the Fourth Amendment's warrant requirement.

### 2. Searches of Qin's property at the border did not require a warrant.

As discussed above, routine border searches do not require any level of suspicion. The Supreme Court has treated searches of property as less invasive and intrusive than searches of a person's body. Accordingly, it has deemed a non-destructive search of property to be a routine border searches even where it involved the removal, disassembly, and reassembly of a fuel tank. *Flores-Montano*, 541 U.S. at 154-55; *United States v. Molina-Gomez*, 781 F.3d 13, 19 (1st Cir. 2015) (describing the types of searches that have been found to be routine in comparison to non-routine in the border search context).

Unlike routine searches, non-routine searches at the border require reasonable suspicion. As discussed below, whether a search qualifies as routine or non-routine depends on the "degree of invasiveness or intrusiveness associated with" the search that was conducted. *United States v. Braks*, 842 F.2d 509, 511 (1st Cir. 1986).[15] In contrast, border searches of a person that are "highly

---

[15]The Court need not decide the issue of whether the border search of Qin's electronic devices was either routine or non-routine because even assuming that the search was non-routine, reasonable suspicion existed to the justify the search. *Accord United States v. Molina-Gomez*, 781 F.3d 13, 19-20 (1st Cir. 2015) (declining to decide whether the search of defendant's laptop computer and PlayStation was routine or non-routine because CBP had reasonable suspicion to justify 22-day border search).

intrusive" such as strip searches and body cavity searches are only permissible if they are supported by reasonable suspicion. *Id.*; *see Montoya de Hernandez,* 473 U.S. at 540-44 (holding that overnight detention for monitored bowel movement followed by rectal examination constituted a non-routine border search requiring reasonable suspicion); *see Flores-Montano*, 541 U.S. at 152 (rejecting argument that non-destructive searches of property at the border raise the same dignity and privacy interests as that of "intrusive" searches of a person). To date, neither the Supreme Court nor the First Circuit has held that reasonable suspicion was required for non-destructive border searches of property. *Molina-Gomez*, 781 F.3d at 19; *see United States v. Robles*, 45 F.3d 1, 5-6 (1st Cir. 1995) (finding reasonable suspicion was required to drill a hole into metal cylinder being imported into the United States from Columbia and was satisfied where customs agents had reasonable suspicion that cylinder was being used to import contraband). Because the searches here were of property and were non-destructive, this Court should find for the reasons discussed in more detail below, that it was a routine border search, which required no suspicion, no probable cause, and no warrant. See *Montoya de Hernandez*, 473 U.S. at 538.

The Supreme Court's decision in *United States v. Riley,* 573 U.S. 373 (2014)*,* does not alter the reasonableness of border searches or import a warrant requirement into the border search context. Despite the defendant's argument to the contrary (Def. Mem. at 13), *Riley* does not require this Court to conclude that a warrant was required prior to HSI conducting a search of Qin's electronic devices. Every court to consider this issue, including the case upon which Qin relies – *Cano* – has recognized the continuing validity of the border search exception and "no court has required more than reasonable suspicion to justify even an intrusive border search." *Cano*, 934 F.3d at 1015; *see Wanjiku*, 919 F.3d at 485 ("no circuit court, before or after *Riley*, has required more than reasonable suspicion for a border search of cell phones or electronically-stored data."); *Kolsuz*, 890 F.3d at 147 (Even after *Riley*, "there are no cases requiring more than reasonable

suspicion for forensic cell phone searches at the border."); *Touset*, 890 F.3d at 1234 ("*Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border."); *United States v. Vergara*, 884 F.3d 1309, 1313 (11th Cir. 2018) ("At the border, the highest standard for a search is reasonable suspicion.").   Indeed, "not a single court addressing border searches of computers since *Riley* has read it to require a warrant."  *United States v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018) (in affirming denial of motion to suppress evidence obtained during border search of a cell phone, concluding that "no court has ever required a warrant to support searches, even nonroutine ones, that occur at the border.").   *Riley* itself expressly limited its holding to the search incident to arrest exception.   573 U.S. at 401-402 (holding only that a warrant must be obtained before searching a cell phone seized incident to arrest and "other case-specific exceptions may still justify a warrantless search of a particular phone.").[16]  It therefore has no application to this case.

