1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3    _____

     UNITED STATES OF AMERICA,
4
                      Plaintiff,          Criminal Action
5                                         No. 18-10205-DJC
     V.
6                                         December 16, 2019
     SHUREN QIN,                          10:00 a.m.
7
                      Defendant.
8    _____

9

10

11          TRANSCRIPT OF MOTION HEARING DAY 1

12        BEFORE THE HONORABLE DENISE J. CASPER

13           UNITED STATES DISTRICT COURT

14         JOHN J. MOAKLEY U.S. COURTHOUSE

15               1 COURTHOUSE WAY

16             BOSTON, MA  02210

17

18

19

20
           DEBRA M. JOYCE, RMR, CRR, FCRR
21            Official Court Reporter
          John J. Moakley U.S. Courthouse
22          1 Courthouse Way, Room 5204
              Boston, MA  02210
23            joycedebra@gmail.com

24

25

1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    B. STEPHANIE SIEGMANN, ESQ.
     JASON A. CASEY, ESQ.
4    U.S. Attorney's Office
     1 Courthouse Way
5    Suite 9200
     Boston, MA 02210
6    617-748-3191

7    FOR THE DEFENDANT:

8    WILLIAM H. KETTLEWELL, ESQ.
     SARA E. SILVA, ESQ.
9    ELIZABETH CARR PIGNATELLI, ESQ.
     Hogan Lovells US LLP
10   125 High Street
     Suite 2010
11   Boston, MA 02110
     617-371-1005

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2            (The following proceedings were held in open

3    court before the Honorable Denise J. Casper, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on December 16, 2019.

7            The defendant, Shuren Qin, is present with counsel.

8    The Assistant U.S. Attorneys are present.)

9            THE CLERK:  Court is in session.  Please be seated.

10:01 10        Criminal action 18-10205, <u>United States v. Qin</u>.

11           Would the interpreter please rise?

12           (Interpreter sworn in by the clerk.)

13           THE CLERK:  Thank you.

14           Would counsel please state your name for the record.

15           MS. SIEGMANN:  Good morning, your Honor.  Stephanie

16   Siegmann for the United States.

17           THE COURT:  Good morning, counsel.

18           MR. CASEY:  Good morning, your Honor.  Jason Casey for

19   the United States.

10:01 20        THE COURT:  Good morning, counsel.

21           MR. KETTLEWELL:  Good morning, your Honor.  William

22   Kettlewell for Mr. Qin, together with my partner, Sara Silva.

23           THE COURT:  Good morning, counsel.

24           MR. KETTLEWELL:  And this is one of our paralegals,

25   Melissa Cieszkowski, your Honor.

```
 1            MS. PIGNATELLI:  Elizabeth Pignatelli also for
 2     Mr. Qin.
 3            THE DEFENDANT:  Good morning, your Honor.  I'm Shuren
 4     Qin, the defendant.
 5            THE COURT:  Good morning.
 6            Good morning, sir.
 7            Counsel, sir, I know we're here for a suppression
 8     hearing.  I've received the filings on either side in this
 9     case.
10:02 10       I do understand this is an evidentiary hearing?
11            MS. SIEGMANN:  Yes, your Honor.
12            THE COURT:  Counsel, from the government's
13     perspective, who's being called?
14            MS. SIEGMANN:  So we anticipate calling five or six
15     witnesses, your Honor.  We believe that we'll hopefully get
16     through two today, and then we're ambitiously trying to get
17     through the rest for tomorrow, but there is a chance that we
18     will not complete all the witnesses, so we mentioned that to
19     Ms. Hourihan before you came on the bench.
10:02 20       THE COURT:  Okay.  So we'll see about scheduling.
21            Other additional witnesses from the defense side, do
22     you anticipate any?
23            MR. KETTLEWELL:  Your Honor, there may be one, but
24     that would be a very brief witness, but that will depend,
25     obviously, on the flow of evidence and what comes in.
```

1          THE COURT:  Okay.

2          Counsel, are we ready to proceed?

3          MS. SIEGMANN:  We are, and the first witness is in the

4     courtroom.

5          The government calls Special Agent Brian Andersen.

6          MS. SILVA:  Your Honor, before we begin evidence, we

7     want to sort of very briefly frame the issues for the Court if

8     that would be helpful.

9          THE COURT:  Counsel, if you'd like to, briefly, if

10:03 10    Mr. Andersen will wait for a moment.

11         MS. SILVA:  Thank you, your Honor.

12         Your Honor, we're aware that the Court does not need a

13    lengthy exegesis on border search authority.  We have read the

14    Court's opinion in Alasaad and understand and respect the

15    decision that at a minimum a border search of electronic

16    devices requires reasonable suspicion that the device contains

17    contraband.

18         But the government is defending this search here on

19    the basis of it being a routine border search, and we submit,

10:03 20    your Honor, that the government is not going to be able to

21    carry that burden of proof for the simple fact that the search

22    at issue here was not a border search.  It was conducted as

23    part of an evidence gathering mission pursuant to a

24    long-standing, ongoing criminal investigation of Mr. Qin.

25         The evidence is going to show that that investigation

1    had been taking place for more than seven months before the

2    putative border search at issue here.  And that despite two

3    undercover meetings and multiple communications between Mr. Qin

4    and the case agent, the first witness you'll be hearing from

5    today, Agent Andersen, the government had not probable cause or

6    reasonable suspicion at the time that they seized Mr. Qin's

7    laptop computer and iPhone.

8              You'll hear, your Honor, that the government learned

9    months before Mr. Qin left the country to go to China that he

10:04 10   was going.  He, in fact, told the government on June 30th that

11   he was planning to go to China in October, and he did, in fact,

12   do that.

13             While he was gone, Agent Andersen reached out to

14   Customs and Boarder Protection agents and directed them to stop

15   Mr. Qin on his way back and to detain his electronics.  And

16   Customs and Boarder Protection did exactly that on November 24,

17   2017.

18             THE COURT:  Counsel, I promise I'll give you a full

19   opportunity for closing, but I have read the papers, so I'll

10:05 20   give you 30 seconds more.  I'll give the government a few

21   minutes if they'd like to make some opening remarks, but I'd

22   like to get started with our witnesses given the calendar

23   that's been presented.

24             MS. SILVA:  Appreciate that, your Honor.

25             Just very briefly then, we understand that the

 1    government has since that search attempted to justify this

 2    search on the grounds of reasonable suspicion that contraband

 3    was evident in the device.

 4         With regard to reasonable suspicion, your Honor, we

 5    suggest that the official government reports that documented

 6    the reasons for the search at the time are highly relevant to

 7    credibility as to the government's new position that reasonable

 8    suspicion existed at the time this was recorded as a routine

 9    border search for merchandise or evidence of merchandise.

10:06 10         THE COURT:  Understood.

11         MS. SILVA:  On the piece of contraband, your Honor,

12    the government has suggested this was a search for technical

13    data.  Technical data is a term of art.  It is defined in the

14    International Traffic and Arms Regulations, it's ITAR

15    controlled.  Technical data is listed on the U.S. Munitions

16    List.  You will hear, your Honor, that there was never any

17    contraband found on Mr. Qin's devices and there was certainly

18    never any United States Munitions List items.

19         Thank you, your Honor.

10:06 20         THE COURT:  Counsel, do you want to say a few words?

21         MS. SIEGMANN:  Yes.

22         THE COURT:  And I should say I'm cognizant of the fact

23    that the parties' filing on either side came ahead of my

24    decision in Alasaad, so, counsel, I'll hear closing arguments

25    after I've heard all of the evidence, but I understand if

1    either side wanted to supplement their papers at some point, I

2    can hear from either side about that.

3         MS. SIEGMANN:  Your Honor, just if I could have two

4    minutes.

5         THE COURT:  Sure.

6         MS. SIEGMANN:  I wasn't planning to do a -- frame the

7    issues, but in response to the defense.

8         First of all, the government stands on its papers.  We

9    understand your Honor's decision in the civil matter, but we do

10:07 10  believe that -- and especially in light of this may go up on

11   appeal on either side, the issue is for a border search the

12   government believes that no suspicion is required to do a

13   routine border search, and that this was a routine border

14   search.

15        At some point if the Court finds that it was a

16   non-routine border search, there was clearly reasonable

17   suspicion.  I believe, as suggested in the search warrant

18   materials, there also was probable cause.  They had identified

19   at least three violations of the Export Administration

10:07 20  Regulations prior to the border search occurring.  The

21   defendant then proceeded to make a false statement at the

22   border before the search of the electronic devices.  So there

23   was numerous violations of federal law that the -- they had

24   probable cause to investigate.

25        Additionally, because no decision at the time the

border search, which was November of 2017, had -- Cano hadn't
been decided, nor had your decision, your Honor.  They had
good-faith basis to rely on the existing case law that did not
require or limit border searches to just looking for
contraband.

Having said that, they were looking for contraband
being tech data, and they were investigating ongoing export
violations.  Tech data is not limited to ITAR, by the way, it's
actually -- technical data is controlled both under the
Commerce Control List as well as the United States Munitions
List, and basically it is the designs, the specifications, the
blueprints regarding control technology.

And during the secondary inspection when Mr. Qin was
at the border, he actually showed diagrams on his computer to
the CPB officer.  And so there was actually reasonable
suspicion to suggest that there would be other technical type
information on his laptop computer.  And technical data, as you
will hear, is something that is of concern because it's so easy
to transfer and export, your Honor.

But that really -- and of course we'll argue later,
but just to respond to the arguments of the defense this
morning.

THE COURT:  Thank you.

And with that, I think we can have Mr. Andersen take
the stand, sir.

```
 1              THOMAS BRIAN ANDERSEN, JR., having been duly sworn by
 2      the Clerk, was examined and testified as follows:
 3              THE COURT:  Good morning, sir.
 4              THE WITNESS:  Good morning, your Honor.
 5              THE COURT:  Counsel.
 6              MS. SIEGMANN:  Thank you, your Honor.
 7                            DIRECT EXAMINATION
 8      BY MS. SIEGMANN:
 9      Q.   Can you state your name for the record, spelling your last
10      name, after you get your water.
11      A.   Sure, thank you.
12              This is a really different perspective.  I'm used to
13      testifying over there.
14              My name is Thomas Brian Andersen, Jr.  Andersen is
15      spelled A-n-d-e-r-s-e-n.
16              THE COURT:  Thank you.
17      BY MS. SIEGMANN:
18      Q.   How are you employed?
19      A.   I'm a special agent with the U.S. Department of Homeland
20      Security.  I'm currently assigned to Homeland Security
21      Investigations, Boston Field Office.
22      Q.   How long have you worked as a special agent for Homeland
23      Security Investigations?
24      A.   In February it will be 14 years.
25      Q.   And you said you're assigned to the Boston office?
```

1    A.    That's correct.

2    Q.    Have you always been assigned to the Boston office?

3    A.    I have.

4    Q.    Can you please describe for the Court the positions or

5    work assignments you've had over the last 14 years?

6    A.    Sure.  When I first arrived at the Boston Field Office, I

7    was assigned to the HSI National Security Group, and that group

8    fundamentally focused on two types of investigations, national

9    security threats and human rights violators and war criminals.

10:11 10  In the early days of my assignments in this office, I found

11   myself doing human rights violator investigations, so

12   investigation of those who are suspected of committing

13   genocide, war crimes, and torture.  I've done a number of those

14   cases, prosecutions, in this district and others.

15         That group also supplied agents to the Joint

16   Terrorism Task Force, so there was a time while still assigned

17   to that group that I was posted at the FBI's JTTF, Joint

18   Terrorism Task Force.  And I think maybe 2010 or 2011 I was

19   given a long-term acting supervisor assignment, so I was

10:11 20  brought back from the JTTF still in the National Security

21   Group.

22         In 2013 or so, I was assigned to the HSI Boston

23   Counterproliferation Investigations Group, that's the group

24   that I'm currently assigned to now.

25   Q.    So what types of offenses does your -- the group you are

 1    assigned to now, Counterproliferation Investigations Group,

 2    investigate?

 3    A.   Fundamentally we investigate cases that involve the

 4    unlawful export of U.S. origin goods to other destinations

 5    around the world.  Typically the commodities that we're

 6    investigating require a license for export, either a license

 7    issued by the Department of Commerce or one issued by the

 8    Department of State if it's an item that's controlled on the

 9    United States Munitions List.

10:12 10          There are other things that may not be controlled by

11    license but can't go to embargoed countries, so occasionally we

12    do investigations in that area as well.

13    Q.   And have you received any training in the area of illegal

14    exports and counterproliferation?

15    A.   I have.

16    Q.   Can you please describe the training you received to the

17    Judge.

18    A.   So that was the variety of training seminars.  Certainly

19    in our six-month basic academy counterproliferation

10:13 20    investigations are -- receive some degree of focus because of

21    the programmatic area that our agency works in.

22          I then received specific training,

23    counterproliferation investigations offered by our agency at

24    the Federal Law Enforcement Training Center.

25          I went back to an advanced school also conducted by

1    our agency, counterproliferation investigations.  And I've been

2    to a number of undercover-focused classes.  So conducting

3    undercover investigations in the counterproliferations field

4    and using some of the techniques that are available to us

5    through an undercover platform.

6    Q.   And during the trainings that you've received was there

7    any focus on any countries of concern or national security

8    threats?

9    A.   Sure.  Those are almost always part of the discussion.  In

10:14 10   addition to those classes that I outlined, I have attended a

11   number of seminars conducted by the Department of Defense or

12   members of the intelligence community, and those classes in

13   particular have a tendency to focus on specific threats,

14   specific technology.  So countries that are of concern that

15   almost always rise to the top include China, Russia, North

16   Korea, Iran, Syria; and a number of embargoed countries, Sudan,

17   for example, gets a lot of press, occasionally their effort to

18   get munitions, products, really.  They're focused more on

19   weapons, that are a weapon.

10:15 20   Q.   Were you involved in the investigation of Shuren Qin and

21   his company, LinkOcean Technologies Limited?

22   A.   I was.

23   Q.   When did you first get involved in this investigation?

24   A.   I think May of 2017, sometime in the month of May 2017.

25   Q.   What was your role in the investigation at that time?

1    A.    I think when I initially heard about it, I didn't have a

2    defined role.  I think one of my colleagues was working on the

3    case, and, as we typically do, we have a small group of people,

4    we typically talk to each other, we know what everybody is

5    working on.  So I think I just heard about it in those early

6    days.

7                 Eventually, I was asked to participate in the

8    investigation and to manage the undercover communication

9    between an undercover platform and Shuren Qin.

10:16 10   Q.    Did your role in the investigation at some point change

11   from that of being undercover agent to a different role?

12   A.    Yes.  Eventually I was tasked with taking over the case

13   and became what's known as the case agent.

14   Q.    When approximately did that occur?

15   A.    I think August of 2017.

16   Q.    And just to give some background to the Court, were any

17   other agencies involved in the investigation of Qin and

18   LinkOcean?

19   A.    Yeah, these cases typically are investigated in a

10:16 20   collaborative fashion.  So at the time agencies that were

21   included in this investigation were the Department of Commerce;

22   Naval Criminal Investigative Service; the Defense Criminal

23   Investigative Service; I think CPB, Customs and Boarder

24   Protection.  I think that's who was involved at the outset.

25   Q.    And was that the same group of agencies that were involved

1    in November 2017 when the border search occurred?

2    A.   Yes.

3    Q.   Now, let's discuss in more detail what you did in this

4    investigation.

5           Can you describe to the Judge what you do as an

6    undercover agent?

