# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **v.** | )  **Criminal No.  18-cr-10205** |
|  | ) |
| **SHUREN QIN et al.,** | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

_____)

## <u>MEMORANDUM AND ORDER</u>

**CASPER, J.**                                                            **November 30, 2020**

## I.      Introduction

Defendant Shuren Qin ("Qin") has moved to suppress evidence seized from his laptop computer and iPhone and statements he made to agents during a secondary inspection upon his return to the United States from China at Logan Airport on November 24, 2017.  D. 212.  Having considered the evidence offered by the parties at an eight-days-long hearing (conducted on various dates between December 2019 and August 2020) and the arguments of counsel presented in their various filings and during the hearing, the Court DENIES the motion to suppress, D. 212. At a minimum, the agents had reasonable suspicion for the search and seizure on November 24, 2017 and, any statements made by Qin were non-custodial statements not in contravention of the Fifth Amendment.  In support of same, the Court makes its findings of fact and legal analysis below.

## II.     Findings of Fact

These findings are based upon the testimony of the various witnesses who testified at the suppression hearing and the exhibits introduced by both parties at that hearing.

A.    **Qin's Business, LinkOcean**

Qin resides in Wellesley, Massachusetts and has provisional permanent resident status to live in the United States through the EB-5 visa program.  II:28; V:8-9.[1]  He founded his company, Defendant LinkOcean Technologies ("LinkOcean") in Qingdao, China in August 2005.  I: 35; Exh. 3.  According to LinkOcean's website, its clients are in China.  I:36; Exh. 3.  One of those customers is the Chinese Navy.  II:76.  Others are research institutes located in China, VI:70, which were not on the U.S. entities list,[2] but were still of concern to the agents, since some such research institutes receive substantial funding from the Chinese military, I:36-37, 41, and provide research and development for same.  V:126; VI:5.  LinkOcean identifies itself as the "exclusive representative" of twenty-four manufacturers, some that are in the United States.  II:72; VI:69; Exh. 2, 3.

B.    **Investigation of Qin Prior to November 24, 2017**

The investigation of Qin began in April 2017.  I:27.  Over the course of the investigation and by the time of November 24, 2017 search at Logan Airport, the investigation involved Homeland Security Investigations division ("HSI") of the U.S. Department of Homeland Security ("DHS"), Department of Commerce ("DOC"), Naval Criminal Investigative Service ("NCIS"), Defense Criminal Investigative Service, and Customs and Border Protection ("CBP").  I:14-15.

*1.  Initial Investigation After Tip from Riptide*

---

[1] Reference to the hearing transcripts is indicated as "[Day]: [page]."  The transcripts for each of the eight days of the hearing are now on ECF:  Day I (December 16, 2019), D. 245; Day II (December 17, 2019), D. 246; Day III (February 3, 2020), D. 251; Day IV (February 6, 2020), D. 257; Day V (February 7, 2020), D. 258; Day VI (February 25, 2020), D. 276; Day VII (July 21, 2020), D. 285; and Day VIII (August 11, 2020), D. 293.  Exhibits admitted during the hearing are indicated as "Exh. [exhibit number]."

[2] When an entity is on the U.S. entities list, exports to that entity will require a license approved by the DOC.  15 C.F.R. § 744, Supp. No. 4; VI:106.

The investigation of Qin began with a tip in April 2017 from Riptide Autonomous Solutions, LLC ("Riptide"), a cleared defense contractor, to the Defense Security Service. Riptide reported that Qin had approached the company about purchasing a micro, unmanned underwater vehicle ("micro-UUV"), a type of underwater unmanned vehicle ("UUV"), for sale to his Chinese customers. I:22-25; II:50; VIII:7; Exh. 1.

Shortly thereafter, on April 21, 2017, an undercover agent (from NCIS) posing as an employee of Riptide, picked up the discussions with Qin. I:29-30; II:55; Exh. 2. In this meeting, Riptide explained that most of their customers were U.S. military and in the oil and gas industry and that research institutes/universities were not great customers for it since they tend to purchase just one vehicle and Riptide liked to sell their vehicles in bulk. Exh. 2. Qin said he was interested in representing Riptide in China. Exh. 3. Although Qin may have originally approached Riptide regarding a micro-UUV, a type of vehicle that could be used for research, I:56-57, or military use during the discussions with the undercover NCIS agent, Qin asked Riptide about exporting a U.S.-made autonomous underwater vehicle ("AUV") and expressed interest in its ability to gather data "in real time" which is not typical for research vessel and indicated that his customers included the Chinese Navy, a military operation. Exh. 2; I:30-31. Agents were concerned that the vehicle that Qin had expressed interest in acquiring from Riptide would require a license to export to China, an effort that he appeared to want to circumvent with discussion about creating a domestic (U.S.) company for the purchase. Exh. 2; I:37. Riptide never sold Qin any of the items that he was seeking to procure from them. VII:12; VIII:9, 39.

The ongoing investigation revealed that Qin had not only approached Riptide about the purchase of AUVs, but other U.S. manufacturers of same, namely, OceanServer and Xylem. I:42.

Both of these companies produce similar vehicles, include AUVs produced for the U.S. Navy. I:43. Both companies declined to sell their vehicles to Qin. I:44.

