## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— )
UNITED STATES OF AMERICA,      )
         )
    v.        )      Criminal Case No. 18-cr-10205-DJC
         )
SHUREN QIN,         )
         )
    Defendant.      )
———————————————————— )

### DEFENDANT SHUREN QIN'S SENTENCING MEMORANDUM

On April 28, 2021, Defendant Shuren Qin ("Mr. Qin" or "Shuren") pleaded guilty to charges that he caused two shipments containing a total of 60 hydrophones part no. HTI-92-WB ("hydrophones" or "HTI-92-WB hydrophones") to be exported to China without a license; one shipment of 40 hydrophones was sent in 2015 and one shipment of 20 hydrophones was sent in 2016.  Mr. Qin accepts responsibility for the crimes he committed.  He has acknowledged his guilt to this Court, his family, his community, and the public at large.  And he has experienced real punishment for his conduct already, including being arrested and jailed for more than three months; spending nearly three years on supervised release; and facing the likelihood of deportation at the end of whatever sentence the Court imposes.

Despite the seriousness of Mr. Qin's admitted conduct, multiple mitigating factors in this case support a sentence of time served with a condition of supervised release that he serve 12 months on home incarceration.  Some of those mitigating factors relate to Mr. Qin's history and characteristics, which are described in the PSR, this memorandum, and the letters in support of Mr. Qin that have been presented to the Court.  Other factors relate to the offense conduct itself.

This case does not involve any actual or intended risk to the national security of the United States.  The HTI-92-WB hydrophones at issue in this case are not highly sensitive

1

products and are not controlled for national security purposes; rather they can be and are freely exported from the U.S. to China without any export license whatsoever. This fact alone renders this case unlike every other case in which courts have chosen to apply the enhanced base offense level of 26 set forth in USSG §2M5.1(a)(1)(A), and instead brings this case much closer to cases where courts have either departed downward or varied to an adjusted guideline range more akin to the alternative base offense level of 14 set forth in USSG §2M5.1(a)(2). *See United States v. Cheong Yue, et al*, Case No. 19-cr-102140-IT (March 3, 2021) (Talwani, J.) (imposing sentence of time served plus 3 years supervised release in case involving export and attempted export of atomic clocks controlled for national security purposes but nonetheless available for purchase in Hong Kong); *U.S. v. Sevilla*, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006). For similar reasons, Mr. Qin's motive in committing these crimes had nothing to do with assisting NWPU in obtaining hydrophones that it could not otherwise obtain. To the contrary, the evidence produced by the government in this case – including contemporaneous emails between the parties to the hydrophone transactions – demonstrates that Mr. Qin was motivated by the far more mundane purpose of trying not to lose a sale.

In this country, proof matters. Mr. Qin is deeply ashamed of what he has done; he has admitted it and is prepared to accept this Court's judgment. But Mr. Qin's sentence should be based on what he actually did, and not on the basis of rhetoric or speculation that has no evidentiary support. For the reasons that follow, the Court should reject the government's suggestion that this case warrants a sentence of more than 6 years in prison. Rather, a sentence of time served with a supervised release condition of home incarceration for 12 months is sufficient but not greater than necessary to satisfy the purposes of punishment and avoid unwarranted disparities among similarly situated defendants.

I.      **NATURE AND CIRCUMSTANCES OF THE OFFENSE CONDUCT**

   A.   **The Offense Conduct**

   The parties largely agree about the facts underlying the two unlawful exports at issue in

this case.  *See* PSR at ¶¶ 20-48 (government version) and ¶¶ 58-66 (defense version):

   In or around July 2015, two professors who work for Northwest Polytechnical Institute

(Dr. Yang Shi and Professor Kunde Yang) requested that LinkOcean Technologies obtain price

quotes for hydrophones.  When LinkOcean obtained the winning quote from High Tech, Inc.,

Mr. Qin disclosed to High Tech that NWPU was the intended end user and asked High Tech to

begin the process of obtaining an export license – a process that High Tech described as "really a

simple process" and "did not see any reason why it would be denied."  *See* PSR ¶¶ 60-61.  It was

only after High Tech informed Mr. Qin that it would not be able to meet the research vessel's

delivery timetable unless LinkOcean would pay 60% of the cost upfront and assume the risk of a

license denial, *see* PSR ¶ 61, and Mr. Qin was specifically instructed by his customer Dr. Shi not

to mention NWPU because NWPU was "partly a military unit" and that might make the import

"difficult," *see* PSR ¶ 28, that Mr. Qin changed course and informed High Tech that the end user

was a professor from Xi'an Shiyou University.  This statement was false because Mr. Qin knew

that the end users were the NWPU professors who had placed the order.  *See* ¶¶ 31, 62.[1]  Mr. Qin

---

[1] Nine of the charges to which Mr. Qin pleaded guilty arose directly from these two hydrophone
shipments or involved statements of fact that were false because of those shipments.  *See* PSR ¶¶
52, 54, 66-68.  The remaining false statement charge (Count 6) involved a statement Mr. Qin
made during the border stop in 2017.  At that time, in an effort to explain his business in
shorthand, Mr. Qin stated that LinkOcean only imported products that attach to a buoy when, in
fact, over the course of the 12 years that LinkOcean had been in business, it had purchased and
resold some products that did not attach to a buoy.  *See* PSR ¶ 69.  While Mr. Qin admits that
statement was false when made, the significance of whether or not a product attaches to a buoy
remains unclear; for example, HTI-92-WB hydrophones attach to a buoy.

made the false statement because he did not want to lose the sale, and because he did not want LinkOcean to get stuck paying for the hydrophones in the event the license did not come through in time.  It was a terrible decision, one that has fundamentally altered the arc of his and his family's lives forever, but it was made for the same mundane reason that brings many otherwise law-abiding business people before this Court.

