UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.             )<br>)<br>SHUREN QIN,         )<br>)<br>Defendant.        )<br>) | Case No. 1:18-cr-10205-DJC |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully asks this Court to sentence the defendant, Shuren Qin, to 87 months of imprisonment, a fine within the Guidelines sentencing range, and 24 months of supervised release. This sentence is warranted because the defendant deliberately endangered U.S. national security, at the very least by exporting hydrophones with applications in anti-submarine warfare to a Chinese military university that he *knew* was on the Department of Commerce's Entity List because of its ties to the Chinese military. The national security risks associated with the defendant's conduct are manifest. The defendant willfully ignored these risks — not to mention federal law — in order to further his business interests and satisfy a "VIP" customer. Later, he lied to federal law enforcement agents about engaging in illegal exports, his business dealings with a second PRC military university, and other troubling aspects of LinkOcean's business; and he lied again in immigration documents to attain unconditional permanent resident status in the U.S. The government's recommended sentence is the minimum necessary to reflect the seriousness of these offenses, to promote respect for the law, and to provide just punishment.

A lengthy sentence is also necessary to send a deterrent message to others who, whether motivated by greed or a desire to assist a foreign adversary, are similarly inclined to violate U.S. export and national security controls, particularly those aimed at the PRC. To be sure, the threat posed to the United States and its allies by the PRC has only intensified since the defendant was

arrested in 2018. *See, e.g,* Chris Buckley & Keith Bradsher, *Marking Party's Centennial, Xi Warns That China Will Not be Bullied*, N.Y. Times, Jul. 1, 2021, available at https://www.nytimes.com/2021/07/01/world/asia/xi-china-communist-party-anniversary.html (President Xi Jinping threatening foreign powers with bloodshed).

### *The Sentencing Guidelines*

The parties agree that the defendant's base offense level is 26 because he evaded national security controls. *See* ECF No. 310 (*citing* USSG § 2M5.1(a)(1)); PSR ¶ 5. The parties further agree, as outlined in the plea agreement, that the offense level is increased by two levels under USSG § 2S1.1(b)(2)(B) because the defendant was convicted of violations of 18 U.S.C. § 1956 (money laundering) and decreased by three levels under USSG § 3E1.1 because the defendant has accepted responsibility for his crimes. *Id.*

The government believes that the offense level should be increased by four additional levels under USSG § 3B1.1 because the defendant was an organizer or leader of criminal activity that involved five or more participants. This would result in a total offense level of 29. "To earn the enhancement, the government must show by a preponderance of the evidence that the defendant did more than participate in shared criminal activity; he must have led or facilitated that criminal activity." *United States v. Grullon*, 996 F.3d 21, 34 (1st Cir. 2021). One way to demonstrate leadership is by "the degree of control and authority exercised over" at least one other person. *United States v. Picanso*, 333 F.3d 21, 23 (1st Cir. 2003). The "[e]vidence of the defendant's role in the conspiracy may be wholly circumstantial, and need only show that he exercised authority or control over [one other] participant on one occasion." *Grullon*, 996 F.3d at 34 (internal quotations omitted). To distinguish between organizational and leadership roles and other lesser roles, the Guidelines instruct courts to consider the following factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the agree of control and authority exercised over others." USSG § 3B1.1, Application Note 4.

The defendant does not dispute that he conspired with at least four others in the People's Republic of China ("PRC") — two LinkOcean employees and two employees of Northwestern Polytechnical University ("NWPU") — to unlawfully export the hydrophones. *See* PSR ¶¶ 24, 26, 28, 30; *see also* USSG § 3B1.1, Application Note 1 (noting that a "participant" is a person "who is criminally responsible for the commission of the offense, but need not have been convicted"). The undisputed evidence also establishes that the defendant was an organizer or leader of criminal activity. For starters, the defendant was LinkOcean's founder and president. PSR ¶ 13. Not surprisingly, therefore, one co-conspirator in the PRC referred to the defendant as her "boss" in an email about the illegal export scheme. PSR ¶ 26. Consistent with his leadership role, the defendant oversaw, participated in, and at times coordinated nearly every key aspect of crime: the creation of fabricated documents concerning "Xi'an Shiyou University," the provision of the fabricated documents and other information to the U.S. manufacturer of the hydrophones, the placement of purchase orders with the U.S. manufacturer, and the coordination of international wire transfers from LinkOcean's bank account in the PRC to the U.S. manufacturer. PSR ¶¶ 20-48.