### a.   No degree of suspicion was required to conduct searches of Qin's electronic devices.

The search of Qin's electronic devices was conducted using basic forensic tools.   Nothing was done during the examination of the devices that was designed to destroy Qin's computer, his cell phone, or the data they contained.   As noted above, both Supreme Court and the First Circuit have found non-destructive searches of personal property constitute routine searches that do not require any level of suspicion.   The search of Qin's electronic devices should be treated similarly.

---

[16]In denying a motion to dismiss a civil lawsuit filed against officials at DHS, in *Alasaad v. Nielsen*, 2018 WL 2170323, *21 (D. Mass. May 9, 2018), this Court concluded that "*Riley* has some weight in the border search context" but that decision was made prior to the majority of cases cited by the government above minimizing or negating *Riley's* impact in the border search context.

To be clear, the First Circuit has never decided the issue of whether a forensic search of an electronic device is a "routine" or "non-routine" border search.  It therefore has not adopted, nor should this court, the artificial dichotomy that manual searches of electronic media constitute "routine" searches while forensic searches are always considered "non-routine."  The use of basic forensic tools does not change the degree of invasiveness.  Indeed, searching a copy of a traveler's electronic media using commonly used forensic tools such as forensic toolkit (FTK) and UFED Physical Analyzer preserves the integrity of electronic files.  Compared to manually reviewing a file or document on the traveler's original device, which can alter the metadata of an electronic file or document, a forensic review of electronic media actually ensures that the original data is undisturbed and the attributes of the file are not changed by an agent's mere inspection of the item (e.g. last viewed or modified dates may be changed by simply opening a word document on a computer).  In this case, by using forensic tools to conduct key words searches that were designed to only search for illegal exports and evidence of illegal exports or assistance to the Chinese military, the agents ensured that the border search of Qin's devices was targeted and efficient, not overbroad or overly intrusive.  *See supra* at 16 and n.9.  Thus, this Court should refuse to adopt the manual search versus forensic search dichotomy that originated from the Ninth Circuit's decision in *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc).  *See United States v. Touset*, 890 F.3d 1227, 1233-36 (11th Cir. 2018) (rejecting *Cotterman* reasonable suspicion standard for forensic search of an electronic device because it "is a search of property" and does not pose same level of "personal indignity" and intrusiveness as a search of a person's body).

As this Court concluded in *House v. Napolitano*, Civ. No. 11-10852-DJC, 2012 WL 1038816, *8 (D. Mass. March 28, 2012):

> [r]equiring reasonable suspicion for all computer searches may 'allow individuals to render graphic contraband, such as child pornography, largely immune to [a] border search simply by scanning images onto a computer disk before arriving at the border.' *United States v. Irving,* 2003 WL 22127913, at *5 (S.D.N.Y. Sept.15,

2003). Thus, the level of suspicion required to conduct a search of information carried by a person should not be based on the form in which that information is kept and presented at the border.

Like the Eleventh Circuit, in the First Circuit, whether a search qualifies as "routine" is determined by the "degree of invasiveness or intrusiveness." *Braks*, 842 F.2d at 511. The First Circuit has stressed that invasiveness "is a function of the degree of indignity that accompanies a particular search method rather than of the extensiveness or thoroughness of the search per se." *Id.* at n.6. Indeed, the factors cited by the *Braks* court to evaluate the degree of invasiveness -- e.g. exposure of intimate body parts, physical contact between Customs officials and the suspect, use of force, pain inflicted on the person being searched -- focus on searches of persons, not property. *Accord Touset*, 890 F.3d at 1234 (finding that "intrusiveness" factors used to evaluate whether a border search is routine is "irrelevant to searches of electronic devices."). To date, neither the Supreme Court nor the First Circuit have found a non-destructive search of property to constitute a non-routine search. Moreover, the "only types of border search of an individual's person that have consistently held to be non-routine are strip-searches and body-cavity searches." *Braks*, 842 F.2d at 512-13 (affirming District Courts' denial of motion to suppress and finding search of person in a private room that required traveler to lift her skirt and expose her underwear to be a permissible routine border search).

Searches of property, even data on electronic devices, do not trigger the same kind of indignity as searches of a person. As the *Touset* Court correctly concluded:

> A forensic search of an electronic device is not like a strip search or an x-ray; it does not require border agents to touch a traveler's body, to expose intimate body parts, or to use any physical force against him. Although it may intrude on the privacy of the owner, a forensic search of an electronic devise is a search of property.