7    A.   Well, the specific focus that I would undertake as an

8    undercover agent would be to facilitate communication with a

9    prospective buyer.  We typically deal with resellers, people

10:17 10    who are making an effort to buy a product in the United States

11    and have an end user in mind, a place where that product is

12    going to go, and then have to navigate purchasing a product in

13    the U.S. and then getting it to the person who's ultimately

14    going to use it.

15           So as an undercover, my role typically is to work

16    with the U.S. manufacturer, perhaps transition the potential

17    buyer from the U.S. manufacturer in a communication, whether

18    it's e-mail or phone, transition them to some other platform,

19    and then eventually communicate, whether it's in person, over

10:18 20    the phone, through e-mail, text messaging, et cetera, with a

21    potential subject who wants to purchase a commodity.  And --

22    that's typically what I do as an undercover.

23    Q.   And prior to drafting any undercover communications to a

24    target, do you do any preparation or research?

25    A.   Sure.  I've been in law enforcement for 20 years, but I

 1   don't know much about a lot of the commodities that are

 2   controlled both by the State Department or the Department of

 3   Commerce.  So one of the things that we have to do initially is

 4   try to get an understanding of what's the product, what does it

 5   do, what are its capabilities, what are the controls, how can

 6   you -- how can one expand those controls.  So if you bought

 7   certain widget, could you do anything to that widget to make it

 8   more capable, more operational, would that change the

 9   perspective of controllability; if it could do more, would that

10:19 10   trigger license requirements by the State Department or by the

11   DOC, Department of Commerce.  So to figure that out, you

12   typically have to talk to the people who are manufacturing

13   those products.

14   Q.   And did you do that in this case?

15   A.   I did.

16   Q.   And before we talk about that, you mentioned a few

17   seconds -- 30 seconds ago that you've been in law enforcement

18   for 20 years, you were in HSI for 14 of those years, what did

19   you do prior to that?

10:20 20   A.   So immediately prior I was an undercover detective with

21   the Vermont State Police working with the Southern Vermont

22   Joint Task Force.  That's the job I held immediately before I

23   came on with HSI, and had been a uniformed police officer and

24   detective in the years preceding that for about six years

25   before I came on the job with HSI.

1   Q.   Now, so in doing your background investigation or research

2   prior to engaging in conversations with the defendant, what

3   were you told about Qin and his company, LinkOcean?

4   A.   So I was told -- it was my understanding that -- so when I

5   was first apprised of the investigation, I understood that Qin

6   was in the United States, that he represented a company that

7   existed in China, LinkOcean Technologies, and I guess at the

8   outset I wasn't clear like what was his presence, what was his

9   lawful presence in the United States.  That's something that we

10:21 10   eventually came to understand.  And I knew that he was

11   interested in acquiring vehicles used in the marine setting.

12   So there are different types of vehicles, some are towed, some

13   can operate without human interaction, plot a course, throw it

14   in the water, does its thing, comes back, you retrieve it; and

15   then there are others that are literally controlled

16   essentially, like, by a joy stick, remotely operated vehicle.

17   So Qin was trying to acquire different vehicles kind of

18   throughout that spectrum and had contacted a number of

19   Massachusetts-based manufacturers of those goods.

10:21 20   Q.   You mentioned towed, and you mean like towed, t-o-w-e-d?

21   A.   I do.

22   Q.   And can you explain to the Judge what you mean by "towed"?

23   A.   A vehicle that has some sort of sensing capability that is

24   tethered to another vessel.  So it's released, it gathers data,

25   and then can be retrieved by cable.

1   Q.   So -- and Special Agent Andersen, what is your

2   understanding as who how Qin came to the attention of the

3   investigators?

4   A.   So Qin, as I understand it, contacted a number of

5   manufacturers, including a company called Riptide.  Riptide had

6   some interaction with Qin, and, as a result of that

7   interaction, made a report to the Defense Security Service.  I

8   think Riptide is a cleared defense contractor, which means that

9   they are allowed to keep classified materials onsite, and they

10:23 10   use those classified materials to produce goods that are used

11   by the military typically.  The rules about that, about the

12   cleared defense contractor and who's allowed access to that

13   information, how that information is stored, those are things

14   that are all monitored by the Defense Security Service.  And

15   one of the regulations that cleared defense contractors have is

16   they have to report what they view to be suspicious contact,

17   and they report that to the Defense Security Service.  Defense

18   Security Service produces a report and typically sends that to

19   the law investigative agencies, many of the ones that I named

10:23 20   earlier who were initially involved in this investigation.  So

21   that's my understanding of how HSI came to learn of Qin and

22   LinkOcean.

23   Q.   So it's your understanding that Riptide had suspicions

24   about Mr. Qin?

25   A.   Yeah, I -- *de facto* because they reported it to DSS.  You

```
 1    don't make reports to DSS if you don't have concerns.
 2    Q.   And based your role in this investigation, did you ever
 3    talk to Riptide --
 4         THE COURT:  I'm trying to follow all of the acronyms,
 5    and I know DSS is referring to what --
 6         THE WITNESS:  I'm sorry, your Honor, Defense Security
 7    Service.
 8         THE COURT:  Thank you.
 9    BY MS. SIEGMANN:
10:24 10   Q.   Based upon your role in the investigation, did you ever
11    talk to Riptide about their concerns about Mr. Qin?
12    A.   Yes, I did.
13    Q.   And we're going to talk about that in a few minutes, but
14    prior to conducting the border search in November 2017, how
15    many times did you talk to Riptide?
16    A.   I don't know the exact number.  I talked to them a number
17    of times.  I just don't know the exact number.  It could have
18    been six, could have been ten, maybe more than that.
19    Q.   Does Riptide still exist?
10:25 20   A.   They do exist.  I think they have been bought.  They have
21    been bought out by a larger company.  I think BAE bought
22    Riptide.
23    Q.   Now, you mentioned briefly that Riptide is a CDC, a
24    cleared defense contractor.  Can you describe to the Judge what
25    types of items they manufacture?
```

1  A.   I'm not sure I know their entire product line, but the

2  product line that I'm aware of is they produce a line of

3  autonomous underwater vehicles.  An autonomous underwater

4  vehicle is a vehicle that can be placed into the water and can

5  be operated without a person being in the vehicle.  And Riptide

6  produces micro versions up to, you know, substantial, like

7  torpedo-size vehicles.  And they all have various

8  instrumentation, things that make them drive and then can take

9  on certain payload, what you want the vehicle to be able to do,

10:26 10  then it takes on a certain payload to be able to perform

11  whatever that desired action is.  So Riptide at least produces

12  those.  They may produce others things.

13  Q.   And to whom does it sell these types of products to?

14  A.   I don't know the definitive customer list.  I know that

15  the U.S. Navy, for example, is a substantial customer of

16  Riptide's and purchases a variety of those autonomous

17  underwater vehicles.

18  Q.   So with that background, you indicated you spoke to

19  Riptide on numerous occasions.  And based upon your discussions

10:27 20  with them why was it -- are you aware why it is that they sent

21  the initial contact or reported Qin to DSS, Defense Security

22  Service?

23       MR. KETTLEWELL:  Objection, your Honor.  What they

24  said, not what his reasoning is as to why they did something.

25       THE COURT:  Counsel?

```
 1              MS. SIEGMANN:  The case agent is on the witness stand,
 2       and it's his reasonable suspicion that is actually at issue in
 3       this hearing, and so, therefore, it's his understanding that's
 4       actually the most important of all the witnesses we're going to
 5       hear today.
 6              THE COURT:  I'll allow it on that basis.
 7              Counsel.
 8       A.   So, just to be clear, could you ask me the question again?
 9       Q.   Yes.  So when you first talked to Riptide, what was your
10:28 10  understanding as to why they reported Qin to the authorities,
11       the investigators?
12       A.   Okay.  So my understanding at the time was that there had
13       been a series of conversations between Qin and Riptide about a
14       particular vehicle.  As a result of that interaction, Riptide
15       submitted a commodity classification to the Department of
16       Commerce about the particular vehicle that Qin was interested
17       in purchasing.  That vehicle -- the commodity classification
18       came back from the Department of Commerce, I think it was
19       8A001, which would have a variety of controls for export,
10:28 20  including national security.  China is noted on the country
21       chart as national security 2.  So there's a national security
22       reason why a license would be required for that particular
23       product.
24              My understanding at the time was that what Qin
25       described was kind of a traditional researcher
```

1    oceanographer-type interest, but the vehicle that was quoted

2    would trend away from a typical research application and more

3    towards a military application.  So that's where the commerce

4    regulations apply, things that have a civilian use but also

5    have a military use.

6           And so my understanding is that Riptide did not

7    necessarily believe Qin's claim about the specific end use of

8    the product that he was seeking.  And then, when it came back

9    with the national security classification, the 8A001, or

10:30 10  controlled for national security reasons, instead of talking

11   with Qin further, they just made a report to the Defense

12   Security Service.

13   Q.   Did Riptide provide any documents to the investigators?

14   A.   They did.  They provided their e-mail, their e-mail

15   exchanges with Qin.  I think Riptide also provided a copy of

16   the commodity classification.

17          MS. SIEGMANN:  May I approach, your Honor?

18          THE COURT:  You may.

19          MS. SIEGMANN:  I'm handing the witness what has been

10:30 20  marked Exhibit 1.

21          THE COURT:  Counsel, I'd just note for the record I

22   have this binder on the bench up here.  Do these correspond to

23   what the government is planning to offer?

24          MS. SIEGMANN:  Yes, your Honor.  That binder is all of

25   the government's exhibits.

```
 1   BY MS. SIEGMANN:

 2   Q.   Special Agent Andersen, do you recognize Exhibit 1?

 3   A.   I do.

 4   Q.   What is it?

 5   A.   It appears to be e-mail communications, copies of e-mails

 6   between Qin and Riptide.

 7            MS. SIEGMANN:  The government moves to admit Exhibit

 8   1, your Honor.

 9            THE COURT:  Any objection, Exhibit 1?

10   MR. KETTLEWELL:  No objection, your Honor.

11            THE COURT:  They may be admitted as Exhibit 1.

12            (Exhibit 1 received into evidence.)

13            MS. SIEGMANN:  Can we use -- can we have it on the

14   computer for everyone?

15            THE COURT:  You may.

16            (Discussion off the record.)

17            MS. SIEGMANN:  There it is, thank you.

18            So if we could, can we turn to page 2?

19            Can we zoom in on that so we can all see it?

20   BY MS. SIEGMANN:

21   Q.   So, Special Agent Andersen, is this one of the first

22   e-mail -- the earlier of the e-mails that was provided by

23   Riptide to the government?

24   A.   As far as I know, that's correct.

25   Q.   And is it dated August 28, 2016?
```

1    A.    Yes.

2    Q.    And it reads the names --

3          MS. SIEGMANN:  The individuals at Riptide have been

4    redacted, your Honor, for the purpose of this hearing.

5    Q.    Is that your understanding, that the individual names have

6    been redacted from the exhibits here?

7    A.    Yes.

8    Q.    So it says Dear (an employee),

9          How are you?  I am Shuren from LinkOcean Technologies

10   in China.  I am interested in your micro-UUV and want to sell

11   to Chinese customers.  LinkOcean is the distributor of 24

12   oceanographic instruments makers.

13         I am in Boston this week, can I visit your office and

14   have a talk with you?

15         Did I read that portion of the e-mail correctly?

16   A.    Yes, you did.

17   Q.    Can you tell her Honor what "micro-UUV" stands for?

18   A.    Micro-UUV is -- I think is a term that they use.  I'm not

19   sure -- I think other companies use that as well.  The

20   micro-UUV, the underwater vehicle, micro is the smallest

21   version that they produce.

22   Q.    And what does "UUV" stand for?

23   A.    Underwater vehicle.

24   Q.    Underwater unmanned vehicle?

25   A.    Sorry, underwater unmanned vehicle.

1    Q.   Can you explain the difference -- you said earlier you

2    were talking about autonomous underwater vehicles, is that AUV?

3    A.   That's AUV, a subset of the UUV.

4    Q.   And what's the -- is there a difference between UUVs and

5    AUVs?

6    A.   So a UUV could be an AUV, an autonomous underwater

7    vehicle.  It could also be an ROV, a remotely operated vehicle.

8    So UUV is kind of the broader umbrella; and then AUV,

9    autonomous underwater vehicle, that's a vehicle that can

10:34 10   operate without a person being in it, without it being tethered

11   to some other vehicle.  It's not attached to a cord like a

12   remotely operated vehicle.  If you think about the movie

13   "Titanic," they go down in a vehicle that's tethered, right,

14   and so that would be an example of an ROV.  So UUV is the broad

15   category, AUV is a subset of that.  No person inside of it, not

16   attached to something else.

17   Q.   And are you aware as to when it said "your micro-UUV," who

18   Riptide was developing this micro-UUV for?

19   A.   I don't know if they developed it for the United States

10:35 20   Navy, but they certainly sold some to the United States Navy if

21   that answers your question.

22        MS. SIEGMANN:  Now, turning now to the first page,

23   Mr. Bruemmer.

24        In the middle there, the e-mail, starting "from"?

25   Q.   And then there's an e-mail on the first page that's dated

1    April 19, 2017.  Do you see that projected on the screen for

2    you?

3    A.   I do.

4    Q.   And that one reads, Dear (employee),

5         How are you?  I'm glad to hear that you have teamed

6    with Kraken Sonar to integrate AquaPix MINSAS on Riptide's new

7    2-man portable UUV platform.  It is great news.  LinkOcean is

8    representing Kraken in China and I have several leads for AUV

9    with MINSAS, but the AUV is not allowed to export to China.  I

10:36 10   am in Boston now, can we have a talk?

11        Did I read that portion of the e-mail correctly?

12   A.   Yes.

13   Q.   Now, Special Agent Andersen, did you read these e-mails

14   before conducting any e-mail communications with the defendant

15   in the undercover capacity?

16   A.   Yes.

17   Q.   And what, if anything, was significant to you about these

18   e-mails?

19   A.   That he identified himself as the owner of a Chinese

10:36 20   business, that he had some -- that it was his intention to get

21   these vehicles to China, and one of the things that I took away

22   is that he had some understanding of export regulations in the

23   United States because he says that he understands that in

24   particular, the e-mail that you just read, he highlights the

25   fact that it could not be exported to China.  I think -- to me

1    that implied that he had some understanding of -- that that

2    product was controlled in some way.

3    Q.   And by the time this April 19, 2017 e-mail was sent to

4    Riptide, had the commodity classification been obtained?

5    A.   Yes, I think so.  It was closer in time to the original

6    e-mail as opposed to this follow-up one.

7    Q.   Okay.  Did you review any other materials prior

8    communicating with Qin in any undercover capacity, any reports?

9    A.   I did.  As I said earlier, there were a number of other

10:37 10    investigative agencies that have been involved in this

11    investigation with us, and there was a meeting that had taken

12    place between Qin and a personnel who worked for Riptide, and

13    NCIS I think had created a report documenting what took place

14    at that meeting.

15             MS. SIEGMANN:  May I approach, your Honor?

16             THE COURT:  You may.

17             MS. SIEGMANN:  I'm handing the witness what has been

18    marked as Exhibit 2.

19    BY MS. SIEGMANN:

10:38 20    Q.   Do you recognize that report, Special Agent Andersen?