> 2. *Joint Agency Investigation Begins and Undercover Operation Involving HSI Starts*

After the NCIS undercover communications with Qin, the investigation regarding Qin and LinkOcean continued in earnest. In May to July 2017, HSI Special Agent ("SA") Thomas Anderson, acting in an undercover capacity, communicated via e-mail with Qin about his interest in purchasing AUVs. I:43-44, 58; II:78-79; Exhs. 4-7, 62. SA Anderson did so after Riptide had indicated that it did not want to do business with Qin, but there was another company, represented by Anderson operating in an undercover capacity, that might. I:48. Although in his various communications, Qin identified his customer as a marine ecologist, the agent did not believe that to be true given the nature of his inquiry about capabilities of the AUV, including, for example, WiFi capability, typically not necessary for research purposes. I:46-47, 56; Exhs. 4-5. SA Anderson forwarded quotes and brochures to Qin based upon the specifications that Qin indicated that he needed for his customer. II:86-87; IV:8; Exh. 39. Other of Qin's communications raised red flags for Anderson as well, including their discussions about getting a Xylem AUV. Exh. 6. During their email exchanges, Qin had become more interested in the EcoMapper from Xylem instead of any vehicle from Riptide, II:94, particularly after the UCA meeting described below. As to same, Qin asked Anderson not to tell Xylem that the end user was in China. I:49; Exh. 6 (Qin asked "[p]lease do not tell Xylem your end user is in China, you could tell them your customer is in US"). SA Anderson knew, from agents' discussions with Xylem, that this product was "controlled for export" to China and that the agent believed that Qin's statement reflected some awareness of same if the end user was known to be in China. I:50.

Qin's interest in the purchase of sonobuoys also raised concerns for the agent.  I:51; II:68; Exh. 6 (Qin noting that "[m]y customer wants some other products" and then seeking quotes for three types of sonobuoys).  A sonobuoy is an object that can detect movement, sound and objects in the water around it and it is a "military item that is controlled under the United States Munitions List and only has a military purpose," I:51, and cannot be exported to China.  Exh. 21 at 14 n.3; Exh. 20 (22 C.F.R. § 121.1); see United States v. Zhen Zhon Wu, 711 F.3d 1, 12 (1st Cir. 2013). Qin had particular interest in a sonobuoy produced by Ultra Electronics ("Ultra"), a U.S. manufacturer.  I:51-52; III:103-04.  Ultra confirmed the use of same for military purposes and that it was at work on an AUV that worked in conjunction with sonobuoy, again strictly for military use by the U.S. Navy.  I:51-52; III:108-09; IV:70-71.

As part of this undercover operation, Qin met with another undercover agent posing as SA Anderson's boss.  II:13-14, 80-81.  This meeting took place on June 30, 2017 and was recorded by the agents.  Exh. 44 (including transcript).  Qin and the undercover agent discussed a number of matters.  Exh. 44.  At this meeting, Qin initially was still interested in the Riptide vehicle with Ecomapper sensors, Exh. 44 at 13, and accessories for "spare parts" and the software for the vehicle, Exh. 44 at 66.  The UCA explained that these components were made by other companies and that if, as Qin indicated, his customer wanted a "turn-key product," then he might be interested in products from Xylem.  Exh. 44 at 19-21, 29, 41.  The UCA also explained that Riptide did not want to sell its vehicle in China.  Exh. 44 at 40.   At a point in their meeting, the UCA called a purported salesman ("Larry") to get more information about the Riptide AUV.  Exh. 44 at 29-34. Larry explained some of the features of the Riptide AUV including that Qin would not get the software until purchasing one of the AUVs.  Exh. 44 at 34.   When asked about the end user of his product, Qin indicated that it was "a scientist" in China.  Exh. 44 at 20, 27.  Qin indicated that he

might be interested in the Xylem product for his customer, "the same customer." Exh. 44 at 47, 66. After this meeting, Qin indicated that he wanted the Xylem AUV with EcoMapper, not a Riptide product, for his client. II:99; Exh. 44 at 54. Qin expressed concern about the "exporting licenses" since it is not easy if commodities have military applications, Exh. 44 at 61, but disclaimed that his customer's interest was for military use. Exh. 44 at 68. In follow-up emails with Anderson, Qin asked Anderson to get quotes for Xylem product with EcoMapper for him. II:106; Exh. 45-47. Qin asks Anderson not to tell Xylem that his end user was in China. II:106; Exh. 6. Qin contends that this was because he had gotten a higher price from Xylem in China and did not want the company to know that he was getting a better price from a third-party seller in the U.S. II:108-09.

By end of summer 2017, agents were concerned that Qin's efforts to acquire an AUV and/or sonobuoys may be in an attempt to assist the Chinese Navy in "working on a system that would incorporate an autonomous underwater vehicle and somehow use it in conjunction with sonobuoys in a military battle space" that might harm national security. I:57. By this time in the investigation, agents suspected that Qin may have committed export violations (seeking to purchase items controlled on U.S. Munitions List), may have made false statements on his visa application (on which Qin had answered "no" to a question about whether he was entering the U.S. to "engage in export control violations or other unlawful activity, Exh. 21 at 15), and may have failed to register as an agent of a foreign government. I:58-59, 64.

### 3. Investigation Continues with Review of AES regarding LinkOcean

As part of their investigation into Qin and LinkOcean, agents reviewed the company's Electronic Export Information ("EEI") entered in U.S. government's system, the Automated Export System ("AES"). I:59-60; IV:86; Exhs. 85, 86, 92. EEI includes information about exports

6

including the ultimate consignee, the U.S. principal party of interest ("USPPI"), name of the commodity, value of the commodity and other information.  I:60.  EEI is required for an export over $2500 or for any export that requires a license for export.  I:60, 67.  It is the USPPI that has the obligation enter EEI regarding an export in AES and complete a license application if one is required for a particular export.  II:65; III:41-42; VI:90; Exhs. 28, 29 (15 C.F.R. § 30.2, 30.3).[3] Qin or LinkOcean, is not required to do so and would not be able to enter EEI in AES.  III:41, 60-61.  Causing the filing of false EEI, however, still violates the Export Administration Regulations ("EAR").[4]  VI:68; Exh. 21 at 5 (citing 15 C.F.R. § 764.2).