### B.  There Was No Military-Related Purpose Underlying this Offense

Despite the fact that the parties largely agree about the facts of this case, the government attempts to take the Court beyond those facts by asserting that the NWPU professors must have wanted the hydrophones to assist in China's anti-submarine warfare efforts, and that Mr. Qin must have sold them the hydrophones to help them in their efforts, despite a lack of any evidence supporting those conclusions.  Mr. Qin does not dispute: (1) that NWPU is listed on the Entity List and, therefore, that any U.S. export to NWPU requires an export license, (2) that NWPU was placed on the Entity List for national security reasons, or (3) that NWPU is affiliated with the Chinese military.  He does dispute, however, the government's repeated insinuation that these factors circumstantially prove that his offense conduct involved or was intended to involve military-related end uses or national security risks as opposed to scientific research.

At the time of the shipments at issue, Mr. Qin was the President of LinkOcean, a company he founded in 2005 in Qingdao, China – the same city in which Mr. Qin obtained his degree in marine biology from Ocean University of China, and where he and his wife Zoe lived with their two children.  LinkOcean's business was to provide high quality, reliable scientific instruments to Chinese scientists and engineers working in the oceanographic, hydrological, and geological markets.  For the most part, LinkOcean conducted its business by receiving requests for the purchase of scientific instruments from its customers in China, obtaining price quotes for such instruments from manufacturers around the world, purchasing the instruments directly from

the manufacturer, and reselling the instruments to its customers in China after applying a small mark up from which LinkOcean received its revenue. By 2015, LinkOcean was the exclusive representative in the Chinese market of 24 manufacturers of oceanographic instruments from around the world, including companies in Canada, Germany, the United Kingdom, New Zealand, Norway, and eight U.S. manufacturers. This was not a shell company acting as a "front" for the Chinese government – it was a legitimate, reputable business that worked together with other legitimate, reputable businesses lawfully selling scientific instruments for many years.

The government knows all of this because, for the past four years, agents from at least four separate federal agencies have been mining Mr. Qin's computers and iPhones, which included millions of email and text communications from the early 2000s up to 2018, and have failed to find <u>any</u> communications in which Mr. Qin discussed or supported military efforts in general or anti-submarine efforts in particular. The government has also spent years mining gmail accounts belonging to Dr. Shi at NWPU, one of the two professors who bought the hydrophones at issue in this case – and, again, has not identified or produced <u>any</u> evidence showing that Dr. Shi and Mr. Qin discussed "anti-submarine warfare" efforts or military uses in connection with the two hydrophone exports at issue in this case (or at all).

The best the government can point to is that LinkOcean's customers included the Chinese Navy and its affiliates. But that was no secret – as this Court learned during the suppression hearing, the "China Navy" was identified on LinkOcean's public website as a customer, and Mr. Qin disclosed that fact in every recorded conversation the undercover agents had with him in this case. Free and full disclosure is not the hallmark of a secret military agent. Moreover, as the government well knows, <u>none</u> of LinkOcean's other sales violated U.S. export laws and, as discussed more fully in Part I(C) *infra.*, <u>none</u> (including the hydrophones in this case) involved

5

products that are controlled for national security purposes.  Nor has the government produced

any evidence showing that these hydrophones were in fact used for such purposes.  The <u>only</u>

evidence the government has produced in this case is that the hydrophones were to be used by

teachers and students to monitor marine animal noise and seismic noise.  *See* PSR ¶ 63.  That

purpose is consistent with the general uses to which HTI-92-WB hydrophones are regularly put

in the scientific community, and consistent with the export controls placed on HTI-92-WB

hydrophones by the U.S. Commerce Department.  *See* Part I(C), *infra.*[2]

      Nor is there a legal basis for the Court to conclude that doing business with two

professors from NWPU must have inherently involved military end uses.  In fact, the opposite is

true.  The Export Administration Regulations ("EAR") affirmatively task the Commerce

Department with identifying entities in China that support efforts to obtain and/or develop

munitions and other products used for military purposes.  *See* 15 C.F.R. § 744.21.  Those entities

are listed by the Commerce Department on the Military End Users List – a list that is separate

---

[2] The government suggests that the Court should ignore this evidence simply because Professor Yang (one of the NWPU professors who purchased the hydrophones at issue in this case) was the source of the information.  But the government has never claimed that statements concerning the <u>uses</u> to which the hydrophones would be put were false – likely because the government has no evidence to support that conclusion.  More to the point, the government must be aware that Professor Yang has published papers in respected U.S. journals that openly discuss his use of hydrophones in conducting oceanographic research.  *See, e.g.*, Y. Zhang, K. Yang, Q. Yang & C. Chen, *Mapping sea surface observations to spectra of underwater ambient noise through self-organizing map method*, The Journal of the Acoustical Society of America, Vol. 146, Issue 2 (publ. Aug. 5, 2019), available at https://asa.scitation.org/doi/10.1121/1.5120542.  Similarly, the government must be aware that reputable universities in the U.S. and throughout the world have long collaborated with NWPU and its professors because it is a well-regarded scientific research institute despite its military affiliation.  By way of example, in 2018, the Massachusetts Institute of Technology included NWPU as a participating university in its annual MIT Asian Career Fair, *see* http://asianclub.mit.edu/2018/northwestern-polytechnical-university; the Florida Institute of Technology partners with NWPU in offering "summer camp" scholarships that allow FIT students to study abroad at NWPU, *see* https://www.fit.edu/ipo/partner-university-summer-camp/; and Iowa State University has an undergraduate exchange program with NWPU, *see* https://www.mse.iastate.edu/news/going-the-distance-for-education/.

and distinct from the Entity List.  *See* Pt. 744, Supplement No. 7.  NWPU has never been listed

on the Military End Users List by the Commerce Department.  Thus, not only is there an absence

of evidence to support the conclusion that military uses or purposes had anything to do with the

exports at issue in this case, there is no basis for the Court to hold that merely doing business

with NWPU is sufficient to circumstantially support such a finding.