The defendant also oversaw at least one other participant in the illegal export scheme. Because he was in the United States, the defendant necessarily relied on subordinate co-conspirators in the PRC, namely his LinkOcean employees, to ensure that the hydrophones were delivered from LinkOcean's facility in the PRC to NWPU. In one email, for example, the defendant and a PRC-based LinkOcean employee discussed the shipment of hydrophones to the

3

PRC, including the fact that the hydrophones should be falsely identified as "data loggers" in shipping documents. PSR ¶ 46. This employee undoubtedly participated in the illegal export scheme (at a minimum, by falsely identifying the hydrophones in shipping documents) and the defendant — LinkOcean's president — "exercised authority or control" over the employee. *See Grullon*, 996 F.3d at 34. Coupled with the overall nature and extent of the defendant's participation in the offense and his obvious decision-making authority, this warrants the imposition of a four-level aggravating role enhancement. The fact that other individuals (at NWPU, for example) might also have played a leadership role does not preclude the application of this enhancement to the defendant. *See* USSG § 3B1.1, Application Note 4 (noting that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy").[1]

### *The Sentence*

The Supreme Court has directed federal trial courts to initially calculate the appropriate guideline sentencing range under the advisory federal sentencing guidelines. *Gall*, 552 U.S. at 41. The sentencing guidelines, the Supreme Court has acknowledged, are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46 (footnote omitted). The First Circuit has noted that "the guidelines are the starting point for the fashioning of an individualized sentence, so a major deviation from them must 'be supported by a more significant justification than a minor one.'" *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 50); *see also United States v.*

---

[1] If the Court is not inclined to order a four-level enhancement, the Government respectfully suggests that at least a two-level enhancement is warranted because, at a minimum, the defendant was "an organizer, leader, manager, or supervisor in any criminal activity." USSG § 3B1.1(c).

*Kimbrough*, 552 U.S. 85, 89 (2007) (reasoning that the Guideline sentencing range often will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives").

The starting point here is the Guideline sentencing range: at offense level 29 and criminal history category I, 87 to 108 months of imprisonment.[2] There is no reason to deviate from this starting point. The defendant appears to suggest that he only vaguely understood NWPU's connection to the PRC military and that, in any event, he had absolutely no idea how the hydrophones would be used. He must not be permitted to hide behind a claim of willful ignorance. This was not a mere technical violation of the U.S. export laws. It was a serious breach of our national security involving the export of a commodity with well-known military applications, to a military-aligned university, in a country that distinguishes little between civilian research and its military-industrial complex.[3] To make matters worse, the defendant lied about his export activities — the types of products that he exported and the fact that he had two customers on the Department of Commerce's Entity List, among other things — to federal investigators and on immigration forms. His conduct is worthy of substantial punishment.

The defendant has admitted to exporting to the PRC hydrophones known as the HTI-92-WB, manufactured by High Tech, Inc. ("HTI") in the United States. It is no secret that these hydrophones can be used in anti-submarine warfare ("ASW"). In fact, at all relevant times, HTI's

---

[2] Consistent with the Plea Agreement, in which the government agreed to recommend a period of incarceration "in the low end of the Guidelines sentencing range as calculated by the Court," the government's recommendation of 87 months' imprisonment assumes that the Court imposes a 4-level role enhancement under § 3B1.1 of the Guidelines.