890 F.3d at 1234. Consequently, the border search of Qin's devices should be deemed to constitute a routine border search requiring no level of suspicion. *See Braks*, 842 F.2d at 514 ("border search

that is less invasive than a strip search requires no level of suspicion on the part of custom officials."). Further, as discussed below, requiring "reasonable suspicion" for searches of electronic devices would "create a special rule that will benefit offenders" by allowing travelers to conceal contraband and evidence of criminal activity "in a new kind of property." *See Touset*, 890 F.3d at 1236 (applying traditional no reasonable suspicion standard to border searches of electronic devices and leaving to Congress the task of designing the appropriate standard for border searches of electronic devices).

Lastly, to the extent that Qin argues that the agents were seeking to obtain evidence to support their criminal investigation, the Court should find that intent of agents' irrelevant. As this Court itself has acknowledged, the HSI agents' subjective motivations for searching Qin's electronic devices is irrelevant to the determination of whether a border search is valid or qualifies as routine. *See House v. Napolitano*, 2012 WL 1038816 at *8 (declining to consider underlying intent or motivation of the officers when analyzing the viability of a Fourth Amendment claim."); *see also United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) (determining that the following factors are irrelevant to legitimacy of border search: whether reasonable suspicion arises entirely from investigation by Custom's official, whether border search is prompted by another federal agency, or whether search conducted to further another federal agency's criminal investigation); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("the validity of a border search dos not depend on whether it is prompted by a criminal investigative motive.").

**b. Even if court finds reasonable suspicion was required, that standard was easily met here.**

In *Braks*, the First Circuit concluded that the "reasonable suspicion" standard applies only to non-routine border searches. 842 F.2d at 514. Under the reasonable suspicion standard, the government "must demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." *Braks*, 842 F.3d at 513 (omitting citations) (adopting Fifth

Circuit's "reasonable suspicion standard rather than Ninth Circuit's "real suspicion" standard).  As demonstrated above, on November 24, 2017, the HSI agents reasonably suspected based upon objective, articulable facts that Qin was involved in ongoing scheme to illegally export controlled technology from the United States to the PRC to benefit the Chinese Navy.  The agents also believed the Qin had concealed information about the actual end-users to U.S. companies based upon statements Qin had made to an undercover employee and knew that Qin had caused false shipping paperwork to be filed with the United States government.

It is sufficient that the agents had reasonable suspicion that Qin was involved in ongoing illegal activity.  The government need not prove that it suspected that Qin's devices contained contraband to satisfy the reasonable suspicion standard.  As discussed above, the purpose of border searches is to protect the territorial integrity of the United States.  Thus, as the Supreme Court made clear in *Montoya de Hernandez*, at the border, customs officials "are charged … with protecting this Nation from entrants who may bring anything harmful into this country …" 473 U.S. at 544.  Further, in defining the "reasonable suspicion standard," cited to *United States v. Cortez*, 449 U.S. 411 (1981).  In *Cortez*, the Supreme Court concluded that an "investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  449 U.S. at 417.  Unlike in *Kim*, the investigating agents here suspected Qin was involved in ongoing criminal activity, not just prior illegal exports that occurred several years earlier.  103 F.Supp.3d at 44-46 (suppressing evidence from search of laptop because it was predicated upon agent's expectation that the computer would contain evidence of an earlier criminal conspiracy agent had investigated but there was no "objective manifestation" that Kim was currently engaged in criminal activity).

As explained above, contrary to the holding in *Cano*, border searches are not limited to searches for contraband.  *See Kolsuz*, 890 F.3d at 143 & 147 n.7 (expressly rejecting this premise