21    A.   I do.

22    Q.   What is it?

23    A.   It is an investigative report that was produced by a

24    special agent assigned to the Naval Criminal Investigative

25    Service.

```
 1    Q.    Was she working on this case with you?

 2    A.    She was, yes.

 3          MS. SIEGMANN:  Your Honor, the government moves to

 4    admit Exhibit 2.

 5          THE COURT:  Any objection?

 6          MR. KETTLEWELL:  No objection.

 7          (Exhibit 2 received into evidence.)

 8    BY MS. SIEGMANN:

 9    Q.    You mentioned before this was a report that was

10    summarizing a meeting; is that right?

11    A.    Yeah, that's right.  Qin requested a meeting with Riptide,

12    and --

13          MS. SIEGMANN:  Can we bring up the exhibit?

14    Q.    It says, "Results of Initial Meeting With Shuren Qin."  Is

15    that the title of the report?

16    A.    Yes.

17    Q.    And can you summarize -- or strike that.

18          Was there anything contained in this report that you

19    found important to your investigation?

20    A.    So there were a couple of things.  I think -- I'm trying

21    to find --

22    Q.    Page 2.

23    A.    Yes.  So the thing that stood out to me the most --

24          MS. SIEGMANN:  Highlight paragraph 4.

25    A.    -- was that Qin suggested to Riptide that he could open a
```

1    U.S.-based company and that Riptide could sell vehicles to him

2    in the United States, basically creating a domestic sell, and

3    that Qin would take on the responsibility of getting the

4    product from the United States to China.  And that is something

5    that stood out to me immediately.

6    Q.    Why is that?

7    A.    Well, that's a very common proliferation tactic.  The

8    export laws that U.S. manufacturers are obligated to enforce

9    and to ensure that they're not violating, they don't apply to

10:40 10   domestic sales unless the manufacturer were to know that that

11   product was going to be exported.  So if you create a

12   U.S.-based company and you go to Riptide and say, Hey, my

13   U.S.-based company X, Y, Z wants to buy these vehicles, if you

14   didn't tell Riptide anything about them going to China, then

15   they could just do the domestic sale and then the proliferation

16   agent would take care of getting it out of the country.  And

17   typically that's done in a way that we refer to as smuggling.

18   They find a way, contrary to law, to get it out of the United

19   States.  So -- and it's a tactic that is applied across the

10:41 20   broad spectrum of our investigations.  So that he suggested it

21   in his very first meeting with Riptide was noteworthy to me.

22   Q.    Just so the Court understands, so this was in the context

23   of a meeting with Riptide where there was an agent who was

24   posing as an employee of Riptide, so acting in an undercover

25   capacity?

1    A.    That's correct.

2    Q.    And this is a report documenting that meeting?

3    A.    That's right.

4    Q.    The meeting wasn't recorded?

5    A.    Not to my knowledge, no.

6    Q.    So in addition to the suggestion, was there anything --

7    anything in addition to that that was of concern to you?

8    A.    Yes, so -- there was.  I think consistent with what I was

9    talking about earlier, that the description of who he was

10:42 10   trying to buy this for, researcher or oceanographer, was

11   inconsistent with the capabilities that he was requesting.  And

12   obviously Riptide folks have a lot more experience in that

13   realm.

14         One of the things that Qin talked about in the

15   meeting was the ability to gather data in real time.  This

16   stood out to Riptide, and it stood out to me as well when I was

17   talking to them about that particular request, because a

18   typical research vessel is programmed, thrown into the water,

19   runs a mission, zigzag or whatever, whatever is programmed --

10:43 20   collects data, water samples, temperature readings, also

21   whatever it's programmed to do -- the vessel comes back, it's

22   retrieved, the data is downloaded and then analyzed by the

23   researcher.  Small vehicles, low cost.

24         Qin's request that the vehicle be able to communicate

25   the data that it's collecting in real time and so that humans

1    on another vessel could see what data was being collected,

2    according to Riptide that was inconsistent with what his

3    described end use was, and that trended for Riptide folks to be

4    that's a military mission, that the gathering of data and the

5    transmission of that data in real time is one that military use

6    would be indicative.  So that stood out as well.

7    Q.   Was there any discussion about the Chinese military during

8    the course of this undercover meeting?

9    A.   Yes.  So in this, one of the things that -- I guess Qin

10:44 10   made a comment about when discussing the ability to communicate

11   the data in real time, Riptide described that, the use of

12   Iridium in order to achieve that result, and Qin responded

13   something to the effect of, Yeah, Chinese Navy doesn't want to

14   do that, Iridium is not secure.

15          My implication when reading -- the implication that I

16   took when reading it was that he may have revealed that in fact

17   the Chinese Navy was the customer of this vehicle that he was

18   talking to them about.

19   Q.   First of all, can you tell the Court what Iridium -- I

10:45 20   don't know if I said it right -- is?

21   A.   No, I can't.

22   Q.   Okay.  Can you also -- looking at this paragraph that's

23   highlighted on the screen here, there was -- did Mr. Qin

24   discuss who his customers were during this meeting?

25   A.   He did.

1  Q.   And does it read, Qin stated his customers were mostly

2  researchers and that he also sold to the Chinese Navy?

3  A.   That is what he said.

4  Q.   So during the first meeting with Qin, is that something

5  that he disclosed?

6  A.   It is.

7  Q.   During the course of this meeting did he also indicate

8  that he contacted U.S. companies?

9  A.   He did.  He indicated that he had contacted several.

10:45 10  Q.   And what was the purpose for him in contacting, that he

11  disclosed during this meeting, contacting those U.S. companies?

12  A.   My understanding was he was contacting those companies in

13  an effort to purchase autonomous underwater vehicles.

14  Q.   And what was the response he received from the U.S.

15  companies?

16  A.   That they would not sell him any.

17  Q.   So based upon your entire reading of this report -- or

18  what was the significance in total of all these statements that

19  you saw in this report to your investigation?

10:46 20  A.   I think if I had to synthesize it down to one thing, I

21  read this report and after my conversations with Riptide, I

22  believed that his customer was the Chinese Navy, that he was

23  looking to purchase vehicles that could be a prototype of a

24  system or were going to be put into use by the Chinese Navy.

25  Q.   Did that raise any national security concerns for you?

```
 1    A.   At this time there was a substantial ongoing dispute

 2    between the United States and China about the South China Sea,

 3    and that I was substantially concerned about the application of

 4    this technology in that disputed space that could potentially

 5    be used against our war fighters, and my review of this report

 6    heightened that concern.

 7    Q.   Did you review any other materials about Qin's company

 8    prior to engaging in undercover communications?

 9    A.   Yes.  I looked at his website, that was -- I would say

10:47 10    that was kind of the principal piece of information that I

11    accessed to learn more about LinkOcean.

12         MS. SIEGMANN:  May I approach, your Honor?

13         THE COURT:  You may.

14         MS. SIEGMANN:  I'm handing the witness what has been

15    marked Exhibit 3.

16    BY MS. SIEGMANN:

17    Q.   Special Agent Andersen, do you recognize that document I

18    just handed you?

19    A.   I do.

10:47 20    Q.   What is it?

21    A.   It looks like a printout from pages associated with

22    LinkOcean Technologies in China.

23    Q.   Now --

24         MS. SIEGMANN:  Your Honor, the government moves to

25    admit Exhibit 3.
```

1          THE COURT:  Any objection?

2          MR. KETTLEWELL:  No objection, your Honor.

3          (Exhibit 3 received into evidence.)

4    BY MS. SIEGMANN:

5    Q.   Prior to discussing that document, did you personally

6    review the contents of LinkOcean's website on your own

7    computer?

8    A.   I believe I did.  I reviewed --

9          THE COURT:  It may be published if you wish.

10:48 10   A.   Yes, I think I saw it on my own and I saw it on others.

11         MS. SIEGMANN:  Can you bring up Exhibit 3?

12   Q.   So did you make this screenshot yourself of the website?

13   A.   No, I did not.

14   Q.   Do you know who made it?

15   A.   I believe this was made by Special Agent Ed Hayden, the

16   Department of Commerce.

17   Q.   And with the exception of the fact that this is black and

18   white, does it appear to be identical or the content appear to

19   be identical to what you saw when you did your own searches?

10:49 20   A.   Yes, I would agree with that.

21   Q.   All right.  Let's walk through the website.

22         MS. SIEGMANN:  If you can highlight the first -- thank

23   you, Mr. Bruemmer.

24   Q.   So this screenshot is three pages; is that correct?

25   A.   Yes, that's correct.

```
 1    Q.   This is the English version, right?
 2    A.   That's correct.  He had a Chinese version; this was the
 3    English version.
 4    Q.   And it indicates your link to the oceanographic and
 5    hydrological markets in China, correct?
 6    A.   Yes.
 7    Q.   And then it indicates that LinkOcean Technologies was
 8    founded in August 2005.
 9    A.   That's correct.
10:49 10   Q.   In Qingdao by Shuren Qin.
11    A.   Yes.
12    Q.   Based on that, were you aware this was Mr. Qin's company?
13    A.   That was my understanding.  That was my understanding
14    prior to reviewing this, I guess this helped to cement that.
15    Q.   And then it indicates that LinkOcean represents 24
16    companies; is that correct?
17    A.   Yes.
18    Q.   And on the list of companies, were there U.S. companies
19    that he claimed to represent?
10:50 20   A.   Yes, there were.
21         MS. SIEGMANN:  Can you turn to the next page,
22    Mr. Bruemmer?
23    Q.   And was there anything that you found interesting on this
24    page of the website?
25    A.   Yes.  So, in particular, one of the things -- in the
```

1    investigation of proliferation networks, particularly with a

2    focus on China, we have a tendency to focus on research

3    institutes because of the way in which the Chinese military

4    uses research institutes in China to conduct kind of

5    foundational research for weapons or weapons systems that

6    they're going to employ in the field.  So we always have an eye

7    towards what's the relationship between an individual and

8    research institutes in China.  And so I just noted that he did

9    business with research institutes in China.

10:51 10   Q.   And based upon the defendant's website, were all of

11   LinkOcean's customers located in the People's Republic of

12   China?

13   A.   Yeah.  So that was the other thing, is that although he

14   was purchasing commodities effectively around the globe, he

15   didn't have customers other than those in China, at least as

16   far as we could tell at this point.

17   Q.   Did the website list -- you mentioned research institute,

18   did the website list LinkOcean's customers?

19   A.   They did.  It did.

10:51 20   Q.   And did you review that list?

21   A.   I did.

22   Q.   And in addition, you mentioned research institutes.  Was

23   there anything -- any other customers that raised concerns to

24   you?

25             MS. SIEGMANN:  Turn to page 3, please.

A.   Well, on page 3, at least in this version of his website,

he identified the China Navy as one of his customers.

Q.   Is that what you're referring to, number 47, China Navy?

A.   Yes, 47.

Q.   I'm sorry, you said on this version of the website.  What

do you mean by that?

A.   At sometime after the border search, he or someone at his

direction modified the website and I think took out China Navy.

Q.   Now, why were you concerned whether -- I'm sorry, did you

say you were concerned about the China Navy being a customer?

A.   Of course.  The technology that he was expressing an

interest in purchasing it, at least what we knew about at the

time, required a license for export to China.  It was unlikely

that he would have gotten one.

Just as an example, if he had identified the Chinese

Navy or a research institute that was doing work on behalf of

the Chinese Navy, if he had identified them as an end user,

it's unlikely that he would have been able to get a license for

that particular product.  And so if I harken back to some of

the things that he talked about with Riptide, for example,

about creating a domestic company, you can sell it to me here,

I'll take care of getting it to China, things of that nature,

and then to see that he himself identified the Chinese Navy as

one of his customers, yeah, I was -- I was obviously concerned

that he was procuring commodities that ultimately would be used

1    against our naval forces we'll just say in the South China Sea.

2    Q.   Are you familiar with the arms embargo against China?

3    A.   Yes.

4    Q.   What does that mean, that the United States has an arms

5    embargo against China?

6    A.   Well, as I think implied in the title, in particular

7    munitions goods cannot go to China.  Dual-use goods are

8    reviewed.  Because of the concern about the use of certain

9    goods by the Chinese military, we have to review the product,

10:54 10   the end user, the person that's actually going to put it into

11   play, and the country, obviously in this case we're talking

12   about China.  So the country of ultimate destination.  Like we

13   take a very close look at things that have a military

14   capability going to China in part because of the arms embargo.

15   Q.   So when you saw item number 47, China Navy, as one of the

16   defendant's customers, what did you interpret that to mean?

17   A.   I guess at the time I interpreted it to mean that he sold

18   products directly to the Chinese Navy, because he's putting it

19   on his website, I'm selling to the Chinese Navy as a customer.

10:55 20   So that's what I took it to mean, I'm working on behalf of

21   them.

22   Q.   Now, and when you -- do you have any experience with

23   the -- personal experience with the military?

24   A.   Yes.  I served as a United States Marine.

25   Q.   So when you saw the term "Navy," what does that imply to

1    you?  Is it just ships, is it submarines, is it both?  What did

2    you interpret that to mean?

3              MR. KETTLEWELL:  Objection to the leading, your Honor.

4              THE COURT:  Well, counsel, you can ask another

5    question; you can rephrase.

6    BY MS. SIEGMANN:

7    Q.   How broad of an interpretation did you infer from the

8    China Navy reference here?

9    A.   I think my initial understanding was as it related to the

10:56 10   technology that he was looking at, so given the fact that he

11   was looking for an underwater vehicle, I took that to mean that

12   we were talking about naval subsurface fleets, sonar nets, the

13   ability to detect the movement, anti-submarine warfare, mine

14   countermeasures.  So I really was thinking about it in kind of

15   a submarine aspect.  And then I think there are lots of

16   different -- for lack of a better term, there are a lot of jobs

17   in that environment.  So, as I said, anti-submarine warfare

18   being one, mine countermeasures, intelligence surveillance

19   reconnaissance, ISR job, so that's where I thought that his

10:57 20   customer found themselves, he was buying on behalf of Chinese

21   naval forces that were focused on that effort.

22   Q.   Now, I'm going to move on to beyond the website now.

23              THE COURT:  Just so I understand on the licensing

24   piece of it.  I think you said that a license would have been

25   required for the purchase and it likely would have been denied

1    if the end user were the China Navy.  Does that mean there's

2    some possibility of a license being received if it was for a

3    research institute in China or no?  Do you understand my point?

4              THE WITNESS:  Yeah, I think that's right, your Honor.

5    That if Qin had identified a research institute and after

6    vetting the Department of Commerce believed who Qin claimed the

7    end user was going to be research institute X, then the

8    Department of Commerce, if the capabilities of the vehicle

9    required, the Department of Commerce could issue a license for

10:58 10   its export to that destination, that specific entity in that

11   place.  But as I talked about earlier, because of the arms

12   embargo, the regulating agencies take a very close look at

13   anything that may be used by the Chinese military, and I'm not

14   a licensing officer, but working in these investigations, we

15   have a tendency to know if Qin had said specifically, I want to

16   buy this vehicle and I'm going to ship it to Chinese subsurface

17   naval force X, can I have a license, he would not have been

18   able to get a license for that, that would not have been

19   allowed.

10:59 20         THE COURT:  Thank you.

21   BY MS. SIEGMANN:

22   Q.   And to follow up, so Special Agent Andersen, based on your

23   experience and training, what is the relationship between

24   research institutes and the Chinese military?

25   A.   Right, so the research institutes are an important part of

         1   the Chinese military.  The research institutes receive

         2   substantial funding from the Chinese military.  So if you talk

         3   about the People's Liberation Army and the People's Liberation

         4   Army Naval Force, they get a lot of money, the research

         5   institutions do, from the military.  From my training and

         6   experience, a lot of the systems that the Chinese military

         7   develops are developed through research institutes, and then

         8   once they have the technology down, once they can produce it in

         9   sufficient quantity, it moves to whatever their fleet force is.

11:00   10   Q.   And when you just said "research institutes," you were

        11   specifically referring to Chinese research institutes, correct?