During the investigation of Qin, agents had reviewed EEI in the AES pertaining to LinkOcean and discovered that the company was listed as the ultimate consignee on at approximately thirty-one transactions, V:128; VI:13, when the company is only the reseller of commodities.  The agents believed that certain entries of EEI therein were false and thereby violations of EAR regulations.  I:62-63; III:19-20; V:112; VI:36.  Although the agents could not tell necessarily just from examining EEI if a company has been properly designated as the ultimate consignee, they needed to follow up with the U.S. manufacturer to investigate same, VII:18-19, 73, since it is the USPPI that is required to know all the parties to a transaction and whether export license is required.  VII:60, 73; see 15 C.F.R. § 732.3(m).

---

[3] The Court has considered Qin's motion to strike testimony bearing upon the regulatory scheme that applies to the exports at issue here.  D.  264.  Having considered the motion, D. 264, opposition, D. 270, reply, D. 274, and the various arguments regarding same during the hearing, the Court DENIES the motion, D. 274.  The Court, however, has considered the parties' respective arguments about the applicable law and the regulations cited by them (some of which were marked as exhibits) in resolving the motion to suppress.

[4] The EAR controls the export of "dual-use" commodities (i.e., commercial items that also have a military use) to foreign countries.  15 C.F.R. § 730-744; Exh. 21 at 6; Exh. 32 (15 C.F.R. § 730.3); Zhen Zhou Wu, 711 F.3d at 21.  The DOC promulgates the EAR and the commodities that require export licenses.  Id.

The agents' review of AES as to LinkOcean revealed several exports from U.S. companies. Some of those had an ECCN of 8A992 which indicates that a commodity falls under the China Military Rule.   VII:49-50, 76-77; Exh. 85; 15 C.F.R. § 744.21.   Review of EEI regarding LinkOcean also revealed several transactions with Marine Sonic Technology Ltd. ("Marine Sonic"), a subsidiary of Atlas North America.  I:65; III:10; Exh. 86.  Marine Sonic is one of the manufacturers listed on LinkOcean's website.  III:18; Exh. 3.  LinkOcean had a shipment that it had purchased from Marine Sonic in October 2017 that was headed to it at its Qingdao address. I:66; III:8; Exh. 92.  The EEI for this export listed LinkOcean as the ultimate consignee.  III:11; Exh. 92.  As to this export, agents believed that there may have been several violations of EAR regulations.  III:22.  First, LinkOcean was listed as the ultimate consignee, I: 63; III:20, 27; Exh. 75, but since the company was not an "end user" of the products, but at best, a reseller or intermediary for the products that it arranged to export from the United States, the agents believed the EEI regarding same may be false or, at least suspicious.  I:63-64; VI:82; VII:9-10.  Although the end user is not a required entry for EEI, Exh. 30, the U.S. manufacturer should know the end user since it determines whether an export license is required.   VII:14-16.   Second, the classification number for the export, ECCN, was not properly listed (i.e., listed as 6A001, but should have been listed as EAR99).  III:20, 29, 43-44; Exh. 92; Exh. 16 (15 C.F.R. § 774).  Third, the value of the commodity was not correct as it was higher than the $13,500 listed.  III:21, 45-46. Although the agents were unsuccessful in intercepting this export in October 2017, Exh. 50 at 5, they turned their attention to this company for further investigation.  I:66; III:6, 11-12.

### 4.  *Examining LinkOcean's Exports Purchased from Marine Sonic*

On November 7, 2017, SA Anderson and SA Hayden of the DOC interviewed senior managers of Marine Sonic.  I:66; III:18, 32; Exh. 8.  Like Riptide, Marine Sonic is a cleared

defense contractor.  I:68; Exh. 8.  Marine Sonic produces AUVs for the U.S. Navy.  I:68; Exh. 8.

It also produces side scan sonars and other items for AUVs.  Exh. 8.  Qin had been a long-time

client of Marine Sonic, even before it was acquired by Atlas North America.  I:70; III:35-36.  The

agents' conversation with Marine Sonic revealed, among other things, that the EEI listed for the

October 2017 export ordered by LinkOcean, referenced above, for "compasses" was incorrect as

it does not make compasses.  VI:87.  The export instead was a "side scan sonar system" so the EEI

was incorrect in the AES, I:69; III:40-41; VI:87; Exh. 8, a mistake made by Marine Sonic.  VI:92.

This shipment did not require a license.  III:64.  The discussion also revealed that there were

instances in which Marine Sonic knew ultimate consignee, but Qin asked it to report LinkOcean

as the ultimate consignee.  I:70: VI:95-96.