### C.  HTI-92-WB Hydrophones Are Commonly Used in Oceanographic Research, Are Not Controlled for National Security Purposes, and Are Widely Available for Purchase in China

The government has also repeatedly asserted that hydrophones can be used for military

purposes.  That is true as far as it goes; for example, the U.S. Navy had great success using

hydrophones to locate German submarines and icebergs during World War I.  But here again, the

government conspicuously fails to cite to a single piece of evidence that the hydrophones at issue

in this case were in fact intended or used for such purposes, despite having unfettered access to

all of Mr. Qin's and Dr. Shi's communications about these transactions.  Mr. Qin certainly had

no such understanding; he believed – then and now – that the hydrophones would be used for

oceanographic research.  Moreover, as the government must be aware, HTI-92-WB hydrophones

are not controlled by the Commerce Department for military or national security purposes, and

are easily available for purchase in China. [3]

---

[3] As the government well knows, the Commerce Department places specific export controls on items with potential military applications that are being exported to China.  *See* 15 C.F.R. § 744.21(a)(1), (f).  The items subject to these additional controls are listed in 15 C.F.R. Part 744, Supplement No. 2 ("List of Items Subject to the Military End-Use License Requirement of § 744.21").  Products controlled under ECCN 6A991 – like the HTI-92-WB hydrophones at issue in this case – are not included in that list and can be exported for resale in China without any license whatsoever.

A hydrophone is an underwater device that detects and records ocean sounds.  *See* U.S. Dept. of Commerce, National Ocean and Atmospheric Administration, "What Is a Hydrophone," available at https://oceanservice.noaa.gov/facts/hydrophone.html.  Hydrophones have long been used by scientists conducting oceanographic research around the world, including in the U.S. and China.  Back in 2013, for example, out of 200+ scientific studies that were presented for discussion at the 1st International Conference and Exhibition on Underwater Acoustics, there were more than 950 references to the word "hydrophone."  *See* J. Papadakis & L. Bjorno (Ed.), 1st International Conference and Exhibition on Underwater Acoustics (June 23-28, 2013), IBSN 978-618-80725-0-3.[4]  Many oceanographic studies specifically reference HTI-92-WB hydrophones in their research papers, particularly (though not exclusively) in the context of monitoring marine animal noises.  *See, e.g.*, S. Fregosi et al, *Detections of Whale Vocalizations by Simultaneously Deployed Bottom-Moored and Deep-Water Mobile Autonomous Hydrophones*, Front. Mar. Sci. (publ. Aug. 31, 2020) (joint study conducted by NOAA and various universities in 2016 using HTI-92-WB hydrophones to compare mobile and stationary methods for surveying and monitoring marine mammal populations);[5] L. Coquereau et al., *Marine soundscape shaped by fishing activity*, R. Soc. Open sci 4: 160606 (Dec. 2016) (2014 underwater study using HTI-92-WB hydrophones from High Tech);[6] E. Kusel et al., *Marine*

---

[4] Available at
https://www.uaconferences.org/docs/Past_Proceedings/UACE2013_Proceedings.pdf.

[5] Available at https://www.frontiersin.org/articles/10.3389/fmars.2020.00721/full.

[6] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5319325/pdf/rsos160606.pdf.

*mammal tracks from two-hydrophone acoustic recordings made with a glider*, Ocean Sci. (publ. June 22, 2016) (describing studies performed in 2014 using HTI-92-WB hydrophones).[7]

Consistent with that scientific use, the Commerce Department has assigned an Export Control Classification Number ("ECCN") of 6A991 to HTI-92-WB hydrophones. The letter and digits that make up ECCNs have precise regulatory meanings. *See* 15 C.F.R. § 738.2(d). The digit immediately following the letter in an ECCN is most relevant to this case, because that digit identifies the type of export control associated with the item's potential uses. *Id.* A "0" following the letter in an ECCN indicates that export controls have been assigned for national security reasons; a "1" indicates export controls for missile technology reasons; a "2" indicates nuclear proliferation reasons; a "3" indicates chemical & biological weapons reasons; a "5" indicates national security or foreign policy regulatory reasons; a "6" indicates munitions-related reasons; and a "9" indicates reasons not captured in the other control categories, such as anti-terrorism, crime control, regional stability, short supply, UN sanctions, etc. *Id.*

The "9" that follows the "A" in 6A991, which is the ECCN assigned to HTI-92-WB hydrophones, means as a matter of law that HTI-92-WB hydrophones are <u>not</u> controlled for national security or any of the other specific purposes described above. *See id.* The precise export controls established for products assigned an ECCN of 6A991 are "anti-terrorism" controls, but only if the product is going to certain identified countries; otherwise a product controlled under ECCN 6A991 is controlled only for general "foreign policy" purposes. *See* 15 C.F.R. Pt. 774, Supplement No. 1, Category 6. China is not one of the countries to which "anti-