[3] It is widely understood that the PRC promotes the elimination of barriers between civilian research and its military and defense industrial sectors. This is part of an "aggressive, national strategy of the Chinese Communist Party" called "military-civil fusion" designed to "enable the PRC to develop the most technologically advanced military in the world." *See* MILITARY-CIVIL FUSION AND THE PEOPLE'S REPUBLIC OF CHINA, available at https://2017-2021.state.gov/wp-content/uploads/2020/06/What-is-MCF-One-Pager.pdf.

own website stated that the HTI-92-WB is "[u]sed in ASW industry and for noise measurements." *See* Exhibit A.  Hydrophones and other dual-use technologies are sought after by proliferators, like the defendant, who seek to advance the military capabilities of a foreign adversary – particularly one that is subject to a complete U.S. arms embargo like the PRC.  *See* 21 C.F.R. § 126.1.  Because PRC-based proliferators and their agents cannot lawfully obtain U.S.-manufactured weapons and other items that have only a military use, they often focus on acquiring dual-use technologies that are not subject to the embargo or stringent license requirements. As HSI Special Agent Brian Andersen testified during the suppression hearing, proliferators use many strategies to get these items into the hands of foreign militaries including, most notably, lying to the manufacturer and the U.S. government about how the item will be used and by whom.  So-called end user controls like the Department of Commerce's Entity List are one tool that regulators and law enforcement use to combat this persistent threat.

The undisputed evidence reflects how the defendant followed this illegal path, aware of the risks that it posed to U.S. national security.  As a long-time reseller of marine technology with a background in marine science, surely the defendant knew that the hydrophones had both military and commercial uses.  After all, this information was prominently displayed on HTI's website. That the defendant took steps to conceal the hydrophones in shipping documents by identifying them as "data loggers" only underscores his awareness of their potential military use.  *See* PSR ¶ 48.  That is to say, absent concerns about the hydrophones themselves and how they could be used, there was absolutely no reason to lie about them in shipping documents.  The defendant claims that he believed the sonobouys would be used by teachers and students for research because that is what NWPU told him.  But this ignores the obvious fact that NWPU made this representation in the context of their efforts, along with the defendant, to *intentionally bypass the licensing requirement by fabricating documents and information*.  Openly acknowledging an

intended military use would clearly *not* have served that purpose, and it most certainly would have generated law enforcement scrutiny. The claimed end use of the hydrophones, therefore, should be taken with a grain of salt.

The defendant exported 60 hydrophones to NWPU between December 2015 and December 2016. PSR ¶ 21. NWPU is a PRC military university "that is heavily involved in military research and works closely with the … [People's Liberation Army] on the advancement of its military capabilities." PSR ¶ 17. Not surprisingly, therefore, NWPU has been designated on the Department of Commerce's Entity List for national security reasons for twenty years, since 2001. *Id.* The defendant was aware of NWPU's Entity List designation. PSR ¶ 27. Indeed, from the very outset, he knew that NWPU was "partly a military unit." PSR ¶ 28. Still, he and his co-conspirators took extensive measures — all documented in contemporaneous emails, as described in the PSR and the Superseding Indictment — to export the hydrophones to NWPU in violation of U.S. export laws. Using fabricated documents that omitted any mention of NWPU, the defendant lied to the manufacturer of the hydrophones and, ultimately, the U.S. government. That his conduct jeopardized U.S. national security is not reasonably in dispute.

The defendant significantly downplays and, at times, ignores the risks associated with his conduct by noting that a license from the Department of Commerce is not required to export the hydrophones to the PRC except where the end user is on the Entity List.[4] In doing so, the

---

[4] The hydrophones at issue here are classified by the Department of Commerce as ECCN 6A991, which applies to "Marine or terrestrial acoustic equipment … capable of detecting or locating underwater objects or features or positioning surface vessels or underwater vehicles…." *See* 15 C.F.R. § 774, Supplement No. 1 (the Commerce Control List). According to the Commerce Control List, items like hydrophones associated with this specific ECCN are controlled for anti-terrorism ("AT") reasons only. *Id.* The Department of Commerce does not maintain anti-terrorism controls on China. *See* 15 C.F.R. § 738, Supplement No. 1 (the Commerce Country Chart) (noting that China is controlled by Commerce for national security, nuclear proliferation, and missile technology reasons, among other reasons). Thus, there is no general license requirement when exporting the hydrophones to China. Of note: Iran, Syria and North Korea are the only three countries subject to anti-terrorism controls by the Department of Commerce.