and finding that border search of traveler's phone was justified where agents reasonably believed "search would reveal not only evidence of the export violation of they already had detected, but also 'information related to other ongoing attempts to export illegally various firearms parts.'"); *Levy*, 803 F.3d at 124 (where reasonable suspicion existed that defendant was engaged in a financial crime, CBP officer "was entitled to inspect and copy" a notebook to search for evidence of that crime). Rather, customs officers are authorized to search for evidence of criminal activity during a border search. *See supra* at 23-24; *Wanjiku*, 919 F.3d at 488 (affirming denial of motion to suppress because "facts raised a reasonable suspicion that a search of Mr. Wanjiku's electronic devices would reveal evidence of criminal activity involving minors."); *Levy*, 803 F.3d at 124 (CBP officers "have authority to search traveler's documents and other items at border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties."); *Kim*, 103 F.Supp.3d at 44 (finding border search would have been lawful if a "reasonably prudent officer would have been justified in his belief that [the defendant] was engaged in ongoing criminal activity at the time he was stopped at LAX rather). Indeed, the *Kolsuz* Court made clear that cases involving transnational offenses like this one -- attempts to export U.S. goods illegally and without a license -- go "the heart of the border search exception, which rests in parts on 'the sovereign interest in protecting and monitoring exports from the country.'" 890 F.3d at 143. Thus, "all that is required" to justify a non-routine border search is a reasonable suspicion that the electronic device contains "contraband or evidence of criminal activity." *United States v. Saboonchi*, 990 F.Supp. 2d 536, 570 (D. Md. 2014); *Kolsuz*, 890 F.3d at 144 (affirming use of border search exception because "forensic search of Kolsuz's phone was conducted at least in part to uncover information about an ongoing transnational crime – in particular, information about additional illegal firearms exports already underway, by freight or in the custody of a coconspirator …"). Because the agents reasonably believed Qin was involved in

ongoing criminal activity when they began their search, the reasonable suspicion standard was met.

### c. The scope and duration of the border search was reasonable.

As discussed in detail above, this Court should reject the defendant's arguments to confine the scope of border searches to searches for digital contraband.  In *Cano*, the Ninth Circuit erroneously limited the scope to "searches for digital contraband" and not evidence of future, ongoing, or past crimes, including ones involving the border and national security.  Such a decision could have detrimental consequences in disrupting espionage and procurement networks designed to illegally obtain U.S. technology and proprietary information and will also prevent the Department of Homeland Security from fulfilling its primary mission of "prevent[ing] terrorist attacks within the United States" and "reduc[ing] the vulnerability of the United States to terrorism."[17]  6 U.S.C. § 111(b)(1).  As explained by the Fourth Circuit in *Kolsuz*, "the justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to export contraband illegally."  890 F.3d at 143.  Other courts have similarly rejected attempts to impose a warrant requirement to search property at the border.  *Kolsuz*,  890 F.3d at 143-148; *Wanjiku*, 919 F.3d at 484-85.  Further, *Cano's* adoption of special rules to narrow

---

[17]Adopting the *Cano* "digital contraband" test for border searches of electronic media would also have dangerous implications for the detection, apprehension, and prosecution of persons involved in drug and human trafficking and terrorism, which as this Court is well aware is not a crime for which Qin is charged or was ever being investigated.  Nevertheless, if the Court chose to give special protection for electronic media such as phones and computers, agents would be unable to search, under the border search exception, a suspected terrorist's electronic devices to search for communications or conspirators (in the United States or abroad) related to plots to commit an attack in the United States, or documents or files that could contain items that could pose harm to the United States like bomb making instructions or even a manifesto detailing plans to commit acts of violence.

the scope of the border search exception for only one category of property -- electronic devices -- is also unsupported by Supreme Court jurisprudence.  *See Touset*, 890 F.3d at 1236-37.

Even if the Court were to adopt the *Cano* "digital contraband" search restriction for electronic devices, it should not be confined to only child pornography.  Digital contraband also includes (1) possession of data and information to which one is not entitled and it is illegal to possess without a license or approval such as classified information, export restricted technical data (controlled under either the USML or CCL), trade secrets belonging to another person/company, copyrights in violation of 18 U.S.C. §§ 793, 1831, 2319, 22 U.S.C. § 2778, 50 U.S.C. § 1705; (2) the act of transferring in electronic form classified information, export restricted technical data, stolen property (i.e. electronic files containing designs or proprietary information), pirated software; and (3) importation of technology for circumventing copyright protection, in violation of 17 U.S.C. § 1201, and smuggling of goods into the United States contrary to any law, in violation 18 U.S.C. § 545.  Because the agents had reasonable suspicion to believe Qin was illegally exporting technology or U.S. goods to China for among other customers, the PLA Navy, even under *Cano*, the border search in this case was reasonable and did not violate the Fourth Amendment.  Indeed, increasingly exports and transfers of technical data controlled under the U.S. export laws are being done electronically.