        12   A.   Yes.

        13   Q.   And why is there an effort by the Chinese military and

        14   research institutes to acquire dual-use technologies from the

        15   United States?

        16   A.   Because they can't get the stuff that's controlled on the

        17   United States Munitions List, they can't get things that are in

        18   and of themselves munitions items, they're embargoed.  So they

        19   target items that have a dual use and make those purchases and

11:00   20   try to incorporate them in a system that serves their purposes.

        21   So they can't buy the munitions good, they have to buy

        22   something and -- my terminology -- tune it up to get it to

        23   perform in a battle theater, for example.

        24   Q.   Did you -- in addition to reviewing the website and the

        25   e-mails and the reports, did you talk to any non-governmental

```
 1   entities prior to starting communications with Mr. Qin?
 2   A.    I did, yes.
 3   Q.    Who did you talk to?
 4   A.    We went to -- we went and spoke with other -- so we spoke
 5   with the folks at Riptide, and then to get a -- I guess a
 6   broader handle on the technology, we went to two U.S.
 7   manufacturers actually down in Fall River, Mass.  L3
 8   OceanServer, it used to be OceanServer, then L3, big defense
 9   manufacturer bought out OceanServer.  So L3 OceanServer we went
10   to, and then we went to Xylem, they were located in the same
11   building.  They work -- it's like a research facility on the
12   water down in Fall River.
13   Q.    Why did you contact them?
14   A.    They appeared to produce a similar line of products as
15   Riptide, so I think it's good -- instead of focusing just on
16   what Riptide told us, I think it's helpful if I get other
17   perspectives.  So we went and spoke to those -- the folks at
18   OceanServer and at Xylem as well.
19   Q.    Based upon those conversations did you learn anything that
20   was significant to your investigation?
21   A.    Yeah, so a couple of things.  They, too, were producing
22   similar vehicles on behalf of the U.S. Navy.  The U.S. Navy is
23   a big customer for folks in that marketplace.  They -- I'm
24   talking about both companies, OceanServer and Xylem, produced
25   kind of the full range of vehicles so that went from little or
```

1    no control through commerce control, and then they had ones

2    that were controlled under the ITAR, U.S. munition-type items.

3    Both companies had those.  And I think in talking to both

4    companies we learned that, in fact, Qin had been in contact

5    with them and had been asking about autonomous underwater

6    vehicles, and they declined to sell him any.  They were not

7    interested in selling to the China market, and, in particular,

8    they wouldn't sell any to Qin.

9    Q.   Now, you mentioned that you were the undercover agent on

11:03 10   this investigation.  How long did the undercover investigation

11   last?

12   A.   Not that long, a couple of months.  I think sometime in

13   May until sometime early or mid-July.

14   Q.   How did you communicate with the defendant?

15   A.   Through e-mail.

16   Q.   I want to review some of those communications with you.

17             MS. SIEGMANN:  Your Honor, may I approach the witness?

18             THE COURT:  And just so I'm clear and I'm not assuming

19   I shouldn't, when you refer to the undercover, you mean

11:04 20   something that did not include the naval undercover.

21             THE WITNESS:  Yes, that's correct, your Honor.  I

22   wasn't involved in that initial meeting.

23             THE COURT:  Thank you.

24             MS. SIEGMANN:  May I approach, your Honor?

25             THE COURT:  You may.

1         MS. SIEGMANN:  I'm going to hand the witness exhibits

2    4 through 7.

3    Q.   Do you recognize those exhibits, Special Agent Andersen?

4    A.   Yes, I do.

5    Q.   What are they?

6    A.   So these are some of the e-mail communications that I had

7    with Qin on behalf of an undercover company.

8    Q.   And just --

9         MS. SIEGMANN:  Your Honor, may I move to admit Exhibit

11:05 10   4 through 7?

11        THE COURT:  Any objection?

12        MR. KETTLEWELL:  Just checking one thing, your Honor.

13        THE COURT:  Sure.

14        (Pause.)

15        MR. KETTLEWELL:  No, your Honor.

16        THE COURT:  They may be admitted, 4 through 7, and

17   published if you wish.

18        (Exhibits 4, 5, 6, 7 received into evidence.)

19   BY MS. SIEGMANN:

11:05 20   Q.   And before talking about those communications, I just want

21   to follow up on one of the Judge's questions.

22        So, Special Agent Andersen, did you ever meet in

23   person with the defendant?

24   A.   No, I didn't.

25   Q.   So that initial meeting occurred in April 2017?

           1    A.   I don't remember the date.  I know that I got involved --

           2    it's probably written on the document that you gave me, but

           3    that sounds correct.  I wasn't involved in that, and I never

           4    met with Qin face to face until the day that we arrested him.

           5    Q.   And these were e-mail communications that you were in

           6    charge of writing?

           7    A.   That's correct.

           8         MS. SIEGMANN:  Let's pull up Exhibit 4, please,

           9    Mr. Bruemmer.

    11:06  10    Q.   So this is -- was this one of your first e-mails with

          11    Mr. Qin or around that time that you started communicating with

          12    him?

          13    A.   Yes, I believe that's correct.  It was around that time.

          14    Q.   And are these e-mails in Exhibit 4 that reflect -- that

          15    occurred on or about June 1, 2017?

          16    A.   Yes.

          17    Q.   If you could summarize for the Judge what occurred in

          18    these two e-mails from -- one from Mr. Qin and one from you.

          19    A.   Qin asked a series of questions about the vehicle that he

    11:07  20    had been talking to Riptide about.  I guess we -- we asked

          21    Riptide to transition him to an undercover platform so that we

          22    could take over the communication with him, and so these are

          23    some of the exchanges that we had in, I think, the early days.

          24         And Qin asked a series of questions about the

          25    particular vehicle, and then he gets the answers that I

1    provided to him after I consulted with Riptide.

2    Q.    I want to follow-up on that.

3          So he would ask a set of questions of you.  Were they

4    of a technical nature?

5    A.    Yeah, I would say that they were, yes.

6    Q.    So how did you -- in all your e-mail communications with

7    Mr. Qin, how did you respond to those technical questions?

8    A.    Typically I would pick up and call one of a couple -- I

9    think by this time I was talking to a specific Riptide

11:08 10   employee, and I would ask, you know, here's the question he

11   asked, how do I respond to that?  You know, obviously I'm not

12   an expert in this technology, I don't manufacture it, I don't

13   sell it, so I would talk to Riptide and ask them how should I

14   respond.

15   Q.    In this e-mail -- if we can highlight the first paragraph

16   on top.

17         Do you see that paragraph?

18   A.    Yes.

19   Q.    And, Special Agent Andersen, did Mr. Qin identify his

11:08 20   customer in this e-mail to you?

21   A.    He did.

22   Q.    And how did he identify his customer?

23   A.    Customer is a marine ecologist, not a developer.

24   Q.    Did you -- based upon your communications with Riptide,

25   did you believe that to be true?

1    A.    Neither I nor Riptide believed that to be true.

2    Q.    Why not?

3    A.    Well, we were -- consistent with what he had said earlier,

4    asking for specifications that denoted a more capable use or

5    end use, and I guess, in particular, with the paragraph you

6    highlighted here, he was focusing on Wi-Fi communication with

7    the vehicle.  And Riptide's view of that was, again, in a

8    typical research-based application, the use of Wi-Fi would not

9    be an application that a normal researcher would ask for or

11:09 10   would want to pay for.

11   Q.   And with regards to the communications, did you see

12   whether he continued to identify himself as the president of

13   LinkOcean?

14   A.    I did, I did note that.

15   Q.    Moving to Exhibit 5.

16         MS. SIEGMANN:  Can I just have one second, your Honor?

17         THE COURT:  Yes.

18         (Discussion off the record.)

19   BY MS. SIEGMANN:

11:10 20   Q.    All right.  So, Exhibit 5, can you describe this set of

21   e-mail communications that occurred, is it on or about June 9,

22   2017?

23   A.    Yes.  So I think the bottom part of Exhibit 5 is an e-mail

24   response that I sent to him providing answers to questions that

25   he asked, and then his response at the top.

1          MS. SIEGMANN:  Can you highlight that on top?

2    A.    I'm sorry?

3    Q.    I'm going to highlight the top so you can read it easier.

4          And this was Mr. Qin's response?

5    A.    Yes.

6    Q.    Now, in the top there, is there any reference to any

7    particular part?

8    A.    So here he's specifically talking about the Riptide UUV.

9    So we're talking about that vehicle, a Riptide vehicle, it's

11:11 10   still an autonomous vehicle.  Here the UUV is still the big

11   umbrella, but we were always talking about the unmanned

12   vehicle, non-tethered, able to do its mission on its own.

13   Q.    And that was the one that you indicated earlier had a

14   commodity classification had been conducted for it?

15   A.    Yeah, that Riptide had done based on specifications that

16   he had submitted to them.

17          THE COURT:  Not to be dense here, so I'm not assuming

18   something that's incorrect.  When you said you had the company

19   move you over to another platform, is your undercover capacity

11:12 20   as some employee of Riptide?

21          THE WITNESS:  So, in this case, that was not correct.

22   We -- Riptide provided information to Mr. Qin about their lack

23   of desire to want to do business with him, and then suggested

24   that there was another company that they were familiar with who

25   he could speak with.

```
 1              THE COURT:  Okay.  Thank you.
 2    BY MS. SIEGMANN:
 3    Q.   So, Special Agent, we have the discussions continuing on
 4    the Riptide UUV.  Let's continue onto Exhibit 6.
 5              And if we could highlight the first paragraph on that
 6    page.
 7              Special Agent Andersen, do you recognize these e-mail
 8    communications?
 9    A.   I do.
10    Q.   And these were dated in July of 2017?
11    A.   That's correct.
12    Q.   And I want to direct your attention to the middle of the
13    paragraph there.
14              Does it read, Could you contact Xylem for the quote
15    for one units of old EcoMapper 32 or the new i3XO EcoMapper?
16    The requirements are attached.  Please do not tell Xylem your
17    end user is in China, you could tell them your customer is in
18    U.S.
19              Did I read that correctly?
20    A.   You did.
21    Q.   Did that raise any concern for you?
22    A.   It did.
23    Q.   Why was that?
24    A.   Well, in particular, the last part of that line.  So
25    having spoken to the folks at Xylem, I understood that this
```

1    particular product would be controlled for export to China.

2    And the implication to me was that Qin knew the same thing,

3    which is why he said that, I, in the capacity of the company

4    that I was representing, should not tell Xylem that the end

5    user is in China.  It -- to me that seemed like a very clear

6    indication that either he understood it wouldn't get a license

7    or that we should avoid the license process altogether.

8    Q.   Had you talked to Xylem -- you indicated that you had

9    prior to these undercover communications.

11:14 10   A.   Yeah, that's right.  So we had spoken to them earlier in

11   that spring, and then in response to this e-mail we spoke with

12   them again about this particular product.

13   Q.   And what did you learn from Xylem about this product?

14   A.   That this product would be controlled for export to China

15   and they wouldn't export it; they wouldn't engage in the effort

16   to try to export it to China.

17   Q.   With regards to -- and going further down in this e-mail

18   to the last line -- well, I'm sorry, let's go through the whole

19   thing.

11:15 20        My customer wants to buy some other products, if you

21   could provide the quote and make sure you could export to

22   China, it would be great.

23        And then he cites to two sonobuoys.  Do you see that?

24   A.   Yes, I do.

25   Q.   Can you tell the Judge what a sonobuoy is?

A.   A sonobuoy is a tube, your Honor, that is deployed in a
marine environment.  It sends out a signal to detect movement,
sound, objects in the water around it, and then has the
ability, when it identifies something, a submarine, just say
for example, then it transmits a signal.  And a sonobuoy is
strictly a military item that is controlled under the United
States Munitions List and only has a military purpose.

Q.   So did this inquiry for sonobuoys raise any concerns for
you?

A.   It sure did.

Q.   Why is that?

A.   Well, he's identified a number of research institutes in
China who he's working on behalf of; he's identified the
Chinese Navy as a customer.  He has offered to open a U.S.
business so that Riptide would be willing to send him a vehicle
that required a license for export to China, and has already --
has told me in the same e-mail when asking for a quote on a
Xylem product not to tell Xylem that the end user is in China.
And then, we're talking about the Xylem quote, the customer who
wants that vehicle, and he says "my customer."  I obviously
assume it's the same customer that we're talking about, that
there hasn't been another customer.  Then requests military
sonobuoys.  And then Qin directs me exactly where he wants me
to get the quote from, and sonobuoys@ultra-ms.com, Ultra is
actually Ultra Electronics, a leading manufacturer of defense

1   technology.

2   Q.   Did you talk to Ultra Electronics about this inquiry?

3   A.   I did.  So Ultra has an office in the Commonwealth of

4   Massachusetts.  They don't manufacture here, so I contacted

5   somebody here in Massachusetts, they put me in touch with one

6   of the folks at a manufacturing facility in the Midwest, and we

7   specifically talked about these particular items.

8   Q.   And what did you learn from Ultra Electronics?

9   A.   So fundamentally I learned that they're controlled under

11:18 10   the United States Munitions List; they only have a military

11   purpose.  One of the ones that he asked me to quote actually

12   was no longer in production, it was an older model, and if I

13   wanted to get any of those, I had to order a substantial

14   number.

15        And when I was closing my conversation with them, I

16   said to the guy out in the Midwest, I said, Does it mean

17   anything to you if the person who's asked me to quote these is

18   also asking me to quote autonomous underwater vehicles?  And

19   the employee who I was speaking with was surprised to hear

11:19 20   that, was actually shocked, and then asked if the person who I

21   was quoting on behalf of was Chinese.  And I said he was.  And

22   he said that Ultra was trying to produce an autonomous vehicle

23   that worked as part of a system involving the use of sonobuoys.

24   Traditional deployment of a sonobuoy is it's dropped in the

25   water and then you have to pass an aircraft or some other

1    vehicle overhead to gather the signal.  So the ability to

2    deploy a sonobuoy and receive signals in an underwater capacity

3    increases the stealth of that mission, that it could be done in

4    a way that is largely undetected.

5            So Ultra Electronics told me that they were working on

6    a system that involved autonomous vehicles and sonobuoys and

7    the collection of data from sonobuoys and the transmission in

8    the battle space.  So he was concerned that a subject from

9    China was asking for quotes of those individual parts because

11:20  10   they viewed them -- they were trying to build a system that

11   incorporated both.

12   Q.   And that was for a military --

13   A.   Sorry, Ultra Electronics, when they were talking to me

14   about that, they were strictly talking about the military

15   battle space, and their consumer would be, you know, U.S.

16   military, Canadian military, UK, things of that nature.

17   Q.   So turning now to Exhibit 7.

18           Can you describe what --

19           MS. SIEGMANN:  That's great, Mr. Bruemmer.  Zoom it

11:21  20   in, please.

21   Q.   Can you describe to the Judge what transpired in these

22   e-mails dated July 17th and July 18th of 2017?

23   A.   So in the top portion of the e-mail, that's an e-mail from

24   Qin to me through the undercover company in which he basically

25   says that he's, you know, effectively out on the Riptide

1    vehicle and wants to focus on the EcoMapper, and that his

2    customer is in agreement for the same thing.

3    Q.   And so there's some more communications regarding the

4    EcoMapper in this e-mail chain, correct?

5    A.   That's right.

6    Q.   Did Mr. Qin end up purchasing a sonobuoy from your

7    undercover platform?

8    A.   No, he didn't.

9    Q.   Did he place any orders with you?

11:22 10   A.   No, ultimately, he did not.

11   Q.   Okay.  So did the -- how did the communications end?

12   A.   I don't -- I don't remember exactly, but I'm not sure if

13   this is the last e-mail, but my sense is that this is one of

14   the last.  I think we got to a point where there just wasn't

15   anymore follow-up.