At the end of Marine Sonic interview, the agents served a grand jury subpoena seeking

documents from the company about its business with Qin and LinkOcean with a return date of

November 22, 2017.  I: 76; III:39-40; Exh. 8.  This subpoena sought documents including but not

limited to "technical data and specifications" relating to the products it sold to LinkOcean.  I:77;

Exhs. 9, 49.[5]

The agents reviewed the subpoenaed documents from Marine Sonic later in November

2017, a few days before the border search at Logan Airport and were able to do a "cursory review"

of same before that search.  I:79; VII:43-44.  The document production from Marine Sonic in

response to the subpoena included but were not limited to a purchase order from LinkOcean

indicating that the end user for the October 2017 purchase by LinkOcean was the Qingdao Police

---

[5]Such technical data for commodities on the U.S. Munitions List is also controlled and would require the same license for export as the commodity itself.  I:77-78, 99; IV:41; Exh. 20. Moreover, any item that was on the Munitions List could not go to China.  IV:45; Exh. 21 at 14 n.3; Exh. 20 (22 C.F.R. § 121.1).

and the total value of the export was $36,067.  III:47-51; Exh. 76A.  Although the agents did not

necessarily hold Qin accountable for the "mistake(s)" regarding the incorrect ECCN or value listed

in AES for the October 2017, they did as to the designation of LinkOcean as the ultimate consignee

given his direction to Marine Sonic to do so.  III:58-59.

      **C.**      **<u>Qin's Arrival at Logan Airport from China on November 24, 2017</u>**

Given their ongoing investigation, the agents were aware that Qin would be returning to

Logan Airport from China on November 24, 2017.  I:80-81, 99.  The agents were aware that he

had traveled from the United States to China on October 18, 2017.  II:17, 20; <u>see</u> Exh. 44 at 28.

Although the agents did not stop Qin from leaving the United States in October, II:20, given the

further information from their investigation and knowing that he was scheduled to return in

November 2017, agents were interested in doing an "inspection of Qin and whatever goods he

might have upon his return to Logan," including detaining his electronic devices, II:23, 26; V:20-

23; Exh. 60, and they contacted CBP agents at Logan to coordinate same as a secondary inspection.

I:81; I:27 (noting that Qin was originally scheduled to return on November 10, 2017, but when he

changed his return to November 24, 2017, the agents had the same plan as to his secondary

inspection); V:5.  To that end, SA Anderson briefed CBP Officer Hughes on the nature of their

investigation of Qin.  I:82-83; II:26; V:6.  Although SA Anderson and SA Valentine were at Logan

at the time of Qin's arrival, they were not part of the secondary inspection, which was conducted

by the CBP.  I:84.

Qin arrived from China with his wife and two children on November 24, 2017.  IV: 25;

V:7 Exhs. 51,70.  In his secondary inspection, CBP Officers Hughes and Officer Belmarsh, V:5,

spoke with Qin and searched the family's luggage.  V:10.  The agents conducted the interview of

Qin in English.  V:11.  They did not have any concerns about Qin's ability to understand their questions.  V:12, 43.

Qin indicated that they were returning from a one-month trip to visit his parents in China. V:8.  He confirmed that he was president and owner of LinkOcean, based in China.  I:84-86.  He indicated that while in the United States, he conducted the business from his residence in Wellesley.  V:10.  He indicated that he exported commodities to China including instruments for measuring current, water depth and water temperature, all which attach to marine buoys.  V:13. When asked about other exports, Qin indicated that he only exported items attached to buoys. V:13, 61.  Based upon their investigation to that point, the investigating agents believed this statement to be false given that the investigation revealed his interest in procuring side scan sonar systems, AUVs and sonobuoys.  I:85; IV:66.

In course of this inspection, the CBP agents went through the family's luggage and found Qin's Dell Latitude laptop in one of the bags, V:10, 73, and that Qin had an Apple iPhone on him. V:14, 73.  He indicated that he used both devices to conduct his business while in the United States. V:14.   In the course of the interview, Qin opened his laptop and showed a diagram to illustrate the types of items that he exported.  I:84-85.  Hughes showed SA Anderson the diagram on Qin's laptop for a brief moment, II:31, described by Anderson as "technical in nature," for water equipment that would attach to a buoy.  V:49.  Based on this quick viewing, SA Anderson could not say that this singular document was contraband, II:35; V:26,[6] but it was not consistent with the type of commodities that were reflected in the AES for LinkOcean's purchases or the agents' discussions with Marine Sonic.  I:87.

---

[6]Although the agent could not identify the document, the defense offered from its forensic expert, Mark Spencer, that the two documents opened during the time of the secondary inspection on Qin's laptop were Exhs. 68, 69.  VII:98-100.

After questioning by CBP and detention of his laptop and iPhone, Qin provided passwords to both devices, V:17, 55, and was permitted to leave Logan.  I:88.  The inspection took a few hours, although the interviewing of Qin took approximately seventy-five minutes.  V:17.

**C.      Search and Seizure of Qin's Electronic Devices**

The laptop and iPhone were seized by HSI, Exhs. 51, 88, and were brought to HSI SA Anderson and SA Steven Valentine, a computer forensics agent, along with the passwords for access to both.  II:33; V:24.  SA Valentine conducted a preview of iPhone and laptop.  V:73-75.  He observed that both were set for Chinese language and the laptop had capacity of 250 gigabytes or more and it would be best to use forensic tools to review data as to same.  V:74-75.  The agents took the electronic devices to the HSI forensic lab so that they could be imaged and searched.  I:88-89; V:77-78.  Two of the challenge of doing the searches was the volume of data, much of it in Mandarin, and that the data included a number of encrypted files.  I:89.

As to the volume data, the agents were able to use some forensic tools to preview same, but given the bulk in Mandarin, they had to locate and engage an agent from another city fluent in Mandarin.  V:82-85.  From mid-December 2017 to mid-January 2018, the agents were able to work with the Mandarin-speaking agent to use the forensic tools to search the devices.  V:82-85.