---

[7] Available at
https://www.researchgate.net/publication/304340667_Marine_mammal_tracks_from_two-hydrophone_acoustic_recordings_made_with_a_glider.

terrorism" controls apply.  *See* 15 C.F.R. Pt. 738, Supplement No. 1.  Thus, the only purpose of export controls on HTI-92-WB hydrophones bound for China is a general "foreign policy" purpose.[8]

In practice, this means that the Commerce Department allows HTI-92-WB hydrophones to be exported to China for resale without any license whatsoever (so long as the end user is not on the Entity List).  For example, LinkOcean sold a shipment of HTI-92-WB hydrophones to a different end user in China at approximately the same time as the transaction with NWPU, but because that end-user was not on the Entity List, that export and resale were perfectly legal.  High Tech, Inc., the manufacturer of the HTI-92-WB hydrophones, itself has two official resellers located in China: one in Beijing and one in Wuxi.  *See* Exhibit B (screenshot of High Tech, Inc. website, available at http://www.hightechincusa.com/).  Critical to the Court's disposition of this case is that fact that, if anyone wants to purchase HTI-92-WB hydrophones in China, they can easily do so.  LinkOcean may have offered a better price and better customer service – factors that are unimportant in military contexts, but very important to individual scientists with constrained budgets – but it did not offer a product that was difficult to obtain or different from what was otherwise available for purchase throughout the country.

---

[8] USSG §2M5.1's enhanced BOL closely tracks some – but not all – of the ECCN categories described in Part I(C), *supra*.  Under the guidelines, a court should apply a BOL of 26 if "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded," and it should apply a BOL of 14 "otherwise."  *See* USSG §2M5.1(a)(1)(A), (a)(2).  A product assigned an ECCN with a "0" following the letter has "national security" controls; a product assigned an ECCN with a "2" following the letter has "nuclear" controls; and a product assigned an ECCN with a "3" following the letter has "biological" or "chemical" controls.  *Id.*  A product assigned an ECCN with a "9" following the letter – like HTI-92-WB hydrophones – does not have any of those types of controls.

The government's suggestion that this offense involved "anti-submarine warfare efforts" or created "national security risks" is belied by the record evidence, the vast number of accepted scientific uses for HTI-92-WB hydrophones, and the ready availability of those hydrophones in China.  There is no question that Mr. Qin's conduct was criminal – he intentionally made materially false statements in order to cut a corner and make a sale.  But to suggest that his crime somehow endangered this country's national security is simply not credible because it is not supported by evidence connected to <u>this</u> man or <u>this</u> case, and it is refuted by the regulatory scheme that governs the export of these products.

## II.    USSG CALCULATION

As set forth in the Plea Agreement, Mr. Qin agrees that USSG §2M5.1 applies to the offense conduct in this case; that all of the offenses in this case should be grouped under USSG §3D1.2(b); that the offense level should be increased by two levels under USSG §2S1.1(b)(2)(B); and that the offense level should be lowered by three levels under USSG §3E1.1.  *See* Plea Agreement, ¶ 3.  The parties have also discussed and agree that there is no relevant conduct in this case within the meaning of USSG §1B1.3, and the government is not seeking to forfeit any property from Mr. Qin.

The parties disagree, however, on two important aspects of the guideline calculation.  <u>First</u>, while the parties agree that the Entity List is a "national security control" within the meaning of USSG §2M5.1 and thus that §2M5.1(a)(1)'s base offense level ("BOL") of 26 is facially applicable, Mr. Qin contends that this case falls outside of the heartland of cases to which that enhanced BOL should be applied.  Instead, a downward departure to §2M5.1's alternative BOL of 14 is appropriate due to the presence of mitigating circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in

formulating the guidelines.  *See* USSG §5K2.0; *see also* USSG §2M5.1, comment. n.2.[9]  Second,

the parties disagree on whether Mr. Qin's offense level should be increased by four levels under

USSG §3B1.1(a) for his role in the offense.

### A.  A Downward Departure to §2M5.1(a)'s Alternative BOL Is Proper in this Case

USSG §2M5.1 governs the offense level calculation in this case.  That guideline has two

BOLs that are potentially relevant here: a BOL of 26 "if (A) national security controls or controls

relating to the proliferation of nuclear, biological, or chemical weapons or materials were

evaded," and a BOL of 14 "otherwise."  *See* USSG §2M5.1(a)(1)(A), (a)(2).  USSG §2M5.1's

commentary expressly notes that a departure may be warranted when certain relevant factors are

present in an extreme form, including "the degree to which the violation threatened a security

interest of the United States, the volume of commerce involved, the extent of planning or

sophistication, and whether there were multiple occurrences." *See* USSG §2M51, comment., n.2.

Turning to the issue of national security first, application of the 12-level enhancement

required by §2M5.1(a)(1)(A) vastly over-punishes Mr. Qin because it fails to take into account

the fact that the product at issue in this case is not controlled for national security purposes and

can be (and is) freely exported to China without any license whatsoever.  This fact alone

differentiates Mr. Qin's case from every case in which the First Circuit has affirmed application

of a BOL of 26.  In all of those cases, the defendant (1) evaded national security controls

specifically assigned to the product at issue, and/or (2) evaded a trade embargo that prohibited

any commercial exports to the recipient country, *see, e.g., U.S. v. Cheng*, 849 F.3d 516, 517 (1st

Cir. 2017) (defendant caused at least 1,185 nuclear pressure transducers to be fraudulently

---

[9] In the plea agreement, Mr. Qin reserved his right to argue for any downward departure
available under the guidelines, as well as a variance under 18 U.S.C. § 3553(a).  *See* Plea
Agreement, ¶ 3.

shipped to Iran in violation of Iran trade embargo to assist in Iran's nuclear weapons program);
*United States v. Wu*, 711 F.3d 1, 8 (1st Cir. 2013) (defendants convicted of unlawfully exporting
munitions controlled under ITAR and electronic parts controlled for national security under
EAR; *U.S. v. McKeeve*, 131 F.3d 1, *5 (1st Cir. 1997) (defendant shipped large quantity of
computer equipment to Libya in violation of Libya trade embargo).  In each of those cases, the
product at issue was not available to the putative purchaser <u>except</u> through the unlawful export.