7

defendant essentially asks this Court to disregard NWPU and the Entity List and, instead, focus on the exported commodity and the way *it* was controlled under the Commerce Control List. This straw man argument ignores the obvious crux of this case: the defendant intentionally violated an *end user control* — the Entity List — implemented for national security reasons. It is NWPU's close ties to the PRC military that gives rise to the primary national security concern in this case. That the hydrophones could also be used in anti-submarine warfare only amplifies that concern. The defendant's argument that he is somehow less culpable because he did not *also* violate end use controls, therefore, makes little sense. Just as robbery defendant is unlikely to receive consideration for looting one cash register instead of two, Mr. Qin should not benefit from having violated only one type of national security control.

Beyond exporting hydrophones to NWPU, the defendant's conduct demonstrates a general willingness to acquire goods and technology for the PRC military, regardless of export controls. Records found on the defendant's computer, including a "VIP" customer list, indicate that LinkOcean had several military and military-affiliated customers, including the People's Liberation Army ("PLA") Navy South China Sea Fleet Troop 91388, the PLA Naval Submarine Academy, the National University of Defense Technology ("NUDT"), and the PLA University of Science and Technology at NWPU. PSR ¶ 16. Like NWPU, NUDT is on the Department of Commerce's Entity List (and has been since 2015) for national security reasons. PSR ¶ 18. In a May 2018 email to one of his employees, the defendant described his approach to assisting military customers in the PRC: "tell the customer to find a research unit, import it [the commodity being sought by the military customer] in the name of scientific research, a lot less trouble this way." The defendant used this very same tactic — importing a dual-use commodity to a university "in the name of scientific research" — to supply hydrophones to NWPU. The fact that he was willing to continue doing so more than a year later, after becoming aware of the government's

8

investigation, reflects a criminal mindset that militates in favor of a Guideline sentence.[5] So too does the fact that the defendant lied to law enforcement agents about LinkOcean's business and its customers, PSR ¶¶ 53-54, and in an immigration document in order to achieve unconditional permanent resident status. PSR ¶¶ 49-52.

### *Conclusion*

The defendant's conduct — the intentional violation of U.S. national security controls involving the PRC military, coupled with lies to law enforcement agents and immigration officials about his business activities and illegal exports — was egregious and harmful to the United States. The defendant understood the risks associated with his illegal conduct, including the likelihood that the hydrophones would be used by China's military or for its benefit, but he chose to act anyway. He must not be permitted to hide behind a veil of willful blindness. The government's recommended sentence is sufficient, but not greater than necessary, to adequately punish the defendant and promote respect for the law. It will also provide important general deterrence to other actors inclined to engage in similar unlawful behavior. Respectfully, the government asks the Court to sentence the defendant to 87 months of imprisonment, a fine without a Guideline sentencing range, and 24 months of supervised release.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:   /s/ Jason A. Casey
      B. Stephanie Siegmann
      Jason A. Casey
      Assistant U.S. Attorneys

---

[5] To be clear, the government is not suggesting that this email is evidence of a violation of U.S. export laws. The commodity being discussed in the email was manufactured in Canada. The email is indicative, however, of the defendant's overall approach to exporting goods to PRC military customers, and it suggests that his conduct with NWPU was not aberrant or unusual.

CERTIFICATE OF SERVICE

I hereby certify that this document was filed on September 1, 2021 through the ECF system, which will provide electronic notice to counsel as identified on the notice of Electronic Filing.

                                             */s/ Jason A. Casey*
                                             Jason A. Casey
                                             Assistant U.S. Attorney