Lastly, the fact that this border search took 60-days does not itself provide a basis to suppress the evidence because under the circumstances (i.e., the impediments presented by the translation and encryption issues and Qin's own counsel's assurances that the passwords would be provided), the timing of the search was reasonable and the agents worked diligently during that time period. Indeed, as the First Circuit has acknowledged, the Supreme Court has "consistently rejected hard-and-fast time limits." *Molina-Gomez*, 781 F.3d at 21; *Montoya de Hernandez*, 473

U.S. at 543 (concluding "'common sense and ordinary human experience must govern over rigid criteria.'").

> **3.** **Additionally, the Court should deny Qin's motion to suppress because the good faith exception applies as the HSI agents possessed an objectively good faith belief that the warrantless border search of defendant's electronic devices did not violate the Fourth Amendment.**

"The highest standard that has been applied by the Supreme Court at the border is reasonable suspicion." *Wanjiku*, 919 F.3d at 481. Indeed, as discussed at length above, the Supreme Court has never required any particularized level of suspicion for a non-destructive border search of property like that performed here. Nor has the First Circuit. *See supra* at 29-31. Even the Ninth Circuit's recent decision in *Cano*, upon which Qin's greatly relies, does not require a warrant based upon probable cause to forensically search electronic devices at the border although it did limit the permissible scope of the searches authorized under the border search exception. *See Cano*, 934 F.3d at 1016 ("we hold that manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing for reasonable suspicion.").

Based upon the state of the law at the time when the agents conducted the border search of Qin's electronic devices beginning on November 24, 2017 and ending on January 23, 2018, the agents possessed an objectively good faith belief their conduct did not violate the Fourth Amendment. At a minimum, as demonstrated above, when the agents began the border search they had "reasonable suspicion that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border." *See Wanjiku*, 919 F.3d at 479 (applying good-faith exception to warrantless search of electronic devices -- cell phone, laptop, and external hard-drive -- at the border); *Kolsuz*, 890 F.3d at 147-48 (applying good-faith

exception to warrantless search of cell phone at border); *Molina-Isidoro*, 884 F.3d at 293 (applying good-faith exception to warrantless search of cell phone at border).[18]

### 4. CBP's interview of Qin at Logan Airport was noncustodial and therefore, did not require any *Miranda* warnings.

When he arrived at Logan Airport on November 24, 2017, the defendant was subject to a secondary inspection by customs officials in the baggage claim area of Terminal E, Logan's international arrivals terminal.  He answered routine questions from customs officials and otherwise waited while officials searched his luggage and electronic devices pursuant to their border search authority.  The defendant was neither "in custody" nor subject to "interrogation" at any point during the secondary inspection, obviating the need for officials to advise him of his *Miranda* rights.  The defendant's argument that his statements during the secondary inspection were obtained in violation of his Firth Amendment rights, therefore, lacks merit.

"The Supreme Court developed the *Miranda* rules as a prophylactic measure to dissipate the coercion inherent in the custodial interrogation setting, with a goal of ensuring that any statements made by a suspect are 'truly the product of free choice'" and consistent with the Fifth Amendment to the United States Constitution.  *United States v. Vázquez,* 857 F.2d 857, 861 (1st Cir. 1988) (quoting *Miranda v. Arizona,* 384 U.S. 436, 457-58 (1966)).  Accordingly, "[i]t is well established that *Miranda* warnings must be communicated to a suspect before he is subjected to custodial interrogation." *United States v. Nai Fook Li,* 206 F.3d 78, 83 (1st Cir. 2000) (internal quotations omitted).  Both "custody" and "interrogation" must be present to

---

[18]As the *Molina-Isidoro* Court explained, "if federal judges and a leading Fourth Amendment scholar [Wayne Lafave] do not believe *Riley* overrides the caselaw allowing warrantless border searches of cell phones (especially nonforensic ones), it is reasonable for government agents to take the same view until something changes."  884 F.3d at 292.  In direct contrast to this decision, the *Cano* court found that the good faith exception was inapplicable because "[t]his is a rapidly developing area, not an area of settled law." 934 F.3d at 1022.  This conclusion disregards the numerous cases of the Supreme Court and several Circuit Courts that hold that no warrant is required to perform a search of property at the border.

require *Miranda* warnings.  *See, e.g., United States v. Fernández–Ventura,* 85 F.3d 708, 710 (1st Cir. 1996).