16   Q.   With regards to -- I'd just like to summarize your

17   undercover -- just the e-mail communications, because you

18   weren't part of -- you were not the person who met him in

19   person?

11:23 20   A.   I did not, no.

21   Q.   Was there an in-person meeting during the course of these

22   e-mail communications?

23   A.   There was.

24   Q.   So with regards to just the e-mail communications,

25   however, so during the course of those, did Mr. Qin talk to you

1    about the performance requirements he wanted for various parts?

2    A.   I would say that was underpinning most of our

3    communication.  The technical questions that we talked about

4    earlier, those typically related to capability and performance.

5    Based on my conversations with manufacturers, there was a

6    constant balance, size of the vehicle, propulsion of the

7    vehicle, payload capacity, electronics, navigation systems.  If

8    you add it here, you might have to take away there or you had

9    to go up in vehicle size.  So the back and forth with Qin was

11:24 10   largely related to capability, adding to the confined space of

11   the vehicle itself.

12   Q.   Going back to Exhibit 4, which was the e-mail in which he

13   described his customer as being a marine ecologist, do you see

14   that?

15   A.   Yes.

16   Q.   Did you believe that to be true?

17   A.   Initially I would say that question was somewhat open

18   ended.  You take it on its face that this is who he says he's

19   buying on behalf of.  But, as I said, my conversations with

11:24 20   Riptide at the time -- and as far as I understood, this is the

21   only customer that we were ever talking about.  I think there

22   is another -- there was -- I don't know if it's one of these

23   e-mails, but -- in which I'm clarifying with him about are we

24   talking about the same customer or someone different, and he

25   says -- I'm paraphrasing -- but we're talking about the same

customer.  So I always understood that we were talking about
one customer.

        So by the time we get to the question about, hey, my
customer would like you to quote these sonobuoys, there's no
way that I believe at that point that the customer that he's
talking about is a marine ecologist.

Q.   So by the time these communications with Mr. Qin end, who
did you believe that he was procuring parts for?

A.   I believe that he was procuring parts on behalf of the
Chinese Navy.

Q.   And did you believe there was a single customer?

A.   No, I don't know enough about how the Chinese Navy is
organized, but I didn't believe that there would be an
individual customer as much as, you know, for example, if he
was buying these on behalf of a research institute, part of the
way the proliferation networks work is that they try to make
purchases through a number of different venues to mask the
total number of a particular product that they're looking to
get.  So while Qin could have been talking to me, he just as
easily could have been talking to somebody else trying to get
the same parts in a different manner.  We see that consistently
in our investigations.

Q.   And just to clarify then, so did you during the course of
your communications see inconsistencies between what the
defendant said his end use or end user was and what the

1    applications of these parts were?

2    A.   Sure, I did.

3    Q.   And what significance did that have going into the end of

4    the summer of 2017 for you?

5    A.   For me the significance was that given the large volume of

6    communication, the ongoing effort that Qin was making by

7    talking to U.S. manufacturers about this particular type of

8    vehicle, an autonomous underwater vehicle, because he didn't

9    just talk to Riptide, he talked to a lot of different

11:27 10    companies, I was substantially concerned by the end of the

11    summer that the Chinese were working on a system that would

12    incorporate an autonomous underwater vehicle and somehow use it

13    in conjunction with sonobuoys in a military battle space that

14    would put our people at risk.  That's a real national security

15    threat, and it's one that I believed he was working to satisfy

16    on behalf of the Chinese.  That's what I thought, that's what I

17    was concerned about.

18    Q.   Okay.  So -- and following up on that, in the summer of

19    2017, what, if any, criminal violations did you and your

11:28 20    co-case agents from the other agencies suspect Qin of

21    committing?

22    A.   By then -- so, at some point, I don't remember exactly

23    when, but at some point during this period of time we reviewed

24    all of the records concerning exports conducted or in which

25    LinkOcean and/or Shuren Qin was involved.  And so we go to the

1    Automated Export System, we refer to it as AES, and we went and

2    looked at AES records pertaining to exports that Qin or

3    LinkOcean was a party to.  And I don't remember the exact

4    number, it was more than 20, it might have been more than 30,

5    I'm not exactly sure.  But in reviewing all of those records,

6    LinkOcean had been identified as the ultimate consignee in

7    every one.  I think there were two exceptions.  They were

8    identified as the ultimate consignee, but in two they were also

9    identified as an intermediate consignee.

11:29  10          So by review of the AES records, it was clear that he

11   was not disclosing, at least to the U.S. government, who the

12   true end user, what the real use of those products that he

13   purchased, what that use was going to be, who was actually

14   going to put that product into play.

15   Q.   Okay.  So, just generally and then we'll going into more

16   detail about the AES records, but in the summer of 2017, you

17   suspected the defendant of committing -- was it more than the

18   Export Administration Regulation violations?  Was there

19   anything else you suspected that he might be committing?

11:30  20   A.   Well, so -- yeah.  He was requesting things that were

21   controlled under the U.S. Munitions List, so was there an Arms

22   Export Control Act violation?  We didn't know, but we certainly

23   suspected that there could be.  Were there violations of the

24   Export Administration Regulations?  Yes, we believed that was

25   possible.  To be honest, at that point I think I had reviewed

1    his A-file and the review of records in AES seemed to suggest

2    or contradict statements that he made in connection with his

3    visa application.  So that was an area that we were thinking

4    about at that time.  Violations, you know, like 18 USC 1546,

5    visa fraud, making a false statement on a form.  That form was

6    taken under oath, that was the potential to be a perjury

7    violation.  So there were additional violations that we were

8    considering.

9    Q.   Was there any charges in relation to the fact that he was

11:31 10   working for the Chinese government?

11   A.   Right.  So one of the areas that we look at, I think with

12   most proliferators, particularly those who we know are --

13   potentially are acting on behalf of a foreign power, we look at

14   whether or not, for example, he registered as an agent of a

15   foreign government and was he acting on China's behalf,

16   specifically receiving direction from them.  So that was

17   another area that we were looking at.

18   Q.   You mentioned a few minutes ago AES, is that the Automated

19   Export System?

11:31 20   A.   Yes.

21   Q.   And what types of records -- I'm sorry, and you reviewed

22   records in AES?

23   A.   We did.

24   Q.   What types of records are maintained in the AES database?

25   A.   So the Electronic Export Information, the information

```
 1   that's required to be filed with the government when certain
 2   criteria are met, we refer to that as EEI, Electronic Export
 3   Information, that's the actual data that's maintained in the
 4   Automated Export System.  That's things like ultimate
 5   consignee, the U.S. principal party of interest, the name of
 6   the commodity, the value of the commodity, whether or not
 7   there's an applicable ECCN --
 8   Q.   Is that Export Control Classification Number?
 9   A.   Sorry?
10   Q.   Is that --
11   A.   Yes, it is.
12   Q.   Okay.
13   A.   I said value -- so that's not every single category of
14   information as part of the Electronic Export Information, but
15   those are the ones that we fundamentally find ourselves looking
16   at.
17   Q.   And EEI, Electronic Export Information, is that required
18   to be filed for any export of $2,500 or over or for which an
19   export license is required?
20   A.   Yes, that's correct.
21   Q.   And with regards to your job, looking at, investigating
22   export violations, do you often review EEI records, AES
23   records?
24   A.   In every case we look at EEI.
25   Q.   And how often do you review them, review those records
```

1    during the course of an investigation?

2    A.    So in a case like Qin, because the system, the Automated

3    Export System, is updated continuously, if we're conducting an

4    investigation of Qin today but we haven't done anything, he

5    still has the ability to export goods.  AES can change on a

6    daily basis, new exports are added.  So we look at AES quite

7    frequently and then look at the Electronic Export Information

8    filed in connection with a particular export.  And we do that

9    sometimes on a daily basis, sometimes once a week, it depends

11:34 10   on the case.

11    Q.    So are there criminal penalties for failing to file EEI or

12    filing false EEI within the United States government?

13    A.    There are.

14    Q.    I'm sorry, the EEI is filed with the United States

15    government, correct?

16    A.    Right, through the Automated Export System.

17    Q.    Do you know what the purpose of those filings are?

18    A.    Well, are we talking about it from an investigator

19    perspective?  The purpose is to identify the good, the value,

11:34 20   whether or not -- what the specific commodity classification

21    is, whether or not a license is required for that export, and,

22    in effect, who's going to have their hands on it.  So the

23    exporter, that is a person who had their hands on it, could be

24    the U.S. principal party of interest, the manufacturer.  If

25    it's going through a reseller, for example, a trading company,

1    something like that, that would be an intermediate consignee,

2    someone through whom it passes.  But one of the things that

3    we're most interested in, the thing that's within the U.S.

4    government's interest, is knowing where that thing, in this

5    case an autonomous underwater vehicle, where that thing is

6    going to be used and by whom.  And we look at that as the

7    ultimate consignee, a person who is going to put that commodity

8    into use.

9    Q.   Let me just clarify one issue.  So prior to the border

11:36 10   search in November of 2017, had you reviewed the EEI records

11   pertaining to LinkOcean?

12   A.   Yes.

13   Q.   How many times had you reviewed it by that point?

14   A.   I don't know.  I really don't know.  Quite a few.

15   Q.   And based upon your review of those EEI records, you

16   mentioned a few minutes ago that you had identified more than

17   20 transactions that you believe were false, that EEI had been

18   filed in false --

19        MR. KETTLEWELL:  Option, your Honor, I don't think he

11:36 20   said this.

21        THE COURT:  Sustained as to that question.

22        MS. SIEGMANN:  I'll rephrase.

23   BY MS. SIEGMANN:

24   Q.   So based upon your review of those EEI records had you

25   identified any records that you believed contained false

1    information?

2    A.    Records that identified -- so Electronic Export

3    Information that noted LinkOcean Technologies as the ultimate

4    consignee end user of particular goods, it was clear to me that

5    LinkOcean was not the end user, that at best LinkOcean would be

6    an intermediate consignee.  And so my view of that, the agents

7    that I was working with at the time with as much if not more

8    experience than me was that those were all false statements.

9    When Qin either did on his own or caused somebody else to

11:37 10   report that LinkOcean was the ultimate consignee of these

11   particular goods, my view is that that was not a truthful

12   statement.

13   Q.    Why is that?  Why couldn't LinkOcean -- in your view, why

14   shouldn't it have been reported as the ultimate consignee?

15   A.    Because they weren't the ones who were going to put it

16   into use.  It was clear from the conversations that Qin had

17   with folks at Riptide, with conversations that he had with us

18   in the undercover platform, conversations that he had with

19   other manufacturers of the same technology, that he was, as I

11:38 20   said, at best an intermediary, that it was going to pass

21   through him and go to someone else who was going to put it to

22   use.

23   Q.    And I'm sorry, how often was LinkOcean listed as the

24   ultimate consignee in the EEI that had been filed with the

25   government?

A.   I don't have the AES in front of me, but my memory is that

on every occasion they were identified as the ultimate

consignee.  My memory is on two occasions they were also

identified as an intermediate consignee.  I'm not entirely sure

how that could be true, but maybe -- well, I believe that's all

they ever were, was an intermediary, but I don't know how you

could identify them as both in the same export.

Q.   So the EEI requests the information about the exporter,

the intermediate consignee, and the ultimate consignee?

A.   That's correct.

Q.   So based upon your then review of the EEI and the fact

that LinkOcean was identified as the ultimate consignee in

every transaction, did you believe the defendant had violated

the Export Administration Regulations prior to November 2017?

A.   I did.

Q.   You mentioned that you discussed that conclusion with your

co-case agents?

A.   Yes.  I mean, that's the nature of the work, particularly

in this district, we take a pretty collaborative approach to

these types of investigations, and we work all the time --

there are very few cases -- actually, I can't think of any in

which I work on a CPI case, a counterproliferation

investigations case, by myself.  We always work on them in

concert with colleagues from other agencies.

Q.   Did any of your co-case agents disagree with your

1    conclusion?

2           MR. KETTLEWELL:  Objection, your Honor.

3           THE COURT:  Sustained as to that, counsel.  You can

4    ask another question.

5    BY MS. SIEGMANN:

6    Q.   Well, you said you work in a collaborative environment.

7    So -- is that correct?

8    A.   That's correct.

9    Q.   And when you're talking about the case, you all together

11:40 10   come up with a joint understanding or a collective

11   understanding as to how you're going to proceed?

12   A.   I would agree.

13   Q.   Was there anyone in the -- in your -- amongst the co-case

14   agents that raised any concern with continuing to investigate

15   this case?

16   A.   Nobody raised any concerns about that, no.

17   Q.   Turning now -- directing your attention to October of

18   2017, what, if anything, happened in October pertaining to this

19   investigation?

11:41 20   A.   In October, if my memory is right, there was an export

21   of -- on behalf of LinkOcean Technologies.  The U.S.

22   manufacturer was identified as Marine Sonic, it's also known as

23   Atlas North America, they're the parent company in Marine

24   Sonic, a subsidiary of Atlas North America, and there was an

25   export of something that we wanted to inspect.

1    So we have the ability to target certain shipments for

2    inspection, and we targeted that shipment in October.  And for

3    a variety of reasons we weren't actually able to get it

4    stopped.  And it ultimately was exported, and then that

5    prompted us to want to have a conversation with the folks at

6    Marine Sonic Incorporated.  Their offices were in Yorktown,

7    Virginia, I think.

8    Q.   Did you eventually talk to Marine Sonic?

9    A.   Yes, we did.

11:42 10   Q.   Directing your attention to November 7, 2017, where did

11   you go?

12   A.   Myself and one of my colleagues, Special Agent Hayden,

13   traveled to the offices of Marine Sonic Incorporated in

14   Yorktown, Virginia and met with some of the employees of that

15   company to talk about specifically that most recent export that

16   we weren't actually able to stop and get a look at, and also

17   then to serve them with a grand jury subpoena for records.

18   Q.   Why did you decide to talk to Marine Sonic in November of

19   2017?

11:43 20   A.   Well, it was clear that Qin and LinkOcean were customers

21   of Marine Sonic.  I thought that they would have relevant

22   information about who Qin was, perhaps who he was purchasing on

23   behalf of.  They would have financial records and things of

24   that nature.  And I wanted to understand -- the export that we

25   missed suggested that a license for export would have been

1    required, that was what was on the Electronic Export

2    Information, that it may have required a license for export to

3    China.  How the commodity was described didn't make sense

4    within the context of the investigation, like, we hadn't seen

5    that before, so we wanted to understand more about that.

6    Q.   What do you mean, like, how was it described?

7    A.   I think that -- I think that's the one that was described

8    as compasses.  We hadn't seen that before.  That didn't comport

9    with what we understood the products he was interested in

11:44 10   purchasing.

11            So we traveled to Marine Sonic to talk about that

12   export, their relationship with Qin and LinkOcean, and, as I

13   said, ultimately served them with a subpoena for records.

14            THE COURT:  And just so I understand.  So the

15   paperwork, the EEI that's required, is actually broader than

16   the subset of commodities that would require a license,

17   meaning, there's some things for which you need to fill out

18   paperwork for which a license is not required.

19            THE WITNESS:  That's correct your Honor.  Anything

11:45 20   over $2,500 requires the filing of an EEI, but you could buy a

21   product that's only valued at $1,000, but if it requires a

22   license for export, then you would have to file EEI and

23   indicate that the license is required.

24            So, in this case, talking specifically about the EEI

25   for this particular product, the EEI suggested, based on the

1    classification number, that a license should have been required

2    for export because it was exported to China.  Subsequent

3    investigation revealed that may not have been true, so -- but

4    that was one of the things that we learned by talking to folks

5    at Marine Sonic.