As to the encrypted files, agents contacted Qin's counsel to gain the passwords to them.  I:92-93; Exh. 10.   Although some information was provided, the agents were not able to access the encrypted files with the information provided by Qin.  I:95; V:86-87, 105.  Although there turned out to be no PGP encryption, keychain system or Bitlocker on Qin's laptop, VII:107-08, there are dozens of other ways to encrypt files including password protection which may or may not result in encryption.  VII:122.  In attempting to conduct this border search of the computer, the agents were looking for, among other things, technical data since "[i]f you have the know-how to

build it, you don't need the thing." I:95, 98.[7]  Possession of such data, if for an export that required

a license, could constitute an unlawful export. I:99.   The agents were also searching the devices

for evidence of export violations and evidence that Qin might be operating as an agent of a foreign

power. I:96. This search uncovered, among other things, emails between Qin and his employees

and Northwestern Polytechnic University ("NWPU"), on the U.S. entity list, looking to purchase

hydrophones and there was some discussion of the creation of false documents to conceal that they

were going to the university. II:4-5, 74-75; Exh. 21 at 18.  Although the last email on Qin's laptop

was dated May 24, 2017, VII:102, other forms of documents or communications that could be used

on laptop and that documents attached to same were maintained on laptop, VII:115-19, and there

were many different types of files that were created after May 2017 on the laptop.  VII:123.

In addition to the issue with accessing encrypted files, it took the agents time to identify

and locate an agent, fluent in Mandarin, to assist them in the translation of many of the documents.

I:97; III:84; Exh. 11.  The search of same revealed what the agents believed to be evidence of

illegal exports. I:103-05; IV:104; Exh. 21 at 5.  The agents considered the border search of the

electronics ended on January 23, 2018, 60 days after the inspection at Logan. I:102-03; Exh. 53.

Thirty days is the presumptive period under HSI policy, but the agents had sought additional

extensions, totaling thirty days. III:89-90; Exh. 14.  In the border search between November 24,

2017 and January 23, 2018, the agents did not find any technical data on Qin's computer, II:46,

but did find evidence of transactions for NWPU, a research institute in China on the U.S. entities

list. Exh. 53.

---

[7] "Technical data" is defined under International Trafficking and Arms ("ITAR") regulations,
II:40, and the Department of Commerce Export Administrative regulations ("EAR") and may
include blueprints, drawings, "the knowledge, know-how, manufacturing requirements to build."
II:36-38; see Exhs. 16, 17.

The agents subsequently requested and received a search warrant on February 2, 2018 to conduct further forensic analysis of Qin's two electronic devices.  II:7; III:97; V:85-86. Exhs. 21, 23.

## III.   Procedural History

Defendants Qin, LinkOcean and NWPU are charged in this case.  D. 106.  All three are charged with conspiracy to commit export violations in violation of 50 U.S.C. § 1705 (Count I). D. 106 at 11.  Qin and LinkOcean are charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count IV) and smuggling in violation of 18 U.S.C. § 554 (Counts XI through XIV).  D. 106 at 22, 34.  The remaining charges are only against Qin:  two counts of visa fraud in violation of 18 U.S.C. § 1546(a) arising from a 2014 visa application (Count II), D. 106 at 20 and arising from a 2016 petition to remove conditions on his permanent resident status, D. 106 at 21 (Count III); two charges of making false statements in violation of 18 U.S.C. §1001 (Count V and VI), the latter of which related to false statements to the CBP officers on November 24, 2017,  D. 106 at 28-29, and money laundering in violation of 18 U.S.C. § 1956 (Counts VII through X), D. 106 at 30-33.  Qin has moved to suppress the evidence seized from his laptop and iPhone as well as statements he made to CBP Officers on November 24, 2017.  D. 212.

## IV.   Discussion

### A. Fourth Amendment Does Not Warrant Suppression of the Electronic Devices Seized on November 24, 2017 at Logan Airport

#### 1. At a Minimum, Agents Had Reasonable Suspicion to Conduct the Search and Seizure on November 24, 2017

Pursuant to the Fourth Amendment, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  Carpenter v. United States, __ U.S. __, 138 S. Ct. 2206, 2221 (2018); United States v. Wurie, 728 F.3d 1, 3 (1st Cir. 2013).  The

government, which bears the burden of showing that a warrantless search was reasonable, United States v. Bain, 874 F.3d 1, 17 (1st Cir. 2018), initially relies upon the border search exception for the search and seizure of Qin's electronic devices at Logan Airport on November 24, 2017.  D. 226 at 19.  For reasons consistent with this Court's ruling in Alasaad v. Nielson, 419 F. Supp.3d 142 (D. Mass. 2019), appeal pending, No. 20-1081 (1st Cir. Jan. 29, 2020), the Court rejects the government's reliance on this exception here for what amounts to a non-routine search.[8] The Court concludes, however, that the agents had, at a minimum, reasonable suspicion to search Qin's electronic devices for contraband on November 24, 2017.