      Even in those circumstances, other courts have exercised their authority to depart
downward when appropriate due to the specific facts of the case.  In *U.S. v. Sevilla*, 2006 WL
3486872 (N.D. Ill. Nov. 29, 2006) ("*Sevilla II"*), for example, the court departed downward to
§2M5.1's alternative BOL of 12 notwithstanding that the defendant attempted to evade the trade
embargo against Iran.  Initially, the court found that 12 was the correct BOL under the guidelines
because the government failed to prove by a preponderance of the evidence that the product at
issue was controlled for national security purposes.  *See U.S. v .Sevilla*, 2006 WL 1710139, *4
(N.D. Ill. June 13, 2006) ("*Sevilla I*")**.**  The government thereafter moved for reconsideration,
arguing that the national security control applicable to the defendant's conduct was not product-
related but rather was the trade embargo itself, and the court accepted that argument because the
trade embargo was based on an Executive Order finding that Iran "constitute[s] an unusual and
extraordinary threat to the national security, foreign policy, and economy of the United States.
*See Sevilla II*, 2006 WL 3486872 at *2.  Nonetheless, the court again departed downward to a
BOL of 12, because the product at issue did not threaten the proliferation of nuclear, biological,
or chemical weapons, the defendant's conduct occurred on only one occasion and he had no prior

criminal history, the volume of commerce was minimal, and there was no evidence that the

attempted export was made with terroristic intent. *Id.* at *3.[10]

No published case has addressed the BOL to apply where, as here, the "national security

control" at issue is neither product based nor country based, but instead is based on the fact that

the particular end-user at issue was listed on the "Entity List."  The Entity List is a long list of

thousands of entities for whom the Commerce Department has assigned varying degrees of

additional export controls separate and apart from the controls assigned to products.  *See* 15

C.F.R. § 744.11 & Pt. 744, Supplement No. 4.  Some of the entities listed on the Entity List are

prohibited from receiving any exports whatsoever, while other entities can receive exports so

long as the exporter obtains an export license from the Commerce Department in advance of the

export.  NWPU, the end user at issue in this case, falls into that latter category.  Thus, any export

to NWPU requires an export license from the Commerce Department even if the product itself is

so benign that it does not otherwise require a license to export, as is the case with HTI-92-WB

hydrophones.

---

[10] *Sevilla II*'s focus on the absence of proliferation threats concerning nuclear, biological, or chemical weapons likely came from the history of USSG §2M5.1 itself.  Prior to 2001, §2M5.1(a)(1)'s enhanced BOL only went to a level 22. In 2001, the Sentencing Commission increased the BOL to 26 in direct response to a Congressional directive that had nothing to do with national security cases.  Specifically, the Commission responded to "a sense of Congress that guideline penalties are inadequate for certain offenses involving the importation and exportation of nuclear, chemical, and biological weapons, materials, or technologies by providing a four-level increase <u>for those offenses</u> in subsection (a)(1) of [] §2M5.1 . . . ."  *See* USSG, App. C, Vol. II, Amend. 633 at 216.  Unfortunately, the Commission applied that 4-level increase to cases involving the evasion of national security controls as well, without an empirical basis or a review of national sentencing practices or even any comment.  In other words, there is no empirical basis to assign Mr. Qin a BOL of 26.  This is precisely the type of situation that the Supreme Court has said warrants judicial discretion in rejecting a guideline.  *Accord Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (crack guidelines based on congressionally-set mandatory minimums rather than "empirical data and national experience" do not "exemplify the Commission's exercise of its characteristic institutional role").  *See also* Part III(B), *infra.*

Again, Mr. Qin does not dispute that the broad authority granted to the Department of Commerce qualifies the Entity List as a national security control, *see* 15 C.F.R. § 744.11 (entity can be added to Entity List if Department has reasonable cause to believe entity "has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States," or is "acting on behalf" of such an entity)**,** nor does he dispute the government's assertion that NWPU was added to the Entity List in 2001 for national security reasons.  He does, however, dispute that his case falls within the heartland of the 12-level BOL increase required by §2M5.1(a)(1)(A) in light of the unique fact that HTI-92-WB hydrophones can be and are exported to and resold in China without any license whatsoever.

This case does not involve shipments of products specifically controlled for national security, *Wu*, 711 F.3d at 22, or shipments to countries that were under a specific trade embargo, *McKeeve*, 131 F.3d at 14, or both, *Cheng*, 849 F.3d at 517.  Like the defendant in *Sevilla*, there is no evidence that Mr. Qin was motivated by an intent to harm this country's national security. *See Sevilla*, 2006 WL 3486872 at *3.  A marine biologist by training, he was well aware that hydrophones are common research tools and had no reason to believe they were potentially dangerous to the United States.  The NWPU professors themselves affirmed that the hydrophones would be used for oceanographic research, *see* PSR ¶ 63, and High Tech's president Brian Spychalski told Mr. Qin that getting a license to export the hydrophones to NWPU "really is a simple process" and that he did "not see any reason why it would be denied." *See* PSR ¶ 60.  Nor does Mr. Qin have any history of animus toward the United States; to the contrary, he and his wife Zoe invested $500,000 of their life savings in the U.S. as part of the EB-5 immigration process and, at the time of the shipments at issue in this case, were in the

process of moving their family here to be near Zoe's father, step-mother, and sister – all of whom are U.S. citizens.