Custody exists where there is "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Id.* (internal quotation marks and citations omitted). "Relevant considerations in a custody determination include, but are not limited to, whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  *Molina-Gomez*, 781 F.3d at 22 (internal quotations omitted); *see also United States v. Pratt*, 645 F.2d 89, 91 (1st Cir. 1981) (the duration of the encounter is "never a singly determinative factor").  "Interrogation refers to both express questioning and its functional equivalent, which includes any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* (internal quotations omitted).  "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points."  *Id.* at 23 (internal quotations omitted).  "This understanding cuts against the potentially coercive aspect of the Customs inquiry, and [thus] lessens the need for *Miranda* warnings."  *Id.* (internal quotations omitted).

Furthermore, in the border context, the court must also "take into account the strong governmental interest in controlling our borders."  *United States v. Fernández–Ventura,* 132 F.3d 844, 846 (1st Cir. 1998).  "As a result, the rules surrounding *Miranda* at the border are more relaxed" and "events which might be enough to signal custody away from the border will not be enough to establish custody in the context of entry into the country."  *Molina-Gomez*, 781 F.3d at 22 (internal quotations and brackets omitted).  For example, even though a traveler being questioned by CBP is not necessarily "free to leave," he is not necessarily in custody either.  *Id.*

At no time during the secondary inspection was the defendant in custody.  For starters, the defendant (who was accompanied at all times by his wife and children) was not questioned in a "secondary inspection room" as he claims in his motion, *see* Def. Mem. at 25, but rather he was interviewed in the large expanse of the public baggage claim area at Terminal E.  Only two CBP officials were present during the interview portion of the inspection—a routine practice—which was amicable and non-confrontational throughout.  Contrary to the defendant's memorandum, the interview portion of the inspection did not "last[] over two hours."  Although approximately two hours elapsed from the moment Mr. Qin entered the baggage claim area until the time he left the airport, the defendant and his wife were subject to questioning for approximately 60 minutes.  During the remaining 60 minutes, customs officials explained administrative matters to Qin (regarding the review and ultimate detention of his electronic devices), and they took several breaks during which they stopped questioning Qin altogether.  The longest of these breaks, according to CBP officials, lasted approximately fifteen minutes.  Considering these facts together, and especially considering that all of this occurred as part of a customs inspection *at the border*, the defendant was decidedly not subject to "coercive restraint on freedom of movement of the degree associated with a formal arrest."  *See Fernández–Ventura,* 132 F.3d at 848 (finding that defendant was not in custody despite being questioned off and on by four customs officials in a secondary inspection room for approximately 90 minutes).

While the fact that the defendant was not in custody is, by itself, dispositive of the defendant's Fifth Amendment claim, so too is the fact that he was not subject to "interrogation." Customs officials limited their questions of the defendant to three areas: (1) personal information concerning the defendant, including his travel documents and itinerary; (2) the defendant's U.S. visa; and (3) the defendant's business and employment.  This questioning—limited to areas routinely inquired about by customs officials—was straightforward, non-accusatory, and "less

apt to intimidate than is the obvious use of entrapping devices or ploys" typical of interrogations. *See Pratt*, 645 U.S. at 91. There was nothing about the interview, in other words, that was "perceptively outside the routine Customs process." *See United States v. Ventura*, 947 F. Supp. 25, 29 (D. Puerto Rico 1996). *Miranda*, therefore, was not required.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Government respectfully requests that the defendant's motion to suppress be denied in its entirety.

<div align="center" style="text-align:left;margin-left:40%">

Respectfully submitted,

ANDREW LELLING
United States Attorney

By:     /s/ *B. Stephanie Siegmann*
        B. Stephanie Siegmann
        Jason Casey
        Assistant U.S. Attorneys

</div>

CERTIFICATE OF SERVICE

I hereby certify that this document was filed on September 27, 2019, through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

/s/ *B. Stephanie Siegmann*
B. Stephanie Siegmann