6              THE COURT:  Thank you.

7    BY MS. SIEGMANN:

8    Q.    Okay.  So now moving -- so on November 7, 2017, did you

9    actually go to Marine Sonic?

11:46 10   A.    We sure did, went down to Yorktown, Virginia and met with

11   some of the employees at Marine Sonic.

12   Q.    Did they talk to you?

13   A.    They did.

14   Q.    And can you describe what happened during the interview?

15   A.    So we met with -- over the course of our meeting, I think

16   we met with three employees.  We talked about what Marine Sonic

17   produces.  It turns out they're a cleared defense contractor as

18   well, so they produce a line of products for the United States

19   military, in particular -- yeah, my memory from that interview

11:46 20   was that they produce a line of autonomous vehicles for the

21   Navy, specifically for SEALs, for SEAL teams, and they have

22   classified information on site, so they're a CDC.

23              They talked a little bit about who they are as a

24   company, bought by Atlas North America, and eventually we

25   focused the discussion to purchases made by Qin and LinkOcean.

1         He did not buy compasses.  He bought -- it turns out

2    that he was -- I think -- I don't have all the records in front

3    of me, obviously, but my memory of it was that he was

4    purchasing towed, t-o-w-e-d, towed vehicles, a side scan sonar

5    system from Atlas North America.  In fact, I think that is what

6    actually was exported on the one that kind of led off this part

7    of the conversation, it was actually a towed system that was

8    exported the month prior, not a compass.

9    Q.   So the description in the EEI was wrong?

11:47 10   A.   That's correct.

11   Q.   So it -- and I just want to focus in on what was

12   significant to your investigation of Qin.  Can you tell the

13   Judge what you found significant to that investigation during

14   this interview of Marine Sonic?

15   A.   At this point we've -- the investigative team, we've

16   talked to a number of U.S. manufacturers of products like this

17   autonomous vehicle.  And I think every single one of them had

18   contracts with the U.S. Navy.  The U.S. Navy was obviously

19   buying a lot of this technology, and my experience in this

11:48 20   investigative work, in this programmatic area, if the U.S. Navy

21   is buying all these products from here, then there are other

22   navies that are interested in buying products from the same

23   company.  If they're controlled, then they're more difficult to

24   get, so you have to come up with a scheme in order to be able

25   to do that.  That's where I and the other people that do the

1    work that I'm doing, that's where we step in and try to unpack

2    that scheme.

3              The other thing that we learned and that stood out to

4    me in particular was that apparently Qin had been a

5    long-standing customer of Marine Sonic, even though they had

6    been bought out by Atlas North America.  And one of the

7    gentlemen that we spoke with I think described Marine Sonic

8    prior to being bought out as a little bit more than a mom and

9    pop operation, they were smaller.  Then the purchase infusion

11:49 10   of capital, bigger contracts, they had a bigger kind of space

11   in that market.

12             And so because Qin had been a prior customer, he

13   could effectively pick up the phone, make a call, send an

14   e-mail, and because he had kind of this historical

15   relationship, they didn't ask a lot of him.  But one of the

16   things that we learned in that meeting with Marine Sonic was

17   that there were occasions when Marine Sonic knew who the

18   ultimate consignee was, the person or the entity that was going

19   to put that vehicle into use, and Qin asked Marine Sonic to

11:50 20   just report LinkOcean as the ultimate consignee.

21             There was even an occasion, we learned about it in

22   that meeting, there was a discrepancy between what the invoice

23   said the cost of a vehicle was and the value that was reported

24   within the Electronic Export Information.  So there was a

25   commercial invoice that went with that particular sale, the

```
     1    value on that invoice was higher than what was reported through

     2    EEI.

     3    Q.   So I'm sorry, so he undervalued?

     4    A.   He undervalued.  So we asked about the discrepancy, and we

     5    were told that Qin asked for the EEI, the value, to be reported

     6    incorrectly.  And my understanding is that the explanation was

     7    that that would make it easier for him to get into China.

     8    Q.   Have you seen undervaluing on EEI before this

     9    investigation?

11:51 10   A.   Sure.

    11    Q.   And what's your understanding as to why folks undervalue?

    12    A.   I mean, consistent with what Qin claimed, it was easier on

    13    the back end.  But that doesn't make it any less of a violation

    14    in the United States.  That information is required to be

    15    reported accurately.  So either Qin did it or he asked somebody

    16    to do it, but that's the information that the U.S. government

    17    collects to understand the goods that are going out of our

    18    country.

    19    Q.   I'm going to hand you --

11:52 20        MS. SIEGMANN:  Your Honor, may I approach?

    21        THE COURT:  Yes.  But, counsel, just give me a moment.

    22        (Discussion off the record.)

    23        THE COURT:  Counsel, we're just going to take a

    24    10-minute break, and then we'll come back.

    25        Sir, you can step down.  We'll take a 10-minute
```

```
 1   recess.

 2            THE CLERK:  All rise.

 3            (Recess taken.)

 4            THE CLERK:  All rise.

 5            Court is in session.  Please be seated.

 6            THE COURT:  We'll wait for a moment.

 7            (Discussion off the record.)

 8            (Pause.)

 9            THE COURT:  Counsel.

12:05 10            MS. SIEGMANN:  Thank you, your Honor.

11            May I approach the witness?

12            THE COURT:  You may.

13            MS. SIEGMANN:  I'm handing the witness what has been

14   marked Exhibit 8.

15   BY MS. SIEGMANN:

16   Q.   Do you recognize that document I just handed you?

17   A.   I do.

18   Q.   What is it?

19   A.   It looks like a copy of a report of investigation authored

12:05 20   by Special Agent Hayden after our visit to Marine Sonic

21   Technologies in Yorktown, Virginia.

22   Q.   Have you reviewed that report?

23   A.   I have.

24   Q.   And does it summarize the interview that you just

25   mentioned of Marine Sonic?
```

```
 1    A.    Yes.
 2          MS. SIEGMANN:  Your Honor, the government moves to
 3    admit Exhibit 8.
 4          THE COURT:  Any objection?
 5          MR. KETTLEWELL:  No objection, your Honor.
 6          THE COURT:  It may be admitted and published, if you
 7    wish.
 8          (Exhibit 8 received into evidence.)
 9          MS. SIEGMANN:  Can we bring it up?
12:06 10   BY MS. SIEGMANN:
11    Q.    So, Special Agent Andersen, so in the report that you --
12    Exhibit 8, it appears to be a three-page report, correct?
13    A.    That's right.
14    Q.    And in the report does it discuss the EEI concerns that
15    you mentioned prior to our break?
16    A.    It does.
17    Q.    And based upon your interview of Marine Sonic, had you
18    identified any specific EAR violations?
19    A.    Yes, I would say that we did.
12:07 20   Q.    Turning to the second page of the report --
21          MS. SIEGMANN:  If you can zoom in on that paragraph,
22    Mr. Bruemmer.
23    Q.    Was this one of the transactions or one of the EEI filings
24    that you discussed with Mr. -- I'm sorry, with the folks at
25    Marine Sonic?
```

1    A.   It is.

2    Q.   Can you describe what this was?

3    A.   So as I talked about earlier, we spoke with Marine Sonic

4    personnel, in particular, we talked about the export from

5    October of 2017.  And the export classification number for that

6    export that we attempted to stop was identified as 6A001, and

7    if that were the accurate ECCN, then it would have required a

8    license to be exported to China.  And then we talked about the

9    fact that we asked whether or not it was really a compass, and

12:08 10    it was not.

11    Q.   Was there any other specific EEI violations that you

12    discussed with Marine Sonic during the course of that

13    interview?

14    A.   We discussed the identification of LinkOcean as the

15    ultimate consignee, and whether or not Marine Sonic knew who

16    the actual ultimate consignee was; and then, as I discussed

17    earlier, we talked about the value of a particular export as it

18    related to what was on the invoice and then what was reported

19    through the Automated Export System and the EEI, that the EEI

12:09 20    was reported as a different number than what the true value

21    was.

22    Q.   And this is what you had seen for other companies as well

23    as Marine Sonic, that the ultimate consignee was listed at

24    LinkOcean?

25    A.   Absolutely.  I thought you were talking about the value,

1  but, yeah, that is what we had seen, that in every circumstance

2  LinkOcean was identified as the ultimate consignee.

3  Q.   At the end -- how did the interview end at Marine Sonic?

4  A.   So it ended with us handing them a grand jury subpoena for

5  records, and I think we left shortly thereafter.

6          MS. SIEGMANN:  Your Honor, may I approach?

7          THE COURT:  You may.

8          MS. SIEGMANN:  I'm handing the witness what has been

9  marked Exhibit 9.

12:10 10  BY MS. SIEGMANN:

11  Q.   Special Agent Andersen, do you recognize Exhibit 9?

12  A.   Yes.

13  Q.   What is it?

14  A.   It's a copy of the grand jury subpoena that we hand

15  delivered to Marine Sonic on the day of the interview there.

16          MS. SIEGMANN:  The government moves to admit Exhibit

17  9, your Honor.

18          THE COURT:  Any objection?

19          MR. KETTLEWELL:  No objection, your Honor.

12:10 20          THE COURT:  Okay.

21          Exhibit 9 is admitted and may be published.

22          (Exhibit 9 received into evidence.)

23  BY MS. SIEGMANN:

24  Q.   Special Agent Andersen, is this Exhibit 9, you indicated

25  this was a grand jury subpoena?

```
 1   A.   Yes, that's correct.

 2   Q.   And is there an attachment -- I'm sorry, what kind of

 3   subpoena is it?  What were you looking to obtain?

 4   A.   Records.

 5   Q.   Who drafted the attachment, like, the records to be

 6   produced?

 7   A.   I did.

 8        MS. SIEGMANN:  I want to turn now to page 3,

 9   Mr. Bruemmer.

12:11 10   Q.   So that's the attachment that you drafted?

11   A.   Yes.

12   Q.   And so what types of documents were you looking to obtain

13   from Marine Sonic through this subpoena?

14   A.   Category -- essentially, all documents that they had

15   pertaining to their business interactions with LinkOcean and/or

16   Shuren Qin.

17        MS. SIEGMANN:  Now, turning to paragraph 5, can you

18   zoom in on that, Mr. Bruemmer?

19   A.   Yeah, I see that.

12:11 20   Q.   And did you draft this language that's in paragraph 5?

21   A.   I did.

22   Q.   And it reads, Any technical and marketing information

23   regarding the technical specifications, military capabilities,

24   purposes and uses, or commodity classification or license

25   restrictions (including any photographs, scientific analysis,
```

1    or draft license applications) of any products quoted to,

2    purchased for, and shipped to LinkOcean Technologies and Shuren

3    Qin.

4            Did I read that correctly?

5    A.   That's right.

6    Q.   Why, sir, why, Special Agent Andersen, did you want that

7    type of information for your investigation?

8    A.   In these types of investigations, we are always looking

9    for technical data and specifications.  Sometimes proliferators

12:12 10   are not able to get the product.  Sometimes they can't get --

11   we'll just use this case, they can't get the autonomous

12   vehicle, but through a variety of ways, they may actually be

13   able to get the plans, the schematics, the technical drawings,

14   the manufacturing information that would allow -- through the

15   collection of that data that would allow someone to be able to

16   build the thing that they could not get exported.  And the

17   reason why proliferators do that is because it's a lot easier

18   to hide the data than it is necessarily to hide a box.

19           And so across the spectrum of our investigations in

12:13 20   this programmatic area, we're always looking for tech data,

21   because they may get the plans on how to make the widget but

22   they couldn't get the widget itself.  And if they can get the

23   plans out, then that means that, in this case, the Chinese can

24   build the thing without having to buy it.

25           So it's -- as it's iterated here in the attachment,

1    it's one of the many things that we're always on the lookout

2    for.

3    Q.   Is technical data controlled?

4    A.   Technical data can be controlled, just like the product.

5    Q.   On what list is it controlled?

6    A.   Well, it's definitely controlled -- I mean, it's

7    controlled on the U.S. Munitions List, the ability to build a

8    nuclear warhead, the same thing as the warhead itself, but it's

9    also controlled under the Commerce Control List.

12:14 10   Q.   It depends on what the technology relates to.

11   A.   Absolutely.  So just like the device itself, it depends on

12   what it is, who's going to use it, where it's going, and what

13   it's intended use is, those are the things that would dictate

14   its controllability.  And so it has the same controls as, in

15   this case, the vehicle itself.

16        MS. SIEGMANN:  Now, turning to page -- the next page,

17   Mr. Bruemmer, paragraph 10.

18   Q.   And did that section of the grand jury subpoena request

19   any materials relating to the export or attempted export of any

12:14 20   defense articles (including technical data) and services to

21   LinkOcean Technologies and Shuren Qin or any affiliated

22   companies?

23   A.   Yes, you read that correctly.

24   Q.   And, sir -- so, Special Agent, as you just mentioned, you

25   were looking to see if Marine Sonic had provided any technical

 1   data related to defense articles to Mr. Qin?

 2   A.   That's correct.

 3   Q.   And this was on November 7, 2017, that this subpoena was

 4   served?  On the same date as the interview?

 5   A.   It was the same date as the interview, yes.

 6   Q.   So that was November 7, 2017?

 7   A.   Yes.

 8   Q.   That was approximately two weeks before the border search

 9   was conducted?

12:15 10   A.   That's correct.

11   Q.   Turning, lastly, to paragraph 11 of this document.

12        Does that read, Any documents, photographs, records,

13   logs, or tangible items concerning, referring to, or relating

14   to, any defense articles or any commodities, technical data or

15   information, or services or training provided to employees of

16   LinkOcean Technologies?

17   A.   It does say that.

18   Q.   Do you recall whether Marine Sonic produced any records in

19   response to this subpoena?

12:16 20   A.   They did produce records in response to the subpoena.

21   Q.   Do you remember when you received them?

22   A.   I don't remember the exact day.  Within a couple of days

23   of November 24th, I think a couple of days before the border

24   search.

25   Q.   Did you review those records?

```
 1      A.    We did review them, yes.

 2      Q.    Did you review all of them before the border search?

 3      A.    Yeah, my memory is that, you know, we did a cursory review

 4      of all of the material that we got from them and a more

 5      substantive review over time.

 6      Q.    Now, directing your attention to November 24, 2017, was an

 7      interview and search of the defendant conducted that day at

 8      Logan Airport?

 9      A.    Yes.

12:17 10      Q.    What is a secondary inspection?

11      A.    So at Logan Airport we refer to primary inspection usually

12      has to relate to issues concerning visa admissibility, we'd say

13      like, you know, someone gets flagged and goes to passport

14      primary.  Secondary is typically a search for traditional

15      customs related items.  And so when we send someone to

16      secondary, we are asking that Customs and Border Protection

17      officers conduct a closer examination of either a person or

18      goods or both.

19      Q.    Is that what happened to Mr. Qin on November 24, 2017?

12:18 20      A.    It is.

21      Q.    How did you learn that Mr. Qin was flying into Logan that

22      day?

23      A.    So I had a record in one of our systems that alerted me to

24      the fact that he was traveling back from China.  I think we

25      get -- I think that's a 72 hours -- typically we are alerted to
```

1     that fact within 72 hours unless, for example, somebody walks

2     up to the airport and they buy the ticket that day and fly that

3     day, then that's the notice that you're going to get.  But if

4     it's a reservation that's already been purchased in advance,

5     then typically we get notification within 72 hours of the

6     expected arrival.

7     Q.   And with regards to Mr. Qin, had he originally been

8     scheduled to travel earlier in that month or earlier?