The government is correct that the border search exception is rooted in "the recognized right of the sovereign to control" who and what enters the United States and its "paramount interest in protecting [ ] its territorial integrity." Id. at 155 (quoting United States v. Ramsey, 431 U.S. 606, 620 (1977) and United States v. Flores-Montano, 541 U.S. 149, 153 (2004)).  Between the balance of legitimate government interests and an individual's expectation of privacy, the former is at "its zenith" at the border and the latter is reduced.  Id. (citing Flores-Montano, 541 U.S. 152, 154).  Even so, "[w]hen applying exceptions to the warrant requirement, courts must determine whether the search at issue is within the scope of the exception, i.e., whether the search furthers the underlying purposes of the exception.  Id. at 157.  As to control of who may enter the United States, the agents were aware that Qin was a lawful permanent resident (even as they suspected that he may have previously made a false statement as to his export activities on his visa

---

[8]Although the agents may have considered the search of Qin's devices to be a "routine" border search, II:8-9; Exh. 14, the Court concludes that the scope of same, which extended into forensic searches beyond November 24, 2017, to be a non-routine search.  Alasaad, 419 F. Supp. 3d at 164; see United States v. Molina-Gomez, 781 F.3d 13, 19 (1st Cir. 2015) (concluding that non-routine searches require reasonable suspicion); see also United States v. Kim, 103 F. Supp. 3d 32, 57 (D.D.C. 2015).

application) and was returning to his residence in Massachusetts.  Although the border authority presumably applies both for inbound and outbound travelers, given the agents' concern about Qin's alleged exports to China, the control of same seems to be a stronger border concern as to his outbound travel (when he left the U.S. for China in October 2017, as the agents were aware) even as it remained a law enforcement and national security concern upon his return to the United States on November 24, 2017.  Moreover, Qin was not stopped at the border because of concerns about his admissibility and concerns that he was carrying good that would not be admissible, but because he was the target of an ongoing, criminal investigation.  As CBP SA Hughes testified, HSI agents briefed him on their investigation and requested that CBP stop Qin for secondary inspection and there was a plan to seize his electronic devices at this time, V:31, which was then executed.  As CBP Hughes acknowledged, he had no basis to detain devices based on the secondary inspection that CBP conducted.  V:24-25.  Based on the record, this secondary inspection of his devices was not a routine border search tied to the underlying purposes of the border search exception, but more akin to a "walled off" stop of a vehicle (on other reasonable suspicion or probable cause) in the midst of a larger criminal investigation.  See, e.g., United States v. Mitchell, No. 08-cr-10097-PBS, 2008 WL 4951667, at *1 (D. Mass. Nov. 14, 2008).

Even if reliance upon the border search exception (with no showing of cause) is not appropriate here, the Court concludes that the agents had, at least, reasonable suspicion to stop Qin and seize and search his electronic devices on November 24, 2017.  Without repeating the entirety of this Court's analysis in Alasaad, the Court concludes that there must be "a showing of specific and articulable facts, considered with reasonable inferences drawn from those facts, that the electronic devices [at issue] contain contraband."  Alasaad, 419 F. Supp. 3d at 166.  After the Supreme Court's decision in Riley v. California, __ U.S. __, 134 S. Ct. 2473 (2014), several courts

have applied such standard to the searches of digital devices at the border, see id. (citing cases), although there is disagreement about whether there should be limitation to the search for "contraband" versus the broader category for the search of evidence of past and future crimes.  Id. (citing cases).  Under either formulation, the government has made this showing here.

Electronic devices "can contain *digital contraband*."   United States v. Cano, 934 F.3d 1002, 1014 (9th Cir. 2019) (emphasis in original); D. 226 at 35. That is certainly true here, where the export of technical data for controlled exports would be a violation of export laws in the same way that the underlying export would be.   Such technical data were among the items and information that agents were concerned that Qin had obtained from U.S. manufacturers and were among the items that they sought in the grand jury subpoena to Marine Sonic, Exh. 9, before Qin was stopped at Logan on November 24, 2017, and later in the search warrant for the laptop and phone, Exh. 21, 23; IV:60, 67.   DOC agents assisted in the search of the devices as the agents were "looking for any potential technical data that could turn up on his computer that could require a license from the Department of Commerce for the export of those documents."  VI:39; Exh. 38. Such technical data could be proprietary data, trade secrets, schematics, diagrams, technical know-how.  V:71; VI:41, 47.  If Qin had technical data on his devices when he went to China, it could constitute export violations.  IV:60.  It was reasonable for the agents to suspect same given the nature of Qin's recent contact with U.S. manufacturers and that he was an authorized reseller of some manufacturers in China, IV: 95, including Marine Sonic.  VII:87.

Even assuming *arguendo*, that this Court adopted the broader application of reasonable suspicion that the electronic devices contained evidence of criminal conduct, the government would have met that standard as well.  Based upon their investigation by November 24, 2017, the agents had reasonable suspicion that the electronic devices, which Qin identified as devices he

used for work, would contain evidence of export violations, V:111, including but not limited to causing the filing of false EEI, VI:68; Exh. 21 at 5; 15 C.F.R. § 764.2, visa fraud (to the extent that agents had reason to believe that devices would contain evidence of export control violations when he had answered a question regarding same on his visa application in the negative, IV:58-59), and, after his statements to CBP agents about the limits of his exports (which the investigating agents reasonably believed to be false), false statements to federal officers.   Accordingly, on Qin's electronic devices, the agents were looking for, among other things, records, e-mails, chat logs, WeChat, IV:60, 67 and other business communications regarding transaction of U.S. technology export to China.  V:71.