The remaining factors identified in §2M5.1's commentary also distinguish this case from *McKeeve*, *Wu*, and *Cheng*, and support a downward departure similar to *Sevilla II*. The volume of commerce involved was minimal: two shipments of 60 hydrophones worth $108,491.50 out of thousands of imported products worth millions of dollars over a 12-year period. Mr. Qin was clearly not a sophisticated participant – he initially disclosed to High Tech that NWPU was the end user. While his conduct was deceitful, it was by no means well-planned or complicated. None of LinkOcean's other transactions violated U.S. export laws, and Mr. Qin has no other criminal history. These mitigating circumstances, taken together, distinguish this case from every other case in this Circuit where a BOL of 26 was applied, and justify a downward departure to the alternative BOL of 14 set forth in §2M5.1(a)(2). *See* USSG §§2M5.1, comment., n.2; 5K2.0; *accord Sevilla II*, 2006 WL 3486872 at *3.

The government has attempted to obscure these mitigating facts by insinuating – and, at times, directly stating – that the HTI-92-WB hydrophones Mr. Qin resold to the professors at NWPU were to be used in anti-submarine warfare. But as discussed in Part I, *supra*, beyond mere speculation there is no factual support for this claim. And the insinuation that HTI-92-WB hydrophones are munitions-like is flatly belied by the lack of export controls to which they are subject – and the fact that they can be exported for resale to anyone in China other than users like NWPU for whom a license is required.

The government has also repeatedly stated that Mr. Qin's company did business with "the PLA Navy, Chinese military entities, and Chinese research institutes" and/or sold products with "military applications," presumably in an effort to suggest a generalized nationalistic concern

16

about LinkOcean's business.  Again, to be clear, between 2005 and 2018, LinkOcean was a legitimate business with long-standing relationships with manufacturers around the globe. During that time period, LinkOcean resold oceanographic instruments to many customers in China, including some who were affiliated with the Chinese Navy.  Those relationships were no secret; LinkOcean publicly and freely identified the Chinese Navy as a customer on its website. And as the government well knows, **<u>none</u>** of the products that LinkOcean resold to the Chinese Navy (or any other customer) were classified or controlled under the EAR for military end-use or national security purposes, and none met any of the criteria set forth in §2M5.1(a)(1)(A) as supporting a BOL of 26.  After having access to every bit of information contained in Mr. Qin's electronic devices between 2005 and 2018, the only transactions identified by the government as violating any U.S. laws were the two HTI-92-WB hydrophone transactions at issue in this case. The government's hyperbole is just that – an effort to raise a national security "concern" that simply does not exist as a matter of law or record evidence.

Where, as here, the product at issue was (and is) available for purchase by NWPU within China, and the conduct was neither extensive nor sophisticated, there is no justification for imposing a 12-level increase on Mr. Qin's BOL for causing that product to be shipped to China for resale to NWPU without a license.  For the foregoing reasons, the Court should depart downward to a BOL of 14 under §2M5.1(a)(2).  After grouping all offenses under §3D1.2(b), applying a 2-level enhancement under §2S1.1(b)(2)(B), and applying a 3-level reduction under §3E1.1, Mr. Qin should be subject to a final offense level of 13 and, with 0 criminal history points, a recommended sentencing range of 12 to 18 months.

**B. Mr. Qin Was Not an Organizer or Leader of Criminal Activity that Involved 5 or More Participants or Was Otherwise Extensive**

The government also seeks a 4-level increase to Mr. Qin's offense level under USSG §3B1.1(a).  But there was no evidence to suggest that Mr. Qin exercised decision-making authority over the NWPU professors; to the contrary, by the government's own description, it was Dr. Shi who "instructed LINKOCEAN to falsely identify the end-user" of the hydrophone shipments.  *See* PSR at ¶ 28; *compare* USSG §3B1.1, comment. n. 4.  Nor is there evidence that Mr. Qin directed anyone else's conduct in the commission of this crime; as the U.S. Probation Office found, "there is no evidence that the defendant directed the actions of any other co-conspirator, exerted authority over others, or otherwise played a distinguished leadership role," and "others often instructed the defendant about how transactions would be handled and the necessary steps to facilitate them."  *See* PSR at 38.

Nor was this offense "otherwise extensive."  It consisted of two shipments of HTI-92-WB hydrophones out of thousands of products that LinkOcean lawfully imported to and resold in China between 2005 and 2018.  This was not a sophisticated crime; at heart, this was a lie about the fact that the end user of the hydrophones worked for Xi'an Shiyou University rather than NWPU.  Mr. Qin was clearly not a sophisticated participant – in fact, he freely disclosed to High Tech that NWPU was the end user before he was instructed by his customer not to do so.  And LinkOcean was clearly not a criminal enterprise; it was founded in 2005, not for the criminal purpose of committing an export violation 10 years later, but for the legitimate purpose of providing high quality, reliable scientific instruments to Chinese scientists and engineers working in the oceanographic, hydrological, and geological markets.  Overseas activities and international wire transfers were an inherent part of LinkOcean's legitimate business, and while

they may have played a role in facilitating the two shipments at issue in this case, they did not facilitate the lie that formed the basis of this crime.