9     A.   Yes.  I think he was supposed to travel -- my memory is he

12:19 10   was supposed to travel back within like a day or two of our

11    visit to Marine Sonic, like maybe the next day after we spoke

12    with the folks at Marine Sonic, I think he was due back in the

13    country the next day or the day after that.

14    Q.   And what did you do upon learning that Mr. Qin was going

15    to be traveling back into the United States?

16    A.   Talked with my investigative partners, talked with the

17    other agents who I work with.  We talked about the possibility

18    of an inspection of Qin and whatever goods he might have upon

19    his return to Logan.  And the group was in agreement that that

12:19 20   was the appropriate next step.  And then I reached out to

21    Customs and Boarder Protection officers at Logan Airport and

22    communicated our interest in doing that.

23    Q.   Can you just describe to the Court, when you said reach

24    out, what, if anything, did you tell CPB at that time?

25    A.   I think -- so I originally reached out to the person who I

1    thought was the supervisor of what we call inbound inspections.

2    It turns out that he was no longer in that position, and I

3    think that person referred me to Customs and Boarder Protection

4    Officer Chris Hughes.

5         So I think initially I just said there's a subject

6    coming into the United States from China, we'd like to do a

7    border search, do an inspection or border search, something

8    along those lines, and do you have some time for us to get

9    together and talk about that.

12:20 10   Q.   And what did you tell him about the investigation, if

11   anything?

12   A.   I think I told him -- are you talking about in the e-mail

13   or are you talking about like --

14   Q.   Just inform --

15   A.   Down the road when we spoke, it was more substantial.

16   Here's the nature of the investigation, we believe he's working

17   on behalf of the Chinese Navy, he's been attempting to procure

18   these underwater vehicles.  He asked about Munitions List

19   items, sonobuoys.  He's coming back to the United States.  He's

12:21 20   been in China for sometime, we'd like to set him up for an

21   inspection.

22   Q.   So what happened next related to that?  Did CPB actually

23   interview him?

24   A.   Yeah.  So he came in.  So that was within a couple of days

25   of Mr. Qin's entry, and then, ultimately, he was inspected by

1    Customs and Boarder Protection at Logan Airport.

2    Q.    So did you conduct the interview at the border?

3    A.    I did not.

4    Q.    Who did?

5    A.    The person -- so there were two officers there; I

6    interacted with one officer, as I said, Chris Hughes.  So Chris

7    and another officer, who I don't recall speaking with, so my

8    interactions were with Officer Hughes, and I think Chris was

9    leading that effort to do the interview and the inspection.

12:22 10    Q.    Did you tell CPB Officer Hughes what questions, specific

11    questions to ask Mr. Qin?

12    A.    I tend not to do that.  I don't like other people telling

13    me how to do my job.  You know, the customs hall at Logan

14    Airport, that's very much a CPB environment.  So I don't think

15    it's appropriate that I tell Chris how to do his job.

16        So we provided Officer Hughes I think with relevant

17    information about the nature of the business that Qin was

18    involved with and said we'd like you to do an inspection, and

19    we'll be available to assist if you need us.  But, as a general

12:23 20    rule, I don't tell CPB officers what to ask or how to ask it or

21    things of that nature.  I think they have the experience,

22    they're there on a daily basis, so they know how to do their

23    jobs.

24    Q.    Did you participate in the interview at all?

25    A.    I did not.  I was not present in the customs hall while

1    that took place.

2    Q.    Where were you when the interview took place?

3    A.    I was in an office outside of the customs hall.

4    Q.    Was anyone else with you?

5    A.    Special Agent Steve Valentine was with me.

6    Q.    And were any searches conducted of Mr. Qin or his property

7    in connection with the secondary inspection?

8    A.    Yes.

9    Q.    What was searched?

12:23 10   A.    His bags.  I don't -- his bags, his phone, his computer,

11   and then -- like, those are the things I think were searched.

12   And then he himself was asked a series of questions.

13   Q.    Okay.  And what was your understanding as to what Mr. Qin

14   told the CPB officers on November 24, 2017?

15   A.    I understood that Qin told CPB that he was the president

16   and owner of LinkOcean Technologies, that that company was

17   based in China, that he purchased parts in the United States,

18   U.S. origin goods for export to China, that he described the

19   nature of the parts that he purchased to be the category of

12:24 20   things that attach to a buoy, and that's what he exported.  And

21   I think he was asked a follow-up question to that one, and he

22   reiterated that that was all that he exported from the United

23   States to China, things that attach to a buoy.

24          At some point in the interaction with Officer Hughes,

25   he opened his laptop and produced a diagram, a technical

1    diagram, I think as a way of highlighting these are the things

2    that I export.

3    Q.    I'm sorry, let's break that down a little.

4    A.    Sorry.

5    Q.    So you indicated that he, Mr. Qin, told CPB that he only

6    exported items that attached to a buoy.

7    A.    That is what he said.

8    Q.    And based upon your review of AES records and records

9    obtained from Marine Sonic, did you believe that Qin's answer

12:26 10   or statement to CPB on November 24th was true?

11   A.    No, I believe that was a lie.

12   Q.    Why is that?

13   A.    Because he did not only export products that attached to a

14   buoy.  He exported a variety of other products that did not

15   have to attach to a buoy, other vehicles, things that floated

16   on the surface, things that went below the ocean surface; that

17   just wasn't true.  He exported a number of other goods that did

18   not fall into that category.

19   Q.    And the parts that Mr. Qin didn't disclose, they did have

12:26 20   any particular applications of concern?

21   A.    I would say that the application of concern there was that

22   they were consistent with what our overall concern was, the

23   combination of vehicles and sensing equipment that could be

24   used in a military capacity by the Chinese Navy, and that we

25   certainly viewed that as a national security threat.  And his

1    answer about the question is that all that you export, words to

2    that effect, was not consistent with the wide categories of

3    items that he had, in fact, exported from the United States.

4    Q.   So you mentioned that there was a diagram that was

5    produced or shown to the CPB officer during the interview?

6    A.   Yes.

7    Q.   At any point during the secondary inspection were you

8    shown anything?

9    A.   Yes.  So it was at that point, I think in conjunction with

12:27 10    the question about I only export things that attach to a buoy,

11    and then the production, you know, opening of the laptop and

12    the demonstration of the what looked like a technical diagram,

13    that was the point at which Officer Hughes came back to the

14    office that we were sitting in, myself and Special Agent

15    Valentine, and showed us that diagram and told us the answer to

16    this particular question.

17         Officer Hughes told us things like -- he confirmed

18    that he's the president of LinkOcean, that he's coming back

19    from China, that he uses the laptop and phone to conduct his

12:28 20    business, things of that nature.  But he said the only things

21    that he exports are things that attach to a buoy.  And I said

22    that's not true, that's a lie.  And showed us a diagram -- I

23    did not immediately recognize what it was, and so Officer

24    Hughes went back out, he took the -- my memory is he took the

25    laptop at that time and went back out and continued to speak

1    with Mr. Qin.

2    Q.   So based upon your best memory today, what do you remember

3    seeing on Mr. Qin's laptop when the CPB officer showed it to

4    you?

5    A.   Well, that was consistent with the claim that I -- like,

6    water testing equipment, that could, in fact, attach to a buoy.

7    That's my memory of what we were looking at.  I don't remember

8    the manufacturer.  As I sit here now, I don't remember who the

9    manufacturer was or -- but that as a demonstration was

12:29 10    inconsistent with everything that we had reviewed through the

11    Automated Export System and the review of Electronic Export

12    Information, and, frankly, our conversations with Marine Sonic.

13    They were selling him vehicles, a towed vehicle that does not

14    attach to a buoy, so --

15    Q.   How many pages of the diagram did you review?

16    A.   I think I only saw the page that was up on the screen.  We

17    didn't -- I mean, you have -- we didn't alter what was there.

18    Our job, when we make a decision about whether or not we want

19    to conduct a border search of that electronic item, is that

12:30 20    we're going to do it in a forensically sound way.  So all I saw

21    is what was on the screen.  We didn't manipulate, up the page,

22    down the page.  We didn't do anything like that.

23    Q.   So based on your glance at it, did it appear to be

24    technical in nature?

25    A.   It did.

1    Q.   What happened after the defendant was interviewed at

2    Logan?

3    A.   After he was interviewed -- he was ultimately released.

4    He answered the questions of CPB.  We made -- I say "we,"

5    myself and Special Agent Valentine understood that the volume

6    of data that was on the laptop and on the computer could not be

7    imaged in a short amount of time, and so instead of having

8    Mr. Qin and his family wait at Logan Airport, we detained the

9    items.  We gave him a receipt for his property, and we let him

12:31  10    know that someone would be in touch with him about getting his

11   property back.  And then he was allowed to leave the customs

12   hall.

13   Q.   With regards to the items, are you referring to his laptop

14   and iPhone --

15   A.   Yes.

16   Q.   -- that were detained?

17   A.   Yes.

18   Q.   What happened to those electronic devices after Mr. Qin

19   was allowed to leave the airport?

12:31  20    A.   We brought them back to the HSI Boston Field Office.  We

21   have a forensic lab, so they were brought back to the forensic

22   lab to begin the imaging process so that we could review the

23   content of those boxes, really the computer is a box, the phone

24   is a box, and there's stuff inside the box.  So in order to be

25   able to do that, we want to forensically image them, and then

         1    we review the image so that we don't disturb the original item.

         2    And we left the airport and went directly to the office and

         3    started that process.

         4    Q.    So on the evening of November 24th?

         5    A.    Yes.

         6    Q.    How far is the field office from the airport?

         7    A.    Three miles maybe, two miles, three miles.

         8    Q.    And what did you and Special Agent Valentine do when you

         9    arrived at the HSI office?

12:32   10    A.    Fired up the lab and Steve -- Special Agent Valentine --

        11    I'm not a computer forensic agent, Special Agent Valentine is.

        12    So we documented the commodities, the laptop and the phone, and

        13    then Special Agent Valentine started to process them so that we

        14    could get forensic images that we could subsequently review.

        15    Q.    And did -- were you able to subsequently review them?

        16    A.    Yes.

        17    Q.    Were there any problems reviewing the data on the

        18    defendant's electronic devices?

        19    A.    Yes, there were some challenges along the way.  One of the

12:33   20    challenges was that the volume of the data, it took a while for

        21    the image itself to process.  Then, once we had a processed

        22    image that we could look at, we found that there were a number

        23    of encrypted files, and we found that a substantial volume of

        24    the data on the computer was actually in Mandarin Chinese, not

        25    in English.

1    Q.   Were any steps taken to decrypt the files or obtain the

2    defendant's passwords?

3    A.   So -- both.   The -- and Special Agent Valentine can speak

4    to this a lot more cogently than I can.   But there was a

5    process in which, without breaking the files, an attempt to

6    basically unlock the encrypted files, that process was

7    undertaken.

8            As far as the kind of language issues, that was more

9    problematic and required a lot more time and effort in order to

12:34 10   be able to get resources aligned so that we could conduct a

11   border search.

12            MS. SIEGMANN:   May I approach, your Honor?

13            THE COURT:   You may.

14            MS. SIEGMANN:   I'm handing the witness what has been

15   marked as Exhibit 10.

16   BY MS. SIEGMANN:

17   Q.   Do you recognize that document, Special Agent Andersen?

18   A.   Yes, I do.

19   Q.   And what is that?

12:34 20   A.   Collection of e-mails back and forth between one of the

21   attorneys representing HSI through the Office of the Principal

22   Legal Advisor and the person who we understood to be Qin's

23   attorney for the purposes of this border search, Bill Joyce.

24   Q.   Did these e-mails describe efforts by the government to

25   obtain Qin's passwords for the encrypted files?

```
 1    A.    They do.  This is not the sum of all the communication

 2    between the Office of the Principal Legal Advisor and

 3    Mr. Joyce, but it is the content that was captured in e-mail.

 4    My understanding is there were a number of phone calls back and

 5    forth before these e-mails started to be produced.

 6              MS. SIEGMANN:  The government moves to admit Exhibit

 7    10.

 8              THE COURT:  Any objection?

 9              MR. KETTLEWELL:  Can we just have one moment, your

10    Honor?

11              THE COURT:  Sure.

12              (Discussion off the record.)

13              MR. KETTLEWELL:  Your Honor, I'd object.  It's post

14    the detention or seizure of the computer, so it doesn't go to

15    probable cause, and it's hearsay.

16              THE COURT:  Counsel, what do you say to that?  I see

17    the dates appear to be in January.

18              MS. SIEGMANN:  It goes to the scope and why it took so

19    long.  The e-mails show efforts of the government to try to

20    get --

21              THE COURT:  The reasonableness of the detention of the

22    device.

23              Counsel, what do you say to that?

24              MR. KETTLEWELL:  I didn't object to the relevance,

25    your Honor, I objected to the fact that it's hearsay.  We have
```

12:35  (line 10)
12:36  (line 20)

 1   two people that are communicating with one another, neither one

 2   is here, and it's all post the seizures of both the laptop and

 3   the iPhone.

 4            THE COURT:  Counsel.

 5            MS. SIEGMANN:  Number one, I don't think it's hearsay

 6   as to the defendant's attorney because that would be an

 7   admission of a party opponent being admitted by the government.

 8   The agent, he was acting as the agent for the defendant, so it

 9   would be admissible under 801 and would not constitute hearsay

12:37 10   for that purpose.  And the fact is that, again, goes to --

11   well, I can elicit from the witness his understanding as to

12   whether the passwords were coming.

13            THE COURT:  Overruled on hearsay grounds.  I'm focused

14   on the purpose for which it's being offered.  I'll allow it.

15            Exhibit 10 may be admitted.

16            (Exhibit 10 received into evidence.)

17   BY MS. SIEGMANN:

18   Q.   So, Special Agent Andersen, what is your understanding as

19   to whether Mr. Qin and counsel was going to provide passwords

12:37 20   for the devices?

21   A.   Right.  So we understood -- there was a point in time

22   where communication was made and there was a promise of

23   passwords for various files, and I don't think -- I'm not sure

24   if it's captured in here or not, but there was a point at which

25   we received something that was claimed to be a password.  It

1    was not a password to anything that would decrypt some of the

2    files that were locked.  And so this engagement, this

3    engagement was always between the Office of the Principal Legal

4    Advisor and Qin's counsel, at least for this particular issue,

5    Mr. Joyce.  I didn't speak with Qin about these passwords,

6    Special Agent Valentine didn't speak with Qin.  We communicated

7    with our attorney, and then our attorney consulted with

8    Mr. Joyce, trying to get passwords that would allow us to

9    unlock encrypted space and then complete the border search.

12:38 10              MS. SIEGMANN:  Can you bring up page 1 of Exhibit 10.

11              Can you zoom in on the -- the second e-mail there.

12    Q.   Now, Special Agent Andersen, do you see that e-mail that's

13    been zoomed in further?

14    A.   Yes.

15    Q.   And does that -- is that e-mail dated January 10, 2018?

16    A.   It is.

17    Q.   And is that the password information that was provided by

18    Qin's counsel?

19    A.   It is.

12:39 20    Q.   Is that what you're referring to a moment ago as -- that

21    that didn't work to decrypt any of the files?

22    A.   Right, that's -- on my review, that's not actually

23    password information, but it's what was provided as such.

24              MS. SIEGMANN:  And now turn to page 3 of that

25    document, Mr. Bruemmer.

1    A.    Yes.

2          MS. SIEGMANN:  Can you zoom in on the top e-mail,

3    please, Mr. Bruemmer.

4    Q.    And just reading, was this in response to the e-mail that

5    we just read a few seconds ago regarding the password

6    information that was provided by Mr. Joyce?