Moreover, an agent's conclusions do "not have to be correct to constitute reasonable suspicion." United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010); see Illinois v. Wardlow, 528 U.S. 119, 125 (2000).  Much of Qin's contentions are less about whether the agents had reasonable suspicion that Qin had and was committing export violations prior to November 24, 2017 and more about whether they might prevail on same.  First, that Qin's direction not to tell Xylem the end user was in China could have been for a business reason (trying to get lower price through third party) or whether, as the agents contend, to conceal end user to avoid export controls, IV:76, still lends to reasonable suspicion based on other information from the investigation.   This is particularly true where Qin believed that he was communicating with a USPPI that would be required to enter EEI accurately and apply for an export license if, based on the nature of the export and/or end user, one was required.   That is, even if ultimate consignee could be the Foreign Principal Party in Interest ("FPPI") or end user, Exhs. 27 (15 C.F.R. § 30.1, defining "end user"), 39, concealment of the latter could still be of concern to the agents since the USPPI "wouldn't be able to accurately determine if a license was required if you don't have the true end user of the

product."  VI:11.  Second, although Qin contends that his expressed interest in AUV and its capabilities was for a customer engaged in marine research, IV:11; see Exh. 67, given the nature of his inquiries and information from manufacturers in the field that "he was asking for things that were inconsistent with, . . ., a simple water quality testing application," IV:35, the agents had reasonably suspected that the customer, the end user, was not a researcher, but another entity in China that would be prohibited from receiving such imports, including but not limited to another of Qin's customers, the Chinese Navy.  IV:37; see IV: 95 (testifying that agents were "concerned that Qin was involved [in] working on behalf of the Chinese Navy to procure items for the United States, export them to China so that they could be used or incorporated in systems the Chinese Navy or research institutes were developing to be used in electronic warfare, anti-submarine warfare").  Third, that the agents did not believe that they had probable cause to arrest Qin in October 2017 when he left the U.S. for China, IV:105, or that agents could have entertained a search then, IV:110, does not answer question of the existence of reasonable suspicion for a search of his electronic devices upon his return a month later, particularly as the investigation continued. The agents were not considering this information in a vacuum, but in the course of an ongoing investigation in which U.S. manufacturers raised concern about the nature of Qin's inquiries, the UCA communications with Qin reflected some of the same concerns and, by the time of the seizure of the electronic devices, Qin had made statements about the limits of the exports he supplied to customers in China.

Although the application of the reasonable suspicion standard for non-routine border searches of electronic devices arose after the Supreme Court's decision in Riley, the Court does not agree with Qin's contention that the seizure and search of his electronic devices on November 24, 2017 required probable cause and a search warrant.  D. 215 at 7.  Although the Supreme Court

recognized that 'digital is different,' given that breadth of personal information that can be contained on digital devices (as the parties recognize here in regard to the numerous categories of personal information about Qin and his family on his laptop and phone, Exh. 88), post-Riley cases have recognized that the balance of such privacy interests against the governmental interest at the border does not mandate the probable cause standard at the border, but the reasonable suspicion standard that had been applied pre-Riley for non-routine border searches.  See, e.g., Wanjiku, 919 F.3d at 485 (discussing cases).

### 2.   Search and Seizure of Electronic Devices was Reasonable in Scope

Qin also challenges the reasonableness of the scope and duration of the border search of his electronic devices which extended sixty days after the November 24, 2017 encounter at Logan Airport.  As with a stop and search under Terry v. Ohio, 392 U.S. 1, 30 (1968), the government must show that same was both "justified at [its] inception" and reasonable in terms of its scope. Id. at 6.  It is well settled that the concept of the "border" extends beyond the actual border to the "functional equivalent of the border."  Kim, 103 F. Supp. 3d at 57.  This is particularly true as to forensic search of electronic devices that cannot be conducted at the border.  Molina-Gomez, 781 F.3d at 21.  The Supreme Court has not set a bright line for the detention of electronic devices at the border, declining any "hard-and-fast time limits," but directing courts to assess the reasonableness of same in terms of "common sense and ordinary human experience."  United States v. Montoya de Hernandez, 473 U.S. 531, 543 (1985) (internal citation omitted).   In concluding that the border search of electronics, including a laptop, did not become unreasonable during the twenty-two day detention of same, the First Circuit declined to "second guess the techniques used by the [forensic] lab" to require a faster alternative.  Although the detention of Qin's electronic devices was longer than in Molina-Gomez, there were circumstances here that

warranted the longer detention.  First, a reasonable examination of Qin's devices could not be conducted at Logan as SA Valentine explained.  V:74-75.  Second, they determined that there was an extensive amount of data on the devices, some of the data on the laptop appeared to be encrypted and most of the data was in Mandarin.  Although it took some time to attempt to get information that the agents thought they needed to access the encrypted files from Qin, most of the delay was attributed to their need to find a Mandarin speaking agent who could assist them in assessing the contents of the devices.  It took until mid-December 2017 to have an agent from another city assigned to do so and it took her two trips to Boston in mid-December and then again in January 2018 to assist the agents.  The reasonableness of the detention of electronic devices have to assessed in terms of the circumstances presented in a particular case, see House v. Napolitano, 11-10852, 2012 WL 1038816, at *9-10 (D. Mass. Mar. 28, 2012) (denying motion to dismiss Fourth Amendment claim based upon the forty-nine-day detention of an electronic device at the border, but not reaching merits of whether detention was reasonable), and given the record here, the Court does not conclude the detention of the devices was unreasonable.

For all these reasons, the Court concludes that the search and seizure of Qin's electronic devices did not violate the Fourth Amendment.