There is no question that it was a crime to falsely represent that Dr. Ziheng at Xi'an Shiyou University, and not Dr. Shi and Professor Yang at NWPU, was the end-user of the hydrophones; Mr Qin has admitted his conduct and accepts responsibility for it.  But there is no evidence that in doing so, Mr. Qin organized, led, directed, recruited, or exercised control or authority over any other criminal participant or that this crime was otherwise extensive within the meaning of §3B1.1.  *Accord U.S. v. Cheng*, 2016 WL 413077, *2-3 (D. Mass. Feb. 2, 2016) (unpub.) (no enhancement under §3B1.1 where defendant and other criminal participants were "co-equals in the criminal scheme").

## III.    18 U.S.C. § 3553(a) ANALYSIS

Of course the guideline calculation is the beginning, not the end, of the sentencing analysis.  For the reasons given below and based on the facts of this case, a sentence of time served with a supervised release condition of 12 months home detention is sufficient but not greater than necessary to satisfy the purposes of punishment and avoid unwarranted disparities as required by 18 U.S.C. § 3553(a).

### A.  History and Characteristics of Mr. Qin

Mr. Qin was born in 1976 in rural Guiping, China.  He and his siblings were raised by their parents Xize and Chaolian in a close knit, loving family.  When Shuren was 3 years old, his father moved more than 800 miles away to the city of Chengdu in order to obtain a factory job and with the hope that, eventually, he could give his children better educational opportunities.

For three years, the rest of the family had to remain in Guiping due to government restrictions.[11] When Shuren was six years old, Xize was able to get permission for the four children to join him in Chengdu.  It took another five years after that, or until Shuren was 11, for his mother Chaolian to obtain permission to join her husband and children.

Shuren worked hard in school and was the only one of his four siblings to complete the Chinese equivalent of high school and go on to college; his siblings remained in Chengdu, where his sister is a homemaker and his brothers perform manual labor jobs.  Despite (or perhaps because of) growing up in a landlocked city, Shuren developed a real passion for the ocean as a child, including inventing a fresh (rain) water catch buoy that he designed in the shape of a jellyfish to float on the surface of the ocean.  When he learned he would be able to attend college due to his test scores, Shuren chose to pursue a degree in marine biology at Ocean University of China in Qingdao – a beautiful city located on the coast of the Yellow Sea; the first time he actually saw the ocean was when he moved to Qingdao.  Initially Shuren's dream was to become an oceanographer himself; however, his college grades were not sufficiently strong to allow him to move on to graduate school, so instead he put his degree to work as a sales person selling oceanographic instruments to researchers and scientists in China.  He also met, fell in love with, and married his wife Zoe, whose family was from Qingdao and who also studied marine biology at Ocean University.  Zoe was Shuren's first and only girlfriend, and the couple remains deeply committed to each other.  They now have two children – their son, who is 12 years old, and their daughter who is 9 years old.  Shuren and Zoe were able to avoid the one-child rule when their daughter was born by paying a "fine" amounting to the equivalent of more than $26,000 to the

---

[11] The Chinese government limits the numbers of people who are allowed to live in urban areas, and obtaining permission to move from a rural area to an urban area requires government approval that is extremely difficult to obtain.

Chinese government, and Shuren is universally described as a joyful, active, loving, and supportive father to his children.  *See* Exhibit A (letters in support).

In 2005, after several years working for YSI China and Nortek selling their oceanographic instruments to customers in China, Shuren decided to open his own company.  He called it LinkOcean because he wanted the company to "link" oceanographic scientific communities around the world.  The company was small but successful, due primarily to Shuren's hard work and his passion for and experience in oceanographic work.  Shuren and Zoe carefully saved their income from LinkOcean and, in 2011, began the lengthy and costly process of obtaining an EB-5 visa in order to become lawful permanent residents here in the U.S.  Shuren believed strongly that the U.S. offered the best educational opportunities for his children, and Zoe longed to be near her father, step-mother, and sister, all of whom had moved to New England and become naturalized U.S. citizens years before.  By 2016, the $500,000 EB-5 investment was paid out of the family's savings, the green cards had been issued, and the family was finally settled in Wellesley, Massachusetts.

Despite the short time Shuren and his family have lived in this country and despite the notoriety of his arrest in 2018, many of his Wellesley neighbors have written letters to this Court in an effort to help the Court better understand Shuren's true character.  To a one, those letters describe his community spirit, generosity, enthusiasm for teaching, devotion to his family, and love of science and oceanography.  Those comments are echoed by Shuren's family, friends, customers and business colleagues in China and elsewhere.  There is no hint anywhere in Shuren's background to suggest that he is political; neither he nor his family was involved with the military or privileged in any way by the Chinese government.  To the contrary, the letters reflect a cross-section of Shuren's entire life and make clear that he is an authentic person,

complete with the real flaws that have brought him before this Court, but also real and genuine decency and worth.  *See* Exhibit A (letters in support of Mr. Qin)

### B. Purposes of Sentencing and Avoiding Unwarranted Disparities

In imposing a sentence on Mr. Qin, this Court must consider the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (B) afford adequate deterrence; (C) protect the public from future crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a)(2).  In addition, the Court must impose a sentence that avoids unwarranted disparities with similarly situated defendants.  *Id.* at (a)(6).  Here, a sentence of time served with a 12-month period of home incarceration best satisfies these statutory considerations.