7    A.    Yes.

8    Q.    And does the e-mail read, The below information does not

9    appear to provide the access needed to complete the border

12:40 10   search inspection of electronic devices?

11   A.    It does say that.

12   Q.    Is this e-mail, again, asking for the passwords, the PGP

13   pass phrase, the key chain pass phrase, and the password or

14   pass phrase needed to access the Windows encrypted file system?

15   A.    Right, it does say that.  We were very specific of what we

16   were looking for.

17   Q.    Was that information ever provided?

18   A.    Not to my knowledge, no.

19         MS. SIEGMANN:  Turning to page 6 of that same exhibit.

12:41 20        Can you zoom in on the top paragraph, Mr. Bruemmer.

21   Q.    Now, do you see this e-mail dated January 24, 2018?

22   A.    Yes.

23   Q.    And as of that date, were you still -- was the government

24   still seeking that information from the defense?

25   A.    So I think the border search had ended on the 23rd, so

1    this is actually -- like, we never got it.  We never got that

2    information.  So the border search ended on January 23rd.  This

3    is after that event.

4    Q.   And based upon your understanding, had the defense agreed

5    to provide that information?

6    A.   They had agreed to provide it, and they had provided

7    something.  And then I think, as the e-mails show, we said that

8    that wasn't sufficient to get into the encrypted spaces within

9    the laptop.  So, I mean, ultimately, we had to proceed without

12:42 10   it, and eventually we just stopped and we ended the border

11   search.

12   Q.   And so during the border search, were you ever able to

13   review any of the encrypted files?

14   A.   No.

15        And I would just say not to my knowledge.  I don't

16   recall that we were able to do that.

17   Q.   What were you looking for on the defendant's electronic

18   devices during the border search?

19   A.   Obviously we talked about it a lot.  We were looking for

12:42 20   technical data, we were looking for -- as I said earlier,

21   technical data is just as valuable as a particular commodity.

22   If you have the know-how to build it, you don't need the thing.

23   You may have the specifications needed in order to be able to

24   do it on your own.  So that's one of the things that we were

25   looking for.

1          We were also looking for items that would suggest an
2    ongoing export -- export violations.  We were looking for
3    things that would solidify -- either solidify or contradict our
4    understanding that he might be operating as an agent of a
5    foreign power.  Were there e-mails with instructions from
6    Chinese naval officials or research institutes or things of
7    that nature, lists of items to be purchased, things like that
8    that we thought would exist in that box.
9    Q.   Now, you mentioned earlier there was some Mandarin
10   documents.  How much of the computer or documents were in
11   Mandarin?
12   A.   I mean, I don't know the actual percentage.  For the
13   things that I would say were of relevance to the questions that
14   I just outlined, I would say most of that appeared to be in
15   Mandarin.
16   Q.   So what did do you?  I mean, do you read Mandarin?
17   A.   Unfortunately, I don't.
18          So we efforted within HSI, HSI is an investigative
19   agency that has offices throughout the country and overseas, so
20   we didn't have a Mandarin speaker and reader.  That was kind of
21   the issue is that we needed somebody who could not only speak
22   it, we did have access to a person who could speak it, we
23   didn't have access to someone locally who could speak it, read
24   it, and write it, and I think that was the critical
25   requirement.  So I talked to my supervisor at the time, group

1   supervisor, Mike McGonigle, about our need to as quickly as

2   possible get someone into our office who could read, speak,

3   write in Mandarin and assist us with the border search.  And he

4   went through field offices, he went through our headquarters,

5   he went through undercover operations.  And then, because of

6   the time of the year that we were in, we had trouble getting --

7   identifying a person who could actually come and do the work

8   and then physically get them to Boston to do that work.  And

9   eventually we were able to land Special Agent Katie McKenna

12:46 10   from our HSI New York office, who is fluent in Mandarin, can

11   read and speak and write in Mandarin, and we got her to our

12   office to assist us with the border search.

13   Q.   How long did she stay?

14   A.   She came twice, she stayed a week each time.  And I think

15   the second time she came I think it was shortly after that,

16   that's when we ended the border search.

17   Q.   Can you give us, the Judge, some examples of the search

18   queries or terms that you were using to search the devices?

19   A.     Search queries were kind of a moving target, your Honor.

12:46 20   We started off with kind of a base set of queries, and then,

21   depending upon responsiveness, whether or not we find any hits

22   to those searches in the forensic tools that we were using, we

23   were searching for things like ITAR, CCL, EEI, sonobuoy, AUV,

24   UUV, spelled out, obviously not spelled out, using the

25   acronyms, Navy, Army, those were some of the general terms.

1    Eventually we narrow that focus, depending upon results.

2            MS. SIEGMANN:  May I approach, your Honor?

3            THE COURT:  Yes.  I just had a follow-up question.

4            MS. SIEGMANN:  I'm sorry.

5            THE COURT:  Sir, when you made reference to technical

6    data, what -- can you give me a specific example of what that

7    would be?  Meaning, is that -- when you say "technical data,"

8    do you mean specifications for a commodity that would require a

9    license?

12:48 10          THE WITNESS:  So that certainly could be, that

11   certainly could be the thing.  But specifications I think is

12   perhaps a little too broad because a manufacturer can have

13   specifications on their website, but that doesn't constitute

14   technical data.  That's the kind of information that they put

15   out to a potential consumer about, hey, look at our thing, this

16   is why it would be great for you to contact us and then we

17   could design a product that suits your needs.

18          So specifications on a website, in my view, are not

19   technical data.  But specifications combined with blueprints,

12:48 20   production information, schematics --

21            THE COURT:  Proprietary information about a component?

22            THE WITNESS:  And how to make it, how to build it.

23            THE COURT:  And is the possession of that a violation

24   of criminal law?

25            THE WITNESS:  If he brought it outside of the United

1    States, it would require the same license for export as the

2    product itself.

3              THE COURT:  Thank you.

4              Counsel.

5    BY MS. SIEGMANN:

6    Q.   And he had just returned from --

7    A.   He had just returned from China.

8    Q.   So if you had found technical data on his computer that

9    required an export license to go to China, would that

12:49 10   constitute a violation -- would that constitute contraband?

11   A.   It certainly would, it certainly would.  We'd have to

12   investigate that further, when did he get it, how did he get

13   it, things of that nature that we would be able to do in the

14   forensic environment, but the possession of that having come

15   back from China, if it, in fact, was technical data and did

16   require a license for export and he had it on his laptop or in

17   first phone, or, frankly, if it was design plans that were in

18   his suitcase, that could be the same thing.  If he came into

19   the United States with that and it was evaluated and required a

12:50 20   license for export, so his possession upon arrival at Logan

21   would constitute a violation, that it had been an unlawful

22   export.

23              MS. SIEGMANN:  I'm sorry, your Honor, do you have any

24   other questions?

25              THE COURT:  No, thank you.

1          MS. SIEGMANN:  May I approach?

2          THE COURT:  You may.

3          MS. SIEGMANN:  I'm handing the witness what has been

4     marked Exhibit 11.

5     BY MS. SIEGMANN:

6     Q.    Special Agent Andersen, do you recognize that?

7     A.    Yes.

8     Q.    What is it?

9     A.    Two-page e-mail communication with Special Agent McKenna

12:50 10    drafted at some point after we learned that she was going to be

11    the one coming to assist us with the border search, and her

12    request of me was to kind of give her a head start, to give her

13    a set of terms that we were going to use in the course of the

14    border search so that she could do the research necessary to

15    make sure that they were translated correctly into Mandarin

16    Chinese.

17          MS. SIEGMANN:  The government moves to admit Exhibit

18    11.

19          THE COURT:  Counsel?

12:51 20    MR. KETTLEWELL:  No objection, your Honor.

21          THE COURT:  It may be admitted and published, if you

22    wish.

23          (Exhibit 11 received into evidence.)

24          MS. SIEGMANN:  Mr. Bruemmer, can you bring up Exhibit

25    11.

1               Can you zoom in on just the bottom.

2    BY MS. SIEGMANN:

3    Q.   So is this dated December 13, 2017?

4    A.   Yes.

5    Q.   Is that an e-mail from you to Special Agent McKenna?

6    A.   Yes.

7    Q.   And it reads, Here is a list that I promised you --

8               MS. SIEGMANN:  Going on to the next page,

9    Mr. Bruemmer.  And can you zoom in on -- yes, perfect.

12:51 10   Q.   And is that the list that you sent to Special Agent

11   McKenna?

12   A.   Yes.

13   Q.   So it reads, Marine sonic technology, Chain Bridge

14   Brokers, Hydroid, Riptide, unmanned underwater vehicle, UUV,

15   autonomous underwater vehicle, AUV, buoy, sonobuoy, towed sonar

16   array, mine, countermeasure, Lowell (instruments) military,

17   Navy, Army, licensing (export license).

18               Did I accurately summarize that list or read that

19   list?

12:52 20   A.   Yes, that is the list.

21   Q.   And, Special Agent Andersen, was that the only terms that

22   you searched on Mr. Qin's devices?

23   A.   No.

24   Q.   But it was an example of some of the terms that you used?

25   A.   As I said, I think the e-mail speaks to it.  This was a

1       list that I gave to Special Agent McKenna so that she could get

2       started on the translation process on her end so that when she

3       arrived she could start immediately.  And so these were the

4       initial terms that we used and transmitted to her.  And then

5       she expanded on this search throughout the border search.

6       Q.   Did you obtain the assistance of any special agents, any

7       co-case agents to conduct the border search?

8       A.   Yes.

9       Q.   Can you explain that to the Court, please?  Who did you --

12:53 10    A.   Yeah, so Special Agent Hayden, who was a co-case agent of

11      mine with the Department of Commerce, and we talked about one

12      of the reports that he authored about our trip to Marine Sonic,

13      that when we're conducting our border search we can seek the

14      technical expertise of others to assist us with that search.

15      And I thought that it was appropriate to use Special Agent

16      Hayden because of his expertise on commerce regulations,

17      commodity classifications, and things of that nature.  And so I

18      asked him.  And I think the policy says that we can direct it,

19      but really I asked if he could offer his assistance in that

12:54 20    regard, and he agreed to do so.

21      Q.   When was the border search terminated or stopped?

22      A.   January 23, 2018, I believe.

23      Q.   Why was the border search stopped at that time?

24      A.   So at that point we were -- I mean, that was basically 60

25      days from the date that the border search had been initiated.

1    As a group I think that we were -- as an investigative group we

2    were certainly concerned about what amount of time is

3    reasonable, and at that point Special Agent McKenna was gone,

4    had already come twice, and it didn't seem likely that we were

5    going to get her back in a timely manner.  And so at that point

6    it didn't seem appropriate to continue the border search.

7          I had asked for an extension of the border search

8    which had been approved by my supervisor.  I did not feel

9    comfortable asking for another extension.  And so we ended the

12:55 10   border search on January 23rd.

11   Q.   When you say "extension," you were asking -- was that

12   under the HSI or ICE policy on border searches?

13   A.   Yeah, that's right.  So when I want to extend a border

14   search, I have to seek permission from a supervisor in order to

15   do that.  I had done that earlier, but I didn't think that we

16   could meet the standards necessary to continue it from that

17   point going forward.  So we ended it on the 23rd.

18   Q.   Well, had all the relevant data been reviewed on Mr. Qin's

19   devices by then?

12:56 20   A.   Not by a long shot, no.

21   Q.   During the border search were any records found regarding

22   illegal exports?

23   A.   Yes.  We certainly believed so.

24   Q.   Could you just briefly summarize that for the Court?

25   A.   Sure.  During the border search we found information that

1    suggested that Qin, through LinkOcean, was directed to purchase

2    hydrophones from a company in Mississippi, and that through his

3    communication -- and he was directed to do so by a research

4    institute that's on the Entity List, that means that they are

5    not eligible to receive license -- sorry -- yeah, licensable

6    commodities, they're not able to receive licensable

7    commodities.  And so that entity is Northwestern Polytechnical

8    University in China.  The commodities were manufactured by

9    HITEC Incorporated, and Qin had been directed or directed some

12:57 10    of his employees to create false paperwork indicating

11    essentially a false end user, make it look like they're going

12    to one place when, in fact, they are going to go to the

13    Northwestern Polytechnical University, the banned entity.

14    Q.    And when you referred to Entity List, is that the

15    Department of Commerce's Entity List?

16    A.    Yes, that is the Department of Commerce.

17    Q.    And with regards to the Entity List, any items that are

18    subject to the Export Administration Regulations require an

19    export license to ship to that entity?

12:58 20    A.    Also correct.

21    Q.    That would include items that weren't controlled based

22    upon the concerns of that end user?

23    A.    That's correct.  So there was a point at which the

24    regulations on that particular issue were changed, and so the

25    concern about Northwestern Polytechnical University became so

1    substantial that every item, even those that were EAR 99,

2    normally wouldn't require a license, needed to be reviewed by

3    the Department of Commerce.

4        THE COURT:  Counsel, given the time, I think we're

5    going to have to stop here.  I want to talk to counsel about

6    scheduling.

7        Sir, you can step down for the moment, thank you.

8        THE WITNESS:  Thank you, your Honor.

9        THE COURT:  Give me a moment.

12:58 10   (Discussion off the record.)

11       THE COURT:  Counsel, since I'm going to see you

12   tomorrow, we can pick this up tomorrow.  If counsel can put

13   their heads together, if we need another date after tomorrow,

14   and then I can hear you about that tomorrow, and if you want to

15   confer with Ms. Hourihan about availability of the Court.

16       MS. SIEGMANN:  Thank you, your Honor.

17       THE COURT:  If we need a date beyond tomorrow, but I

18   know we're on the first witness.

19       MR. KETTLEWELL:  At this pace, I think we will, your

12:59 20  Honor.

21       THE COURT:  Yes.

22       MS. SIEGMANN:  Your Honor, just -- this is the witness

23   with the most --

24       THE COURT:  Counsel, it was not a criticism.  I

25   understand all of the evidence that's been put before me.  I

1    suspect Mr. Kettlewell has a fair amount of cross-examination

2    for the same reasons.  So with all of that said, I think we

3    should plan on another date, and I will see you tomorrow.

4              MR. KETTLEWELL:  Thank you, your Honor.

5              MS. SIEGMANN:  We completely agree with your Honor.

6              THE COURT:  Thank you.

7              THE CLERK:  All rise.

8              (Court adjourned at 12:59 p.m.)

9                     - - - - - - - - - - - -

10                          CERTIFICATION

11             I certify that the foregoing is a correct transcript

12   of the record of proceedings in the above-entitled matter to

13   the best of my skill and ability.

14

15

16

17   /s/Debra M. Joyce_____          December 29, 2019_____
     Debra M. Joyce, RMR, CRR, FCRR   Date
18   Official Court Reporter

19

20

21

22

23

24

25

1                                INDEX

2

3   WITNESS                                               PAGE

4

    THOMAS BRIAN ANDERSEN, JR.
5
        Direct Examination                                10
6       By Ms. Siegmann

7

8                          E X H I B I T S

9

10   Exhibit No.           Description              Received

11
        1          4/19/2018 e-mail                   23
12
        2          5/17/2017 Results of Initial Meeting   28
13                 with Shuren Qin

14      3          Pages from LinkOcean website       34

15   4, 5, 6, 7    2017 e-mails between undercover agent   44
                   and Mr. Qin
16
        8          11/17/2017 Report of Investigation   73
17
        9          11/8/2017 Marine Sonic Grand Jury   75
18                 Subpoena

19      10         1/10/2018 e-mail between Jennifer   92
                   Mulcahy and Chris Li
20
        11         1/17/2019 e-mail from Katie McKenna   100
21                 to Thomas Andersen

22

23

24

25