### 3.  Good Faith Exception Under Leon

Although the government contends that the agents' search was justified under the border search exception (or, alternatively, under the analysis discussed above), they also contend, even if it was not, the Court should decline to grant Qin's motion to suppress under the United States v. Leon, 468 U.S. 897 (1984) good faith exception to the exclusionary rule.  That is, the government contends that, given the state of the law at the time of the search, the agents had a good faith basis for believing that a warrantless, border search of Qin's devices did not violate the Fourth

Amendment.  The touchstone of the exception is law enforcement officers' reasonable reliance on warrants, see Leon, 468 U.S. at 922, or settled appellate precedent at the time of the search, Davis v. United States, __ U.S. __, 131 S. Ct. 2419, 2429 (2011), even if that precedent is later invalidated.  In the wake of Riley and courts' consideration of whether it should extend to border searches of electronic devices, courts have considered whether the Leon good faith exception should apply given these developments in the law.  United States v. Wanjiku, 919 F. 3d 472, 486 (7th Cir. 2019); United States v. Kolsuz, 890 F.3d 133, 147-48 (4th Cir. 2018).  As one court has put it, "it was reasonable for the agents to continue to rely on the robust body of pre-Riley caselaw that allowed warrantless border searches of computers and cell phones."  United Molina-Isidoro, 884 F.3d 287, 292 (5th Cir. 2018).  That was true here as to the border search conducted by the agents, particularly where the Court has found that they had reasonable suspicion to do so at the time.

The fact that the detention of Qin's devices extended beyond the timeframe in Molina-Gomez does not make the Leon good faith exception inapplicable here.  The agents were aware that the prosecutors had imposed a "twenty-one day" rule for the detention of electronic devices.  III:86-87; Exh. 52.  As the prosecutor explained, this guidance to agents was based upon Molina-Gomez, 781 F.3d 13 in which, as referenced above, the First Circuit held that twenty-two-day detention of electronic devices was not unreasonable.  That this recommended practice of twenty-one days (or the law enforcement agency's presumption of 30 days), however, neither renders a search that exceeds same unreasonable nor makes the agents' continued reliance upon the settled precedent that there is no hard-and-fast limit for the duration of same unreasonable.  Accordingly, the Court denies the suppression that Qin seeks on the alternative basis of the Leon good faith exception.

**B. Interview of Qin on November 24, 2017 was Not a Custodial Interrogation**

Qin also seeks to suppress his statements that he made to CBP agents at Logan on November 24, 2017 during the secondary inspection.  "Miranda warnings must be given before a suspect is subjected to 'custodial interrogation.'"  United States v. Taylor, 985 F.2d 3, 7 (1st Cir. 1993) (citing United States v. Maguire, 918 F.2d 254, 262 (1st Cir. 1990)); United States v. Nai Fook Li, 206 F.3d 78, 83 (1st Cir. 2000).  "Determinations about Miranda custody begin by examining all of the 'circumstances surrounding the interrogation' and asking whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  In making such determination, it is the objective circumstances of the questioning, not the subjective views of the parties involved that is relevant.  Ellison, 632 F.3d at 729.  Such inquiry must be made to determine whether an objective person in the defendant's position would have found the circumstances coercive, "thus raising the concern that drove [the decision in] Miranda."  Id.  All this analysis, however, concerns the paradigm of interrogation in the Miranda, "the paradigm example of interrogating a suspect at a police station."  Id.  But when confronted with a case, like this one, "outside of the Miranda paradigm," "custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda."  Id.

This is particularly true, as the First Circuit has recognized, in context of customs inspections at the border.  As to questioning during a customs inspection, "the relevant inquiry, however, . . . is whether there was an arrest or restrain on freedom of movement of the degree associated with a formal arrest."  United States v. Fernandez-Ventura, 85 F.3d 708, 712 (1st Cir. 1996) ("Ventura I").  Such inquiry must be made in view of the "totality of the circumstances" and

the "most significant circumstance is that this incident occurred in the course of a Customs inspection at our nation's border." United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998). Accordingly, "[i]n the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders." Id.

Given the record here, the Court concludes that Qin was not in custody. The questioning was during a secondary inspection at the border. He was not under arrest and the encounter had none of the indicia of restraint akin to a formal arrest. The inspection was conducted in an open area in the baggage claim area, conducted by two agents and, although the entire detention spanned several hours, the questioning of Qin took seventy-five minutes. V:8-17. The bulk of the CBP officers' questions were consistent with border inquiry regarding Qin's trip to China, the purpose of his trip, how long he had been away. Even the questions about the nature of his business based in China was not inconsistent with inquiries at the border. V:10-11, 41; see Ventura I, 85 F.3d at 711 (noting that "questions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry point). Moreover, to the extent that Qin suggests that the fact that the questioning was conducted in English made it coercive, the Court rejects that argument. The CBP agents had no concerns about his ability to understand English during the secondary inspection. V:11-12, 43. Moreover, Qin's prior emails to/from SA Anderson (acting as an UCA) were in English and although the other UCA had instructed "Larry" to slow down in his discussion with Qin because he was not that fluent in English, that UCA also observed that his language skills were "pretty good" and Qin participated in English throughout their meeting, Exh. 44, and Qin's follow-up emails indicated an understanding of same. Moreover, Qin had previously attested to reading and understanding English. Exh. 15 (July 13, 2016 visa

application in which Qin attests that he can read and understand English).  At the end of the secondary inspection, Qin was given a receipt for his digital devices and was free to leave with his family at the end of the interview.  V:16-17.  Given the totality of circumstances, the Court does not conclude that Qin was in custody and where there was no custodial interrogation, <u>Miranda</u> warning were not required.

## V.      Conclusion

For the aforementioned reasons, the Court DENIES Qin's motion to suppress, D. 212.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