At the outset, the Court should exercise its statutory discretion to reject a BOL of 26 for the simple fact that the guideline was not based on empirical data or sentencing practices, but rather was adopted in response to Congressional comment on the sufficiency of sentences in other types of cases – and, specifically, cases "involving the importation and exportation of nuclear, chemical, and biological weapons, materials, or technologies."  *See* USSG, App. C, Vol. II, Amend. 633 at 216.  Obviously, this case does not involve nuclear, chemical, or biological weapons, materials, or technologies.  For that reason alone, the Court should disavow any reliance on §2M5.1(a)(1).  *Accord Kimbrough*, 552 U.S. at 109-10.

Turning to the purposes of punishment set forth at § 3553(a) and the need to avoid unwarranted disparities, there is no question that Mr. Qin's offenses were serious and he deserves to be punished for them.  At the same time, however, Mr. Qin's conduct was less culpable than defendants in other cases where the court departed and/or varied downward from

§2M5.1(a)(1)'s BOL.  *See Sevilla II*, 2006 WL 3486872, at*2; *see also U.S. v. Groos*, 2008 WL 5387852, *3 (N.D. Ill. Dec. 16, 2008).  The defendants in those cases violated trade embargoes that were specifically imposed upon a Presidential finding that Iran constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *See id.*; *see also Groos*, 2008 WL 5387852 at *4 (noting defendant's conduct took place in January and February 2002, shortly after the September 11, 2001 attacks and President Bush's identification of Iran as an "axis of evil").  Obviously, no such embargo or Executive Order from the President exists here.

Mr. Qin's conduct was also less culpable than the defendant who was recently sentenced to time served for export violations in this district.  *See United States v. Cheong Yue, et al*, Case No. 19-cr-102140-IT (March 3, 2021) (Talwani, J.).  The product at issue in *Yue* was cesium atomic clocks, which are specifically controlled for national security.  *See* Gov't's Sentencing Memo at 2-3.  In the course of obtaining the clocks, the defendant not only lied about the end user – he also assured the U.S. manufacturer that the clocks would not be exported, and instead would be used in a fake California plant that purportedly researched, developed, and produced cordless phones.  *Id.*[12]

This case does not implicate the aggravating factors present in Mr. Yue's case: the hydrophones at issue here are not controlled for national security purposes, and Mr. Qin was quite upfront about the fact that they would be used in China.  Yet here, the government is seeking a sentence that is <u>years longer</u> than what the government sought in Mr. Yue's case – even after knowing that the court in *Yue* rejected the government's recommendation and

---

[12] The defendant in *Yue* countered the government's "national security" argument by pointing out that there, as in this case, the same clocks were already available for purchase in Hong Kong, and also sought leniency due to his advanced age and recent cancer diagnosis.

sentenced the defendant to time served (which, for Mr. Yue, was one day in jail).  Similarly, Mr.
McKeeve, who was convicted after trial of attempting to evade the Libya trade embargo by
routing $300,000 worth of computer equipment through Cyprus and Ethiopia (and found to have
perjured himself at trial to boot), was sentenced to 51 months in prison – twenty months less than
the government seeks here.  *McKeeve*, 131 F.3d at 5-6, 14-15.  And the defendants in *Wu*, who
were convicted after trial of unlawfully exporting products controlled for national security (as
well as actual munitions) over the course of 10 years, received sentences that were comparable to
or many years less than the sentence the government seeks in this case.  *See U.S. v. Wu, et al.*,
Case No. 08-cr-10386 (sentences imposed of 84 months for Mr. Wu and 36 months for Ms. Wei)
(dkt #s 377 and 389, respectively).  There is absolutely no basis to impose a sentence on Mr. Qin
that is even remotely comparable to those handed down in *McKeeve* and *Wu* – much less a
sentence that exceeds some of those sentences by a factor of years.  Mr. Qin's conduct was not
even as culpable as Mr. Yue's, who received a sentence of time served after serving one day in
jail.

      For the last three years, Mr. Qin has been punished for his crimes.  He was arrested at his
home and jailed for more than three months, and has served nearly three years on pretrial release
(including nearly seven months on home incarceration and another ten months on home
detention).  During that time, he has not seen his elderly parents or his siblings at all, and has had
to be separated from his own wife and children for the past six months while they care for family
in China without him.  And his punishment will last far beyond the sentence imposed by the
Court because, as a result of this case, Mr. Qin's dream of raising and educating his children in
this country is very likely at an end.

These same factors afford more than adequate deterrence to others who may be tempted to circumvent the EAR's regulatory requirements. This is particularly true given the notoriety of this case, which has added both to the pain and humiliation Mr. Qin has experienced as a result of his misconduct (*i.e.*, punishment) and also to the deterrent effect on others. *Accord* U.S. Dept. of Justice, National Institute of Justice, *Five Things about Deterrence* at 1 (May 2016) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.").[13] Finally, nothing in this case suggests that Mr. Qin has any rehabilitative needs that would be served through a sentence of imprisonment.

## IV.    SENTENCE RECOMMENDATION

For all of the foregoing reasons, the Court should depart downward to the alternative BOL set forth at USSG §2M5.1(a)(2) and impose a sentence of time served with a supervised release condition of 12 months home incarceration. Such a sentence is sufficient but not greater than necessary to satisfy the purposes of punishment, and avoids unwarranted disparities with similarly situated defendants.

Respectfully submitted,

*/s/ William H. Kettlewell*
William H. Kettlewell (BBO #270320)
Sara E. Silva (BBO # 645293)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA  02110
(617) 371-1000
bill.kettlewell@hoganlovells.com
sara.silva@hoganlovells.com

Dated: September 1, 2021

---

[13] Available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.